# Exhibit 1

 KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
  Title 47. Telecommunications (Refs & Annos)
    Chapter 5. Wire or Radio Communication (Refs & Annos)
      Subchapter II. Common Carriers (Refs & Annos)
        Part I. Common Carrier Regulation

47 U.S.C.A. § 230

§ 230. Protection for private blocking and screening of offensive material

Currentness

**(a) Findings**

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States--

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) Civil liability**

No provider or user of an interactive computer service shall be held liable on account of--

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1). [1]

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

**(1) No effect on criminal law**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

**(2) No effect on intellectual property law**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit--

**(A)** any claim in a civil action brought under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

**(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of Title 18; or

**(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of Title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

As used in this section:

**(1) Internet**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3) Information content provider**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) Access software provider**

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

  **(A)** filter, screen, allow, or disallow content;

  **(B)** pick, choose, analyze, or digest content; or

  **(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

## CREDIT(S)

(June 19, 1934, c. 652, Title II, § 230, as added Pub.L. 104-104, Title V, § 509, Feb. 8, 1996, 110 Stat. 137; amended Pub.L. 105-277, Div. C, Title XIV, § 1404(a), Oct. 21, 1998, 112 Stat. 2681-739; Pub.L. 115-164, § 4(a), Apr. 11, 2018, 132 Stat. 1254.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 13925

Ex. Ord. No. 13925, May 28, 2020, 85 F.R. 34079, which related to moderation of content posted on social media platforms, was revoked by Ex. Ord. No. 14029, § 1, May 14, 2021, 86 F.R. 27025.

Notes of Decisions (301)

## Footnotes

1        So in original. Probably should be "subparagraph (A)".

47 U.S.C.A. § 230, 47 USCA § 230

Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document** <span style="float:right">© 2025 Thomson Reuters. No claim to original U.S. Government Works.</span>

2015 WL 3544518

United States District Court,
E.D. Michigan,
Southern Division.

Jahmel BINION, Plaintiff,

v.

Shaquille O'NEAL; Alfonso Clark "Trey" Burke, III; and
Juaquin Malphurs a/k/a Waka Flocka Flame, Defendants.

No. 14–13454.
|
Signed April 2, 2015.

**Attorneys and Law Firms**

John W. Henke, III, Law Offices of John W. Henke, III,
Southfield, MI, for Plaintiff.

| **COUNT I:** | Invasion of Privacy |
| **COUNT II:** | Intentional Infliction of Emotional Distress |
| **COUNT III:** | Defamation |
| **COUNT IV:** | General Negligence |

Now before the Court is Burke's Motion to Dismiss.[1] (Doc.
3) For the following reasons, Burke's motion is GRANTED.

## II. BACKGROUND

### A.

Instagram is a social media website that describes itself
as a "fun and quirky way to share your life with friends
through a series of pictures." (*FAQ,* INSTAGRAM.COM,
https://instagram .com/about/faq/ (last visited Mar. 5, 2015))
Every Instagram user is advised that "[a]ll photos are public
by default which means they are visible to anyone using
Instagram or on theinstagram.com website ." (*Id.*) However,
Instagram allows users to "make [their] account private" such
that "only people who follow [the user] on Instagram will be
able to see [their] photos." (*Id.*) If the Instagram user fails to
make his/her account private, "anyone can subscribe to follow
[their] photos." (*Id.*)

Instagram's privacy policy states that "[b]y using our Service
you understand and agree that we are providing a platform

*ORDER GRANTING TREY BURKE'S
MOTION TO DISMISS (Doc. 3)*

AVERN COHN, District Judge.

## I. INTRODUCTION

**\*1** This is an invasion of privacy case. Jahmel Binion
(Plaintiff) is suing Shaquille O'Neal (O'Neal), Alfonso Clark
"Trey" Burke (Burke), and Juaquin Malphurs (Malphurs)
(collectively, Defendants) claiming that Defendants posted
mocking and ridiculing photographs of him on social media
websites. The Complaint is in four counts:

for you to post content, including photos, comments and
other materials ("User Content"), to the Service and to share
User Content publicly. This means that other Users may
search for, see, use, or share any of your User Content that
you make publicly available through the Service." (*Privacy
Policy,* INSTAGRAM.COM, https:// instagram.com/about/
legal/privacy/ (last visited Mar. 5, 2015)) The privacy
policy further states, "[a]ny information or content that you
voluntarily disclose for posting to the Service, such as User
Content, becomes available to the public, as controlled by
any applicable privacy settings that you set.... Once you have
shared User Content or made it public, that User Content may
be re-shared by others." (*Id.*)

Like Instagram, Twitter is a social media website that
allows users to post "Tweets," which are described as
"an expression of a moment or idea. It can contain text,
photos, and videos. Millions of Tweets are shared in
real time, every day." (*The Story of a Tweet: What Is
a Tweet,* TWITTER.COM, https:// about.twitter.com/what-
is-twitter/story-of-a-tweet (last visited March 12, 2015)).
As with Instagram, Twitter allows users to "share photos,
in real time, with everyone or with the people [they]
choose." (*So Much More than Words,* TWITTER.COM,

https://about.twitter.com/products/photo-sharing (last visited March 12, 2015)). Twitter users can also "follow" other users, so that others' Tweets will appear in the user's Twitter feed. Finally, Twitter allows users to re-post or "Retweet" content from other users' Twitter feeds to be shared with their own followers. (*The Story of a Tweet: What Is a Tweet,* TWITTER.COM, https://about.twitter.com/what-is-twitter/story-of-a-tweet (last visited March 12, 2015)).

**B.**

 **\*2**  Because the Court is responding to Burke's Motion to Dismiss, the facts alleged in the Complaint (Doc. 1–1) are accepted as true and are summarized below.

Plaintiff is an individual who resides in Macomb County, Michigan. Plaintiff suffers from a rare genetic condition called ectodermal dysplasia, which causes cosmetic abnormalities in the hair, nails, sweat glands, and teeth. Burke is a professional basketball player for the Utah Jazz, residing in Salt Lake City, Utah.

In April of 2014, when Plaintiff was approximately 23 years old, Plaintiff posted a number of photographs of himself on his public Instagram account. Shortly thereafter, Juaquin Malphurs obtained and reposted Plaintiff's photograph on his public Instagram account. Burke later obtained Plaintiff's photograph from Malphur's account and reposted it on his Instagram account with the caption, "Hacked by @IanClark." "IanClark" is the username of Ian Clark, close friend and teammate of Burke.

In moving to dismiss under Rule 12(b)(6), Burke argues that Plaintiff's Complaint fails to state a claim upon which relief can be granted.

**III. STANDARD OF REVIEW**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombley,* 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Aschcroft*

*v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 678 (internal quotation marks and citation omitted).

**IV. DISCUSSION**

This is a diversity case. Therefore, Michigan substantive law applies. *Armisted v. State Farm Mut. Auto. Ins. Co.,* 675 F.3d 989, 995 (6th Cir.2012). Burke argues that Plaintiff's claims must be dismissed for failure to state a claim under Michigan law.

**A. Invasion of Privacy**

Under Michigan law, invasion of privacy torts are grouped into four categories: (1) "[i]ntrusion upon the plaintiff's seclusion or solitude, or into his private affairs"; (2) "[p]ublic disclosure of embarrassing private facts about the plaintiff"; (3) "[p]ublicity which places the plaintiff in a false light in the public eye"; (4) "[a]ppropriation, for the defendant's advantage, of the plaintiff's name or likeness." *Beaumont v. Brown,* 401 Mich. 80, 108, 257 N.W.2d 522 (1977), *overruled on other grounds, Bradley v. Saranac Cmty. Sch. Bd. of Educ.,* 455 Mich. 285, 565 N.W.2d 650 (1997). Plaintiff's complaint sounds in all four causes of action.

**1. Intrusion**

 **\*3**  "There are three necessary elements to establish a prima facie case of intrusion upon seclusion: (1) the existence of a secret and private subject matter; (2) a right possessed by the plaintiff to keep that subject matter private; and (3) the obtaining of information about that subject matter through

43 Media L. Rep. 1627

some method objectionable to a reasonable man." *Doe v. Mills,* 212 Mich.App. 73, 88, 536 N.W.2d 824 (1995).

Burke says that the "information"-the photograph of Plaintiff-was obtained via the Instagram account of Malphurs, which was originally obtained from Plaintiff's public Instagram account. Burke argues that no reasonable person, particularly in the social media age, would find it objectionable to obtain and repost a photograph that someone had already posted publicly. This argument is persuasive and, furthermore, Plaintiff concedes this point in his response.

Therefore, Plaintiff cannot establish a prima facia case of intrusion upon seclusion.

### 2. Public Disclosure

Invasion of privacy by publicity involves the public disclosure of embarrassing private facts. *See Beaumont,* 401 Mich. at 95–96, 257 N.W.2d 522. "A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other." *Id.* at 105, 257 N.W.2d 522. "Embarrassing private facts" consist of information that concerns the plaintiff's private life. *Mills,* 212 Mich.App. at 82, 536 N.W.2d 824. The disclosed information must be "highly offensive to a reasonable person and of no legitimate concern to the public." *Sargent v. Barbara Ann Karmanos Cancer Institute,* 2003 WL 21359350 (E.D. Mich ., Feb 7, 2003) (citation omitted).

Here, Burke argues that the Complaint fails to make clear what "embarrassing private facts" were publicly disclosed. Indeed, the only "fact" publicized was the photograph of Plaintiff, which had already been posted publicly by Plaintiff and reposted by Malphurs and others. Plaintiff says that Burke's posting revealed private information relating to his medical condition-namely, that he suffers from ectodermal dysplasia. However, Burke's posting did not state that Plaintiff suffered from any particular medical condition. Finally, Plaintiff had already posted his photograph publicly on his public Instagram account. Therefore, his photograph is not "private." *See Doe v. Peterson,* 784 F.Supp.2d 831, 841 (E.D.Mich.2011) (granting summary judgment on public disclosure claims because images of plaintiff had already been posted on at least one other website, and therefore were not private facts).

Therefore, Plaintiff cannot establish a prima facia case of public disclosure.

### 3. False Light

False light entails the publication of false information regarding the plaintiff, resulting in damage. The cause of action requires the plaintiff to allege that publication "attribut[ed] to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." *Duran v. The Detroit News,* 200 Mich.App. 622, 632, 504 N.W.2d 715 (1993). The two necessary elements to make out a false light claim are (1) publicity and (2) placement of the plaintiff in a false light in the public eye. *Ledl v. Quik Pik Food Stores, Inc.,* 133 Mich.App. 583, 591, 349 N.W.2d 529 (1984). The defendant "must have had knowledge of or acted in a reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Duran,* 200 Mich.App. at 632, 504 N.W.2d 715.

**\*4** Here, Burke says that Plaintiff cannot show how the reposting of his photographs placed him in a false light in the public eye-especially when Plaintiff had voluntarily posted the photographs on his public Instagram account. Plaintiff states that, "[f]rom the nature of the pictures posted, one could reasonably infer that the defendants sought to portray [him] as a moron." (Doc. 5 at 13) However, Burke did nothing to alter the photograph and made no statements regarding the photograph, Plaintiff, or his medical condition. Courts have held that publication of true-likeness photographs do not constitute "information that [is] unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that [are] false and place[ ] the plaintiff in a false position." *Rhoads v. Baker Coll.,* No. 280150, 2008 WL 4648972, at \*6 (Mich.Ct.App. Oct.21, 2008) (citing *Duran,* 200 Mich.App. at 631–32, 504 N.W.2d 715).

Therefore, Plaintiff cannot establish a prima facia case of false light.

### 4. Appropriation

Invasion of privacy through appropriation occurs when a person uses another's name or likeness without permission, to their own pecuniary benefit. Restatement (Second) of Torts, § 652C.

Here, there is no allegation that Burke posted the photograph of Plaintiff for his pecuniary advantage, or that Burke in any way profited from posting the photograph. Although Plaintiff says that Burke "is actively seeking to grow his brand" through self-promotion (Doc. 5 at 15), Plaintiff has failed to demonstrate how posting pictures of him would result in Burke's pecuniary benefit. Nor can Plaintiff establish that there is a "pecuniary interest or significant commercial value in [his] identity," such that would result in profit to Burke. *Armstrong v. Eagle Rock Entm't, Inc.,* 655 F.Supp.2d 779, 785 (E.D.Mich.2009).

Therefore, Plaintiff cannot establish a prima facia case of appropriation.

### B. Intentional Infliction of Emotional Distress

An intentional infliction of emotional distress (IIED) claim requires "(1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Duran,* 622 Mich. App at 629–30. Conduct is not considered "extreme and outrageous" if it is merely insulting. Rather, the defendant's conduct must be "so outrageous in character and so extreme in degree that it goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community." *Grochowalski v. DAIIE,* 171 Mich.App. 771, 775–76, 430 N.W.2d 822 (1988). A defendant is not liable for "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities." *Mills,* 212 Mich.App. at 91, 536 N.W.2d 824.

Here, Burke says that Plaintiff cannot demonstrate that Burke's conduct was sufficiently extreme and outrageous to establish prima facie case. Burke says that he merely shared a photograph that had already been posted on Plaintiff's public account and reposted on Malphurs' account, and that he made no comment related to the photograph, Plaintiff, or his medical condition. Finally, Burke says that even if one could infer that Burke was indirectly mocking Plaintiff's appearance, the law is clear that "mere insults" are insufficient to establish an IIED claim.

**\*5** Burke's arguments have merit. Although the widespread distribution of Burkes post can certainly make the offensive nature of his postings more acute, given the fact that Plaintiff's pictures were already publicly available on social media websites, Burke's conduct does not rise to a level than be considered "beyond all possible bounds of decency" or

"atrocious and utterly intolerable." Further, although Plaintiff argues that there should be discovery as to the degree of emotional stress suffered by Plaintiff, he is otherwise unable to show that Burke's conduct was sufficiently extreme and outrageous. Plaintiff therefore has failed to establish a prima facia case of intentional infliction of emotional distress.

### C. Defamation

To establish defamation, Plaintiff must allege (1) "a false and defamatory statement concerning the plaintiff"; (2) "an unprivileged publication to a third party"; (3) "fault amounting to at least negligence on the part of the publisher"; and (4) "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Rouch v. Enquirer & News,* 440 Mich. 238, 251, 487 N.W.2d 205 (1992). Where there is no evidence of a false *statement,* Michigan recognizes a cause of action for defamation by implication, but only if the plaintiff proves that the defamatory *implications* are materially false. *Hawkins v. Mercy Health Servs.,* Inc., 230 Mich.App. 315, 329–30, 583 N.W.2d 725 (1998). Even when defamation takes place by implication, a plaintiff must plead with specificity the statements that form the basis of the defamatory implication. *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.,* 197 Mich.App. 48, 57, 495 N.W.2d 392 (1992). Further, for a statement to be defamatory, it must capable of interpretation by a reasonable listener as stating "actual facts" about the plaintiff, as opposed to statements of opinion. *Ireland v. Edwards,* 230 Mich.App. 607, 617, 584 N.W.2d 632 (1998) (citing *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 16–17, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)).

Here, the Complaint alleges no single statement to Burke. Instead, Plaintiff contends that the photograph posted by Burke implies that Plaintiff is mentally handicapped, or that his appearance makes him worthy of ridicule. Neither argument has merit.

At most, Burke posted a true and accurate photograph of Plaintiff-the same photograph that Plaintiff posted on his public Instagram account. Plaintiff cannot identify with specificity any statements attributable to Burke that definitively create this implication. Nor does Plaintiff argue that the caption "Hacked by @IanClark" implies that Plaintiff is handicapped. Although Plaintiff cites authority for the

Case 2:25-cv-13037-BRM-APP ECF No. 8-1, PageID.151 Filed 10/02/25 Page 11 of 73
Binion v. O'Neal, Not Reported in F.Supp.3d (2015)
43 Media L. Rep. 1627

proposition that a photograph can create the implication that a person is mentally handicapped, the case cited is distinguishable because the photograph was posted with the caption, "Help for the Mentally Retarded." *See Brauer v. Globe Newspaper Co.,* 351 Mass. 53, 55, 217 N.E.2d 736 (1966).

**\*6** Even if Burke was suggesting that Plaintiff's appearance makes him worthy of ridicule, this would not be sufficient to make out a defamation claim. Michigan courts have held that insults and other derogatory comments on "Internet message boards and similar communication platforms" are best regarded as "statements of pure opinion, rather than statement or implications of actual, provable fact." *Ghanam v. Does,* 303 Mich.App. 522, 547, 845 N.W.2d 128 (2014). Finally, although Plaintiff argues that there should be discovery as to Burke's degree of negligence, Plaintiff is otherwise unable to show that Burke's posted a false and defamatory statement.

Plaintiff therefore has failed to establish a prima facia case of defamation.

### D. General Negligence

To establish a prima facie case of negligence, a plaintiff must prove the following four elements: "(1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages." *Case v. Consumers Power Co.,* 463 Mich. 1, 6, 615 N.W.2d 17 (2000). "A negligence action may only be maintained if a legal duty exists which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Maiden v. Rozwood,* 461 Mich. 109, 131, 597 N.W.2d 817 (1999) (citation omitted). To determine whether the relationship between the parties is sufficient to create a legal duty, a court must consider "whether the defendant is under any obligation for the benefit of the particular plaintiff...." *Id.* at 132, 597 N.W.2d 817 (citations and internal quotation omitted). Another important consideration in whether a defendant owes a duty is "whether it is foreseeable that the

actor's conduct may create a risk of harm to the victim, and whether the result of that conduct and intervening causes were foreseeable." *Moning v. Alfono,* 400 Mich. 425, 439, 254 N.W.2d 759 (1977).

Burke argues that Plaintiff has not sufficiently alleged a legal duty that exists between them, other than "the general duty to conform to the legal standard of reasonable conduct in the light of the apparent risk." (Doc. 1–1 at 6). Burke further says that his relationship with Plaintiff is no different than with the millions of other Instagram users who post photographs that can be shared, reposted, and commented on.

In response, Plaintiff argues that when posting mocking photographs of a stranger to a large audience, it is foreseeable that an emotional harm will result. However, Plaintiff cites no case law in support of his theory that social media users owe any particular duty to the person whose photographs they repost, or that any emotional harm is a foreseeable consequence. Further, Plaintiff did not allege the negligent infliction of emotional distress [2] and provides no support that emotional harms are recoverable under traditional negligence theory.

Plaintiff's general negligence claim therefore cannot prevail.

### V. CONCLUSION

For the above reasons, Burke's Motion to Dismiss has been granted. Plaintiff's claims against Burke are therefore DISMISSED. [3]

**\*7** SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 3544518, 43 Media L. Rep. 1627

---

## Footnotes

1    Burke frames his motion as a motion to dismiss under Fed.R.Civ.P. 12(b)(6), and/or for summary judgment under Fed.R.Civ.P. 56. Because there has been no discovery, Burke's motion for summary judgment is

premature. The Court considers Burke's motion as a motion to dismiss, based on the allegations in the Complaint, and as supplemented by statements during oral argument.

2     Even if Plaintiff had alleged negligent infliction of emotional distress, this cause of action requires some actual physical harm. *See Taylor v. Kurapati,* 236 Mich.App. 315, 360, 600 N.W.2d 670 (1999). Here, Plaintiff alleges no such harm.

3     The Court dismissed the claims against O'Neal in a separate order. However, Plaintiff's claims against Malphurs are still pending. Because Malphurs failed to plead or otherwise defend, the Clerk of the Court filed an Entry of Default on January 7, 2015

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag

Declined to Follow by    Anderson v. TikTok, Inc.,    3rd Cir.(Pa.),    August
27, 2024

755 F.3d 398
United States Court of Appeals, Sixth Circuit.

Sarah JONES, Plaintiff–Appellee,

v.

DIRTY WORLD ENTERTAINMENT
RECORDINGS LLC, et al., Defendants,
Hooman Karamian, aka Nik Richie, aka
Corbin Grimes; Dirty World, LLC, dba
thedirty.com, Defendants–Appellants.

No. 13–5946
|
Argued: May 1, 2014.
|
Decided and Filed: June 16, 2014.

**Synopsis**

**Background:** Cheerleader for professional football team
brought action asserting state-law defamation claims against
operators of user-generated, online tabloid. After judgment
was entered on jury verdict in cheerleader's favor, the United
States District Court for the Eastern District of Kentucky,
William O. Bertelsman, J., 965 F.Supp.2d 818, denied
defendants' motion for judgment as matter of law. Defendants
appealed.

**Holdings:** The Court of Appeals, Julia Smith Gibbons,
Circuit Judge, held that:

[1] on an issue of first impression in the Circuit, material
contribution test applies to determine whether website
operator does not have immunity under Communications
Decency Act (CDA), and

[2] defendants had immunity under the CDA from plaintiff's
claims.

Vacated and reversed with instructions.

**Procedural Posture(s):** On Appeal; Motion for Judgment as
a Matter of Law (JMOL)/Directed Verdict.

**West Headnotes (14)**

[1]    **Federal Courts** 🗝 Taking case or question
from jury; judgment as a matter of law

Court of Appeals reviews a district court's denial
of a motion for judgment as a matter of law
or a renewed motion for judgment as a matter
of law de novo. Fed.Rules Civ.Proc.Rule 50, 28
U.S.C.A.

3 Cases that cite this headnote

[2]    **Libel and Slander** 🗝 By others in general
**Telecommunications** 🗝 Privilege or
immunity

Communications Decency Act (CDA) provision
that no provider or user of an interactive
computer service shall be treated as the publisher
or speaker of any information provided by
another information content provider marks
a departure from the common-law rule that
allocates liability to publishers or distributors of
tortious material written or prepared by others.
Communications Decency Act of 1996, § 509(c)
(1), 47 U.S.C.A. § 230(c)(1).

21 Cases that cite this headnote

[3]    **Libel and Slander** 🗝 By others in general
**Telecommunications** 🗝 Privilege or
immunity

Communications Decency Act (CDA) bars
lawsuits seeking to hold an interactive computer
service provider liable for its exercise of a
publisher's traditional editorial functions, such as
deciding whether to publish, withdraw, postpone
or alter content. Communications Decency Act
of 1996, § 509, 47 U.S.C.A. § 230.

22 Cases that cite this headnote

[4]    **Libel and Slander** 🗝 By others in general
**Telecommunications** 🗝 Privilege or
immunity

By barring publisher-liability and notice-liability defamation claims lodged against interactive computer service providers, Communications Decency Act (CDA) serves three main purposes; (1) it maintains the robust nature of Internet communication and, accordingly, keeps government interference in the medium to a minimum; (2) it protects against the "heckler's veto" that would chill free speech; and (3) it encourages interactive computer service providers to self-regulate. U.S.C.A. Const.Amend. 1; Communications Decency Act of 1996, § 509, 47 U.S.C.A. § 230.

4 Cases that cite this headnote

**[5]** **Libel and Slander** 🔑 **By others in general**
**Telecommunications** 🔑 **Privilege or immunity**

Close cases must be resolved in favor of immunity, under the Communications Decency Act (CDA), from publisher-liability and notice-liability defamation claims lodged against interactive computer service providers. Communications Decency Act of 1996, § 509, 47 U.S.C.A. § 230.

6 Cases that cite this headnote

**[6]** **Libel and Slander** 🔑 **By others in general**
**Telecommunications** 🔑 **Privilege or immunity**

Communications Decency Act's (CDA) grant of immunity to interactive computer service providers from publisher-liability and notice-liability defamation claims is not without limits, as it applies only to the extent that an interactive computer service provider is not also the information content provider of the content at issue. Communications Decency Act of 1996, § 509(c)(1), (f)(3), 47 U.S.C.A. § 230(c)(1), (f)(3).

49 Cases that cite this headnote

**[7]** **Libel and Slander** 🔑 **By others in general**
**Telecommunications** 🔑 **Privilege or immunity**

If a website displays content that is created entirely by third parties, then it is only a service provider with respect to that content, and thus is immune under the Communications Decency Act (CDA) from defamation claims predicated on that content. Communications Decency Act of 1996, § 509(c)(1), (f)(3), 47 U.S.C.A. § 230(c)(1), (f)(3).

7 Cases that cite this headnote

**[8]** **Libel and Slander** 🔑 **By others in general**
**Telecommunications** 🔑 **Privilege or immunity**

If a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content, and is not immune under the Communications Decency Act (CDA) from defamation claims predicated on it. Communications Decency Act of 1996, § 509(c)(1), (f)(3), 47 U.S.C.A. § 230(c)(1), (f)(3).

34 Cases that cite this headnote

**[9]** **Libel and Slander** 🔑 **By others in general**
**Telecommunications** 🔑 **Privilege or immunity**

Under the Communications Decency Act (CDA), a website may be immune from liability for some of the defamatory third-party content it publishes but be subject to liability for the content that it is responsible for as a creator or developer. Communications Decency Act of 1996, § 509(c)(1), (f)(3), 47 U.S.C.A. § 230(c)(1), (f)(3).

7 Cases that cite this headnote

**[10]** **Libel and Slander** 🔑 **By others in general**
**Telecommunications** 🔑 **Privilege or immunity**

The Communications Decency Act (CDA) bars a defamation claim if: (1) the defendant asserting immunity is an interactive computer service provider; (2) the particular information at issue was provided by another information content

provider; and (3) the claim seeks to treat the defendant as a publisher or speaker of that information. Communications Decency Act of 1996, § 509, 47 U.S.C.A. § 230.

20 Cases that cite this headnote

---

**[11]** Libel and Slander 🔑 By others in general
Telecommunications 🔑 Privilege or immunity

The material contribution test applies to determine whether a website operator is responsible, in whole or in part, for the creation or development of allegedly tortious information, and thus is not entitled to immunity under the Communications Decency Act (CDA), under which test the court asks whether the operator made a material contribution to the illegality of the allegedly tortious information; a website operator who intentionally encourages illegal or actionable third-party postings to which he adds his own comments ratifying or adopting the posts does not thereby become a creator or developer of that content. Communications Decency Act of 1996, § 509(c)(1), (f)(3), 47 U.S.C.A. § 230(c)(1), (f)(3).

9 Cases that cite this headnote

---

**[12]** Libel and Slander 🔑 By others in general
Telecommunications 🔑 Privilege or immunity

An interactive computer service provider that adds commentary to allegedly tortious third-party content does not thereby become a creator or developer of that content, as would preclude the provider's immunity under the Communications Decency Act (CDA). Communications Decency Act of 1996, § 509(c)(1), (f)(3), 47 U.S.C.A. § 230(c)(1), (f)(3).

7 Cases that cite this headnote

---

**[13]** Libel and Slander 🔑 By others in general
Telecommunications 🔑 Privilege or immunity

Operators of user-generated, online tabloid did not develop allegedly defamatory statements concerning cheerleader for professional football team and her relationship with a player, and thus operators were not information content providers as to them, within the meaning of the Communications Decency Act (CDA), and thus operators had immunity under the CDA from the cheerleader's defamation and related tort claims; although operators selected the statements for publication and later decided to remove them from the website, they did not author the statements or materially contribute to their alleged illegality, operators did not compensate users for the submission of unlawful content, they provided neutral labels for users to categorize their submissions, and operator's comments on the postings were made only after each of the allegedly defamatory postings had already been displayed. Communications Decency Act of 1996, § 509(c)(1), (f)(3), 47 U.S.C.A. § 230(c)(1), (f)(3).

1 Case that cites this headnote

---

**[14]** Telecommunications 🔑 Privilege or immunity

The Communications Decency Act (CDA) expressly bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions, such as deciding whether to publish, withdraw, postpone or alter content. Communications Decency Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

17 Cases that cite this headnote

---

**Attorneys and Law Firms**

**\*401** ARGUED: David S. Gingras, Gingras Law Office, PLLC, Phoenix, Arizona, for Appellants. Christopher D. Roach, Eric C. Deters & Partners, P.S.C., Independence, Kentucky, for Appellee. ON BRIEF: David S. Gingras, Gingras Law Office, PLLC, Phoenix, Arizona, Alexander C. Ward, Alexis B. Mattingly, Huddleston Bolen, LLP, Ashland, Kentucky, for Appellants. Eric C. Deters, Eric C. Deters & Partners, P.S.C., Independence, Kentucky, for

Appellee. Marc J. Randazza, Randazza Legal Group, Las Vegas, Nevada, John C. Greiner, Graydon Head & Ritchey LLP, Cincinnati, Ohio, Patrick J. Carome, Samir C. Jain, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., Junis L. Baldon, Frost Brown Todd LLC, Louisville, Kentucky, William E. Sharp, ACLU of Kentucky, Louisville, Kentucky for Amici Curiae.

Before GUY, GIBBONS, and GRIFFIN, Circuit Judges.

## OPINION

JULIA SMITH GIBBONS, Circuit Judge.

This case presents the issue of whether the Communications Decency Act of 1996 (CDA), 47 U.S.C. § 230, bars the state-law defamation claims of plaintiff-appellee Sarah Jones. Jones was the unwelcome subject of several posts anonymously uploaded to www.TheDirty.com, a popular website operated by defendants-appellants Nik Lamas–Richie and DIRTY WORLD, LLC ("Dirty World"), and of remarks Richie posted on the site. The website enables users to anonymously upload comments, photographs, and video, which Richie then selects and publishes along with his own distinct, editorial comments. In short, the website is a user-generated tabloid primarily targeting nonpublic figures.

In response to the posts appearing on www.TheDirty.com, Jones brought an action in federal district court alleging state **\*402** tort claims of defamation, libel *per se,* false light, and intentional inflection of emotional distress. Richie and Dirty World claimed that § 230(c)(1) barred these claims. The district court rejected this argument and denied defendants-appellants' motion to dismiss, motion for summary judgment, motion to revise judgment, and motion for judgment as a matter of law. The district court also denied Richie's and Dirty World's motion for leave to file an interlocutory appeal. The case was submitted to a jury, twice. The first trial ended in a mistrial upon a joint motion. The second trial resulted in a verdict in favor of Jones for $38,000 in compensatory damages and $300,000 in punitive damages. On appeal, Richie and Dirty World maintain that § 230(c)(1) barred Jones's claims.

This is a case of first impression in this circuit. In *Doe v. SexSearch.com,* we "explicitly reserve[d] the question of [the] scope [of the CDA] for another day." 551 F.3d 412, 416 (6th Cir.2008). We now consider when a website is not an "information content provider" under 47 U.S.C. § 230(f)(3)

with respect to information it publishes such that § 230(c)(1) bars state-law tort claims predicated on that information.

Jones was found to be the object of defamatory content published on a user-generated, online tabloid; however, the judgment in her favor cannot stand. Under the CDA, Richie and Dirty World were neither the creators nor the developers of the challenged defamatory content that was published on the website. Jones's tort claims are grounded on the statements of another content provider yet seek to impose liability on Dirty World and Richie as if they were the publishers or speakers of those statements. Section 230(c)(1) therefore bars Jones's claims. Accordingly, we vacate the judgment in favor of Jones and reverse the district court's denial of Dirty World's and Richie's motion for judgment as a matter of law with instructions to enter judgment as a matter of law in their favor.

### I.

Richie is currently employed as the manager of DIRTY WORLD, LLC ("Dirty World"), which owns and operates the website www.TheDirty.com. Richie is also the founder of www.DirtyScottsdale.com, which he started in March 2007. Richie created www.DirtyScottsdale.com as a forum to post comments and observations about residents of Scottsdale who he believed warranted comment. Richie's website garnered attention from national media, and, as the site increased in popularity, it branched out to cover more than seventy different cities in the United States and Canada. The site then adopted a geographically neutral name—www.TheDirty.com. The website receives approximately six hundred thousand visits each day and eighteen million visits each month.

As the website grew, its focus and format changed. In the beginning, Richie created nearly all the content on the site, and users could not directly upload content. This is no longer true. For the past several years and currently, users of the site, who colloquially refer to themselves as "The Dirty Army," may submit "dirt"—*i.e.,* content that may include text, photographs, or video about any subject. Users may also post comments about the content submitted by others. The vast majority of the content appearing on www.TheDirty.com is comprised of submissions uploaded directly by third-party users.

The content submission form instructs users to "Tell us what's happening. Remember to tell us who, what, when,

where, why." The content submission **\*403** form requires users to submit a title and category for their submission as well as their city or college for indexing. Submissions appear on the website as though they were authored by a single, anonymous author—"THE DIRTY ARMY." This eponymous introduction is automatically added to every post that Richie receives from a third-party user. Many, but not all, of the submissions and commentaries appearing on the website relate to stories, news, and gossip about local individuals who are not public figures. The site receives thousands of new submissions each day. Richie or his staff selects and edits approximately 150 to 200 submissions for publication each day. The editing done to published submissions only consists of deletion. Richie or his staff briefly reviews each submission selected for publication to ensure that nudity, obscenity, threats of violence, profanity, and racial slurs are removed. Richie typically adds a short, one-line comment about the post with "some sort of humorous or satirical observation." Richie, however, does not materially change, create, or modify any part of the user-generated submission, nor does he fact-check submissions for accuracy. Apart from his clearly denoted comments appended at the end of each submission, which appear in bold-face text and are signed "-nik," Richie does not create any of the posts that appear on www.TheDirty.com. The bold-face text and signature are designed to distinguish editorial remarks from third-party submissions. Comments that appear in bold face and are signed "-nik" are only written and published by Richie.

Sarah Jones is a resident of northern Kentucky. Jones was a teacher at Dixie Heights High School in Edgewood, Kentucky, and a member of the Cincinnati BenGals, the cheerleading squad for the Cincinnati Bengals professional football team. From October 2009 to January 2010, Jones was the subject of several submissions posted by anonymous users on www.TheDirty.com and of editorial remarks posted by Richie.

First, on October 27, 2009, a visitor to www.TheDirty.com submitted two photographs of Jones and a male companion and the following post:

> THE DIRTY ARMY: Nik, this is Sara J, Cincinnati Bengal Cheerleader. She's been spotted around town lately with the infamous Shayne Graham. She has also slept with every other

Bengal Football player. This girl is a teacher too!! You would think with Graham's paycheck he could attract something a little easier on the eyes Nik!

Appearing directly beneath this post, Richie added:

> Everyone in Cincinnati knows this kicker is a Sex Addict. It is no secret ... he can't even keep relationships because his Red Rocket has freckles that need to be touched constantly.— nik

Jones requested that the post be removed. Richie informed Jones that the post would not be removed.

Second, on December 7, 2009, a visitor submitted a photograph of Jones and the following post:

> THE DIRTY ARMY: Nik, here we have Sarah J, captain cheerleader of the playoff bound cinci bengals.. Most ppl see Sarah has [*sic* ] a gorgeous cheerleader AND highschool teacher.. yes she's also a teacher.. but what most of you don't know is.. Her ex Nate.. cheated on her with over 50 girls in 4 yrs.. in that time he tested positive for Chlamydia Infection and Gonorrhea.. so im sure Sarah also has both.. whats worse is he brags about doing sarah in the gym.. football field.. her class room at the school she teaches at DIXIE Heights.

**\*404** Appearing directly after this post, Richie remarked: "Why are all high school teachers freaks in the sack?nik"

Third, on December 9, 2009, a visitor submitted another photograph of Jones and a male companion and the following post:

THE DIRTY ARMY: Nik, ok you all seen the past posting of the dirty Bengals cheerleader/teacher ... well here is her main man Nate. Posted a few pics of the infected couple. Oh an for everyone saying sarah is so gorgeous check her out in these non photoshopped pics.

Appearing directly after this post, Richie added:

Cool tribal tat man. For a second yesterday I was jealous of those high school kids for having a cheerleader teacher, but not anymore.—nik

Jones sent Richie over twenty-seven emails, pleading for Richie to remove these posts from the website, to no avail. Jones's father similarly wrote to Richie, also to no avail. She then sought legal help, and her attorney informed Richie that if the posts were not removed by December 14, 2009, Jones would file suit. The posts were not removed. Jones, *qua* Jane Doe, filed in federal district court this action on December 23, 2009, against Dirty World Entertainment Recordings, LLC, which operated a website called www.thedirt.com. Apparently, Jones sued the wrong party, as neither Richie nor Dirty World has or ever had any relationship with either Dirty World Entertainment Recordings, LLC, or www.thedirt.com. [1] Nevertheless, the lawsuit sparked national media attention, which precipitated further postings on www.TheDirty.com regarding Jones.

For instance, on December 29, a visitor submitted a photograph and the following post:

THE DIRTY ARMY: Nik, i just saw the Huffington Post and I just [*sic* ] the latest post on beat Bang–GALS cheer squad and back in May I was out clubbing in Cinci and those cheer chicks were hosting the club and i could not believe how ugly they were,

here is some pics of them from that night.

Richie added:

I think they all need to be kicked off and the Cincinnati Bengals should start over. Note to self: Never try to battle the DIRTY ARMY.—nik

Also, on December 29, 2009, a visitor to the website published two photographs and the following post:

THE DIRTY ARMY: Nik since the Bengals organization loves you so much i decided to submit some pics from a recent cheerleader calendar release party I went to, to show how beat there squad is with out make up and being half naked. Reality is their cheerleaders are FUGLY and the whole NFL thinks they are beat.

Richie added:

I love how the DIRTY ARMY has a war mentality ... why go after one ugly cheerleader when you can go after all the brown baggers. (Sorry Cleveland Browns that was not a stab at your girls.)—nik

On January 9, 2010, the October 27, 2009, submission was reposted after Richie added an additional comment, which specifically related to the 2009 NFL playoffs. After the litigation commenced, Richie posted a public letter to Jones:

**\*405**  If you know the truth then why do you care? With all the media attention this is only going to get worse

for you. Your lawyer is trying to make a name for himself using you as his pawn. If anything me just seeing your face on the news right now will get you fired from your job. All you had to do is read the FAQ section like every other normal person to get stuff removed. You dug your own grave here Sarah. I am a very reasonable person ... hope it was worth it.nik.

He also removed the first three posts regarding Jones. The posts on www.The Dirty.com humiliated Jones, allegedly undermining her position as an educator, her membership in the Cincinnati BenGals, and her personal life.

Jones amended her action to proceed against Dirty World Entertainment Recordings, LLC, dba www.thedirt.com; Hooman Karamian, aka Nik Richie, aka Corbin Grimes; Dirty World, LLC, dba www.TheDirty.com; and Dirty World Entertainment, LLC, dba www.TheDirty.com, alleging claims of defamation, libel *per se*, false light, and intentional inflection of emotional distress. Dirty World moved to dismiss, arguing that the district court lacked jurisdiction over Dirty World and that Jones failed to state a claim upon which relief may be granted. Richie (formerly known as Hooman Karamian) also moved to dismiss, arguing insufficiency of service of process, lack of personal jurisdiction, and failure to state a claim upon which relief may be granted. The district court denied both motions. *See Jones v. Dirty World Entm't Recordings, LLC (Jones II),* No. 2009–219, 2011 WL 1457343, at *1–2 (E.D.Ky. Apr. 15, 2011); *Jones v. Dirty World Entm't Recordings, LLC (Jones I),* 766 F.Supp.2d 828, 828–36 (E.D.Ky.2011). In their motions to dismiss, both Dirty World and Richie argued that under the CDA, 47 U.S.C. § 230(c), they are immune from suit. The district court treated the CDA argument as a motion for summary judgment and granted Jones's oral motion for a period of discovery to respond. *Jones II,* 2011 WL 1457343, at *2; *Jones I,* 766 F.Supp.2d at 836.

Dirty World and Richie then moved for summary judgment, arguing that § 230(c)(1) affords them immunity from liability for content created by third parties and that the content they created, as opposed to that created by third parties, constitutes non-actionable expressions of opinion that are non-defamatory as a matter of law. The district court denied the motion, holding that Dirty World and Richie are not

entitled to immunity under the CDA. *Jones v. Dirty World Entm't Recordings, LLC (Jones III),* 840 F.Supp.2d 1008, 1010–13 (E.D.Ky.2012).* The case was tried and submitted to a jury, but upon a joint motion by both parties, the court declared a mistrial.

Dirty World and Richie then filed a motion under Federal Rule of Civil Procedure 54(b), requesting that the court change its order holding that Dirty World and Richie were not entitled to immunity under the CDA. In the alternative, Dirty World and Richie moved for an order certifying the issue for an immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court treated the motion as a second motion for summary judgment and denied it. The district court also denied the alternative motion for leave to file an interlocutory appeal. The case was again tried. *See Jones v. Dirty World Entm't Recordings, LLC (Jones IV),* 965 F.Supp.2d 818, 819 (E.D.Ky.2013). At the conclusion of the presentation of evidence in the second trial, Dirty World and Richie made a timely motion for judgment as a matter of law pursuant to **\*406** Federal Rule of Civil Procedure 50. Their Rule 50 motion again claimed immunity. *See id.* The district court denied the motion, holding that "a website owner who intentionally encourages illegal or actionable third-party postings to which he adds his own comments ratifying or adopting the posts becomes a 'creator' or 'developer' of that content and is not entitled to immunity." *Id.* at 821. Thus, the district court concluded that "[d]efendants, when they republished the matters in evidence, had the same duties and liabilities for re-publishing libelous material as the author of such materials."

The case was submitted to the second jury, which returned a verdict in favor of Jones for $38,000 in compensatory damages and $300,000 in punitive damages. The district court entered a judgment in favor of Jones. Dirty World and Richie timely filed a notice of appeal from the district court's (1) entry of final judgment in favor of Jones, (2) denial of their motions to dismiss for lack of personal jurisdiction, and (3) denial of their motion for judgment as a matter of law. The sole issue on appeal is whether the district court erred in denying Dirty World's and Richie's motion for judgment as a matter of law by holding that the CDA does not bar Jones's state tort claims.

II.

A.

 **[1]** "We review a district court's denial of a motion for judgment as a matter of law or a renewed motion for judgment as a matter of law *de novo.*" *Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 720 (6th Cir.2004) (citing *United States v. Alpine Indus., Inc.,* 352 F.3d 1017, 1022 (6th Cir.2003)). The only claim that Dirty World and Richie raise on appeal is entitlement to immunity under the CDA. Appellants argued immunity under the CDA several times before the district court; hence, the claim is properly presented on appeal, *cf. Dunlap v. Mich. Dep't of Corr.,* 65 Fed.Appx. 971, 972 (6th Cir.2003), and reviewed *de novo, Smith v. Leis,* 407 Fed.Appx. 918, 927 (6th Cir.2011) ( "Claims of entitlement to immunity are questions of law, therefore they are reviewed de novo."). Any other claim or defense that they argued before the district court is waived. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol,* 308 F.3d 523, 544 n. 8 (6th Cir.2002) ("It is well established that an issue not raised in a party's briefs on appeal may be deemed waived." (citing *Ahlers v. Schebil,* 188 F.3d 365, 374 (6th Cir.1999))).

B.

We begin with a discussion of § 230 of the CDA. Section 230 of the CDA immunizes providers of interactive computer services [2] against liability arising from content created by third parties. Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Although § 230(c)(1) does not explicitly mention immunity or a synonym thereof, this and other circuits have recognized the provision to protect internet service providers for the display of content created by someone else. *Seaton v. TripAdvisor LLC,* 728 F.3d 592, 599 n. 8 (6th Cir.2013) (recognizing **\*407** that § 230(c)(1) provides immunity); *see also Almeida v. Amazon.com, Inc.,* 456 F.3d 1316, 1321 (11th Cir.2006) ( "The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.") (internal citations and quotations omitted); *accord Johnson v. Arden,* 614 F.3d 785, 791 (8th Cir.2010); *Doe v. MySpace, Inc.,* 528 F.3d 413, 418 (5th Cir.2008); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.,* 519 F.3d 666, 671 (7th Cir.2008); *Universal Commc'n Sys., Inc. v. Lycos, Inc.,* 478 F.3d 413, 418–19 (1st Cir.2007); *Batzel v. Smith,* 333 F.3d 1018, 1026–30 (9th Cir.2003); *Green v. Am. Online (AOL),* 318 F.3d 465, 471 (3d Cir.2003); *Ben Ezra, Weinstein, & Co., Inc. v. AOL,* 206 F.3d 980, 984–85 (10th Cir.2000); *Zeran v. AOL,* 129 F.3d 327, 328 (4th Cir.1997). Furthermore, § 230(e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

 **[2]** Section 230 marks a departure from the common-law rule that allocates liability to publishers or distributors of tortious material written or prepared by others. *See Batzel,* 333 F.3d at 1026–27. "Absent § 230, a person who published or distributed speech over the Internet could be held liable for defamation even if he or she was not the author of the defamatory text, and, indeed, at least with regard to publishers, even if unaware of the statement." *Id.* (citing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.,* 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995)) (pre-CDA case holding internet service provider liable for posting by third party on one of its electronic bulletin boards)). Congress, however, decided to treat the internet differently. *Id.*

 **[3]** At its core, § 230 bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Zeran,* 129 F.3d at 330. In *Zeran,* a case arising shortly after the enactment of the CDA, the panel considered a defamation claim against America Online (AOL) alleging "that AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter." *Id.* at 328. The *Zeran* court explained that the CDA squarely barred this claim. *See id.* at 330–35.

 **[4]** By barring publisher-liability and notice-liability defamation claims lodged against interactive computer service providers, § 230 serves three main purposes. First, it "maintain[s] the robust nature of Internet communication and, accordingly, ... keep[s] government interference in the medium to a minimum." *Id.* at 330; *see also* 47 U.S.C. § 230(b)(2) ("It is the policy of the United States ... to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."). Second, the immunity provided by § 230 protects against the "heckler's veto" that would chill free speech. Without § 230, persons who perceive themselves as the objects of

42 Media L. Rep. 1984

unwelcome speech on the internet could threaten litigation against interactive computer service providers, who would then face a choice: remove the content or face litigation costs and potential liability. *See Zeran,* 129 F.3d at 331 ("The specter of tort liability in an area of such prolific speech would have an obvious chilling effect."). Immunity shields service providers **\*408** from this choice. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 254 (4th Cir.2009) ("[I]mmunity is an immunity from suit rather than a mere defense to liability and ... is effectively lost if a case is erroneously permitted to go to trial." (internal quotation marks omitted)). Third, § 230 encourages interactive computer service providers to self-regulate. An early internet case, *Stratton Oakmont,* held that at common law the provider of an electronic message-board service was potentially liable for its user's defamatory message because it had engaged in voluntary self-policing of the third-party content made available through its service. 1995 WL 323710, at \*4. Section 230 set out to abrogate this precedent. *See* S.Rep. No. 104–230, at 194 (1996) ("One of the specific purposes of [§ 230] is to overrule *Stratton Oakmont v. Prodigy* and any other similar decisions...."); *see also, e.g., Zeran,* 129 F.3d at 331 ("Another important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services. In this respect, § 230 responded to [*Stratton Oakmont* ].").

[5] The protection provided by § 230 has been understood to merit expansion. Congress has extended the protection of § 230 into new areas. *See* 28 U.S.C. § 4102(c)(1) (providing that U.S. courts "shall not recognize or enforce" foreign defamation judgments that are inconsistent with § 230); 47 U.S.C. § 941(e)(1) (extending § 230 protection to new class of entities). And courts have construed the immunity provisions in § 230 broadly. *See, e.g., Nemet,* 591 F.3d at 254 (collecting cases). Moreover, "close cases ... must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157, 1174 (9th Cir.2008) (en banc).

[6] [7] [8] [9] Section 230(c)(1)'s grant of immunity is not without limits, however.[3] It applies only to the extent that an interactive computer service provider is not also the information content provider of the content at issue. An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation

or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). A website operator can simultaneously act as both a service provider and a content provider. If a website displays content that is created entirely by third parties, then it is only a service provider with respect to that content—and thus immune from claims predicated on that content. But if a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content—and is not immune from claims predicated on it. *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1123 (9th Cir.2003) ("Under the statutory scheme, an 'interactive computer service' qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue."). Thus, a website may be immune from liability for some of the third-party content it publishes but be subject to liability for the content that is responsible. *See Roommates,* 521 F.3d at 1162–63, 1165; *see also Batzel,* 333 F.3d at 1033. In short, immunity under the CDA depends on the pedigree of the content at issue.

[10] Aware of this limit on § 230 immunity, courts have recognized that § 230 bars a claim if (1) the defendant asserting immunity is an interactive computer service provider, (2) the particular information at issue was provided by another information content provider, and (3) the claim seeks to treat the defendant as a publisher or speaker of that information. *See, e.g., Universal Commc'n Sys.,* 478 F.3d at 418. By contrast, a defendant is not entitled to protection from claims based on the publication of information if the defendant is "responsible, in whole or in part, for the creation or development of [the] information." 47 U.S.C. § 230(f)(3).

C.

This case turns on how narrowly or capaciously the statutory term "development" in § 230(f)(3) is read. The district court held, and Jones maintains on appeal, that Dirty World and Richie are not immune under the CDA because Dirty World and Richie are information content providers with respect to the information underlying Jones's defamation claims because they *developed* that information. *See Jones IV,* 965 F.Supp.2d at 823. The district court set forth a test to measure whether a defendant is responsible for the development of the information grounding a plaintiff's state tort claim. According to the district court, "a website owner who intentionally

encourages illegal or actionable third-party postings to which he adds his own comments ratifying or adopting the posts becomes a 'creator' or 'developer' of that content and is not entitled to immunity." *Id.* at 821. Dirty World and Richie argue that the district court's test of development is erroneous, swallowing the protection provided by § 230(c)(1) and undermining the purposes served by the CDA. They maintain that, properly understood, they did not develop the statements forming the basis of Jones's defamation claims.

In our two opinions addressing the CDA, this court has neither expounded the meaning of "development" in § 230(f)(3) nor addressed the scope of immunity that § 230(c) provides. *See Seaton,* 728 F.3d at 599 n. 8; *Doe,* 551 F.3d at 416. Nevertheless, drawing inferences from these cases, it is not difficult to identify an overly inclusive and exclusive reading of "development." An overly inclusive interpretation of "development" in § 230(f)(3) would posit that a website operator is responsible for the development of content created by a third party merely by displaying or allowing access to it. *Cf. Roommates,* 521 F.3d at 1167 ("It's true that the broadest sense of the term 'develop' could include the functions of an ordinary search engine—indeed, just about any function performed by a website."). But to read the term so broadly would defeat the purposes of the CDA and swallow the core immunity that § 230(c) provides for the "exercise of a publisher's traditional editorial functions." *See Zeran,* 129 F.3d at 330; *see also Roommates,* 521 F.3d at 1167 (stating that "development" cannot be read to swallow § 230 immunity). Our recognition that the CDA affords immunity forecloses this overbroad reading of "development."

By contrast, an overly exclusive interpretation of "development" would exclude all the publishing, editorial, and screening functions of a website operator from the set of actions that the term denotes. Some courts have implied this interpretation, however. *See, e.g., Doe v. SexSearch.com,* 502 F.Supp.2d 719, 727 (N.D.Ohio 2007), *af'd,* 551 F.3d 412 (6th Cir.2008). But we have refused to adopt **\*410** it. *See Doe,* 551 F.3d at 415 ("[W]e do not reach the question of whether the [CDA] provides SexSearch with immunity from suit. We do not adopt the district court's discussion of the Act, which would read § 230 more broadly than any previous Court of Appeals decision has read it, potentially abrogating all state- or common-law causes of action brought against interactive Internet services."). We have maintained that, despite the CDA, *some* state tort claims will lie against website operators acting in their publishing, editorial, or screening capacities.

Therefore, limited circuit precedent suggests the proper interpretation of "*development* of information provided through the Internet," § 230(f)(3), means something more involved than merely displaying or allowing access to content created by a third party; otherwise § 230(c)(1) would be meaningless. And instances of development *may* include some functions a website operator may conduct with respect to content originating from a third party. *See SexSearch.com,* 551 F.3d at 415.

Beyond providing a basis to identify overly inclusive and exclusive interpretations of "development" in § 230(f)(3), our cases have not further illuminated the scope of the immunity furnished by the CDA. Decisions from our sister circuits, however, provide a workable measure of "development" that not only preserves the broad immunity the CDA provides for website operators' exercise of traditional publisher functions but also highlights the limited circumstances under which exercises of those functions are not protected. The leading case is *Roommates.* There, the Ninth Circuit sitting *en banc* discussed the meaning of "development" at length. *See* 521 F.3d at 1167–68. In *Roommates,* as a condition for using an online roommate-finding service, a website required each user seeking to offer living space to create a profile describing his desired roommate and, in so doing, required that user "to disclose his sex, sexual orientation and whether he would bring children to a household." *Id.* at 1161. The website also encouraged its users to provide additional comments describing themselves and their desired roommate. *Id.* The fair housing councils of San Fernando Valley and San Diego sued, alleging that the website violated the Fair Housing Act and state housing discrimination laws. *Id.* at 1162. The court held that a website operator was not entitled to immunity with respect to allegedly unlawful content that it *required* its users to submit and with respect to the search engine that it built on that content. *Id.* at 1165–68. But the court also held that the website was immune as to claims based on the website's encouragement that users provide additional comments, some of which were alleged to be discriminatory. *Id.* at 1173–75. To arrive at these divergent holdings, the court applied a specific measure of development:

> [W]e interpret the term "development" as referring not merely to augmenting the content generally, but *to materially contributing to its alleged unlawfulness.* In other words, a website helps to develop unlawful

content, and thus falls within the exception to section 230, *if it contributes materially to the alleged illegality of the conduct.*

521 F.3d at 1167–68 (emphasis added). A material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible for what makes the displayed content allegedly unlawful. *Cf. Chicago Lawyers' Comm.*, 519 F.3d at 671 ("Causation ... must refer to causing a particular statement to be made, or perhaps the discriminary content of a statement. That's the sense in which a non-publisher can cause a discriminatory ad, **\*411** while one who causes the forbidden content may not be a publisher."). "In an abundance of caution," the *Roommates* court gave several examples of applications of the "material contribution" test. For example:

If an individual uses an ordinary search engine to query for a "white roommate," the search engine has not contributed to any alleged unlawfulness in the individual's conduct; providing *neutral* tools to carry out what may be unlawful or illicit searches does not amount to "development" for purposes of the immunity exception. A dating website that requires users to enter their sex, race, religion and marital status through drop-down menus, and that provides means for users to search along the same lines, retains its CDA immunity insofar as it does not contribute to any alleged illegality.

521 F.3d at 1169. In contrast to this example, the court observed that Roommates required subscribers to disclose information about protected characteristics as a condition of accessing its service and "designed its search and email systems to limit the listings available to subscribers based on sex, sexual orientation and presence of children." *Id.* at 1166, 1169. Because Roommates required information about protected characteristics and engineered its search and email systems to limit access to housing listings based on

those protected characteristics, the court held that the website materially contributed to the alleged illegality of hiding certain listings. *See id.* at 1166–69, 1172.

The court also gave specific examples of the application of the material contribution test for a website that solicits, edits, and displays content originating from third parties (*i.e.*, a website akin to www.TheDirty.com). For example:

A website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality. However, a website operator who edits in a manner that contributes to the alleged illegality—such as by removing the word "not" from a user's message reading "[Name] did *not* steal the artwork" in order to transform an innocent message into a libelous one—is directly involved in the alleged illegality and thus not immune.

*Id.* at 1169 (alteration in original); *see also* Batzel, 333 F.3d at 1035 (holding that an editor of an email newsletter who received and published allegedly actionable information, adding a short headnote, was immune under § 230 because an editor's changes to the length and spelling of third-party content do not contribute to the libelousness of the message). The *Roommates* court further explained:

And any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230. But if the editor publishes material that he does not believe was tendered to him for posting online, then he is the one making the affirmative decision to publish, and so he contributes materially to its allegedly unlawful dissemination. He is thus properly deemed a developer and not entitled to CDA immunity.

521 F.3d at 1170–71 (internal citations omitted).

Accordingly, the *Roommates* court held that § 230 barred the fair housing councils' claims grounded on the allegedly discriminatory statements displayed through Roommate's

42 Media L. Rep. 1984

operation of the "additional comments" section of its website. *Id.* at 1173. The court explained:

> **\*412** Roommate publishes these comments as written. It does not provide any specific guidance as to what the essay should contain, nor does it urge subscribers to input discriminatory preferences. Roommate is not responsible, in whole or in part, for the development of this content, which comes entirely from subscribers and is passively displayed by Roommate. Without reviewing every essay, Roommate would have no way to distinguish unlawful discriminatory preferences from perfectly legitimate statements. Nor can there be any doubt that this information was tendered to Roommate for publication online. This is precisely the kind of situation for which section 230 was designed to provide immunity.

*Id.* at 1173–74 (internal citation omitted). Furthermore, the court rejected the argument made by the fair housing councils that the website developed the allegedly illegal content displayed in the additional comments section because the website encouraged the submission of discriminatory preferences. *Id.* at 1174. The court reasoned that "[t]he fact that Roommate encourages subscribers to provide *something* in response to the prompt is not enough to make it a 'develop[er]' of the information." *Id.* (second alteration in original). Because "Roommate does not tell subscribers what kind of information they should or must include as 'Additional Comments,' and certainly does not encourage or enhance any discriminatory content created by users," the court held that the operation of the additional comments section did not materially contribute to the alleged unlawfulness of the content displayed on the website's comments section. *Id.*

The material contribution test has been adopted and applied by other circuits, with instructive effect. *Compare Nemet,* 591 F.3d at 257–58 (holding that a website *did not* contribute to alleged illegality), *with Accusearch,* 570 F.3d at 1200–01

(holding that a website *did* contribute to alleged illegality). In *Nemet,* Nemet, the owner of a Chevrolet dealership, sued Consumeraffairs.com, a website allowing users to comment on the quality of goods and services, after various allegedly tortious, third-party posts appeared on the website relating to automobiles sold or serviced by him. 591 F.3d at 252. The website claimed immunity under the CDA. Nemet responded that the website was, in fact, an information content provider under § 230(f)(3), and was thus liable as a co-developer, because of the "structure and design of its website" and because "Consumeraffiars.com solicit[ed] its customers' complaints [and] steered them into specific categor[ies]." *Id.* at 256 (first and third alterations in original) (quotation marks omitted). The panel affirmed the district court's grant of the website's motion to dismiss because "[e]ven accepting as true all of the facts Nemet pled as to Consumeraffairs.com's liability for the structure and design of its website, the amended complaint does not show, or even intimate, that Consumeraffairs.com contributed to the allegedly fraudulent nature of the comments at issue." *Id.* at 257 (internal quotation marks omitted).

In *Accusearch,* Accusearch operated a website that sold the confidential information of individuals, including their telephone records, which the website paid researchers to obtain. 570 F.3d at 1190. The Federal Trade Commission brought suit against the website operator to curtail its sale of confidential information and to disgorge its profits from the sale of information in telephone records. *Id.* Accusearch claimed immunity under the CDA, arguing that it merely displayed the allegedly illegal conduct that originated from its third-party researchers. *Id.* The panel rejected this argument and held that the **\*413** website operator developed the confidential telephone records within the meaning of the CDA. The panel cited *Roommates's* material contribution test and found "[t]hat language applies to Accusearch's role in this case." *Id.* at 1200 (citing *Roommates,* 521 F.3d at 1168). The *Accusearch* panel reasoned that "[b]y paying its researchers to acquire telephone records, knowing that the confidentiality of the records was protected by law, it contributed mightily to the unlawful conduct of its researchers." *Id.* The panel noted that "the offensive postings were Accusearch's *raison d'etre* and it affirmatively solicited them." *Id.* It thus found that "Accusearch's actions were not 'neutral' with respect to generating offensive content; on the contrary, its actions were intended to generate such content." *Id.* at 1201. Accordingly, the panel held that "Accusearch is not entitled to immunity under the CDA." *Id.*

42 Media L. Rep. 1984

Other circuits, while not explicitly relying on *Roommates's* material contribution test, have issued decisions consistent with it. *See, e.g., Johnson,* 614 F.3d at 791 (holding that a website hosting company was immune to state tort claims grounded on unwelcome content posted to a client's website); *Chicago Lawyers' Comm.,* 519 F.3d at 671 (holding that craigslist.com was immune to fair housing claims based on discriminatory listings posted by third parties); *Green,* 318 F.3d at 471 (holding that AOL was immune to state tort claims grounded on third-party content); *Ben Ezra,* 206 F.3d at 984–85 (holding that defendant was immune to the defamation claim when it made its own editorial decisions with respect to third-party information published on its website); *Zeran,* 129 F.3d at 330–35.

### D.

**[11]** Consistent with our sister circuits, we adopt the material contribution test to determine whether a website operator is "responsible, in whole or in part, for the creation or development of [allegedly tortious] information." 47 U.S.C. § 230(f)(3). And we expressly decline to adopt the definition of "development" set forth by the district court.

The district court read the foregoing decisions, identified *Roommates* as the guiding precedent, but derived a different rule. In its memorandum opinion explaining the denial of Dirty World's and Richie's Rule 50 motion, the district court gave two formulations of a rule providing when the CDA does not bar a plaintiff's claim. First, the district court said that a "website owner who intentionally encourages illegal or actionable third-party postings to which he adds his own comments ratifying or adopting the posts becomes a 'creator' or 'developer' of that content and is not entitled to immunity." *Jones IV,* 965 F.Supp.2d at 821. Second, in a different formulation, the district court said that "if ... [website] owners, as in the instant case, invite invidious postings, elaborate on them with comments of their own, and call upon others to respond in kind, the immunity does not apply." *Id.* at 822. The district court arrived at these rules by over-reading the operative language contained in the analytic parts of *Johnson, Accusearch,* and *Chicago Lawyers' Committee. See id.* at 820 (finding that the *Johnson* "ruling was based on the fact that 'the record contains no evidence that [the internet service provider] designed its website to be a portal for defamatory material or [did] anything to induce defamatory postings' " (alterations in original) (quoting *Johnson,* 614 F.3d at 792)); *id.* (finding that the *Accusearch* court "held that

one is not 'responsible' for 'developing' allegedly actionable information only 'if one's conduct was neutral with respect **\*414** to the offensiveness of the content' ") (quoting *Accusearch,* 570 F.3d at 1199); *id.* at 820 (finding that *Chicago Lawyers' Committee* "noted that '[n]othing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination' " (alteration in original) (quoting *Chicago Lawyers' Comm.,* 519 F.3d at 671–72)). The district court read "inducement" to mean invitation and "neutral with respect to the offensiveness of the content" as a description of a website's orientation, not of a condition that users upload unlawful content, *cf. Roommates,* 521 F.3d at 1166–69, or that contractors conduct unlawful action, *cf. Accusearch,* 570 F.3d at 1200–01.

We do not adopt the district court's encouragement test of immunity under the CDA. The district court misapprehended how other circuits, particularly the Ninth Circuit in *Roommates,* have understood what constitutes "development" in § 230(f)(3) from what does not. The district court elided the crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable. *See Roommates,* 521 F.3d at 1169–74. This is the distinction that divides the holdings in *Roommates* and *Accusearch,* which stripped the respective defendants of the CDA's protection, from the holdings in *Roommates, Chicago Lawyers' Committee, Johnson, Batzel, Nemet,* and *Zeran,* which barred the respective plaintiffs' claims. In *Roommates,* the website was responsible for the alleged discrimination by requiring users to submit protected characteristics and hiding listings based on those submissions. 521 F.3d at 1165–68. In *Accusearch,* the website was responsible for the illegal purchase and resale of confidential telephone records. 570 F.3d at 1200–01. But in *Chicago Lawyers' Committee,* 519 F.3d at 671–72, and *Nemet,* 591 F.3d at 256–57, for example, the website operators provided a forum for user posts, did not require users to violate the law as a condition of posting, did not compensate for the posting of actionable speech, did not post actionable content themselves, and therefore were not responsible for the actionable speech that was displayed on their websites. The district court's rule does not neatly divide these cases. An encouragement theory of "development" does not obviously capture what was allegedly unlawful about the design of Roommate's website, particularly its search engine, or Accusearch's payment for unlawful conduct. And it does not obviously leave out the neutral fora created by the commercially oriented websites targeted by the claims in

*Chicago Lawyers' Committee* and *Nemet* (craigslist.com and www.consumeraffairs.com, respectively).

More importantly, an encouragement test would inflate the meaning of "development" to the point of eclipsing the immunity from publisher-liability that Congress established. Many websites not only allow but also actively invite and encourage users to post particular types of content. Some of this content will be unwelcome to others—*e.g.,* unfavorable reviews of consumer products and services, allegations of price gouging, complaints of fraud on consumers, reports of bed bugs, collections of cease-and-desist notices relating to online speech. And much of this content is commented upon by the website operators who make the forum available. Indeed, much of it is "adopted" by website operators, gathered into reports, and republished online. Under an encouragement test of development, these websites would lose the immunity under the CDA and be subject to hecklers' suits aimed at the publisher. Moreover, under the district court's rule, **\*415** courts would then have to decide what constitutes "encouragement" in order to determine immunity under the CDA—a concept that is certainly more difficult to define and apply than the Ninth Circuit's material contribution test. *See Zeran,* 129 F.3d at 333. Congress envisioned an uninhibited, robust, and wide-open internet, *see* § 230(a)(1)-(5), but the muddiness of an encouragement rule would cloud that vision. Accordingly, other courts have declined to hold that websites were not entitled to the immunity furnished by the CDA because they selected and edited content for display, thereby encouraging the posting of similar content. *See, e.g., Roommates,* 521 F.3d at 1174 ("Such weak encouragement cannot strip a website of its section 230 immunity, lest that immunity be rendered meaningless as a practical matter."); *Batzel,* 333 F.3d at 1031. We do the same.

**[12]** The district court also suggested that when an interactive computer service provider adds commentary to third-party content that "ratifies or adopts" that content, then the provider becomes a "creator" or "developer" of that content and is not entitled to the CDA's protection. *Jones IV,* 965 F.Supp.2d at 821; *see also id.* at 823 ("Thus, Richie's conduct cannot be said to have been 'neutral with respect to the offensiveness of the content,' such that he is not 'responsible' for it within the meaning of 47 U.S.C. § 230(f) (3)."). An adoption or ratification theory, however, is not only inconsistent with the material contribution standard of "development" but also abuses the concept of responsibility. A website operator cannot be responsible for what makes another party's statement actionable by commenting on

that statement *post hoc.* To be sure, a website operator's previous comments on prior postings could encourage subsequent invidious postings, but that loose understanding of responsibility collapses into the encouragement measure of "development," which we reject. *See, e.g., Roommates,* 521 F.3d at 1174; *Batzel,* 333 F.3d at 1031. As other courts have recognized, the adoption theory of "development" would undermine the CDA for the same reasons as an encouragement theory. *See Parisi v. Sinclair,* 774 F.Supp.2d 310, 316 (D.D.C.2011) (dismissing plaintiffs' claims as barred by the CDA despite their argument that defendant "adopted" the statements at issue as its own and finding that "it would be contrary to the purpose of the CDA, which sought to encourage the vibrant and competitive free market of ideas on the Internet, by establishing immunity for internet publication of third-party content to require a fact-based analysis of if and when a defendant adopted particular statements and revoke immunity on that basis" (internal citations and quotation marks omitted)).

### III.

**[13]** We now apply the material contribution measure of "development" to the facts of this case. Jones's defamation claims target the statements that were posted by a third party on October 27 and December 7, 2009. Because Dirty World and Richie did not materially contribute to the illegality of those statements, the CDA bars Jones's claims. *See Nemet,* 591 F.3d at 260 (affirming dismissal where plaintiff failed to show defendant "was responsible for the creation or development of the allegedly defamatory content *at issue*" (emphasis added)).

**[14]** Dirty World and Richie did not author the statements at issue; however, they did select the statements for publication. But Richie and Dirty World cannot be found to have materially contributed to the defamatory content of the statements posted on October 27 and December 7, **\*416** 2009, simply because those posts were selected for publication. *See Batzel,* 333 F.3d at 1035 (holding that an editor of an email newsletter who received and published allegedly actionable information, adding a short headnote, was immune under § 230 because an editor's changes to the length and spelling of third-party content do not contribute to the libelousness of the message). Nor can they be found to have materially contributed to the defamatory content through the decision not to remove the posts. *See Zeran,* 129 F.3d at 330 (holding CDA immunity applied even

*Jones v. Dirty World Entertainment Recordings LLC, 755 F.3d 398 (2014)*

42 Media L. Rep. 1984

though "AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter"). The CDA expressly bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Id.*

Unlike in *Roommates,* the website that Richie operated did not require users to post illegal or actionable content as a condition of use. *Cf. Roommates,* 521 F.3d at 1165–68. Nor does the name of the website, www. TheDirty.com, suggest that only illegal or actionable content will be published. Unlike in *Accusearch,* Richie or Dirty World did not compensate users for the submission of unlawful content. *Cf. Accusearch,* 570 F.3d at 1200–01. The website's content submission form simply instructs users to "[t]ell us what's happening. Remember to tell us who, what, when, where, why." The form additionally provides labels by which to categorize the submission. These tools, neutral (both in orientation and design) as to what third parties submit, do not constitute a material contribution to any defamatory speech that is uploaded. *See Nemet,* 591 F.3d at 256 (finding that the "structure and design of [defendant's] website" and the website's "solicit[ion of] its customers' complaints [and] steer[ing] them into specific categor[ies]" did not constitute development under § 230(f)(3)" (fifth alteration in original) (internal quotation marks omitted)); *Roommates,* 521 F.3d at 1173–74 (holding that § 230 barred the fair housing councils' claims grounded on the discriminatory statements displayed through Roommate's operation of the "additional comments" section of its website).

Further, Richie's comment on the December 7 post—*viz.,* "Why are all high school teachers freaks in the sack?"— although absurd, did not materially contribute to the defamatory content of the statements uploaded on October 27 and December 7, 2009. Richie's remark was made after each of the defamatory postings had already been displayed. It would break the concepts of responsibility and material contribution to hold Richie responsible for the defamatory content of speech because he later commented on that speech. Although ludicrous, Richie's remarks did not materially contribute to the defamatory content of the posts appearing on the website. More importantly, the CDA bars claims lodged against website operators for their editorial functions, such as the posting of comments concerning third-party posts, so long as those comments are not themselves actionable. *See Zeran,* 129 F.3d at 330; *see also* 47 U.S.C. § 230(f)(3).

To be sure, Richie was an information content provider as to his comment on the December 7 post. But Jones did not allege that *Richie's* comments were defamatory. And the district court did not hold that Richie's comments were themselves tortious. Rather, the court concluded that those comments "effectively ratified and adopted the defamatory third-party post" and thereby developed the defamatory statements, thus ruling that the CDA did **\*417** not bar Jones's claims. *Jones IV,* 965 F.Supp.2d at 823 ("Defendants are mistaken, for the salient point about Richie's tagline is not that it was defamatory itself and thus outside CDA immunity, but rather that it effectively ratified and adopted the defamatory third-party post."). The district court's adoption or ratification test, however, is inconsistent with the material contribution standard of "development" and, if established, would undermine the CDA. Therefore, Dirty World and Richie did not develop the statements forming the basis of Jones's tort claims and accordingly are not information content providers as to them.

Because (1) the defendants are interactive service providers, (2) the statements at issue were provided by another information content provider, and (3) Jones's claim seeks to treat the defendants as a publisher or speaker of those statements, the CDA bars Jones's claims. *See Universal Commc'n Sys.,* 478 F.3d at 418. Given the role that the CDA plays in an open and robust internet by preventing the speech-chilling threat of the heckler's veto, we point out that determinations of immunity under the CDA should be resolved at an earlier stage of litigation. [4] *See Nemet,* 591 F.3d at 254 ("[I]mmunity is an *immunity from suit* rather than a mere defense to liability [and] is effectively lost if a case is erroneously permitted to go to trial.").

## IV.

We note that the broad immunity furnished by the CDA does not necessarily leave persons who are the objects of anonymously posted, online, defamatory content without a remedy. In this case, Jones conceded that she did not attempt to recover from the person(s) whose comments Richie elected to publish. She conceded that she did not attempt to subpoena Richie or Dirty World to discover who authored the defamatory posts. Instead, she sued Dirty World and Richie. But, under the CDA, Jones cannot seek her recovery from the online publisher where that publisher did not materially contribute to the tortious content. Congress

envisioned a free and open internet, *see* § 230(a)(1)-(5), and the immunity provision of § 230(c)(1), which subverts common-law publisher-liability, serves that purpose. While some exercises of the considerable freedom that Congress allowed online publishers are regrettable, freedom and its uses are distinct. Congress enacted § 230(c)(1) to preserve a free internet, and that enactment resolves this case.

For the foregoing reasons, we vacate the judgment in favor of Jones and reverse the district court's denial of Dirty World's and Richie's motion for judgment as a matter of law with instructions to enter judgment as a matter of law in their favor.

**All Citations**

755 F.3d 398, 42 Media L. Rep. 1984

---

### Footnotes

1     In his affidavit, Richie stated that www.thedirty.com is owned and operated by Dirty World, LLC, not Dirty World Entertainment Recordings, LLC. In her second amended complaint, Jones properly added Dirty World, LLC dba Thedirty.com as a party.

2     "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). These providers include broadband providers, hosting companies, and website operators like Dirty World and Richie.

3     Section 230(e) outlines a few exceptions, such as for claims under intellectual property laws. *See* 47 U.S.C. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."). These exceptions to § 230(c) immunity are inapplicable in this case.

4     Certification of the interlocutory appeal sought by Dirty World and Richie could have obviated the need for the second trial. An even earlier interlocutory appeal would have resolved the case prior to trial.

---

End of Document                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Klayman v. Zuckerberg, 753 F.3d 1354 (2014)

410 U.S.App.D.C. 187, 42 Media L. Rep. 2118, 60 Communications Reg. (P&F) 1112

KeyCite Yellow Flag

Disagreed With by   Daniel v. Armslist, LLC,   Wis.App.,   April 19, 2018

753 F.3d 1354
United States Court of Appeals,
District of Columbia Circuit.

Larry Elliott KLAYMAN, Appellant

v.

Mark ZUCKERBERG and Facebook, Inc., Appellees.

No. 13–7017
|
Argued Feb. 25, 2014.
|
Decided June 13, 2014.

**Synopsis**
**Background:** User of social networking website, proceeding pro se, brought action in state court against site and its founder, alleging negligence and assault. Following removal, defendants moved to dismiss. The United States District Court for the District of Columbia, Reggie B. Walton, J., 910 F.Supp.2d 314, granted motion. User appealed.

**Holdings:** The Court of Appeals, Millett, Circuit Judge, held that:

[1] website was interactive service provider;

[2] information for which user sought to hold website liable was information provided by another information content provider; and

[3] user sought to hold website liable as "publisher or speaker" of information.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

West Headnotes (7)

[1]   **Federal Preemption** 🔑 Telecommunications

**Telecommunications** 🔑 Relationship Between Federal, State, and Local Laws; Preemption

Preemption under the Communications Decency Act (CDA) is an affirmative defense, but it can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint. Communications Decency Act of 1996, § 509, 47 U.S.C.A. § 230.

26 Cases that cite this headnote

[2]   **Telecommunications** 🔑 Privilege or immunity

Social networking website was interactive computer service provider, as required to find website immune under Communications Decency Act (CDA) from user's claims for negligence and assault based on offensive page created by another user; website was a service that provided information to "multiple users" by giving them computer access to a computer server, the servers that hosted social networking website, and when users browsed site and reviewed pages of other users, they did so by gaining access to information stored on website's servers. Communications Decency Act of 1996, § 509(f)(2), 47 U.S.C.A. § 230(f)(2).

36 Cases that cite this headnote

[3]   **Telecommunications** 🔑 Privilege or immunity

Founder of social networking website was provider of interactive computer service, as required to find founder immune under Communications Decency Act (CDA) from user's claims for negligence and assault based on offensive page created by another user, since website provided information to "multiple users" by giving them computer access to a computer server, the servers that hosted social networking website. Communications Decency Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

40 Cases that cite this headnote

**[4]    Telecommunications** 👉 Privilege or immunity

Information for which social networking website user sought to hold website liable was information provided by another information content provider, as required to find website immune under Communications Decency Act (CDA) from user's claims for negligence and assault based on offensive page created by another user, since complaint acknowledged that the objected-to information on pages was provided by third party users, not website itself. Communications Decency Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

47 Cases that cite this headnote

**[5]    Telecommunications** 👉 Privilege or immunity

Under the Communications Decency Act (CDA) a website does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online. Communications Decency Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

27 Cases that cite this headnote

**[6]    Telecommunications** 👉 Privilege or immunity

Social networking website user sought to hold website liable as "publisher or speaker" of information, as required to find website immune under Communications Decency Act (CDA) from user's claims for negligence and assault based on offensive page created by another user; assault claim was based on website's allowing offending pages to exist on its website, and negligence claim relied on timing of website's removal of the pages. Communications Decency Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

5 Cases that cite this headnote

**[7]    Federal Preemption** 👉 Telecommunications

**Telecommunications** 👉 Programming and content

State law cannot predicate liability for publishing decisions on the mere existence of the very relationship that Congress immunized from suit under Communications Decency Act (CDA). Communications Decency Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

20 Cases that cite this headnote

*1355  Appeal from the United States District Court for the District of Columbia, (No. 1:11–cv–00874).

**Attorneys and Law Firms**

Larry Klayman argued the cause and filed the brief for appellant.

Craig S. Primis argued the causes for appellees. With him on the brief was K. Winn Allen.

Before: TATEL, BROWN and MILLETT, Circuit Judges.

Opinion for the Court filed by Circuit Judge MILLETT.

**Opinion**

MILLETT, Circuit Judge:

**\*\*188**  Three years ago, plaintiff-appellant Larry Klayman encountered a page on Facebook's social networking website entitled "Third Palestinian Intifada," which called for Muslims to rise up and kill the Jewish people. Facebook subsequently removed the Third Intifada page from its website, but not promptly enough for Klayman. He filed suit against Facebook and its founder, Mark Zuckerberg, alleging that their delay in removing that page and similar pages constituted intentional assault and negligence. The district court held that the Communications Decency Act of 1996, 47 U.S.C. § 230, shielded Zuckerberg and Facebook from suit. We affirm.

I

In enacting the Communications Decency Act, Congress found that the Internet and related computer services

"represent an extraordinary advance in the availability of educational and informational resources," and "offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a). The Internet has done so, Congress stressed, "with a minimum of **189 *1356 government regulation." *Id.* Congress accordingly made it the "policy of the United States" to "promote the continued development of the Internet," and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation[.]" *Id.* § 230(b).

To that end, Section 230(c) of the Act commands that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). A later section of the Act adds preemptive bite to that prohibition, providing that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e) (3).

As relevant here, the Act defines a protected "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet [.]" 47 U.S.C. § 230(f)(2). An information content provider, in turn, is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3).

Facebook is an Internet-based social networking website that allows its users worldwide to share information, opinions, and other content of the users' own choosing for free. *Klayman v. Zuckerberg,* 910 F.Supp.2d 314, 316 (D.D.C.2012). Like millions of others, Larry Klayman maintains a Facebook account. When he joined Facebook, the Statement of Rights and Responsibilities for users advised Klayman that Facebook does its "best to keep Facebook safe, but we cannot guarantee it," J.A. 23, and that "YOU USE IT AT YOUR OWN RISK. WE ARE PROVIDING FACEBOOK 'AS IS' WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES," J.A. 26 (capitalization in original). The Statement continued: "FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT,

INFORMATION, OR DATA OF THIRD PARTIES [.]" J.A. 27 (capitalization in original).

While using the site a few years ago, Klayman came across a page entitled "Third Palestinian Intifada," which called for an uprising to take place after the completion of Islamic prayers on May 15, 2011, and proclaimed that "Judgment Day will be brought upon us only once Muslims have killed all the Jews." More than 360,000 Facebook users were members of the group; three similar pages calling for a Third Intifada attracted over 7,000 members. Compl. ¶ 7.

At some point, Israel's Minister for Public Diplomacy wrote a letter to Facebook and Mark Zuckerberg to request that the Intifada pages be removed. Klayman alleges that he also requested removal of the pages, but does not indicate when. After "many days," Facebook removed the pages. Compl. ¶ 12.

Klayman subsequently sued Facebook and Mark Zuckerberg (collectively, "Facebook"), in the Superior Court for the District of Columbia, alleging that their insufficiently prompt removal of the Third Intifada pages constituted intentional assault and negligent breach of a duty of care that Facebook allegedly owed to Klayman. Specifically, Klayman alleged that the Intifada pages "amount[ed] to a threat of the use of force against non-Muslims, and particularly Jews," causing him "reasonable apprehension of severe bodily harm and/ or death." Compl. *1357 **190 ¶¶ 15–16. With respect to negligence, Mr. Klayman alleged that, "[a]s a subscriber to Facebook and as a member of the public, Defendants owed Plaintiff a duty of care, which they violated and breached by allowing and furthering the death threats by the Third Palestinian Intifada, and related and similar sites." *Id.* ¶ 19.

Klayman sought an injunction to prevent Facebook from allowing the Intifada page and other similar pages on its website, as well as more than one billion dollars in compensatory and punitive damages. Compl., Prayer for Relief.

Facebook removed the case to the United States District Court for the District of Columbia, and then moved to dismiss the case or, in the alternative, to have it transferred to the Northern District of California. The district court granted the motion to dismiss, FED.R.CIV.P. 12(b)(6), holding that the Communications Decency Act foreclosed tort liability predicated on Facebook's decisions to allow or to remove content from its website.

## II

The court below had diversity jurisdiction under 28 U.S.C. § 1332; this court has jurisdiction over the district court's final judgment of dismissal under 28 U.S.C. § 1291. We review *de novo* a motion to dismiss for failure to state a claim, accepting as true the factual allegations stated in the complaint and drawing all inferences in favor of the nonmoving party. *See, e.g., Autor v. Pritzker,* 740 F.3d 176, 179 (D.C.Cir.2014).

[1] Preemption under the Communications Decency Act is an affirmative defense, but it can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint. *See Jones v. Bock,* 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Jones v. Horne,* 634 F.3d 588, 600 (D.C.Cir.2011). Normally we afford a liberal reading to a complaint filed by a *pro se* plaintiff. *See, e.g., Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Rhodes v. United States,* 518 F.Supp.2d 285, 287 (D.D.C.2007). This Court has not yet decided, however, whether that rule applies when the *pro se* plaintiff is a practicing lawyer like Klayman. *See, e.g., Richards v. Duke Univ.,* 480 F.Supp.2d 222, 234 (D.D.C.2007). We need not resolve that question here because, even under a generous reading of the complaint, the Communications Decency Act forbids this suit.

## III

The Communications Decency Act mandates dismissal if (i) Facebook is a "provider or user of an interactive computer service," (ii) the information for which Klayman seeks to hold Facebook liable was "information provided by another information content provider," and (iii) the complaint seeks to hold Facebook liable as the "publisher or speaker" of that information. *See* 47 U.S.C. § 230(c)(1). We hold that, on the face of this complaint, all three prongs of that test are satisfied.

[2] ***First,*** Facebook qualifies as an interactive computer service because it is a service that provides information to "multiple users" by giving them "computer access * * * to a computer server," 47 U.S.C. § 230(f)(2), namely the servers that host its social networking website. When Facebook users like Klayman browse the site and review the pages of other users, *see* Compl. ¶ 7, they do so by gaining access to information stored on Facebook's servers.

[3] Mark Zuckerberg, too, qualifies for protection because he is a "provider" of Facebook's interactive computer service, **\*1358 \*\*191** 47 U.S.C. § 230(c)(1), and Klayman's complaint seeks to hold him accountable for his role in making that service available, Compl. ¶ 12.

Klayman does not seriously dispute that Facebook meets the statutory definition of an interactive computer service, or that Zuckerberg, as a matter of statutory text, provides such a service. He argues, instead, that Facebook should not qualify because it "can control the contents posted on [its] website." Appellant's Br. 21. The short answer is that Congress did not write that additional limitation into the Act, and it is this court's obligation to enforce statutes as Congress wrote them. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 461–462, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

Worse still, Klayman's reading would put Section 230 at war with itself. Section 230(c)(2) prohibits holding providers of interactive computer services liable for "any action voluntarily taken * * * to restrict access to" content that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(c)(2)(A). It would make nonsense of the statute to say that interactive computer services must lack the capacity to police content when the Act expressly provides them with immunity for doing just that.

[4] ***Second,*** the complaint acknowledges that the objected-to information on the Third Intifada pages was provided by third party users, not Facebook itself. The complaint charges the defendants only with "allowing" the pages to exist and "furthering" them by not "remov[ing] these postings." Compl. ¶ 19; *see also, e.g., id.* ¶ 4 (Facebook has been "used [as] a vehicle for bad purposes" in this case); *id.* ¶ 7 (Facebook "refused" to "take down the page and similar and related pages").

[5] Indeed, the complaint nowhere alleges or even suggests that Facebook provided, created, or developed any portion of the content that Klayman alleges harmed him. Instead, liability in this complaint rests on "information provided by another information content provider," within the meaning of Section 230(c)(1). This case thus presents no occasion to address the outer bounds of preemption under the Act; it is enough here to hold that a website does not create or

develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online. *Compare, e.g., Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157, 1166 (9th Cir.2008) (en banc) (housing website that required users to disclose their sex, family status, and sexual orientation, as well as those of their desired roommate, in violation of federal housing law, not entitled to Communications Decency Act protection), *with Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 257 (4th Cir.2009) (website that did not "contribute[ ] to the allegedly fraudulent nature of the comments at issue" protected by the Communications Decency Act).

Klayman alleges that Facebook collects data on its users and their activities, which it employs to make its advertising more profitable. Appellant's Br. 26. Even if true, that would be irrelevant to Klayman's theories of liability. Facebook could only collect such data about the Intifada pages after some third party had created the pages and their content.

[6] ***Third,*** Klayman's complaint seeks, for liability purposes, to treat the defendants **\*\*192 \*1359** as "publisher[s]" of the offending content. 47 U.S.C. § 230(c)(1). Although the statute does not define "publisher," its ordinary meaning is "one that makes public," and "the reproducer of a work intended for public consumption." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1837 (1981); *cf. also* RESTATEMENT (SECOND) OF TORTS § 577 (1977) ("Publication of defamatory matter" means both the communication of, and the failure to remove, the relevant content.). Indeed, the very essence of publishing is making the decision whether to print or retract a given piece of content—the very actions for which Klayman seeks to hold Facebook liable. *See* Compl. ¶¶ 17–20. Specifically, the assault count of the complaint turns on Facebook's allowing the Third Intifada pages to exist on its website in the first place. Compl. ¶ 17. And the negligence claim relies on the timing of Facebook's removal of the pages. Compl. ¶ 19.

Other circuits agree, holding that similar conduct falls under Section 230's aegis. *See, e.g., Zeran v. America Online, Inc.,* 129 F.3d 327, 330 (4th Cir.1997) (the Communications Decency Act protects against liability for the "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content"); *Green v. America Online,* 318 F.3d 465, 471 (3d Cir.2003) (same); *Universal Communication Systems, Inc. v. Lycos, Inc.,* 478 F.3d 413, 422 (1st Cir.2007) (same);

*Doe v. MySpace, Inc.,* 528 F.3d 413, 420 (5th Cir.2008) (no liability under the Act for "decisions relating to the monitoring, screening, and deletion of content" by an interactive computer service provider) (quoting *Green,* 318 F.3d at 471); *Roommates.com,* 521 F.3d at 1170–1171 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.") \*

Klayman objects that his claims "do not derive from Appellees' status or conduct as a publisher or speaker but are based on Appellees' breach of its duties arising from the special relationship between the parties as a result of their contractual relationship and contractual obligations." Appellant's Br. 23. In particular, he points to a section of Facebook's Statement of Rights and Responsibilities, which says: "We do our best to keep Facebook safe \* \* \*." *Id.* at 24.

That argument does not work. To begin with, Klayman omits the end of that sentence, which reads "but we cannot guarantee it." J.A. 23. Klayman also overlooks the Statement's express warning that "FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES." J.A. 27. The plain text of the Statement thus disavows the legal relationship that Klayman asserts.

[7] Moreover, to the extent that Klayman means by this argument to state a contractual basis for liability, no breach of contract claim appears anywhere in the complaint and is accordingly forfeited, as Klayman acknowledges. Appellant's Br. 23. And to the extent that Klayman means, instead, that any such statement allocating rights and responsibilities between interactive computer services and their users by itself gives rise to a heightened state-law duty of care in publishing, **\*\*193 \*1360** that argument fails. State law cannot predicate liability for publishing decisions on the mere existence of the very relationship that Congress immunized from suit. In other words, simply invoking the label "special relationship" cannot transform an admittedly waived contract claim into a non-preempted tort action.

IV

For those reasons, we affirm the district court's judgment of dismissal.

*So ordered.*

410 U.S.App.D.C. 187, 42 Media L. Rep. 2118, 60 Communications Reg. (P&F) 1112

**All Citations**

753 F.3d 1354, 410 U.S.App.D.C. 187, 42 Media L. Rep. 2118, 60 Communications Reg. (P&F) 1112

---

## Footnotes

\* Because the conduct for which Klayman seeks to hold Facebook liable falls within the heartland meaning of "publisher," this case presents no occasion to define when other types of publishing activities might shade into creating or developing content.

---

**End of Document**  <span style="float:right">© 2025 Thomson Reuters. No claim to original U.S. Government Works.</span>

38 Media L. Rep. 1065, 49 Communications Reg. (P&F) 134

KeyCite Yellow Flag
Distinguished by   Henderson v. Source for Public Data, L.P.,   4th Cir.(Va.),
November 3, 2022

591 F.3d 250
United States Court of Appeals, Fourth Circuit.

NEMET CHEVROLET, LTD; Thomas Nemet,
d/b/a/ Nemet Motors, Plaintiffs–Appellants,

v.

CONSUMERAFFAIRS.COM,
INCORPORATED, Defendant–Appellee.

No. 08–2097
|
Argued: Sept. 23, 2009.
|
Decided Dec. 29, 2009.

**Synopsis**
**Background:** Group of franchised automotive dealers
brought action against owner of consumer review website,
alleging defamation, tortious interference with business
expectancy, and violations of Lanham Act. The United States
District Court for the Eastern District of Virginia, Gerald
Bruce Lee, District Judge, 564 F.Supp.2d. 544, granted
website owner's motion to dismiss or strike complaint.
Dealers appealed.

[Holding:] The Court of Appeals, Agee, Circuit Judge, held
that website was not information content provider, and thus
was entitled to immunity under Communications Decency
Act (CDA).

Affirmed.

Jones, Chief District Judge, concurred in part, dissented in
part, and filed opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss;
Motion to Dismiss for Failure to State a Claim.

West Headnotes (15)

[1]     **Federal Courts** 🔑 Dismissal or nonsuit in
general

Court of Appeals review of the district court's
ruling on a motion to dismiss is de novo.

31 Cases that cite this headnote

[2]     **Federal Courts** 🔑 Pleadings; Dismissal

In reviewing a ruling on a motion to dismiss, the
Court of Appeals draws all reasonable inferences
in favor of the plaintiff, but the Court of Appeals
need not accept legal conclusions drawn from the
facts, accept as true unwarranted inferences, or
accept unreasonable conclusions or arguments.

2173 Cases that cite this headnote

[3]     **Telecommunications** 🔑 Privilege or
immunity

Provisions of the Communications Decency
Act (CDA) bar state-law plaintiffs from
holding interactive computer service providers
legally responsible for information created and
developed by third parties. Communications
Decency Act of 1996, § 509(b)(2), (c)(1), (e)(3),
(f)(3), 47 U.S.C.A. § 230(b)(2), (c)(1), (e)(3), (f)
(3).

74 Cases that cite this headnote

[4]     **Telecommunications** 🔑 Privilege or
immunity

Under the Communications Decency Act
(CDA), providers of interactive computer
services are liable only for speech that is properly
attributable to them. Communications Decency
Act of 1996, § 509(b)(2), (c)(1), (e)(3), (f)(3), 47
U.S.C.A. § 230(b)(2), (c)(1), (e)(3), (f)(3).

50 Cases that cite this headnote

[5]     **Telecommunications** 🔑 Privilege or
immunity

Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250 (2009)

38 Media L. Rep. 1065, 49 Communications Reg. (P&F) 134

Under the Communications Decency Act (CDA), state-law plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online. Communications Decency Act of 1996, § 509(b)(2), (c)(1), (e)(3), (f)(3), 47 U.S.C.A. § 230(b)(2), (c)(1), (e)(3), (f)(3).

80 Cases that cite this headnote

[6]    **Telecommunications** 🔑 Privilege or immunity

Immunity under the Communications Decency Act (CDA), like other forms of immunity, is generally accorded effect at the first logical point in the litigation process. Communications Decency Act of 1996, § 509, 47 U.S.C.A. § 230.

6 Cases that cite this headnote

[7]    **Public Employment** 🔑 Actions

**Public Employment** 🔑 Trial, judgment, and relief

In the qualified immunity context, immunity is an immunity from suit, rather than a mere defense to liability, and it is effectively lost if a case is erroneously permitted to go to trial.

14 Cases that cite this headnote

[8]    **Federal Courts** 🔑 Effect of Changes in Law or Facts

Court of Appeals applies the law as it exists at the time of its decision.

[9]    **Federal Civil Procedure** 🔑 Insufficiency in general

Legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for purposes of evaluating a motion to dismiss for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

2366 Cases that cite this headnote

[10]    **Federal Civil Procedure** 🔑 Claim for relief in general

A complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.

2329 Cases that cite this headnote

[11]    **Federal Civil Procedure** 🔑 Claim for relief in general

Facial plausibility is established once the factual content of a complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged; in other words, the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims across the line from conceivable to plausible.

1293 Cases that cite this headnote

[12]    **Federal Civil Procedure** 🔑 Claim for relief in general

Satisfying the context-specific test of showing facial plausibility of the complaint does not require detailed factual allegations, but the complaint must plead sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct.

249 Cases that cite this headnote

[13]    **Telecommunications** 🔑 Privilege or immunity

Consumer review website was not information content provider, precluding liability in action of group of franchised automotive dealers for defamation, tortious interference with business expectancy, and violations of Lanham Act arising from customers' online postings regarding dealers; regardless of website owner's liability for design and structure of website, owner did not contribute to allegedly fraudulent nature of comments at issue. Communications Decency Act of 1996, § 509(f)(3), 47 U.S.C.A. §

230(f)(3); Lanham Trade–Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

9 Cases that cite this headnote

**[14]    Telecommunications** 👈 **Privilege or immunity**

Allegations that consumer review website contacted consumers to ask questions about their complaints and to help them draft or revise their complaints were bare and conclusory, and thus were insufficient to plead that website was information content provider not entitled to assert immunity under Communications Decency Act (CDA) in action of group of franchised automotive dealers for defamation, tortious interference with business expectancy, and violations of Lanham Act arising from customers' online postings regarding dealers. Communications Decency Act of 1996, § 509(b)(4), (f)(3); 47 U.S.C.A. § 230(b)(4), (f)(3); Lanham Trade–Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

3 Cases that cite this headnote

**[15]    Telecommunications** 👈 **Telecommunications services in general**

Allegation that consumer review website authored eight online postings, and thus was information content provider not entitled to assert immunity under Communications Decency Act (CDA), was bare and conclusory in action of group of franchised automotive dealers for defamation, tortious interference with business expectancy, and violations of Lanham Act arising from online postings regarding dealers; neither website operator's inability to find alleged authors in its records based on information in postings, nor dealers' excellent professional reputation, nor operator's source of income primarily from advertising, nor fact that some postings appeared online after listed creation date, logically led to inference that operator authored postings. Communications Decency Act of 1996, § 509(f)(3), 47 U.S.C.A. § 230(f)(3); Lanham Trade–Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*252**  ARGUED: Andrew Friedman, Patton Boggs, LLP, Washington, D.C., for Appellants. Jonathan David Frieden, Odin, Feldman & Pittleman, PC, Fairfax, Virginia, for Appellee. ON BRIEF: Benjamin G. Chew, John C. Hilton, Patton Boggs, LLP, Washington, DC, for Appellants. Stephen A. Cobb, Odin, Feldman & Pittleman, PC, Fairfax, Virginia, for Appellee.

Before KING and AGEE, Circuit Judges, and James P. JONES, Chief United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge AGEE wrote the majority opinion, in which Judge KING joined. Judge JONES wrote a separate opinion concurring in part and dissenting in part.

**OPINION**

AGEE, Circuit Judge:

Consumeraffairs.com, Incorporated ("Consumeraffairs.com") operates a website that allows consumers to comment on the quality of businesses, goods, and services. The present suit concerns various posts on this website relating to automobiles sold or serviced by Nemet Chevrolet, Ltd. ("Nemet"). Viewing certain of these postings as false and harmful to its reputation, Nemet brought suit against Consumeraffairs.com in the United States District Court for the Eastern District of Virginia for defamation and tortious interference with a business expectancy.[1] Consumeraffairs.com moved to dismiss these claims, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as barred by § 230 of the Communications Decency Act of 1996 ("CDA"), which precludes plaintiffs from holding interactive computer service providers liable for the publication of information created and developed by others.[2] **\*253**  See 47 U.S.C. § 230(c)(1), (e)(3), & (f)(3); Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir.1997).

Case 2:25-cv-13037-BRM-APP ECF No. 8-1, PageID.178 Filed 10/02/25 Page 38 of 73
Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250 (2009)
38 Media L. Rep. 1065, 49 Communications Reg. (P&F) 134

The district court granted the Rule 12(b)(6) motion, but gave Nemet permission to file an amended complaint. Upon filing of the amended complaint, Consumeraffairs.com again filed a Rule 12(b)(6) motion to dismiss based on § 230 of the CDA. The district court granted the motion to dismiss, stating that "the allegations contained in the Amended Complaint [d]o not sufficiently set forth a claim asserting that [Consumeraffairs.com] authored the content at issue. Furthermore, the allegations are insufficient to take this matter outside of the protection of the Communications Decency Act." Joint Appendix ("J.A.") at 303.

Nemet timely appealed the judgment of the district court and we have jurisdiction under 28 U.S.C. § 1291. For the reasons that follow, we affirm the judgment of the district court. [3]

## I.

Nemet's claims, as pled in its amended complaint, are based on twenty specific posts on the Consumeraffairs.com website. As to these twenty posts, Nemet argues its pleading was sufficient to withstand a Rule 12(b)(6) motion because the facts pled, viewed under the proper standard at this stage of the proceeding, show that Consumeraffairs.com was an "information content provider" under § 230(f)(3) of the CDA and, therefore, not entitled to CDA immunity. Further, Nemet contends that because its factual allegations are sufficient to negate the immunity bar claimed by Consumeraffairs.com, it should be entitled to discovery before any ruling on immunity would be appropriate as, for instance, under Rule 56 for summary judgment.

Before we discuss the specific language Nemet relies upon from its amended complaint, it is appropriate to briefly set forth the standard of review, the statutory and case-law parameters of immunity under the CDA, and the clarification of pleading standards recently addressed by the Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

## II.

[1] [2] Our review of the district court's ruling on a motion to dismiss is de novo. *See Novell, Inc. v. Microsoft Corp.,* 505 F.3d 302, 307 (4th Cir.2007). "Because the district court granted Defendants' motion to dismiss, our review is de novo. Like the district court, we must assume all [well-pled

facts] to be true." *Trulock v. Freeh,* 275 F.3d 391, 399 (4th Cir.2001) (quotations and emphasis omitted). We also, like the district court, draw all reasonable inferences in favor of the plaintiff. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir.1999). "[B]ut we need not accept the legal conclusions drawn from the facts, and we need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir.2008) (quotations omitted).

**\*254** III.

Recognizing that the Internet provided a valuable and increasingly utilized source of information for citizens, Congress carved out a sphere of immunity from state lawsuits for providers of interactive computer services to preserve the "vibrant and competitive free market" of ideas on the Internet. 47 U.S.C. § 230(b)(2); *see also Zeran,* 129 F.3d at 330. The CDA bars the institution of a "cause of action" or imposition of "liability" under "any State or local law that is inconsistent" with the terms of § 230. 47 U.S.C. § 230(e)(3). As relevant here, § 230 prohibits a "provider or user of an interactive computer service" from being held responsible "as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). Assuming a person meets the statutory definition of an "interactive computer service provider," the scope of § 230 immunity turns on whether that person's actions also make it an "information content provider." The CDA defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3).

[3] [4] [5] Taken together, these provisions bar state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties. *See Fair Hous. Council v. Roommates.com, LLC,* 521 F.3d 1157, 1162 (9th Cir.2008) (en banc). Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them. *See Universal Commc'n Sys., Inc. v. Lycos, Inc.,* 478 F.3d 413, 419 (1st Cir.2007). State-law plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online. *See Doe v. MySpace, Inc.,* 528 F.3d 413, 419 (5th Cir.2008); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v.*

*Craigslist, Inc.,* 519 F.3d 666, 672 (7th Cir.2008); *Zeran,* 129 F.3d at 330–31.

[6]  [7]  To further the policies underlying the CDA, courts have generally accorded § 230 immunity a broad scope. [4] *See Lycos,* 478 F.3d at 418; *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1123 (9th Cir.2003); *Zeran,* 129 F.3d at 331. This Circuit has recognized the "obvious chilling effect" the "specter of tort liability" would otherwise pose to interactive computer service providers given the "prolific" nature of speech on the Internet. *Zeran,* 129 F.3d at 331. Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process. As we have often explained in the qualified immunity context, "immunity is an *immunity from suit* rather than a mere defense to liability" and "it is effectively lost if a case is erroneously permitted to go to trial."  *255 *Brown v. Gilmore,* 278 F.3d 362, 366 n. 2 (4th Cir.2002) (quotations omitted) (emphasis in original). We thus aim to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from "ultimate liability," but also from "having to fight costly and protracted legal battles." *Roommates.com,* 521 F.3d at 1175.

Nemet does not dispute that Consumeraffairs.com is an interactive computer service provider under the CDA. What Nemet contends is that Consumeraffairs.com is also an information content provider as to the twenty posts and, therefore, cannot qualify for § 230 immunity. In other words, Nemet's argument is that its amended complaint pleads sufficient facts to show Consumeraffairs.com is an information content provider for purposes of denying statutory immunity to Consumeraffairs.com at this stage in the proceedings.

[8]  Our analysis of the sufficiency of Nemet's pleading is informed by the Supreme Court's recent decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). [5] Iqbal, a former high-interest detainee taken into custody after the attacks of September 11, 2001, brought a *Bivens* suit against several high-ranking executive branch officials, alleging infringements of his First and Fifth Amendment rights. *See Iqbal,* 129 S.Ct. at 1943–44. He pled, among other things, that the defendant executive branch officials adopted a policy of labeling Arab Muslim men as high-interest detainees and subjecting them to "harsh conditions of confinement" based solely on their "religion, race, and/or national origin." *Id.* at 1951.

Because these allegations were "conclusory" restatements of the "elements of a constitutional discrimination claim," the Supreme Court refused to accord them an assumption of truth for purposes of weighing a motion to dismiss under Rule 12(b)(6). *Id.* The Court also rejected the sufficiency of Iqbal's supporting factual allegations, including his claim that the federal government "detained thousands of Arab Muslim men." *Id.* Given the "more likely explanation[ ]" for these arrests, *i.e.,* the Government's legitimate investigation into the September 11th attacks, the Court concluded that Iqbal's factual allegations did "not plausibly establish" the "purposeful, invidious discrimination" he asked it to infer. *Id.* at 1951–52.

[9]  As noted above, in evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint. *See id.* at 1950–51; *Adcock v. Freightliner LLC,* 550 F.3d 369, 374 (4th Cir.2008). But we also conclude from the analysis in *Iqbal* that legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes. *See Iqbal,* 129 S.Ct. at 1949. We also decline to consider "unwarranted inferences, unreasonable conclusions, or arguments." *Wahi v. Charleston Area Med. Ctr., Inc.,* 562 F.3d 599, 615 n. 26 (4th Cir.2009); *see also Iqbal,* 129 S.Ct. at 1951–52.

[10]  [11]  Ultimately, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *256 *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Facial plausibility is established once the factual content of a complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims " ' across the line from conceivable to plausible.' " *Id.* at 1952 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

[12]  Satisfying this "context-specific" test does not require "detailed factual allegations." *Id.* at 1949–50 (quotations omitted). The complaint must, however, plead sufficient facts to allow a court, drawing on "judicial experience and common sense," to infer "more than the mere possibility of misconduct." *Id.* at 1950. Without such "heft," *id.* at 1947, the plaintiff's claims cannot establish a valid entitlement to

relief, as facts that are "merely consistent with a defendant's liability," *id.* at 1949, fail to nudge claims "across the line from conceivable to plausible." *Id.* at 1951 (quotations omitted).

We must determine, in a post-*Iqbal* context, whether the facts pled by Nemet, as to the application of CDA immunity, make its claim that Consumeraffairs.com is an information content provider merely possible or whether Nemet has nudged that claim "across the line from conceivable to plausible." *Id.* at 1951 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

IV.

Following the example set by the Supreme Court in *Iqbal* we begin our analysis by "identifying the allegations" of the amended complaint that are either extraneous or "not entitled to the assumption of truth." 129 S.Ct. at 1951. We then proceed to determine the plausibility of the factual allegations of Nemet's amended complaint pertaining to Consumeraffairs.com's responsibility for the creation or development of the comments at issue.

A. Facts Alleged Common to All Posts

In the amended complaint, Nemet recited the specific language from each customer about his or her automobile complaint for each of the twenty posts it claimed were defamatory. Then, Nemet pled as to each of the posts as follows:

> Upon information and belief, Defendant participated in the preparation of this complaint by soliciting the complaint, steering the complaint into a specific category designed to attract attention by consumer class action lawyers, contacting the consumer to ask questions about the complaint and to help her draft or revise her complaint, and promising the consumer that she could obtain some financial recovery by joining a class action lawsuit. Defendant is therefore responsible, in whole or in part, for developing the

substance and content of the false complaint ... about the Plaintiffs.

*See, e.g.,* J.A. at 62. Nemet argues the foregoing (the "Development Paragraph") pleads facts sufficient under § 230(f)(3) to show Consumeraffairs.com is "responsible, in whole or in part, for the creation or development" of the posts so as to be a non-immune information content provider. 47 U.S.C. § 230(f)(3). In short, Nemet argues the language in the Development Paragraph shows Consumeraffairs.com's culpability as an information content provider either through (1) the "structure and design of its website," or (2) its participation in "the preparation of" consumer complaints: *i.e.,* that Consumeraffairs.com "solicit[ed]" its customers' complaints, "steered" them into "specific categor[ies] designed to attract attention by consumer class action lawyers, contact[ed]" customers **\*257** to ask "questions about" their complaints and to "help" them "draft or revise" their complaints, and "promis[ed]" customers would "obtain some financial recovery by joining a class action lawsuit." *See, e.g.,* J.A. at 56, 62.

**[13]** We first examine the structure and design of the website argument, which encompasses all the facts pled in the Development Paragraph except for the claim Consumeraffairs.com asked questions and "help[ed] draft or revise her complaint." J.A. at 62. Nemet cites to the Ninth Circuit Court of Appeals' opinion in *Fair Housing Council v. Roommates.com, LLC,* 521 F.3d 1157, 1174 (9th Cir.2008) to support its structure and design of the website arguments. However, we do not find *Roommates.com* persuasive because it is fundamentally distinguishable and the facts pled here do not show Consumeraffairs.com developed the content of the posts by the structure and design of its website.

In *Roommates.com,* the Ninth Circuit considered whether the operator of a website created to match individuals with spare rooms with prospective renters was entitled to § 230 immunity. *See* 521 F.3d at 1161. The website operator, in that case, required users to disclose their sex, family status, and sexual orientation, as well as those of their desired roommate, using a list of pre-determined responses. *See id.* at 1164–65. Unless a prospective user furnished this information, he or she would be unable to utilize the website. Because the website operator had designed its website to develop unlawful content as a condition precedent of use, the Ninth Circuit held that the operator was an information content provider for the discriminatory postings created by third parties. *See id.* at

Case 2:25-cv-13037-BRM-APP   ECF No. 8-1, PageID.181   Filed 10/02/25   Page 41 of 73
**Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250 (2009)**
38 Media L. Rep. 1065, 49 Communications Reg. (P&F) 134

1166. As a result, the website operator was not entitled to § 230 immunity. *See id.*

Consumeraffairs.com's website differs materially from that at issue in *Roommates.com.* Whereas the website in *Roommates.com* required users to input illegal content as a necessary condition of use, Nemet has merely alleged that Consumeraffairs.com structured its website and its business operations to develop information related to class-action lawsuits. But there is nothing unlawful about developing this type of content; it is a legal undertaking: Federal Rule of Civil Procedure 23, for instance, specifically provides for class-action suits.

The Ninth Circuit did not hold that a website operator becomes an information content provider because the information posted on its website may be developed in a way unrelated to its initial posting, such as its potential to further a class-action lawsuit. *Roommates.com* merely adopted a definition of "development," for purposes of § 230(f)(3), that includes "materially contributing" to a given piece of information's "alleged unlawfulness." *Id.* at 1167–68; *see also* 47 U.S.C. § 230(f)(3).

The theory of liability adopted in *Roommates.com,* therefore, does not aid the sufficiency of Nemet's amended complaint. As the Ninth Circuit noted, a website operator who does not "encourage illegal content" or "design" its "website to require users to input illegal content" is "immune" under § 230 of the CDA. *Roommates.com,* 521 F.3d at 1175. Even accepting as true all of the facts Nemet pled as to Consumeraffairs.com's liability for the structure and design of its website, the amended complaint "does not show, or even intimate," that Consumeraffairs.com contributed to the allegedly fraudulent nature of the comments at issue. *Iqbal,* 129 S.Ct. at 1952. Thus, as to these claimed facts in the Development Paragraph, Nemet's pleading not only fails to show it is plausible that Consumeraffairs.com is **\*258** an information content provider, but not that it is even a likely possibility.

 **[14]**    We now turn to the remaining factual allegations, common to all twenty posts from the Development Paragraph, that Consumeraffairs.com is an information content provider because it contacted "the consumer to ask questions about the complaint and to help her draft or revise her complaint." *See, e.g.,* J.A. at 62. Nemet fails to make any cognizable argument as to how a website operator who contacts a potential user with questions thus "develops" or "creates" the website

content. Assuming it to be true that Consumeraffairs.com contacted the consumers to ask some unknown question, this bare allegation proves nothing as to Nemet's claim Consumeraffairs.com is an information content provider.

The remaining claim, of revising or redrafting the consumer complaint, fares no better. Nemet has not pled what Consumeraffairs.com ostensibly revised or redrafted or how such affected the post. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Nemet's claim of revising or redrafting is both threadbare and conclusory.

Moreover, in view of our decision in *Zeran,* Nemet was required to plead facts to show any alleged drafting or revision by Consumeraffairs.com was something more than a website operator performs as part of its traditional editorial function. *See* 129 F.3d at 330. It has failed to plead any such facts. "Congress enacted § 230's broad immunity 'to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material.' 47 U.S.C. § 230(b)(4). In line with this purpose, § 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions." *Id.* at 331.

We thus conclude that the Development Paragraph failed, as a matter of law, to state facts upon which it could be concluded that it was plausible that Consumeraffairs.com was an information content provider. Accordingly as to the Development Paragraph, the district court did not err in granting the Rule 12(b)(6) motion to dismiss because Nemet failed to plead facts sufficient to show Consumeraffairs.com was an information content provider and not covered by CDA immunity.

B. Fabrication of Eight Posts

 **[15]**    Even if the facts pled in the Development Paragraph are insufficient for Rule 12(b)(6) purposes, Nemet separately argues that as to eight of the twenty posts, the amended complaint pled other facts which show Consumeraffairs.com is an information content provider. Thus, Nemet argues the motion to dismiss should not have been granted as to these eight posts.

In the other twelve posts, Nemet agreed that it could identify from its business records the customer making the posted complaint and the vehicle at issue. However, as to the eight posts, Nemet pled as to each that "[b]ased upon the information provided in the post, [Nemet] could not determine which customer, if any, this post pertained to." *See, e.g.,* J.A. at 70. Nemet then pled the following (the "Fabrication Paragraph") as to each of the eight posts:

"Because Plaintiffs cannot confirm that the [customer] complaint ... was even created by a Nemet Motors Customer based on the date, model of car, and first name, Plaintiffs believe that the complaint ... was fabricated by the  **\*259**  Defendant for the purpose of attracting other consumer complaints. By authoring the complaint ... the Defendant was therefore responsible for the substance and content of the complaint." [6]

*See, e.g.,* J.A. at 68. Taking the Fabrication Paragraph as pled, it is important to note exactly what facts Nemet claims show Consumeraffairs.com was the actual author of the eight posts. Nemet's *sole* factual basis for the claim that Consumer affairs.com is the author, and thus an information content provider not entitled to CDA immunity, is that Nemet cannot find the customer in *its* records based on the information in the post.

Because Nemet was unable to identify the authors of these comments based on "the date, model of car, and first name" recorded online, Nemet alleges that these comments were "fabricated" by Consumeraffairs.com "for the purpose of attracting other consumer complaints." *Id.* But this is pure speculation and a conclusory allegation of an element of the immunity claim ("creation ... of information"). 47 U.S.C. § 230(f)(3). Nemet has not pled that Consumeraffairs.com created the allegedly defamatory eight posts based on any tangible fact, but *solely* because it (Nemet) can't find a similar name or vehicle of the time period in Nemet's business records. Of course, the post could be anonymous, falsified by the consumer, or simply missed by Nemet. There is nothing but Nemet's speculation which pleads Consumeraffairs.com's role as an actual author in the Fabrication Paragraph.

On appeal, Nemet argues that its supporting allegations nonetheless show the Fabrication Paragraph pleads adequate facts that Consumeraffairs.com is the author of the eight posts, but each is meritless. These allegations include (1) that Nemet has an excellent professional reputation, (2) none of the consumer complaints at issue have been reported to or

acted upon by the New York City Department of Consumer Affairs, (3) Consumeraffairs.com's sole source of income is advertising and this advertising is tied to its webpage content, and (4) some of the posts on Consumeraffairs.com's website appeared online after their listed creation date. Nemet's allegations in this regard do not allow us to draw any reasonable inferences that would aid the sufficiency of its amended complaint.

That Nemet may have an overall excellent professional reputation, earned in part from a paucity of complaints reported to New York City's Department of Consumer Affairs, does not allow us to reasonably infer that the particular instances of consumer dissatisfaction alleged on Consumeraffairs.com's website are false. Furthermore, Nemet's allegations in regard to the source of Consumeraffairs.com's revenue stream are irrelevant, as we have already established that Consumer affairs.com's development of class-action lawsuits does not render it an information content provider with respect to the allegedly defamatory content of the posts at issue. Finally, the fact that some of these comments appeared on Consumeraffairs.com's website after their listed creation date does not reasonably suggest that they were fabricated by Consumeraffairs.com. Any number  **\*260**  of reasons could cause such a delay, including Consumeraffairs.com's review for inappropriate content. *See Iqbal,* 129 S.Ct. at 1951.

We are thus left with bare assertions "devoid of further factual enhancement," which are not entitled to an assumption of truth. [7]  *Id.* at 1949. Such conclusory statements are insufficient as a matter of law to demonstrate Nemet's entitlement to relief. *See id.* As recently emphasized by the Supreme Court, Rule 8 requires "more than conclusions" to "unlock the doors of discovery for a plaintiff." *Id.* at 1950. Viewed in the correct "factual context," *id.* at 1954, Nemet's stark allegations are nothing more than a "formulaic recitation" of one of the elements of its claims. *Id.* at 1951. A plaintiff must offer more than "[t]hreadbare recitals of the elements of a cause of action" and "conclusory statements," however, to show its entitlement to relief. *Id.* at 1949.

Viewed in their best light, Nemet's well-pled allegations allow us to infer no more than "the mere possibility" that Consumeraffairs.com was responsible for the creation or development of the allegedly defamatory content at issue. *Id.* at 1950. Nemet has thus failed to nudge its claims that Consumeraffairs.com is an information content provider for any of the twenty posts across the line from the "conceivable

Case 2:25-cv-13037-BRM-APP ECF No. 8-1, PageID.183 Filed 10/02/25 Page 43 of 73

Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250 (2009)
38 Media L. Rep. 1065, 49 Communications Reg. (P&F) 134

to plausible." *Id.* at 1952. As a result, Consumeraffairs.com is entitled to § 230 immunity and the district court did not err by granting the motion to dismiss.

V.

For the above-stated reasons, we affirm the judgment of the district court.

*AFFIRMED*

JONES, Chief District Judge, concurring in part and dissenting in part:

I agree with my colleagues that as to the twelve posts that Nemet connected to real customers, the Amended Complaint fails to sufficiently plead a cause of action. The facts alleged do not show that as to these posts it is plausible that Consumeraffairs.com is an information content provider within the meaning of the Communications Decency Act.

However, as to the remaining eight posts involving fictitious customers, which Nemet claims the website itself fabricated in order to attract other consumer complaints, I disagree and must respectfully dissent.

The majority opinion correctly sets forth the relevant legal framework. The Communications Decency Act offers website providers a limited form of immunity from civil lawsuits. Specifically, the act provides that an "interactive computer service," or website host, may not be liable under state law for website content posted by a third party. 47 U.S.C.A. § 230(c), (e)(3) (West 2001); **\*261** *Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir.1997). A website host loses its immunity under § 230, however, if it is responsible, "in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C.A. § 230(f)(3) (West 2001).

In addition, as the majority opinion points out, the current federal pleading standards mean that in order to pass muster a claim must be " 'plausible on its face,' " which in turn requires that a complaint's facts create more than the "sheer possibility" of a defendant's liability. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

This means in the context of § 230 that in order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Nemet's complaint must contain sufficient factual allegations to allow for the plausible conclusion that Consumeraffairs.com was responsible, in whole or in part, for the creation of the Internet posts in question.

In disagreement with the majority, I believe that the allegations of the Amended Complaint adequately set forth a claim that Consumeraffairs.com was responsible for the eight posts from fictitious customers.

In the first place, we are required to accept as true, at least at this stage of the case, Nemet's allegation that these eight posts did not represent real customers. Nemet alleged that it documented each vehicle sale with forms that give the customer's full name, address, description of the vehicle sold, and the date of sale, as well as other information. Each of the eight posts described in the Amended Complaint gave the first name and hometown of the putative customer as well as the make and model of the vehicle sold by Nemet. All of the posts were dated and all but one set forth the alleged date of the sale. In spite of Nemet's careful documentation of each sale and comparison with the information provided in the posts, Nemet was unable to connect any of these posted complaints with a real transaction.

Moreover, these were not the sole pertinent factual allegations. Nemet also alleged the following in its Amended Complaint:

(1) The eight complaints at issue were never reported to the New York City Department of Consumer Affairs, which, according to Nemet, is responsible for policing consumer issues where Nemet does business, and which has recently pursued highly publicized consumer litigation against other car dealers. (Am.Compl.¶¶ 12–14, J.A. 49.);

(2) Consumeraffairs.com's website encourages consumers to complete complaint forms, but the website does not contain a place for positive reviews. (Am.Compl.¶ 28, J.A. 53.);

(3) The website "entices visitors with the possibility of participating in a class-action lawsuit, with the potential for a monetary recovery," by promising to have "class action attorneys" review all submitted complaints. (Am.Compl.¶ 29, J.A. 53.);

(4) Consumeraffairs.com earns revenue by selling ads tied to its webpage content, including the content posted by consumers. (Am.Compl.¶¶ 21, 22, J.A. 51.);

(5)Consumeraffairs.com wrote derogatory statements about Nemet on the website in connection with the alleged consumer complaints, such as the following:

> Here's what Nemet says about itself on its Web site: "The Nemet Auto Group is an automotive marketing organization **\*262** led by the Nemet family since 1916. For 86 years, the Nemet family has represented many of the world's largest and most prestigious automobile manufacturers selling well over half a million cars internationally."

> Sounds great, but some of Nemet's customers aren't so impressed, as the complaints in this section indicate. A selection of assorted recent complaints appears below, while categorized beefs are listed to the right.

> ....

> ... The Nemet complaints pretty well cover the territory— everything from *prices* engraved in sand to *advertising* that overlooks certain crucial elements. It's also interesting to see how Nemet responds when consumers take the trouble to drag them into *court*.

> ....

> ... [I]f a *dealer* advertisers a car at a certain price, it is obligated to honor that price unless it has clearly disclosed that the price applies only under certain conditions. Does Nemet know this?

(Am.Compl.¶¶ 33–35, J.A. 54–56.).

While *Twombly* and *Iqbal* announced a new, stricter pleading standard, they did not merge the pleading requirements of Rule 8 with the burden of proof required for summary judgment. In fact, the Court in *Twombly* stated that "[a]sking for plausible grounds to infer" a claim's existence "does not impose a probability requirement at the pleading stage." *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955. The

plausibility standard "simply calls for enough fact to raise a reasonable expectation that discovery" will lead to information supporting the plaintiff's claim. *Id.* Nemet's pleading accomplishes this. By stating sufficient factual assertions, Nemet has created the reasonable inference that Consumeraffairs.com wrote the eight posts to attract additional complaints.

It is true that there may be alternative explanations for these posts that show that they are not attributable to Consumeraffairs.com. Nemet may have simply overlooked eight actual customers in its review of the company sales documents. The fictitious posts may have come from mischief makers unrelated to Consumeraffairs.com, or from real consumers who wished to remain anonymous by falsifying the details of their transactions. But I don't believe that any of these alternatives are any more plausible than Nemet's claim.

It cannot be the rule that the existence of any other plausible explanation that points away from liability bars the claim. Otherwise, there would be few cases that could make it past the pleading stage. Indeed, as *Iqbal* teaches, it is only where there are "more likely explanations" for the result that the plausibility of the claim is justifiably suspect. *Iqbal,* 129 S.Ct. at 1951.

While the present federal pleading regime is a significant change from the past, it remains true that a plaintiff in federal court need not allege in its initial pleading all of the facts that will allow it to obtain relief. Otherwise, the summary judgment process under Rule 56 would have little meaning. Of course, I don't know whether Nemet could have ultimately prevailed on its claim that Consumeraffairs.com made up the eight posts in question, or even if it could have withstood a motion for summary judgment, but under the circumstances it ought to have been allowed to attempt to prove its case. For that reason, I respectfully dissent.

### All Citations

591 F.3d 250, 38 Media L. Rep. 1065, 49 Communications Reg. (P&F) 134

---

**Footnotes**

1   The district court exercised jurisdiction over Nemet's state-law claims pursuant to 28 U.S.C. §§ 1332 & 1367(a). In the district court, Nemet also pled several federal claims under the Lanham Act, which are not at issue in this appeal. *See* 15 U.S.C. § 1125.

2   An "interactive computer service" is defined in the CDA as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

3   Nemet does not challenge the dismissal of its original complaint. Consequently, we consider only Nemet's amended complaint in this appeal.

4   There is some disagreement as to whether the statutory bar under § 230 is an immunity or some less particular form of defense for an interactive computer service provider. The Seventh Circuit, for example, prefers to read " § 230(c)(1) as a definitional clause rather than as an immunity from liability." *Doe v. GTE Corp.,* 347 F.3d 655, 660 (7th Cir.2003); *see also Craigslist, Inc.,* 519 F.3d at 669. Of whatever academic interest that distinction may be, our Circuit clearly views the § 230 provision as an immunity: "By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Zeran,* 129 F.3d at 330.

5   Although the district court dismissed Nemet's amended complaint before the Supreme Court rendered its decision in *Iqbal,* we "apply the law as it exists at the time of our decision." *United States v. Carolina Transformer Co.,* 978 F.2d 832, 836 n. 3 (4th Cir.1992).

6   Although it appears odd, to say the least, that as to these eight posts Nemet pled in the Development Paragraph that Consumeraffairs.com steered the customer to make a false complaint by manipulation of the website and then contacting the consumer to revise and redraft the complaint, and *at the same time* also pleads in the Fabrication Paragraph that Consumeraffairs.com simply fabricated the entire post, we will assume Nemet is pleading in the alternative. Consumeraffairs.com raised no objection to the seemingly contradictory factual allegations and the district court considered none.

7   Nemet's amended complaint alleges that several comments Consumeraffairs.com overtly created and posted on its website also support its claims for defamation and tortious interference with a business expectancy. In these statements, Consumeraffairs.com provides commentary on the complaints posted on its website, noting that "some of Nemet's customers aren't so impressed" with Nemet's services and opining that these complaints "pretty well cover the territory" of things that "can go wrong when buying a car." J.A. at 55. Consumeraffairs.com also questioned whether Nemet knew that "if a dealer advertis[es] a car at a certain price, it is obligated to honor that price unless it has clearly disclosed that the price applies only under certain conditions." *Id.* at 56. Because Nemet failed to argue in its opening brief that these comments contributed to the sufficiency of its amended complaint, we will not consider them in this appeal. *See Cavallo v. Star Enter.,* 100 F.3d 1150, 1152 n. 2 (4th Cir.1996).

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

831 F.3d 352
United States Court of Appeals, Sixth Circuit.

Colin O'KROLEY, Plaintiff–Appellant,

v.

FASTCASE, INC.; Google, Inc.; Texas
Office of Court Administration; 11th Court of
Appeals; Yasni.com, Defendants–Appellees.

No. 15-6336
|
Decided and Filed: July 22, 2016

**Synopsis**

**Background:** Plaintiff brought action against Texas state courts, publisher of list of recently-decided cases, German internet search engine, and American internet search engine, alleging various claims related to "severe mental anguish" he purportedly suffered due to manner in which search results for his name were displayed, and seeking $19.2 trillion in damages. The United States District Court for the Middle District of Tennessee, Todd J. Campbell, J., 2013 WL 6148357, adopting report and recommendation of John S. Bryant, United States Magistrate Judge, 2013 WL 5935161, granted motion by courts, publisher, and German search engine, seeking to dismiss for lack of personal jurisdiction, and, 2014 WL 2881526, adopting report and recommendation of Bryant, United States Magistrate Judge, 2014 WL 2197029, granted American search engine's motion to dismiss for failure to state claim. Plaintiff appealed.

**Holdings:** The Court of Appeals, Sutton, Circuit Judge, held that:

[1] under Communications Decency Act, internet search engine could not be held liable for claims related to manner in which search results were displayed, and

[2] district court lacked personal jurisdiction over courts, publisher, and German search engine.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Lack of Personal Jurisdiction.

West Headnotes (6)

[1]  **Telecommunications** 🔑 Privilege or immunity

Under the Communications Decency Act, if a website displays content that is created entirely by third parties, it is immune from claims predicated on that content. Communications Act of 1934 §§ 230, 230, 47 U.S.C.A. §§ 230(c), 230(f)(3).

6 Cases that cite this headnote

[2]  **Telecommunications** 🔑 Privilege or immunity

Under Communications Decency Act, internet search engine could not be held liable for claims related to manner in which search results for plaintiff's name were displayed, even though search engine performed some automated editorial acts on content, such as removing spaces and altering font, and even though it kept search results up even after plaintiff complained, where search engine merely provided access to, and reproduced, allegedly defamatory text, and its editorial acts fell within publisher's traditional editorial functions and did not materially contribute to alleged unlawfulness of content. Communications Act of 1934 §§ 230, 230, 47 U.S.C.A. §§ 230(c), 230(f)(3); 47 U.S.C.A. § 230(f)(2).

7 Cases that cite this headnote

[3]  **Process** 🔑 Nature and necessity in general
**Process** 🔑 Time for service

District court lacked personal jurisdiction over publisher of recently-decided Texas court cases, in suit alleging various claims related to "severe mental anguish" plaintiff purportedly suffered due to manner in which internet search results for his name were displayed, where plaintiff did not properly serve publisher within 120 days after filing his complaint and he offered no "good cause" for his failure to do so. Fed. R. Civ. P. 4(m), 12(b)(2).

More cases on this issue

**[4]**  **Process**  🔑  Nature and necessity in general

**Process**  🔑  Personal service out of jurisdiction

District court lacked personal jurisdiction over German internet search engine, in suit alleging various claims related to "severe mental anguish" plaintiff purportedly suffered due to manner in which internet search results for his name were displayed, where search engine was foreign entity subject to special service requirements, and plaintiff made no showing that he satisfied those requirements. Fed. R. Civ. P. 4(f), (h)(2), 12(b)(2).

More cases on this issue

**[5]**  **Federal Courts**  🔑  Particular Nonresident Entities

District court lacked personal jurisdiction over Texas state courts, in suit alleging various claims related to "severe mental anguish" plaintiff purportedly suffered due to manner in which internet search results for his name were displayed, even though plaintiff properly served state courts, where he offered no basis for court to exercise personal jurisdiction over them. Fed. R. Civ. P. 4(m), 12(b)(2).

More cases on this issue

**[6]**  **Federal Civil Procedure**  🔑  Appointment of counsel

Plaintiff failed to show existence of "exceptional circumstances," precluding relief on his request for appointment of counsel in his suit against Texas state courts, publisher of list of recently-decided cases, German internet search engine, and American internet search engine, alleging various claims related to "severe mental anguish" he purportedly suffered due to manner in which internet search results for his name were displayed.

2 Cases that cite this headnote
More cases on this issue

**\*354**  Appeal from the United States District Court for the Middle District of Tennessee at Nashville. No. 3:13–cv–00780—Todd J. Campbell, District Judge.

**Attorneys and Law Firms**

COUNSEL ON BRIEF: Eric P. Schroeder, Jacquelyn N. Schell, Bryan Cave LLP, Atlanta, Georgia, Robb S. Harvey, Waller Lansden Dortch & Davis, LLP, Nashville, Tennessee, Brian M. Willen, Jason B. Mollick, Wilson Sonsini Goodrich & Rosati, P.C., New York, New York, for Appellee Google. Scot M. Graydon, Office of the Texas Attorney General, Austin, Texas, for Texas Court Appellees. Colin O'Kroley, Bon Aqua, Tennessee, pro se.

Before: SUTTON and COOK, Circuit Judges; HOOD, District Judge. *

## OPINION

SUTTON, Circuit Judge.

Colin O'Kroley googled himself and did not like the results. "Texas Advance Sheet," an entry read, followed by the words "indecency with a child in Trial Court Cause N ... Colin O'Kroley v Pringle." R. 1 at 4–5. Truth be told, O'Kroley was never involved in a case about indecency with a child. What had happened was that his case, *O'Kroley v. Pringle*, was listed immediately after another case, a child-indecency case, on the Texas Advance Sheet, a service that summarizes Texas judicial opinions. If users clicked the Google link they would have seen how the Texas Advance Sheet works and would have seen that the two cases had no relation. But if they did not click the link and stayed on Google, they would see only the name of his case and the description of the other case separated by an ellipsis.

Claiming "severe mental anguish" from the listing, O'Kroley sued Google (and a number of other entities) for $19,200,000,000,000 (that's trillion), on causes of action ranging from "libel" to "invasion of privacy," from "failure to provide due process" to "cruel and unusual punishment," from "cyber-bullying" to "psychological torture." R. 1 at 10, 17, 20–21, 24.

The district court rejected the claims as a matter of law, holding that Google couldn't be liable for the way it displayed

search results. It dismissed O'Kroley's complaint against Google based on the Communications Decency Act, which insulates interactive computer services from certain types of lawsuits. *See* 47 U.S.C. § 230. And it dismissed the rest of his complaint on a variety of other grounds.

The district court got it right in each respect.

*Google*. Seeking to encourage websites like Google to reproduce content from other Internet users, *see id.* § 230(a)–(b), Congress enacted the Communications Decency Act, which applies to "interactive computer service provider[s]" and which immunizes them from claims that seek to treat them as "publisher[s]" of third-party content. *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 409 (6th Cir. 2014); *see* 47 U.S.C. § 230(c). "No cause of action may be brought," the Act says, "and no liability may be imposed under any **\*355** State or local law," for any claim that purports to treat an "interactive computer service" "as the publisher or speaker of any information provided" by someone else. 47 U.S.C. § 230(c), (e)(3).

 **[1]** **[2]** That's what we have here. Google is an interactive computer service, an entity that provides "access by multiple users to a computer server." *Id.* § 230(f)(2); *cf. Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009). And all of O'Kroley's claims treat Google as the publisher or speaker of the allegedly defamatory content on its website, even though a separate "entity [was] responsible ... for the [content's] creation." 47 U.S.C. § 230(f)(3). Under the Act, Google thus cannot be held liable for these claims—for merely providing access to, and reproducing, the allegedly defamatory text. "If a website displays content that is created entirely by third parties, ... [it] is immune from claims predicated on that content." *Jones*, 755 F.3d at 408; *see Klayman v. Zuckerberg*, 753 F.3d 1354, 1357–59 (D.C. Cir. 2014).

O'Kroley insists that Google did more than merely display third-party content. The company was "responsible," he maintains, for the "creation or development" of the content, making it liable. 47 U.S.C. § 230(f)(3). Google, true enough, performed some automated editorial acts on the content, such as removing spaces and altering font, and it kept the search result up even after O'Kroley complained about it. But these acts come within "a publisher's traditional editorial functions"—"deciding whether to publish, withdraw, postpone or alter content"— and thus Google remains eligible for the statute's immunity. *Jones*, 755 F.3d at 416; *see Zeran v. Am. Online, Inc.*, 129

F.3d 327, 330 (4th Cir. 1997). "[T]he term 'develop,' " we have explained, does not "include the functions of an ordinary search engine." *Jones*, 755 F.3d at 409; *see Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1167 (9th Cir. 2008) (en banc).

Nor did Google's alterations "materially contribute to the alleged unlawfulness of the content." *Jones*, 755 F.3d at 412. O'Kroley points to the ellipsis that separated "indecency with a child" from his name and case information. Doesn't that mean, he asks, that Google is "responsible for what makes the displayed content allegedly unlawful"—linking him to a crime he didn't commit? *Jones*, 755 F.3d at 410. No, it does not. For Google did not add the ellipsis to the text. It was already in the Texas Advance Sheet's case preview. Because the Act immunizes Google for reproducing this third-party content, the district court correctly granted Google's motion to dismiss. *See* 47 U.S.C. § 230(c), (e).

 **[3]** **[4]** **[5]** *Other defendants*. The district court also correctly dismissed the other defendants: Fastcase, the author of the Texas Advance Sheet; Yasni, a German people search engine; and the Texas courts and their administrative office. For nearly three years (and counting), O'Kroley has not properly served Fastcase, despite being required to do so within 120 days after he filed his complaint. Fed. R. Civ. P. 4(m) (pre-2015 version). Because O'Kroley offered no "good cause" for his failure to comply with this rule, the district court permissibly dismissed Fastcase from the case. *Id.*; *see Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 521– 22 (6th Cir. 2006). The same goes for Yasni, a corporation in a foreign country subject to special service requirements, because O'Kroley failed to follow those requirements as well. Fed. R. Civ. P. 4(f), (h)(2). And although O'Kroley properly served the Texas courts, he offered no basis for the district court to exercise personal jurisdiction over **\*356** them, a gap that remains unfilled on appeal.

 **[6]** *Other arguments*. O'Kroley raises several other points on appeal, ranging from the meritless to the frivolous. On the meritless side: He "requests a court appointed attorney," Appellant's Br. 13, but he has not shown the "exceptional circumstances" needed to appoint one, *Lavado v. Keohane*, 992 F.2d 601, 606 (6th Cir. 1993). On the frivolous side: He asks us to strike down the Communications Decency Act ("as a simple matter of logic"); he claims violations of the Eighteenth Amendment (the former prohibition on alcohol repealed long before the Internet came into being); he asks us to add Georgetown University as a defendant (because

it might be using this case in its "Robots and Law" class); and he contends the judges below were "biased" against him (because "[t]hey may be ignorant about the English language"). Appellant's Br. 11–16. To restate some claims is to reject them.

* * *

In most respects, O'Kroley didn't accomplish much in suing Google and the other defendants. He didn't win. He didn't collect a dime. And the search result about "indecency with a child" remains publicly available. All is not lost, however. Since filing the case, Google users searching for "Colin O'Kroley" no longer see the objectionable search result at the top of the list. Now the top hits all involve this case (there is even a Wikipedia entry on it). So: Even assuming two premises of this lawsuit are true—that there are Internet users other than Colin O'Kroley searching "Colin O'Kroley" and that they look only at the Google previews rather than clicking on and exploring the links—it's not likely that anyone will ever see the offending listing at the root of this lawsuit. Each age has its own form of self-help.

For these reasons, we affirm.

**All Citations**

831 F.3d 352

---

## Footnotes

*     The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:25-cv-13037-BRM-APP ECF No. 8-1, PageID.190 Filed 10/02/25 Page 50 of 73

Richter v. Seterus, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 8200520
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Bjorn RICHTER and Lada Richter, Plaintiffs,
v.
SETERUS, INC. and Fannie Mae, Defendants.

Case No. 15-cv-12874
|
Signed 05/16/2016

**Attorneys and Law Firms**

Andrew J. Herold, Herold and Associates, PLC, West
Bloomfield, MI, David H. Applebaum, Richard D. Linnell,
Linnell & Associates, PLLC, Keego Harbor, MI, David A.
Applebaum, Minneapolis, MN, for Plaintiffs.

Ari M. Charlip, Dickinson Wright PLLC, Troy, MI, for
Defendants.

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS [6]
AND DENYING PLAINTIFFS' MOTION
TO AMEND THE COMPLAINT [9]**

JUDITH E. LEVY, United States District Judge

*1 This is a foreclosure case. Plaintiffs allege that defendants
violated the Real Estate Settlement and Procedures Act, 12
C.F.R. § 1024.1 et seq. ("RESPA"), and committed negligent
misrepresentation and negligent infliction of emotional
distress in violation of Michigan law when they failed to
properly process an alleged loan modification application and
provide updated reinstatement figures. Pending is defendants'
motion to dismiss (Dkt. 6) and plaintiffs' motion to amend
their complaint. (Dkt. 9.) For the reasons set forth below,
the Court will grant defendants' motion and deny plaintiffs'
motion.

**I. Factual Background**

Plaintiffs allege that on March 3, 2005, they entered into a
loan for the amount of $144,000 to purchase real property
located in Waterford, Michigan, and that the mortgage was
entered into with Mortgage Electronic Registration Systems,
Inc. as nominee for defendant Fannie Mae. (Dkt. 1-2 at 5.)

The loan was actually entered into on April 14, 2004. (Dkt.
6-2 at 3.) Plaintiffs executed a promissory note and granted a
mortgage against the property, which was properly recorded.
(Id.) At some point, plaintiffs became delinquent on their
mortgage payments.

Plaintiffs allege that in June or July of 2014, defendant
Seterus, Inc. ("Seterus") contacted them "orally about a loan
modification." (Dkt. 1-2 at 5.) Seterus "failed to respond in
any fashion other than orally stating that Plaintiff[s] do[ ]
not qualify for a loan modification." (Id.) The property was
foreclosed on by sheriff's sale on March 3, 2015. Plaintiffs
also allege that a week before the foreclosure, they contacted
Seterus to obtain reinstatement figures, and Seterus told
plaintiffs that it did not have updated reinstatement figures.
(Id. at 5-6.)

Plaintiffs filed suit in Michigan state court on July 10, 2015,
and defendants timely removed the complaint to this Court
on August 13, 2015. (Dkt. 1.) On September 21, 2015,
defendants filed a motion to dismiss the complaint. (Dkt. 6.)
On January 11, 2016, plaintiffs filed a motion to amend their
complaint. (Dkt. 9.) The motions are fully briefed, and on
review of the filings, the Court determines that oral argument
is not necessary pursuant to E.D. Mich. Local R. 7.1(f)(2).

**II. Legal Standard**

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)
(6), the Court must "construe the complaint in the light most
favorable to the plaintiff and accept all allegations as true."
Keys v. Humana, Inc., 684 F.3d 605, 608 (6th Cir. 2012).
"To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to state a claim to
relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S.
662, 678 (2009). A plausible claim need not contain "detailed
factual allegations," but it must contain more than "labels and
conclusions" or "a formulaic recitation of the elements of a
cause of action[.]" Bell Atl. Corp. v. Twombly, 550 U.S. 544,
555 (2007).

Under Fed. R. Civ. P. 12(d), if "matters outside the pleadings
are presented to and not excluded by the court, the motion
must be treated as one for summary judgment under Rule 56."
However, "documents that a defendant attaches to a motion
to dismiss are considered part of the pleadings if they are
referred to in the plaintiff's complaint and are central to her
claim." Werner v. Klais and Co., Inc., 108 F.3d 86, 89 (1997).

### III. Analysis

**\*2** Plaintiffs' amended complaint is virtually identical to their original complaint, save for the addition of a breach of contract claim. (Dkt. 9-1 at 4.) Accordingly, the Court will first address the motion to dismiss the original complaint, then the motion to amend as to the additional claim.

### A. Allegations Against Fannie Mae

The Court first notes that plaintiffs make no allegation that Fannie Mae has performed any actionable conduct, nor do they allege what specific role Seterus had with regard to the mortgage. Plaintiffs argue in response to the motion to dismiss that Seterus, in servicing the loan, was acting as a representative for Fannie Mae, and so all assertions of Seterus' wrongdoing apply equally to Fannie Mae. (Dkt. 10 at 8.)

Plaintiffs did not allege an agency theory of liability in their complaint. A response to a motion to dismiss is the improper forum for asserting a new claim. *Morris v. Iron Workers' Local No. 25 Pension Fund*, Case No. 2:09-CV-11007, 2010 WL 6428507, at \*7 (E.D. Mich. Dec. 7, 2010), *report and recommendation adopted*, 2011 WL 1303145 (E.D. Mich. Mar. 31, 2011). Plaintiffs cannot now remedy their failure to plead any cause of action against Fannie Mae, particularly when their amended complaint (filed prior to their response to the motion to dismiss) likewise fails to cure that pleading defect. [1]

Because plaintiffs failed to plead any cause of action against Fannie Mae, all claims against it are dismissed.

### B. RESPA

Plaintiffs first allege that Seterus violated Regulation X of RESPA by failing to complete their loan modification evaluation and failing to provide a written explanation of denial. Plaintiffs rely on 12 U.S.C. § 2605(e)(2), which requires that "[n]ot later than 30 days ... after the receipt from any borrower of any qualified written request under paragraph (1)" the servicer will perform certain tasks in relation with respect to a loan modification inquiry. Plaintiffs also cite § 2605(e)(3), which sets forth steps servicers must take to protect the credit rating of borrowers, but do not explain how that provision is relevant to this case.

RESPA requires a *qualified written request* from the borrower before the servicer is compelled to act. Plaintiffs clearly state that they were "contacted orally" regarding a modification, and fail to allege that they ever submitted a qualified written request for a loan modification. (Dkt. 1-2 at 5.) Accordingly, this claim must be dismissed.

### C. Negligent Misrepresentation

A claim of negligent misrepresentation under Michigan law requires proof that (1) the party justifiably relied to his detriment; (2) on information provided without reasonable care; and (3) by one who owed relying party duty of care. *Thielen v. GMAC Mortg. Corp.*, 671 F. Supp. 2d 947, 956 n.9 (E.D. Mich. 2009) (citing *Law Offices of Lawrence J. Stockler v. Rose*, 174 Mich. App. 14 (1989)). Negligent misrepresentation claims are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b) applied to fraud claims. *Thielen*, 671 F. Supp. 2d at 956. To satisfy Rule 9(b), plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 569-70 (6th Cir. 2008) (quoting *Gupta v. Terra Nitrogen Corp.*, 10 F.Supp.2d 879, 883 (N.D. Ohio 1998)). At a minimum, plaintiffs "must allege the time, place and contents of the misrepresentations upon which they relied." *Id.*

**\*3** Plaintiffs here allege that a week before their house was foreclosed on, Seterus told them that it did not have the updated reinstatement figures necessary for them to reinstate their mortgage. (Dkt. 1-2 at 6.) The two sentences plaintiffs dedicate to this claim do not state with specificity that Seterus acted without reasonable care, or that Seterus had a duty of care to provide plaintiffs those figures at that point in time.

It is also unclear whether plaintiffs are alleging that the information provided was false, in that Seterus actually had the figures, or that Seterus' failure to have the figures in hand was itself negligence. The failure to specifically plead what Seterus' duty of care was and how that duty was breached is also fatal to this claim. Accordingly, plaintiffs' negligent misrepresentation claim must be dismissed.

### D. Negligent Infliction of Emotional Distress

The elements of a claim for negligent infliction of emotional distress under Michigan law are:

> (1) serious injury threatened or inflicted on a person, not the plaintiff, of a nature to cause severe mental disturbance to the plaintiff, (2) shock by the plaintiff from witnessing the event that results in the plaintiff's actual physical harm, (3) close relationship between the plaintiff and the injured person (parent, child, husband, or wife), and (4) presence of the plaintiff at the location of the accident at the time the accident occurred or, if not presence, at least shock 'fairly contemporaneous' with the accident.

*Hesse v. Ashland Oil, Inc.*, 466 Mich. 21, 34 (2002).

This standard is clearly not met here. Plaintiffs allege none of the above elements in their complaint. In their response to the motion to dismiss, plaintiffs first recaption this claim as one for intentional infliction of emotional distress, then argue that this is a claim for emotional distress damages arising from a breach of contract. (Dkt. 10 at 11.)

As the Court has already noted, parties may not assert new claims in response to a motion to dismiss. Plaintiffs provide no reason the claim actually pleaded in their complaint is plausible. Accordingly, the negligent infliction of emotional distress claim is dismissed.

### E. Amended Complaint

Fed. R. Civ. P. 15(a)(2) permits a party to "amend its pleading only with the opposing party's written consent or the court's leave." Rule 15(a)(2) also states that "[t]he court should freely give leave when justice so requires." The Court may deny leave on the basis of "undue delay, bad faith or dilatory motive on the part of the movant [or for] undue prejudice to the opposite party, [or] futility of amendment." *Forman v. Davis*, 371 U.S. 178, 182 (1962). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion

to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).

Other than minor grammatical corrections, plaintiffs' amended complaint differs from its original complaint only in that it asserts a breach of contract claim. Plaintiffs allege that paragraph 19 of the mortgage gave them the right to reinstate the mortgage prior to the sale of the property. (Dkt. 9-1 at 4.) They state that "on several occasions [they] requested reinstatement figures from the Defendants, but were either told the figures were unavailable or otherwise ignored." (Id.) This, plaintiffs argue, "breached [defendants'] duty to provide said figures as per the terms of the mortgage, and therefore, Plaintiffs were prevented from reinstating the mortgage." (Id.)

**\*4** A breach of contract claim under Michigan law must establish three elements: 1) the existence of a contract; 2) breach of that contract; and 3) damages. *Hall v. State Farm Mut. Auto. Ins. Co.*, 215 Fed.Appx. 423, 428 (6th Cir. 2007). Defendants argue that this claim is futile for two reasons: first, the contract in question is between Fannie Mae and plaintiffs, and Seterus is the party accused of failing to provide reinstatement figures; second, the contract contains no duty for either defendant to provide those figures. Defendants also argue that the plain terms of the contract set forth requirements that plaintiffs must satisfy to reinstate their mortgage, but do not contain a requirement that defendants provide reinstatement figures on request.

In response, plaintiffs argue that a factual dispute exists as to whether plaintiffs satisfied the requirements of paragraph 19. However, that is irrelevant to the issue of whether *plaintiffs* have plausibly pleaded that *defendants* breached the contract.

Paragraph 19 of the mortgage states as follows:

> 19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or

(c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

(Dkt. 9-2 at 10.)

Paragraph 19 does not establish a contractual duty that either defendant immediately provide reinstatement figures on the request of a borrower. Instead, it states that a borrower will have the right of reinstatement after satisfying the requirements of paragraph 19.

Plaintiffs state in their amended complaint that they contacted Seterus "for several weeks before the property was foreclosed upon" and that "Seterus stated they did not have updated reinstatement figures[.]" (Dkt. 9-1 at 3.) They do not, however, state what portion of the mortgage agreement created a duty for Seterus to provide those figures. In fact, as defendants point out, Fannie Mae was the defendant that signed the instrument, not Seterus. Plaintiffs fail to connect the necessary dots to make this claim plausible: namely, establishing that a contractual duty existed for either defendant to provide updated reinstatement figures at the time plaintiffs asked for them, or that if the duty existed, it was Seterus' duty rather than Fannie Mae's.

**\*5** Accordingly, plaintiffs' amended complaint is futile, because their previously pleaded claims did not survive a motion to dismiss and their newly pleaded claims cannot survive a motion to dismiss.

### IV. Conclusion

For the reasons set forth above, it is hereby ordered that:

Defendants' motion to dismiss (Dkt. 6) is GRANTED;

Plaintiffs' motion to amend their complaint (Dkt. 9) is DENIED; and

This case is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2016 WL 8200520

---

**Footnotes**

1    For the purposes of these motions, the Court will read plaintiffs' complaint to allege that Seterus performed some role in the servicing of plaintiffs' mortgage.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:25-cv-13037-BRM-APP ECF No. 8-1, PageID.195 Filed 10/02/25 Page 55 of 73

Rosipko v. FCA US, LLC, Not Reported in Fed. Supp. (2015)

2015 WL 8007649
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Jackie ROSIPKO, Brian Hassett,
and Edward Lennon, Plaintiffs,

v.

FCA US, LLC and Schrader-Bridgeport
International, Inc., Defendants.

Case Number: 15-11030
|
Signed 12/07/2015

**Attorneys and Law Firms**

Frank A. Bartela, Nicole T. Fiorelli, Patrick J. Perotti, Erik L. Walter, Dworken and Bernstein Co., LPA, Painesville, OH, Thomas Robenalt, Robenalt Law Firm Inc., Rocky River, OH, for Plaintiffs.

Kathy A. Wisniewski, Thompson Coburn LLP, St. Louis, MO, Larry J. Saylor, Miller, Canfield, Phillip C. Korovesis, Butzel Long, Detroit, MI, for Defendants.

**ORDER GRANTING DEFENDANTS'
MOTIONS TO DISMISS [Dkt. Nos. 20 and 22]**

GERSHWIN A. DRAIN, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

**\*1** On March 19, 2015, Plaintiffs Brian Hassett and Edward Lennon filed a four-count action against Defendants FCA US, LLC ("FCA") and Schrader-Bridgeport International, Inc. ("Schrader"). On July 2, 2015, a First Amended Complaint was filed. Therein, a new plaintiff, Jackie Rosipko, was added and the following claims were alleged: (a) unjust enrichment (Count I); (b) violation of the Michigan Consumer Protection Act ("MCPA"), M.C.L. § 445.903 *et seq.* (Count II); (c) violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.* (Count III); and (d) breach of implied warranty of merchantability, M.C.L. § 440.2314 (Count IV). In the First Amended Complaint, only Rosipko asserts any claims against FCA. Plaintiffs title their First Amended Complaint as a class action complaint and propose to file their cause of action on behalf of themselves and as representatives of all others similarly situated.

Presently before the Court are two motions to dismiss, one filed by each Defendant on July 23, 2015. The motions are fully briefed, and a hearing was held on December 1, 2015. For the reasons that follow, the Court will grant both motions to dismiss.

## II. FACTUAL BACKGROUND

Plaintiffs' cause of action stems from Defendants' alleged practice of using defective tire pressure monitoring systems ("TPMSs") manufactured by Schrader in FCA vehicles. Each TPMS is located in a tire valve stem and monitors the air in the tire. Plaintiffs allege that each of the TPMSs used in FCA's vehicles was designed using an exposed metal valve stem system that corrodes, resulting in failure. When the system fails, including while vehicles are being used at highway speeds, rapid deflation of the tire allegedly presents the risk of a serious or fatal loss of control. According to Plaintiffs, other auto manufacturers switched to using rubber-coated TPMS stems in their vehicles during the class period to avoid this exact problem, but Defendants did not. Plaintiffs claim that Defendants knew or should have known that their aluminum stem TPMS was inferior, defective, and would foreseeably cause harm to their customers. Nonetheless, Plaintiffs allege, Defendants continued to use the defective TPMS design.

Rosipko is a resident of Montville, Ohio, and she purchased a used 2010 Chrysler Town & Country vehicle from a FCA dealership in Ohio. First Amended Complaint, ¶¶ 1, 46. In February 2015, while having the tires on the vehicle replaced at a third-party repair facility in Ohio, Rosipko was told by a mechanic at the repair facility that the left rear tire TPMS on her vehicle was corroded and needed to be replaced. *Id.* at 49. At the time, Rosipko's minivan was 5 years old and had been driven for 81,230 miles. *Id.* at Ex. A, B. Rosipko paid $80.98 for the repair. *Id.* Three days later, Rosipko noticed a slow leak in the right front tire on her vehicle, and she had the TPMS in that tire replaced at the same third-party repair facility at a cost of $76.51. *Id.*

Hassett is an Avon Lake, Ohio resident who purchased a 2009 Chrysler 300. It is unclear when or where he purchased the vehicle, but he does not allege it was in Michigan and Plaintiffs' counsel allegedly has acknowledged it was not purchased in Michigan. Hassett alleges that in September

Case 2:25-cv-13037-BRM-APP    ECF No. 8-1, PageID.196    Filed 10/02/25    Page 56 of 73

Rosipko v. FCA US, LLC, Not Reported in Fed. Supp. (2015)

2013, with 63,500 miles on the vehicle, one of his tires "blew out catastrophically while he was driving on the highway." *Id.* at ¶ 47 and Ex. C. While repairing that tire, a mechanic "discovered that another exposed metal valve stem in another of Hassett's tires had a TPMS sensor[ ] with severe corrosion, that was cracked and at risk of failure, such that it needed to be replaced." *Id.* at ¶ 64. Hassett does not allege that the blown out tire had a TPMS valve stem with "severe corrosion." The repair invoice from an Ohio mechanic notes that Hassett directed the mechanic to "Check all 4 tires, left rear has been losing air." *Id.* at Ex. C. The invoice shows Hassett purchased one new tire and two "TPMS sensors." *Id.* at ¶ 65, Ex. C. One year and 25,000 miles later, "another tire on Hassett's vehicle deflated while driving," and he visited the same mechanic to check leaking left front and left rear tires. *Id.* ¶ 66, Ex. D. Hassett alleges a "sudden loss of tire pressure occurred because of severe corrosion to the TPMS unit, which caused a crack in the sensor and leak in the tire," and he had to replace the unit. *Id.* at ¶¶ 67, 68.

**\*2**   Lennon is a Michigan resident, and he alleges that he "leased and then purchased a 2008 Jeep Commander, which includes the TPMS units challenged in the present action." *Id.* at ¶¶ 93, 75. On January 28, 2015, at least five years and 107,773 miles after the vehicle was manufactured, Lennon brought it to a mechanic. *Id.* at ¶ 77, Ex. E. Lennon told the mechanic that the passenger rear tire was "low" and the tire sensor lamp had been "on for several years." *Id.* at Ex. E. The mechanic noted "all tires low." *Id.*  Lennon alleges two sensors were corroded, rusted or fused and replaced all four. *Id.* at ¶¶ 78, 79. Lennon does not allege that the TPMS unit failed to monitor air pressure in the tires, but he claims he was "deprived of the value of his TPMS unit because of Defendants' inferior design and the defects in the product as described" and had he "known of this defect, it would have affected his decision at the time of his lease or purchase of the vehicle." *Id.* at ¶¶ 82, 89.

Plaintiffs seek "damages for the class based on the defect, including the cost of replacement or refund." First Amended Complaint, Preamble.

### III. LAW & ANALYSIS

#### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows the court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. *See* Fed. R. Civ. P.

12(b)(6). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the...claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 555).

The court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations and quotations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'– 'that the pleader is entitled to relief.' " *Id.* at 1950.

The district court generally reviews only the allegations set forth in the complaint in determining whether to grant a Rule 12(b)(6) motion to dismiss, however "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin College*, 259 F. 3d 493, 502 (6th Cir. 2001). Documents attached to a defendant's "motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Id.*

#### B. Withdrawn Claims – Counts I and IV

In their response brief, Plaintiffs state that they are contesting the motions to dismiss only to the extent such motions relate to Counts II and III of the First Amended Complaint,

*i.e.*, the claims for alleged violations of the MCPA and the MMWA. *See* Plf. Resp., Pg ID 184 n.1 ("Plaintiffs withdraw the remaining counts of their Complaint, Counts 1 and 4"– *i.e.*, the unjust enrichment and breach of implied warranty of merchantability claims). Accordingly, the Court dismisses Counts I and IV of the First Amended Complaint.

## C. Plaintiffs' MCPA Claim – Count II

**\*3** Defendants assert several reasons the Court should dismiss of Plaintiffs' MCPA claim. For the reasons set forth below, the Court finds that Plaintiffs' MCPA claim must be dismissed for failure to satisfy the heightened pleading requirements of Rule 9(b) that require a party to "state with particularity the circumstances constituting fraud." Accordingly, the Court will not address the other reasons Defendants assert the Court should dismiss Plaintiffs' MCPA claim.

To recover for fraud, a plaintiff must show that: (1) the defendant made a material representation; (2) it was false; (3) when the defendant made the statement, the defendant knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) the defendant made it with the intention that it should be acted upon by plaintiff; (5) plaintiff acted in reliance upon it; and (6) the plaintiff thereby suffered injury. *See, e.g., Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336 (1976); *Home Owners Ins. Co. v. ADT LLC*, 2015 WL 3763489, at \*5 (E.D. Mich. May 21, 2015). Furthermore, in order to meet the reliance element of a fraudulent or innocent misrepresentation claim, a plaintiff must prove that reliance on the misrepresentation was reasonable. *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675 (1999).

Like the Defendants, the Court finds that the First Amended Complaint is devoid of any averments regarding the first element of a fraud claim as to: (a) when or where any purported affirmative representations were made, (b) the precise content of what was represented, (c) who specifically made the representation(s), (d) the means by which such representation(s) were conveyed, or (e) when, where, or how Plaintiffs ever heard or saw any purported representation. Further, Plaintiffs fail to allege that either Defendant: (1) made any representation that was false, (2) had any knowledge when such alleged representation was made that it was false or made recklessly, or (3) made it with the intention that Plaintiffs should act upon it, such that (4) Plaintiffs actually and reasonably did rely upon such representation.

Plaintiffs do not challenge Defendants' Rule 9(b) arguments. Instead, Plaintiffs argue that their MCPA claim "need not meet the particularity requirements of Rule 9(b) because they have alleged that the violation of the MCPA at issue is based on the unconscionable and unfair conduct of the Defendants." Plf. Resp. at 7-8 (citing First Amended Complaint, ¶ 103(d)). In ¶ 103(d), Plaintiffs allege: "Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Class Vehicles, which did and tended to mislead Plaintiff and the putative class members about facts that could not be reasonably known by the consumer." (emphasis added). Plaintiffs contend that Defendants fail to acknowledge that courts in the Eastern District of Michigan have held that "[t]he MCPA is much broader than the common law tort of fraud, covering not only deceptive practices but also unfair and unconscionable conduct." Citing *Date v. Sony Elect., Inc.*, 2010 WL 3702599, at \*12 (E.D. Mich. Sept. 16, 2010); *Game On Ventures v. General RV Center, Inc.*, 587 F.Supp.2d 831, 839 (E.D. Mich. 2008). Thus, Plaintiffs suggest, they may bring a MCPA action based on the unfair or unconscionable conduct of Defendants, and they "need not necessarily allege the elements of fraud and certainly not plead a claim under the MCPA with the particularity required" by Rule 9(b). *Date*, 2010 WL 3702599, at \*13.

**\*4** Contrary to Plaintiffs' position, however, courts generally have held that "[t]he provisions of the MCPA are to be construed with reference to the common-law tort of fraud." *Kussy v. Home Depot U.S.A. Inc.*, 2006 WL 3447146, at \*5 (E.D. Mich. Nov. 28, 2006) (citing *Mayhall v. A.H. Pond Co., Inc.*, 129 Mich.App. 178 (1983)). *See also In re OnStar Contract Litig.*, 278 F.R.D. 352, 376 (E.D. Mich. 2011) (citations omitted)("The provisions of the MCPA are to be construed with reference to the common-law tort of fraud."); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp.2d 642, 666 (E.D. Mich. 2011) (requiring fraud standard for MCPA claims).

Significantly, the Court finds that Plaintiffs' MCPA claim is based on both affirmative misrepresentations and alleged omissions. [1] Moreover, as Schrader notes, even ¶ 103(d) of the First Amended Complaint (the one paragraph of the First Amended Complaint Plaintiff cited in its response and at oral argument) indicates that the "unconscionable commercial practices" committed by Defendants were their "fail[ures] to reveal material facts and information" about the vehicles. Such language, on its face, suggests fraudulent conduct.

The Court also finds that the language used by Plaintiffs in ¶ 103(d) of the First Amended Complaint tracks the language of M.C.L. § 445.903(1)(s), [2] a statute that courts have interpreted to be a fraud claim. *See, e.g., In re OnStar Contract Litig.*, 278 F.R.D. 352, 376-77 (E.D. Mich. 2011) (treating allegation that defendants violated M.C.L. § 445.903(1)(s) by "failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer" as a fraud claim requiring particularity); *Kerrigan v. ViSalus, Inc.*, 2015 WL 3679266, at *27 (E.D. Mich. June 12, 2015) ("In order to state a claim pursuant to § 445.903, Plaintiffs must 'state with particularity the circumstances constituting fraud or mistake,' consistent with Fed.R.Civ.P. 9(b)"); *Lipov v. Louisiana-Pacific Corp.*, 2013 WL 3805673, at **2-3 (W.D.Mich. 2013) (where the MCPA claim is based on allegations that a defendant "failed to reveal" certain information, it is a fraud-based claim for which the plaintiff "must state the circumstances with particularity"). *See also Home Owners*, 2015 WL 3763489, at *5 (dismissing MCPA claim for failure to meet Rule 9(b) heightened pleading requirements because the plaintiff alleged that the defendants "actively and (or) passively concealed" information but did not allege "the time, the place, or the person making the misrepresentation" or "the content of the misrepresentation").

**\*5** For the reasons stated above, the Court finds that Plaintiffs' MCPA claim based on failure to reveal defects related to the TPMS constitutes a fraud claim. *See, e.g., In re Onstar, Lipov, supra.* The Court further finds that Plaintiffs have not satisfied their burden of "stat[ing] with particularity the circumstances constituting fraud or mistake." *See, e.g., Kerrigan, Home Owners, supra.* Accordingly, the Court dismisses Plaintiffs' MCPA claim at Count II of the First Amended Complaint for failure to satisfy the heightened pleading requirement of Rule 9(b).

### D. Plaintiffs' MMWA Claim

Defendants argue that if Plaintiffs have "not pleaded a valid claim under the state law [they are] invoking, [they have] not pleaded a viable claim under the MMWA." *Demorato v. Carver Boat Corp.*, 304 F. App'x. 100, 104 (3d Cir. 2008) ("The District Court correctly held that Demorato/Delgado have no federal cause of action for breach of implied warranty under the [MMWA] because that Act provides a remedy only for breach of an implied warranty arising under state law"). *See also Garcia v. Chrysler Group LLC*, 2015 WL 5123134, at *9, 16 (S.D.N.Y. 2015) ("[t]o state a claim under

the MMWA, plaintiffs must adequately plead a cause of action for breach of written or implied warranty under state law"); *Minkler v. Apple, Inc.*, 65 F.3d 810, 817-20 (N.D.Cal. 2014) (dismissing state law warranty claim in class action based on failure to give required pre-suit notice and then dismissing MMWA claim because it "will stand or fall with her express and implied warranty claims under state law"); *HRL Land or Sea Yachts v. Travel Supreme, Inc.*, 2009 WL 427375, at *5 (W.D.Mich. 2009) ("[A]n MMWA claim for breach of an implied warranty depends on the plaintiff having a valid state law implied warranty claim"); *Zanger v. Gulf Stream Coach, Inc.*, 2006 WL 1494952, at *7 (E.D. Mich. May 25, 2006) ("Ultimately, the applicability of the [MMWA] is directly dependent upon a sustainable claim for breach of warranty. Thus, if there exists no actionable warranty claim, there can be no violation of the [MMWA]."). As one court stated:

> The plaintiffs' individual Magnuson–Moss claim is also defective, because they do not assert an underlying state-law warranty claim. "The Act does not provide an independent cause of action for state law claims, only additional damages for breaches of warranty under state law." *Fedrick v. Mercedes–Benz USA, LLC*, 366 F.Supp.2d 1190, 1200 n. 14 (N.D.Ga.2005) (citing *Walsh v. Ford Motor, Co.*, 807 F.2d 1000, 1016 (D.C.Cir.1986)); *see also Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir.2004) (noting that the Act "allows consumers to enforce written and implied warranties in federal court, borrowing state law causes of action"); 15 U.S.C. §§ 2301(7), 2310(d)(1) (allowing suit by consumers damaged by a violation of an "implied warranty" and defining "implied warranty" as one "arising under State law"). Thus, to recover under the Magnuson–Moss Act for the breach of an implied warranty, the plaintiffs must assert a state-law warranty claim. *Fedrick*, 366 F.Supp.2d at 1200 n. 14. The initial Complaint asserted an implied warranty claim under New Jersey law, (Docket No. 1 ¶¶ 179–89), which the court dismissed. The plaintiffs have not replaced that claim in their FAC.

*Bearden v. Honeywell Int'l, Inc.*, 720 F. Supp.2d 932, 937-38 (M.D. Tenn. 2010).

In this case, there are two reasons to find that Plaintiffs do not have, and have not asserted, a viable state law claim. The first is the simple fact that, as Plaintiffs have "withdrawn" their breach of implied warranty of merchantability claim pursuant to M.C.L. § 440.2314, Plaintiffs have not asserted <u>any</u> state-law warranty claim, to say nothing of a <u>viable</u> state-law warranty claim. Second, like the MMWA, Michigan law requires notice before bringing suit or the action is barred.

Rosipko v. FCA US, LLC, Not Reported in Fed. Supp. (2015)

See M.C.L. § 440.2607(3)(a); *Gorman v. Am. Honda Motor Co.*, 302 Mich. App. at 27 ("plaintiff provided defendants no notice at all … [and] [a]ccordingly, plaintiff is barred from any remedy."). As Plaintiffs admit that none of them provided any pre-suit notice, they would have no viable underlying state claim to support their MMWA claim even if they sought to reinstate their state law claim for breach of implied warranty.

**\*6** Accordingly, for the reasons set forth above, the Court concludes that Plaintiffs' individual MMWA claims are defective and Count III of the First Amended Complaint will be dismissed.

### E. Putative Class Action

As the Court has dismissed the MCPA and MMWA claims of the named Plaintiffs (as well as their withdrawn claims for unjust enrichment and breach of implied warranty of merchantability), Plaintiffs have asserted no viable claims upon which to base a class action. Therefore, Plaintiff's proposal to proceed with this matter as a class action is denied.

### IV. CONCLUSION

Accordingly, for the reasons articulated above, the Court hereby ORDERS that both the Motion to Dismiss filed by FCA [Dkt. No. 20] and the Motion to Dismiss filed by Schrader [Dkt. No. 22] are GRANTED. IT IS FURTHER ORDERED that Plaintiff's First Amended Complaint is DISMISSED and judgment will enter for Defendants.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2015 WL 8007649

---

### Footnotes

1    Specifically, Plaintiffs allege that Defendants represented that TPMSs "were safe for use," "the Class Vehicles had approval, characteristics, uses, and benefits that they do not have," "the Class Vehicles were of a particular standard, quality, or grade, when they were of another," and they "disseminated, marketed, and otherwise distributed uniform false and misleading advertisements." First Amended Complaint, at ¶¶ 55, 69, 80, 103. Likewise, Plaintiffs allege that Defendants "failed to reveal...that [TPMSs] could fail" and "failed to reveal facts concerning the TPMS defect." *Id.* at ¶¶ 56, 70, 81, 103.

2    M.C.L. § 445.903(1)(s) provides: "Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."

---

**End of Document**                                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:25-cv-13037-BRM-APP ECF No. 8-1, PageID.200 Filed 10/02/25 Page 60 of 73

State Farm Mutual Automobile Insurance Company v. Max..., Not Reported in Fed....

2019 WL 6481719
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, Plaintiff/Counter-Defendant,
v.
MAX REHAB PHYSICAL THERAPY
LLC, et al., Defendants/Counter-Plaintiffs.

Civil Case No. 18-13257
|
Signed 12/02/2019

**Attorneys and Law Firms**

David D. O'Brien, Miller, Canfield, Ann Arbor, MI, Matthew P. Allen, Thomas W. Cranmer, Miller, Canfield, Paddock and Stone, PLC, Troy, MI, Michael J. Powers, Ross O. Silverman, John W. Reale, Katten Muchin Rosenman LLP, Chicago, IL, for Plaintiff/Counter-Defendant.

Steven Haney, Haney Law Group, PLLC, Southfield, MI, for Defendants/Counter-Plaintiffs.

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF/COUNTER-DEFENDANT'S MOTION TO DISMISS COUNTERCLAIM COMPLAINT**

LINDA V. PARKER, U.S. DISTRICT JUDGE

**\*1** On October 17, 2018, State Farm Mutual Automobile Insurance Company ("State Farm") initiated this lawsuit against Defendants, two physical therapy clinics and two physical therapists who own and/or control the clinics. State Farm alleges that Defendants engaged in a scheme to defraud State Farm by submitting bills for fraudulent services to automobile accident victims eligible for personal injury protection benefits under State Farm insurance policies. (ECF No. 1.) Defendants filed a Counter-Complaint against State Farm asserting unlawful discrimination under 42 U.S.C. § 1981, violation of the Michigan Consumer Protection Act ("MCPA"), tortious interference with business relationship, and defamation. (ECF No. 21.) The matter is presently before the Court on State Farm's motion to dismiss Defendants' counterclaims (ECF No. 24), which has been fully briefed.

(ECF Nos. 25, 26.) Finding the legal arguments fully developed in the parties' submissions, the Court is dispensing with oral argument with respect to State Farm's motion pursuant to Eastern District of Michigan Local Rule 7.1(f).

**Standard of Review**

State Farm seeks dismissal of Defendants' counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action ...." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556. In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption is not applicable to legal conclusions, however. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

**\*2** Notably, *Iqbal* and *Twombly* abrogated the more liberal pleading "no set of facts" standard of *Conley v. Gibson*, 355 U.S. 41 (1957), which Defendants quote and rely upon in

Case 2:25-cv-13037-BRM-APP ECF No. 8-1, PageID.201 Filed 10/02/25 Page 61 of 73

State Farm Mutual Automobile Insurance Company v. Max..., Not Reported in Fed....

response to State Farm's motion to dismiss. *See Twombly*, 550 U.S. at 563 ("We could go on, but there is no need to pile up further citations to show that *Conley*'s 'no set of facts' language has been questioned, criticized, and explained away long enough."). As the *Twombly* Court observed, "Conley [ ] described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* At a minimum, a pleading "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Id.* at 562; *see also Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996).

In addition to the pleading requirements set forth above, Federal Rule of Civil Procedure 9(b) requires "a party [t]o state with particularity the circumstances constituting fraud or mistake." The pleading must "allege the time, place, and content of the alleged misrepresentation ... the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 515 (6th Cir. 2007) (quotation marks omitted). "Rule 9(b)'s 'particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.' " *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 771 (6th Cir. 2016) (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 (11th Cir. 2002), *cert. denied*, 549 U.S. 889 (2006)).

## Applicable Law and Analysis

### 42 U.S.C. § 1981

Section 1981 prohibits intentional racial discrimination in the making and enforcing of contracts. *McCormick v. Miami Univ.*, 693 F.3d 654, 659 (6th Cir. 2012) (citing *Runyon v. McCrary*, 427 U.S. 160, 168 (1976)). To successfully plead a § 1981 claim, the plaintiff must allege that (1) the plaintiff had a contractual right that the defendant impaired; and (2) racial discrimination drove the defendant's decision to interfere with the plaintiff's contractual right. *Williams v. Richland Cty. Children Servs.*, 489 Fed. Appx. 848, 851 (6th Cir. 2012) (citing *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)). To survive a motion to dismiss, Plaintiff must allege the statutory and factual basis for its claim. *Lindsay v. Yates*,

498 F.3d 434, 440 (6th Cir. 2007). Although a complaint does not have to present detailed factual allegations, there must be sufficient factual content to allow the court, armed with "judicial experience and common sense" to "draw the reasonable inference" that the defendant intentionally interfered with or impaired the plaintiff's contractual right on the basis of race. *Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678, 679).

As State Farm argues, Defendants fail to plead facts to support their assertion that State Farm's investigative decisions are based on race. In fact, Defendants expressly acknowledge in their Counter-Complaint that they currently lack a sufficient factual basis to support their claim of race discrimination. (*See* Counter-Compl. ¶¶ 3, 39, ECF No. 21 at Pg ID 313, 324) ("Through discovery it will be established ... that [State Farm] disproportionally investigates insurance claims filed by minorities ..."). Defendants do not even allege that State Farm was aware that the defendant clinics were owned or controlled by Arab Americans when it decided to investigate the insurance claims associated with the clinics.

**\*3** Moreover, a claim under § 1981 must be based on the impairment of a "contractual relationship ... under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). In their Counter-Complaint, Defendants do not identify such a contract. Nor do Defendants do so in response to State Farm's motion to dismiss.

For these reasons, the Court agrees with State Farm that Defendants fail to adequately plead their § 1981 counterclaim.

## Defamation

Defendants allege that State Farm committed defamation per se in violation of Michigan law. To adequately allege defamation under Michigan law, Defendants must set forth facts detailing (1) a false and defamatory statement concerning them, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of State Farm; and (4) either actionability per se or the existence of special harm. *Andrews v. Prudential Sec., Inc.*, 160 F.3d 304, 408 (6th Cir. 1998) (internal quotation marks and citations omitted). "Generally, 'words charging the commission of a crime are defamatory per se, and hence, injury to the reputation of the person defamed is presumed to the extent that the failure to prove damages is not a ground for dismissal.' " *Marks One Car Rental, Inc. v. Auto Club*

Case 2:25-cv-13037-BRM-APP ECF No. 8-1, PageID.202 Filed 10/02/25 Page 62 of 73

State Farm Mutual Automobile Insurance Company v. Max..., Not Reported in Fed....

*Grp. Ins. Co.*, 761 F. App'x 516, 522 (6th Cir. 2019) (quoting *Burden v. Elias Bros. Big Boy Rests.*, 613 N.W.2d 378, 381 (Mich. Ct. App. 2000)) (additional citations omitted); *see also* Mich. Comp. Laws § 600.2911. However, where the alleged defamatory statement relates to a corporation rather than a person, the Michigan courts require proof of actual damages, which can include matters "tend[ing] to prejudice [the plaintiff] in the conduct of its business" or " 'deter[ring] others from dealing with it.' " *Champion Labs., Inc. v. Parker-Hannifin Corp.*, 616 F. Supp. 2d 684, 698 (E.D. Mich. 2009) (quoting *Northland Wheels Roller Skating Ctr., Inc. v. Detroit Free Press, Inc.*, 539 N.W.2d 774, 780 (Mich. Ct. App. 1994)) (additional quotation marks and citation omitted); *see also* Mich. Comp. Laws § 600.2911(2)(a).

State Farm contends that, under Michigan law, "a plaintiff must be specific when alleging defamation" and the "pleading cannot rely on general and conclusory statements, but must instead specifically identify the statements alleged to be defamatory." (State Farm's Br. in Supp. of Mot. at 16, ECF No. 24 at Pg ID 375, citing *N. Point Advisors, Inc. v. Detroit Police & Fire Retirement Sys.*, No. 15-13471, 2017 WL 1077670, at *3 (E.D. Mich. Mar. 22, 2017) (citing *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 495 N.W.2d 392, 394 (Mich. Ct. App. 1992)).) These are pleading requirements under State law, however, which this Court does not believe apply here. *See Ridgway v. Ford Dealer Computer Servs., Inc.*, 114 F.3d 94, 98 n.5 (6th Cir. 1997) ("Of course, an argument that the federal district court should have followed Michigan's pleading requirements would have been meritless."); *see also Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (Stevens, J., concurring) (restating the "long recognized principle that federal courts sitting in diversity 'apply state substantive law and federal procedural law' ") (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). Further, defamation is not a claim subject to the particularity requirements of Rule 9(b). *See Wright v. Sodexho Marriott Servs.*, 30 F. App'x 566, 567 (6th Cir. 2002) (Evaluating the sufficiency of the plaintiff's defamation claim under Federal Rule of Civil Procedure 8(a), only).

**\*4** In their defamation claim, Defendants allege:

> 53. From October 2012 to the present, Plaintiff/Counter Defendant engaged in an audit of numerous therapy bills submitted by Defendant/Counter Plaintiff "Clinics," thereby concluding the submissions of such were evidence of insurance fraud and a criminal conspiracy between the named Defendant/Counter Plaintiff ...

> 54. Included in the State Farm Insurance Special Investigative Unit (SIU) investigation was the contacting of its policyholders, who were also patients of Defendant/Counter Plaintiff Clinics, for the purpose of informing them of their suspicions that Defendant/Counter Plaintiffs were engaged in insurance fraud ..."

> ...

> 58. In this case, Plaintiff/Counter Defendant State Farm Insurance, conducted Examinations Under Oath, and contacted its policyholders, who were also patients of the Defendant/Counter Plaintiff[s], making allegations that the Defendant/Counter Plaintiffs were engaged in fraudulent billing practices and engaged in a criminal conspiracy.

(Counter-Compl., ECF No. 21 at Pg ID 329-30.) Defendants' assertion that State Farm told Defendants' patients that Defendants were engaged in fraudulent billing practices and a criminal conspiracy are sufficient to state a claim of defamation per se under Michigan law. [1] State Farm also argues, however, that the claim is barred by the applicable statute of limitations.

The limitations period for a defamation claim is one year under Michigan law. Mich. Comp. Laws § 600.5805(9). "A defamation claim accrues when 'the wrong upon which the claim is based was done regardless of the time when damage results.' " *Mitan v. Campbell*, 706 N.W.2d 420, 422 (Mich. 2005) (quoting Mich. Comp. Laws § 600.5827). This means that the statute of limitations begins to run when the alleged defamatory statement is made, not when it is republished or causes harm to the plaintiff. *Id.*

While Defendants failed to respond to State Farm's statute-of-limitations arguments, a Rule 12(b)(6) motion to dismiss "is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Cataldo v. United States Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). This is because "[t]he statute of limitations is an affirmative defense, *see* Fed. R. Civ. P. 8(c), and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim, *see* Fed. R. Civ. P. 8(a)[.]" *Id.* But, a statute-of-limitations defense can be raised by motion to dismiss where the complaint affirmatively shows that the claim is time-barred. *Id.* (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)). Here, Defendants' Counter-Complaint does not affirmatively show that their defamation claim is time-barred.

Case 2:25-cv-13037-BRM-APP  ECF No. 8-1, PageID.203  Filed 10/02/25  Page 63 of 73

State Farm Mutual Automobile Insurance Company v. Max..., Not Reported in Fed....

In their Counter-Complaint, Defendants do not specify when State Farm allegedly told clinic patients that Defendants had engaged in criminal activity. (*See* Counter-Compl. ¶ 6, ECF No. 21 at Pg ID 314.) As such, it is impossible to decipher from the four corners of Defendants' pleading whether their defamation claim is barred by the applicable one-year limitations period. The Court, therefore, declines to dismiss the claim *at this time* on statute-of-limitations grounds.

**\*5**  In short, the Court denies State Farm's request to dismiss Defendants' defamation claim.

### Michigan Consumer Protection Act

Defendants allege that State Farm violated the Michigan Consumer Protection Act ("MCPA") by making false or misleading statements about Defendants to clinic patients. (Counter-Compl. ¶ 44, ECF No. 21 at Pg ID 326.) State Farm argues that this claim fails for the same reasons Defendants' defamation claim fails. Unlike Defendants' defamation claim, Rule 9(b)'s heightened pleading requirements apply to their MCPA claim. *See Home Owners Ins. Co. v. ADT LLC*, 109 F. Supp. 3d 1000, 1008 (E.D. Mich. 2015) (citing *In re Packaged Ice*, 779 F. Supp. 2d 642, 666 (E.D. Mich. 2011)).

The Counter-Complaint does not plead facts to satisfy these requirements. "The Sixth Circuit reads [Rule 9(b)] liberally ... requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993) (internal quotation marks and citation omitted). Defendants fail to state with specificity the fraudulent statements State Farm allegedly made to their patients. Defendants also do not identify the speaker(s) or where or when the statements were made. Lastly, Defendants do not set forth facts suggesting that anyone relied on the alleged false statements or that Defendants suffered any resulting damages.

The Court therefore is dismissing Defendants' MCPA claim.

### Tortious Interference with Business Relationship

Defendants allege that State Farm interfered with the relationship between Defendants and their patients by, inter alia, "[m]aking direct contact with several of the[ ] patients and asserting fraudulent and defamatory representations relative to [Defendants'] quality of work product, medical and professional competency and allegations that [Defendants] engage in fraudulent insurance schemes." (Counter-Compl. ¶ 49, ECF No. 21 at Pg ID 328.)

Under Michigan law, a plaintiff claiming tortious interference with a business relationship must allege and ultimately prove:

> "(i) the existence of a valid business relationship or expectancy; (ii) knowledge of the relationship or expectancy on the part of the defendant; (iii) intentional interference causing or inducing a termination of the relationship or expectancy; and (iv) resultant actual damage."

*Saab Auto. AB v. General Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014) (quoting *Lucas v. Monroe Cty.*, 203 F.3d 964, 979 (6th Cir. 2000)). Defendants' Counter-Complaint is devoid of facts suggesting that State Farm's alleged conduct caused or induced a termination of a valid business relationship. Nor do Defendants allege any resulting damage.

The Court is therefore also dismissing Defendants' tortious interference claim.

### Conclusion

For the reasons stated above, the Court holds that Defendants fail to allege sufficient facts to support their § 1981, Michigan Consumer Protection Act, and tortious interference with a business relationship claims. Defendants' defamation claim cannot be resolved on a motion to dismiss.

**\*6**  Accordingly,

**IT IS ORDERED** that State Farm's motion to dismiss Defendants' counterclaims is **GRANTED IN PART AND DENIED IN PART** in that counts one through three of the Counter-Complaint are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2019 WL 6481719

---

## Footnotes

1     On the other hand, Defendants' defamation claim fails to the extent that it is premised on statements State Farm made or makes in its audit(s) or this action. Those statements are not actionable for the reasons set forth in State Farm's briefs in support of its motion to dismiss.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Zeran v. America Online, Inc., 129 F.3d 327 (1997)

25 Media L. Rep. 2526, 10 Communications Reg. (P&F) 456

🚩 KeyCite Yellow Flag

Rejected by   Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.,   7th Cir.(Ill.),   March 14, 2008

129 F.3d 327

United States Court of Appeals, Fourth Circuit.

Kenneth M. ZERAN, Plaintiff–Appellant,

v.

AMERICA ONLINE,
INCORPORATED, Defendant–Appellee.

No. 97–1523
|
Argued Oct. 2, 1997.
|
Decided Nov. 12, 1997.

**Synopsis**

Negligence action was brought against commercial interactive computer service provider alleging that provider unreasonably delayed in removing defamatory messages posted by unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter. The United States District Court for the Eastern District of Virginia, T.S. Ellis, III, J., 958 F.Supp. 1124, granted provider's motion for judgment on pleadings. Plaintiff appealed. The Court of Appeals, Wilkinson, Chief Judge, held that: (1) Communications Decency Act (CDA) barred claims, and (2) CDA applies to any complaint instituted after its effective date, regardless of when relevant conduct giving rise to claims occurred.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Judgment on the Pleadings.

West Headnotes (9)

**[1]   Federal Courts** 🔑 Judgment or dismissal on the pleadings

On appeal of grant of motion for judgment on pleadings, Court of Appeals accepts facts alleged in complaint as true.

20 Cases that cite this headnote

**[2]   Libel and Slander** 🔑 By others in general

Communications Decency Act (CDA) immunized commercial interactive computer service provider from liability for defamatory information posted by third parties. Telecommunications Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

169 Cases that cite this headnote

**[3]   Telecommunications** 🔑 Privilege or immunity

Communications Decency Act (CDA) creates federal immunity to any cause of action that would make interactive computer service providers liable for information originating with third-party user of service. Telecommunications Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

212 Cases that cite this headnote

**[4]   Telecommunications** 🔑 Privilege or immunity

Communications Decency Act (CDA) bars lawsuits seeking to hold interactive computer service provider liable for its exercise of publisher's traditional editorial functions, such as deciding whether to publish, withdraw, postpone or alter content.

223 Cases that cite this headnote

**[5]   Telecommunications** 🔑 Purpose and construction in general

Communications Decency Act (CDA) was enacted, in part, to maintain robust nature of Internet communication and, accordingly, to keep government interference therein to minimum. Telecommunications Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

18 Cases that cite this headnote

**[6]   Telecommunications** 🔑 Purpose and construction in general

One important purpose of Communications Decency Act (CDA) was to encourage interactive computer service providers to self-regulate dissemination of offensive material over their services. Telecommunications Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

39 Cases that cite this headnote

[7]     **Libel and Slander**  🔑  **By others in general**

While publishers may be liable for defamatory statement in their works even if they lacked specific knowledge that such statement was included, distributors are free from liability for defamatory statements in materials they distribute unless, at minimum, they actually knew of defamatory statements upon which liability is based.

4 Cases that cite this headnote

[8]     **Libel and Slander**  🔑  **By others in general**

Interactive computer service provider was "publisher" under Communications Decency Act (CDA) with respect to claim that provider failed to promptly remove defamatory statements posted by third party when informed of those statements; thus, CDA precluded provider's liability on that claim. Telecommunications Act of 1996, § 509(c)(1), 47 U.S.C.A. § 230(c)(1).

119 Cases that cite this headnote

[9]     **Telecommunications**  🔑  **Retroactive or prospective operation**

Communications Decency Act (CDA) applies to any complaint instituted after its effective date, regardless of when relevant conduct giving rise to claims occurred. Telecommunications Act of 1996, § 509(d)(3), 47 U.S.C.A. § 230(d)(3).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*328**  ARGUED: John Saul Edwards, Law Offices of John S. Edwards, Roanoke, VA; Leo Kayser, III, Kayser & Redfern, New York City, for Appellant. Patrick Joseph Carome, Wilmer, Cutler & Pickering, Washington, DC, for Appellee. ON BRIEF: John Payton, Samir Jain, Wilmer, Cutler & Pickering, Washington, DC; Randall J. Boe, America Online, Inc., Dulles, VA, for Appellee.

Before WILKINSON, Chief Judge, RUSSELL, Circuit Judge, and BOYLE, Chief United States District Judge for the Eastern District of North Carolina, sitting by designation.

Affirmed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge RUSSELL and Chief Judge BOYLE joined.

**OPINION**

WILKINSON, Chief Judge:

Kenneth Zeran brought this action against America Online, Inc. ("AOL"), arguing that AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter. The district court granted judgment for AOL on the grounds that the Communications Decency Act of 1996 ("CDA")—47 U.S.C. § 230—bars Zeran's claims. Zeran appeals, arguing that § 230 leaves intact liability for interactive computer service providers who possess notice of defamatory material posted through their services. He also contends that § 230 does not apply here because his claims arise from AOL's alleged negligence prior to the CDA's enactment. Section 230, however, plainly immunizes computer service providers like AOL from liability for information that originates with third parties. Furthermore, Congress clearly expressed its intent that § 230 apply to lawsuits, like Zeran's, instituted after the CDA's enactment. Accordingly, we affirm the judgment of the district court.

I.

"The Internet is an international network of interconnected computers," currently used by approximately 40 million people worldwide. *Reno v. ACLU,* 521 U.S. 844, ——, 117

S.Ct. 2329, 2334, 138 L.Ed.2d 874 (1997). One of the many means by which individuals access the Internet is through an interactive computer service. These services offer not only a connection to the Internet as a whole, **\*329** but also allow their subscribers to access information communicated and stored only on each computer service's individual proprietary network. *Id.* AOL is just such an interactive computer service. Much of the information transmitted over its network originates with the company's millions of subscribers. They may transmit information privately via electronic mail, or they may communicate publicly by posting messages on AOL bulletin boards, where the messages may be read by any AOL subscriber.

 **[1]** The instant case comes before us on a motion for judgment on the pleadings, see Fed.R.Civ.P. 12(c), so we accept the facts alleged in the complaint as true. *Bruce v. Riddle,* 631 F.2d 272, 273 (4th Cir.1980). On April 25, 1995, an unidentified person posted a message on an AOL bulletin board advertising "Naughty Oklahoma T–Shirts." The posting described the sale of shirts featuring offensive and tasteless slogans related to the April 19, 1995, bombing of the Alfred P. Murrah Federal Building in Oklahoma City. Those interested in purchasing the shirts were instructed to call "Ken" at Zeran's home phone number in Seattle, Washington. As a result of this anonymously perpetrated prank, Zeran received a high volume of calls, comprised primarily of angry and derogatory messages, but also including death threats. Zeran could not change his phone number because he relied on its availability to the public in running his business out of his home. Later that day, Zeran called AOL and informed a company representative of his predicament. The employee assured Zeran that the posting would be removed from AOL's bulletin board but explained that as a matter of policy AOL would not post a retraction. The parties dispute the date that AOL removed this original posting from its bulletin board.

On April 26, the next day, an unknown person posted another message advertising additional shirts with new tasteless slogans related to the Oklahoma City bombing. Again, interested buyers were told to call Zeran's phone number, to ask for "Ken," and to "please call back if busy" due to high demand. The angry, threatening phone calls intensified. Over the next four days, an unidentified party continued to post messages on AOL's bulletin board, advertising additional items including bumper stickers and key chains with still more offensive slogans. During this time period, Zeran called AOL repeatedly and was told by company representatives

that the individual account from which the messages were posted would soon be closed. Zeran also reported his case to Seattle FBI agents. By April 30, Zeran was receiving an abusive phone call approximately every two minutes.

Meanwhile, an announcer for Oklahoma City radio station KRXO received a copy of the first AOL posting. On May 1, the announcer related the message's contents on the air, attributed them to "Ken" at Zeran's phone number, and urged the listening audience to call the number. After this radio broadcast, Zeran was inundated with death threats and other violent calls from Oklahoma City residents. Over the next few days, Zeran talked to both KRXO and AOL representatives. He also spoke to his local police, who subsequently surveilled his home to protect his safety. By May 14, after an Oklahoma City newspaper published a story exposing the shirt advertisements as a hoax and after KRXO made an on-air apology, the number of calls to Zeran's residence finally subsided to fifteen per day.

Zeran first filed suit on January 4, 1996, against radio station KRXO in the United States District Court for the Western District of Oklahoma. On April 23, 1996, he filed this separate suit against AOL in the same court. Zeran did not bring any action against the party who posted the offensive messages. [1] After Zeran's suit against AOL was transferred to the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a), AOL answered Zeran's complaint and interposed 47 U.S.C. § 230 as an affirmative defense. AOL then moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). **\*330** The district court granted AOL's motion, and Zeran filed this appeal.

## II.

### A.

 **[2]** Because § 230 was successfully advanced by AOL in the district court as a defense to Zeran's claims, we shall briefly examine its operation here. Zeran seeks to hold AOL liable for defamatory speech initiated by a third party. He argued to the district court that once he notified AOL of the unidentified third party's hoax, AOL had a duty to remove the defamatory posting promptly, to notify its subscribers of the message's false nature, and to effectively screen future defamatory material. Section 230 entered this litigation as an affirmative defense pled by AOL. The company claimed that

Congress immunized interactive computer service providers from claims based on information posted by a third party.

**[3] [4]** The relevant portion of § 230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).[2] By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred.

**[5]** The purpose of this statutory immunity is not difficult to discern. Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum. In specific statutory findings, Congress recognized the Internet and interactive computer services as offering "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." *Id.* § 230(a)(3). It also found that the Internet and interactive computer services "have flourished, to the benefit of all Americans, *with a minimum of government regulation.*" *Id.* § 230(a)(4) (emphasis added). Congress further stated that it is "the policy of the United States ... to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation.*" *Id.* § 230(b)(2) (emphasis added).

None of this means, of course, that the original culpable party who posts defamatory messages would escape accountability. While Congress acted to keep government regulation of the Internet to a minimum, it also found it to be the policy of the United States "to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." *Id.* § 230(b)(5). Congress made a policy choice, however, not to deter harmful online speech through the separate route of imposing

tort liability on companies that serve as intermediaries **\*331** for other parties' potentially injurious messages.

Congress' purpose in providing the § 230 immunity was thus evident. Interactive computer services have millions of users. *See Reno v. ACLU,* 521U.S. at ——, 117 S.Ct. at 2334 (noting that at time of district court trial, "commercial online services had almost 12 million individual subscribers"). The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

**[6]** Another important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services. In this respect, § 230 responded to a New York state court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.,* 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995). There, the plaintiffs sued Prodigy—an interactive computer service like AOL—for defamatory comments made by an unidentified party on one of Prodigy's bulletin boards. The court held Prodigy to the strict liability standard normally applied to original publishers of defamatory statements, rejecting Prodigy's claims that it should be held only to the lower "knowledge" standard usually reserved for distributors. The court reasoned that Prodigy acted more like an original publisher than a distributor both because it advertised its practice of controlling content on its service and because it actively screened and edited messages posted on its bulletin boards.

Congress enacted § 230 to remove the disincentives to selfregulation created by the *Stratton Oakmont* decision. Under that court's holding, computer service providers who regulated the dissemination of offensive material on their services risked subjecting themselves to liability, because such regulation cast the service provider in the role of a publisher. Fearing that the specter of liability would therefore deter service providers from blocking and screening offensive material, Congress enacted § 230's broad immunity "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents

to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(4). In line with this purpose, § 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions.

## B.

**[7]** **[8]** Zeran argues, however, that the § 230 immunity eliminates only publisher liability, leaving distributor liability intact. Publishers can be held liable for defamatory statements contained in their works even absent proof that they had specific knowledge of the statement's inclusion. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 113, at 810 (5th ed.1984). According to Zeran, interactive computer service providers like AOL are normally considered instead to be distributors, like traditional news vendors or book sellers. Distributors cannot be held liable for defamatory statements contained in the materials they distribute unless it is proven at a minimum that they have actual knowledge of the defamatory statements upon which liability is predicated. *Id.* at 811 (explaining that distributors are not liable "in the absence of proof that they knew or had reason to know of the existence of defamatory matter contained in matter published"). Zeran contends that he provided AOL with sufficient notice of the defamatory statements appearing on the company's bulletin board. This notice is significant, says Zeran, because AOL could be held liable as a distributor only if it acquired knowledge of the defamatory statements' existence.

Because of the difference between these two forms of liability, Zeran contends that the term "distributor" carries a legally distinct meaning from the term "publisher." **\*332** Accordingly, he asserts that Congress' use of only the term "publisher" in § 230 indicates a purpose to immunize service providers only from publisher liability. He argues that distributors are left unprotected by § 230 and, therefore, his suit should be permitted to proceed against AOL. We disagree. Assuming *arguendo* that Zeran has satisfied the requirements for imposition of distributor liability, this theory of liability is merely a subset, or a species, of publisher liability, and is therefore also foreclosed by § 230.

The terms "publisher" and "distributor" derive their legal significance from the context of defamation law. Although Zeran attempts to artfully plead his claims as ones of negligence, they are indistinguishable from a garden variety defamation action. Because the publication of a statement is a necessary element in a defamation action, only one who publishes can be subject to this form of tort liability. Restatement (Second) of Torts § 558(b) (1977); Keeton et al., *supra,* § 113, at 802. Publication does not only describe the choice by an author to include certain information. In addition, both the negligent communication of a defamatory statement and the failure to remove such a statement when first communicated by another party—each alleged by Zeran here under a negligence label—constitute publication. Restatement (Second) of Torts § 577; *see also Tacket v. General Motors Corp.,* 836 F.2d 1042, 1046–47 (7th Cir.1987). In fact, every repetition of a defamatory statement is considered a publication. Keeton et al., *supra,* § 113, at 799.

In this case, AOL is legally considered to be a publisher. "[E]very one who takes part in the publication ... is charged with publication." *Id.* Even distributors are considered to be publishers for purposes of defamation law:

> Those who are in the business of making their facilities available to disseminate the writings composed, the speeches made, and the information gathered by others may also be regarded as participating to such an extent in making the books, newspapers, magazines, and information available to others as to be regarded as publishers. They are intentionally making the contents available to others, sometimes without knowing all of the contents—including the defamatory content—and sometimes without any opportunity to ascertain, in advance, that any defamatory matter was to be included in the matter published.

*Id.* at 803. AOL falls squarely within this traditional definition of a publisher and, therefore, is clearly protected by § 230's immunity.

Zeran contends that decisions like *Stratton Oakmont* and *Cubby, Inc. v. CompuServe Inc.,* 776 F.Supp. 135 (S.D.N.Y.1991), recognize a legal distinction between publishers and distributors. He misapprehends, however,

the significance of that distinction for the legal issue we consider here. It is undoubtedly true that mere conduits, or distributors, are subject to a different standard of liability. As explained above, distributors must at a minimum have knowledge of the existence of a defamatory statement as a prerequisite to liability. But this distinction signifies only that different standards of liability may be applied *within* the larger publisher category, depending on the specific type of publisher concerned. *See* Keeton et al., *supra*, § 113, at 799–800 (explaining that every party involved is charged with publication, although degrees of legal responsibility differ). To the extent that decisions like *Stratton* and *Cubby* utilize the terms "publisher" and "distributor" separately, the decisions correctly describe two different standards of liability. *Stratton* and *Cubby* do not, however, suggest that distributors are not also a type of publisher for purposes of defamation law.

Zeran simply attaches too much importance to the presence of the distinct notice element in distributor liability. The simple fact of notice surely cannot transform one from an original publisher to a distributor in the eyes of the law. To the contrary, once a computer service provider receives notice of a potentially defamatory posting, it is thrust into the role of a traditional publisher. The computer service provider must decide whether to publish, edit, or withdraw the posting. In this respect, Zeran seeks to impose liability on AOL for assuming the **\*333** role for which § 230 specifically proscribes liability—the publisher role.

Our view that Zeran's complaint treats AOL as a publisher is reinforced because AOL is cast in the same position as the party who originally posted the offensive messages. According to Zeran's logic, AOL is legally at fault because it communicated to third parties an allegedly defamatory statement. This is precisely the theory under which the original poster of the offensive messages would be found liable. If the original party is considered a publisher of the offensive messages, Zeran certainly cannot attach liability to AOL under the same theory without conceding that AOL too must be treated as a publisher of the statements.

Zeran next contends that interpreting § 230 to impose liability on service providers with knowledge of defamatory content on their services is consistent with the statutory purposes outlined in Part IIA. Zeran fails, however, to understand the practical implications of notice liability in the interactive computer service context. Liability upon notice would defeat the dual purposes advanced by § 230 of the CDA. Like the strict liability imposed by the *Stratton Oakmont* court,

liability upon notice reinforces service providers' incentives to restrict speech and abstain from self-regulation.

If computer service providers were subject to distributor liability, they would face potential liability each time they receive notice of a potentially defamatory statement—from any party, concerning any message. Each notification would require a careful yet rapid investigation of the circumstances surrounding the posted information, a legal judgment concerning the information's defamatory character, and an on-the-spot editorial decision whether to risk liability by allowing the continued publication of that information. Although this might be feasible for the traditional print publisher, the sheer number of postings on interactive computer services would create an impossible burden in the Internet context. *Cf. Auvil v. CBS 60 Minutes, 800 F.Supp. 928, 931 (E.D.Wash.1992)* (recognizing that it is unrealistic for network affiliates to "monitor incoming transmissions and exercise on-the-spot discretionary calls"). Because service providers would be subject to liability only for the publication of information, and not for its removal, they would have a natural incentive simply to remove messages upon notification, whether the contents were defamatory or not. *See Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986)* (recognizing that fears of unjustified liability produce a chilling effect antithetical to First Amendment's protection of speech). Thus, like strict liability, liability upon notice has a chilling effect on the freedom of Internet speech.

Similarly, notice-based liability would deter service providers from regulating the dissemination of offensive material over their own services. Any efforts by a service provider to investigate and screen material posted on its service would only lead to notice of potentially defamatory material more frequently and thereby create a stronger basis for liability. Instead of subjecting themselves to further possible lawsuits, service providers would likely eschew any attempts at self-regulation.

More generally, notice-based liability for interactive computer service providers would provide third parties with a no-cost means to create the basis for future lawsuits. Whenever one was displeased with the speech of another party conducted over an interactive computer service, the offended party could simply "notify" the relevant service provider, claiming the information to be legally defamatory. In light of the vast amount of speech communicated through interactive computer services, these notices could produce an

impossible burden for service providers, who would be faced with ceaseless choices of suppressing controversial speech or sustaining prohibitive liability. Because the probable effects of distributor liability on the vigor of Internet speech and on service provider self-regulation are directly contrary to § 230's statutory purposes, we will not assume that Congress intended to leave liability upon notice intact.

Zeran finally contends that the interpretive canon favoring retention of common law principles unless Congress speaks directly to the issue counsels a restrictive reading of the **\*334** § 230 immunity here. *See United States v. Texas,* 507 U.S. 529, 534, 113 S.Ct. 1631, 1634–35, 123 L.Ed.2d 245 (1993). This interpretive canon does not persuade us to reach a different result. Here, Congress has indeed spoken directly to the issue by employing the legally significant term "publisher," which has traditionally encompassed distributors and original publishers alike.

The decision cited by Zeran, *United States v. Texas,* also recognized that abrogation of common law principles is appropriate when a contrary statutory purpose is evident. *Id.* This is consistent with the Court's earlier cautions against courts' application of the canon with excessive zeal: " 'The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure.' " *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952) (quoting *Jamison v. Encarnacion,* 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082 (1930)); *cf. Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 110–11, 111 S.Ct. 2166, 2170–71, 115 L.Ed.2d 96 (1991) (statute need not expressly delimit manner in which common law principle is abrogated). Zeran's argument flies in the face of this warning. As explained above, interpreting § 230 to leave distributor liability in effect would defeat the two primary purposes of the statute and would certainly "lessen the scope plainly intended" by Congress' use of the term "publisher."

Section 230 represents the approach of Congress to a problem of national and international dimension. The Supreme Court underscored this point in *Reno v. ACLU,* finding that the Internet allows "tens of millions of people to communicate with one another and to access vast amounts of information from around the world.[It] is 'a unique and wholly new medium of worldwide human communication.' " 521 U.S. at ——, 117 S.Ct. at 2334 (citation omitted). Application of

the canon invoked by Zeran here would significantly lessen Congress' power, derived from the Commerce Clause, to act in a field whose international character is apparent. While Congress allowed for the enforcement of "any State law that is consistent with [§ 230]," 47 U.S.C. § 230(d)(3), it is equally plain that Congress' desire to promote unfettered speech on the Internet must supersede conflicting common law causes of action. Section 230(d)(3) continues: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." With respect to federal-state preemption, the Court has advised: "[W]hen Congress has 'unmistakably ... ordained,' that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. The result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (citations omitted). Here, Congress' command is explicitly stated. Its exercise of its commerce power is clear and counteracts the caution counseled by the interpretive canon favoring retention of common law principles.

III.

**[9]** The CDA was signed into law and became effective on February 8, 1996. Zeran did not file his complaint until April 23, 1996. Zeran contends that even if § 230 does bar the type of claim he brings here, it cannot be applied retroactively to bar an action arising from AOL's alleged misconduct prior to the CDA's enactment. We disagree. Section 230 applies by its plain terms to complaints brought after the CDA became effective. As noted in Part IIB, the statute provides, in part: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(d)(3).

Initially, it is doubtful that a retroactivity issue is even presented here. Retroactivity concerns arise when a statute applies to conduct predating its enactment. Section 230 does not directly regulate the activities of interactive computer service providers like AOL. Instead, § 230 is addressed only to the bringing of a cause of action. Here, Zeran **\*335** did not file his complaint until over two months after § 230's immunity became effective. Thus, the statute's application in this litigation is in fact prospective. *See St. Louis v. Texas Worker's Compensation Comm'n,* 65 F.3d 43, 46 (5th Cir.1995) (holding "issue is not technically

one of retroactivity" when statute applies to "filing of the complaint"), *cert. denied,* 518 U.S. 1024, 116 S.Ct. 2563, 135 L.Ed.2d 1080 (1996); *Vernon v. Cassadaga Valley Central Sch. Dist.,* 49 F.3d 886, 889 (2d Cir.1995) (same).

Even if this were a case implicating the application of a federal statute to pre-enactment events, the Supreme Court's *Landgraf* framework would nevertheless require § 230's application to Zeran's claims. *Landgraf* instructs us first "to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994). This case can be resolved at this first step. In § 230(d)(3), Congress clearly expressed its intent that the statute apply to any complaint instituted after its effective date, regardless of when the relevant conduct giving rise to the claims occurred. Other circuits have interpreted similar statutory language to clearly express Congress' intent that the relevant statutes apply to bar new actions under statutorily specified conditions. *See Wright v. Morris,* 111 F.3d 414, 418 (6th Cir.1997) (holding language "No action shall be brought ...," 42 U.S.C. § 1997e(a), to "expressly govern[ ] the bringing of new actions"), *cert. denied,* 522 U.S. 906, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997); *Abdul–Wadood v. Nathan,* 91 F.3d 1023, 1025 (7th Cir.1996) (holding language "In no event shall a prisoner bring a civil action or appeal a judgment ...," 28 U.S.C. § 1915(g), to govern the bringing of new actions or filing of new appeals).

If we were to find a directive as plain as § 230(d)(3) to be ambiguous as to Congress' intent, we would be announcing a new superclear-statement condition for the retroactive operation of statutes. Such a jurisprudential shift would be both unwise and contrary to the Court's admonitions in *Landgraf:* "Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to

emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary." 511 U.S. at 267–68, 114 S.Ct. at 1498. Here, Congress decided that free speech on the Internet and self-regulation of offensive speech were so important that § 230 should be given immediate, comprehensive effect.

There finally is a significant contrast between statutes that impose new liabilities for already-completed conduct and statutes that govern litigants' access to courts. For example, courts often apply intervening statutes that restrict a court's jurisdiction. *See Landgraf,* 511 U.S. at 274, 114 S.Ct. at 1501–02. Section 230 neither imposes any new liability on Zeran nor takes away any rights acquired under prior law. No person has a vested right in a nonfinal tort judgment, much less an unfiled tort claim. *Hammond v. United States,* 786 F.2d 8, 12 (1st Cir.1986). Furthermore, Zeran cannot point to any action he took in reliance on the law prior to § 230's enactment. Because § 230 has no untoward retroactive effect, even the presumption against statutory retroactivity absent an express directive from Congress is of no help to Zeran here.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED.*

**All Citations**

129 F.3d 327, 25 Media L. Rep. 2526, 10 Communications Reg. (P&F) 456

---

## Footnotes

1    Zeran maintains that AOL made it impossible to identify the original party by failing to maintain adequate records of its users. The issue of AOL's record keeping practices, however, is not presented by this appeal.

2    Section 230 defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(e)(2). The term "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development

of information provided through the Internet or any other interactive computer service." *Id.* § 230(e)(3). The parties do not dispute that AOL falls within the CDA's "interactive computer service" definition and that the unidentified third party who posted the offensive messages here fits the definition of an "information content provider."

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.