**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ANTONIO LAVON MANNING,

                  Plaintiff,

v.

TEA DATING ADVICE, INC. d/b/a
TEA, JOHN/JANE DOES 1-20,
individuals,

Case Number: **25-cv-13037**

Honorable Brandy R. McMillion
Magistrate Judge Anthony P. Patti

**PLAINTIFF'S OPPOSITION TO**
**MOTION TO DISMISS**

---

**PLAINTIFFS OPPOSITION TO MOTION TO DISMISS**
**(Filed with Motion for Leave to Exceed Page Limit)**

# TABLE OF CONTENTS

I. **Introduction** ................................................ 5

II. **Statement of Facts** .................................... 6
A. Tea's Specific Promises in Its Terms of Service ..................... 6
B. The Defamatory Posts Violate Tea's Own Policies .................. 8
C. Plaintiff's Repeated Demands for Removal ............................. 9
D. Tea's Complete Failure to Act ................................. 11

III. **Legal Standard** ....................................... 12
A. Rule 12(b)(6) Standard ............................................. 12
B. Section 230 Framework .......................................... 13

IV. **Argument** ................................................ 14
A. Plaintiff's Claims Against Doe Defendants Are Not Subject to Section 230 ........ 14
B. Section 230 Does Not Bar Plaintiff's Claims Against Tea ....................... 14
   1. Tea's Promises Create Liability Independent of Publisher Status .............. 14
      a. Tea Made Specific, Enforceable Promises ................................. 14
      b. Plaintiff Relied on These Promises ........................................... 17
      c. Barnes v. Yahoo! Compels Denial of Tea's Motion .................... 18
      d. Tea Mischaracterizes Barnes .................................... 19

1

2. Section 230 Does Not Immunize Intellectual Property Violations ……... 20

3. Tea's Terms of Service Demonstrate Material Contribution ................... 21

C. Plaintiff Has Adequately Pled All Elements ........................................ 24

1. Negligent Misrepresentation Claim ................................................ 24

a. Rule 9(b) Is Satisfied ................................................. 24

b. Reliance Is Adequately Alleged ................................. 26

c. Tea Owed Plaintiff a Duty ........................................ 27

2. MCPA Claim ................................................................. 28

a. Rule 9(b) Is Satisfied ................................................. 28

b. MCPA Applies to Plaintiff ......................................... 29

3. Appropriation of Name and Likeness .................................................... 30

V. **The Posts Remain Live, Causing Ongoing Harm** ........................................ 32

VI. **Conclusion** .............................................................................. 34

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Eagle Rock Ent., Inc.*, 655 F. Supp. 2d 779 (E.D. Mich. 2009) ....................... 32

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................... 12

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ............................ 5, 6, 14-20, 27

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................ 12

*Binion v. O'Neal*, No. 14-13454, 2015 WL 3544518 (E.D. Mich. Apr. 2, 2015) ................. 32

*Doe v. Grindr Inc.*, 128 F.4th 1148 (9th Cir. 2025) ............................................................... 13

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157
(9th Cir. 2008) ....................................................... 13, 21-23

*Frank v. Dana*, 547 F.3d 564 (6th Cir. 2008) ..........................................................................24, 26

*Jones v. Dirty World Ent. Recordings, LLC*, 755 F.3d 398 (6th Cir. 2014) ......... 13, 14

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) ................. 24

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007)................................ 21

*Richter v. Seterus, Inc.*, No. 15-CV-12874, 2016 WL 8200520 (E.D. Mich. May 16, 2016)...... 26

*Williams v. Polgar*, 215 N.W.2d 149 (Mich. 1974) ................................................... 27

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)........................................................ 13

**Statutes**

47 U.S.C. § 230 ....................................................................... 6, 13, 14, 20

47 U.S.C. § 230(c)(1) ......................................................... 13, 15

47 U.S.C. § 230(e)(2) ............................................................... 6, 20

MCL 445.903 ............................................................................. 28-29

MCL 445.911 ............................................................................. 30

**Rules**

Fed. R. Civ. P. 9(b) ................................................................. 24-25, 28, 29

Fed. R. Civ. P. 12(b)(6) ................................................................. 12

## I.   <u>INTRODUCTION</u>

May it please this Honorable Court:

Defendant Tea Dating Advice, Inc. seeks dismissal under Section 230 of the Communications Decency Act, arguing it is merely a passive platform immune from all liability for third-party content. The evidence tells a different story.[1]

Tea operates a social media application that enables anonymous users to post allegations about named individuals, including intimate health information and defamatory accusations. But Tea does not merely host this content—it makes specific, detailed promises about content moderation in its Terms of Service, invites users and third parties to report violations, and claims to use artificial intelligence to remove content that violates its policies.

When Plaintiff discovered that anonymous users had posted his copyrighted photographs alongside false claims that he has a sexually transmitted infection—content that explicitly violated Tea's own stated prohibitions on "health information" and "libelous, defamatory" posts—he did exactly what Tea's Terms of Service instructed: he submitted formal demands for removal to the email address Tea specified for such complaints.

**Tea ignored him**.

On August 25, 2025, Plaintiff sent a detailed cease and desist letter to multiple Tea email addresses, specifically invoking Tea's Terms of Service prohibitions, citing the false STI allegations, and demanding removal within 10 days. (*Manning Decl. ¶¶ 11-13; Ex. B.*)

---

[1] Plaintiff notes that his Motion to Remand this action to Wayne County Circuit Court (ECF No. [4]) remains pending before this Court. Plaintiff respectfully requests that the Court address the remand motion and this Motion to Dismiss together, as the propriety of federal jurisdiction is a threshold issue. However, should the Court reach the merits of Defendant's Motion to Dismiss before ruling on remand, Plaintiff submits that dismissal is inappropriate for the reasons stated herein.

On August 26, 2025—the day Plaintiff filed this lawsuit—he sent a formal preservation of evidence letter, again demanding Tea preserve all content and account data. (*Manning Decl. ¶ 29; Ex. C.*)

**Tea has responded to neither letter. The defamatory content remains live on Tea's platform today.** (Manning Decl. ¶ 17.)

This case is not about holding Tea liable for merely publishing third-party content. It is about holding Tea accountable for:

1. **Breaking specific promises** it made in its Terms of Service to prohibit and remove certain categories of harmful content;
2. **Ignoring formal removal requests** that invoked those promises and followed Tea's own stated procedures;
3. **Commercially exploiting** Plaintiff's copyrighted photographs without authorization; and
4. **Continuing to host** content that violates Tea's own policies, causing ongoing harm.

Section 230 does not shield platforms that make specific promises, induce reliance, and then breach those promises. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009). Section 230 does not immunize intellectual property violations. *47 U.S.C. § 230(e)(2)*. And Section 230 does not protect platforms whose design and policies materially contribute to unlawful content. Defendant's Motion to Dismiss should be denied.

## II.  <u>STATEMENT OF FACTS</u>

### A. Tea's Specific Promises in Its Terms of Service

Tea operates a mobile application marketed to women as a "safe, moderated community" for sharing information about dating experiences. Tea's business model depends on user-generated

content—specifically, posts about named individuals that other users can read before deciding whether to date those individuals.

Tea's Terms of Service, effective August 11, 2025, make detailed and specific promises about the type of content permitted on its platform and how Tea moderates that content.

(See *Tea Terms of Service, attached as Ex. A to Manning Decl*.)

**First**, Tea explicitly **prohibits** certain categories of content. Section 7 of the Terms of Service states:

> "Your User Generated Posts **may not display any personal details** (e.g., phone numbers, last names, addresses, **health information**, specific details about an individual's occupation), banking information, nudity, obscene images, or pornographic images. Moreover, you should **refrain from Submitting User Generated Posts that are offensive, abusive, libelous, defamatory**, obscene, racist, ethnically or culturally offensive, indecent, that promotes violence, terrorism, or illegal acts, incites hatred on grounds of race, gender, religion or sexual orientation."

> (*Ex. A, Tea TOS § 7*) (emphasis added).

**Second**, Tea promises to **actively monitor and remove** violating content. Section 7 states:

> "You understand and agree that **we may monitor or review your User Generated Post, and we reserve the right to remove, delete, edit, limit, or block or prevent access to any User Generated Posts at any time at our sole discretion**."

> (*Ex. A, Tea TOS § 7*) (emphasis added).

**Third**, Tea represents that it uses **artificial intelligence** to identify and remove prohibited content. Section 8 states:

> "We may utilize artificial intelligence, machine learning tools, or similar technology in the Platform and the Services... You further agree that we (or one of our vendors) may use any output generated from the Artificial Intelligence Tools for our own commercial purposes, **including to remove any User Generated Posts that violate the Section 7**..."

> (*Ex. A, Tea TOS § 8*) (emphasis added).

**Fourth**, Tea provides a specific **procedure for reporting violations**, including copyright complaints and other prohibited content. Section 10 directs users to submit complaints to "**accounthelp@teaforwomen.com.**"

(*Ex. A, Tea TOS § 10.*)

**Fifth**, Tea claims extensive **commercial rights** over all user-uploaded content, including a "worldwide, royalty-free, perpetual, irrevocable, sublicensable, non-exclusive right and license to translate, reproduce, sell, publish, distribute, modify, adapt, display, perform, promote, link to, use, or authorize others to use, in any form or media, any User Generated Posts..."

(*Ex. A, Tea TOS § 7.*)

These are not vague aspirations or marketing puffery. They are specific, detailed promises about:

- **What content is prohibited** (health information, defamation)
- **How Tea monitors content** (AI-powered moderation)
- **What Tea will do** (remove violating posts)
- **How users can report violations** (specific email address)

## B. The Defamatory Posts Violate Tea's Own Policies

On or about August 25, 2025, Plaintiff discovered that anonymous users had posted content about him on Tea's platform that violated multiple provisions of Tea's Terms of Service.

(*Manning Decl. ¶ 2.*)

The posts included:

1. **False health information**: Anonymous users falsely claimed Plaintiff has a sexually transmitted infection. This allegation is completely false—Plaintiff has never been

diagnosed with any STI and has medical documentation proving this. (*Manning Decl. ¶ 3.*) This violates Tea's explicit prohibition on "health information." (*Tea TOS § 7.*)

2. **Defamatory characterizations**: The posts misleadingly portrayed Plaintiff as a dangerous "predator sex offender," when the reality is that Plaintiff's registry status stems solely from a consensual high school relationship when he was 18 and his girlfriend was 15. (*Manning Decl. ¶ 4.*) This violates Tea's prohibition on "libelous, defamatory" content. (*Tea TOS § 7.*)

3. **Unauthorized use of copyrighted photographs**: The posts displayed photographs that Plaintiff took and originally posted on his personal Instagram account. Plaintiff owns the copyright to these photographs and never authorized their use on Tea's platform. (*Manning Decl. ¶ 5.*)

In short, the content about Plaintiff violated at least three separate prohibitions in Tea's Terms of Service: the ban on health information, the ban on defamatory content, and the protection of intellectual property rights.

## C. Plaintiff's Repeated Demands for Removal

Upon discovering the posts, Plaintiff immediately took action, relying on Tea's Terms of Service promises and following Tea's stated complaint procedures.

**August 25, 2025 - Cease and Desist Letter**

On August 25, 2025, at 11:27 AM, Plaintiff sent a formal cease and desist letter via email to three Tea email addresses:

- accounthelp@teaforwomen.com **(the email specified in Tea's DMCA procedure)**
- contact@teaforwomen.com

- press@teaforwomen.com

(*Manning Decl. ¶ 11; Ex. B.*)

Plaintiff's cease and desist letter:

- Identified himself by name and provided full contact information
- Demanded immediate removal of his images and all content about him
- Specifically referenced "the unauthorized use, distribution, and/or display of my image and likeness"
- **Explicitly cited the false STI allegation**: "Someone stated I have an STI which is non reversible and I have medical documentation to prove otherwise. **With this legal notice by continuing to allow this content you open your company to liability.**"
- Explained the context of his sex offender status
- Warned: "You are putting my reputation and life at risk"
- Requested written confirmation of compliance **within 10 days**
- Attached three screenshots of the violating posts
- Warned of legal action if Tea failed to comply

(*Ex. B*) (emphasis added).

Plaintiff's letter directly invoked Tea's liability for hosting content that violated its own Terms of Service prohibitions.

**August 25, 2025 - Apple DMCA Complaints**

Also on August 25, 2025, Plaintiff submitted formal DMCA complaints to Apple regarding two versions of the Tea app available in the Apple App Store (App IDs: 6467346509 and 6748969382). (*Manning Decl. ¶ 19.*)

In these complaints, Plaintiff specifically noted: "I have contacted the Tea app operators directly (at accounthelp@teaforwomen.com and support@teatheapp.com) to request immediate removal, but they have failed to resolve the matter." (*Manning Decl. ¶ 20.*)

**August 26, 2025 - Preservation of Evidence Letter**

On August 26, 2025—the day Plaintiff filed this lawsuit—Plaintiff sent Tea a formal

Preservation of Evidence letter via certified mail and email to multiple Tea addresses. (*Manning*

*Decl. ¶ 29; Ex. C.*)

This letter:

- Identified the pending litigation
- Demanded preservation of all posts, account data, IP addresses, and internal moderation records concerning Plaintiff
- Explained Tea's legal duty to preserve evidence
- Warned of spoliation sanctions
- Requested written confirmation within 10 days

(*Ex. C.*)

## D. Tea's Complete Failure to Act

Despite these repeated, formal demands—sent to the exact email addresses specified in Tea's

Terms of Service—Tea has:

- **Never responded** to Plaintiff's August 25 cease and desist letter
  (*Manning Decl. ¶ 16*)

- **Never responded** to Plaintiff's August 26 preservation letter
  (*Manning Decl. ¶ 30*)

- **Never removed** the defamatory content
  (*Manning Decl. ¶ 17*)

- **Never removed** Plaintiff's copyrighted photographs
  (*Manning Decl. ¶ 17*)

**The posts remain live on Tea's platform today, October 2025—more than six weeks after**

**Plaintiff's initial demand.** (*Manning Decl. ¶ 17.*)

11

Tea's ten-day deadline for compliance with the cease and desist expired on September 4, 2025. Tea took no action. (*Manning Decl. ¶ 18.*)

As a result of Tea's failure to honor its Terms of Service promises, Plaintiff has suffered:

- Severe damage to his professional reputation as a business owner
- Loss of business opportunities
- Emotional distress and humiliation
- Fear for his personal safety
- Comments from clients, contacts, and members of his church who have seen the posts

(*Manning Decl. ¶¶ 28-33.*)

Had Tea honored its promises and removed the content when Plaintiff first requested it on August 25, 2025, much of this harm could have been prevented. Instead, Tea's ongoing failure to act causes continued damage every day the posts remain accessible.

## III. LEGAL STANDARD

### A. Rule 12(b)(6) Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Iqbal*, 556 U.S. at 678. The question is not whether plaintiff will ultimately prevail, but whether plaintiff has stated a claim that is plausible on its face. *Twombly*, 550 U.S. at 570.

At this early stage, before discovery, the Court must resolve doubts in favor of the plaintiff and allow the case to proceed unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

## B. Section 230 Framework

Section 230 of the Communications Decency Act provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

Section 230 immunity applies when: (1) the defendant is an interactive computer service provider; (2) the plaintiff's claims treat the defendant as a publisher or speaker; and (3) the content at issue was created by third parties. *Jones v. Dirty World Ent. Recordings, LLC*, 755 F.3d 398, 409 (6th Cir. 2014).

However, Section 230 is not absolute. Courts have recognized several important limitations:

**First**, Section 230 does not bar claims based on a defendant's "own statements or conduct." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009). When a platform makes specific promises and then breaches those promises, liability arises from the promise-breaking, not from publisher status. *Id.*

**Second**, Section 230 expressly excludes intellectual property claims. 47 U.S.C. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.").

**Third**, Section 230 does not protect platforms that "materially contribute" to unlawful content through their design choices. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008).

13

**Fourth**, platforms lose immunity when they develop or create content themselves, becoming "information content providers" rather than mere conduits. *Id.* at 1162-63.

Courts construe Section 230 immunity issues at the motion to dismiss stage, but "close cases... must be resolved in favor of immunity." *Jones*, 755 F.3d at 408. However, this does not mean plaintiffs must prove their case at the pleading stage—only that they must plausibly allege facts showing immunity does not apply.

## IV. ARGUMENT

### A. Plaintiff's Claims Against Doe Defendants Are Not Subject to Section 230

As a threshold matter, Counts I through IV of Plaintiff's Complaint assert claims for defamation per se, false light, public disclosure of private facts, and intentional infliction of emotional distress solely against the Doe Defendants—the anonymous users who created and posted the defamatory content. (*Compl. ¶¶ 13-23.*)

Section 230 does not protect content creators themselves, only platforms that host third-party content. *Jones*, 755 F.3d at 407 ("Section 230 immunizes providers of interactive computer services against liability arising from content created by third parties.").

Tea's Motion does not meaningfully challenge these counts against the Does. Accordingly, these claims should proceed, and Plaintiff's pending motion for early discovery to identify the Doe Defendants should be granted.

### B. Section 230 Does Not Bar Plaintiff's Claims Against Tea

#### 1. Tea's Promises Create Liability Independent of Publisher Status

#### a. Tea Made Specific, Enforceable Promises

14

Tea argues all of Plaintiff's claims against it are barred by Section 230 because they seek to treat Tea as a publisher of third-party content. (*Def. Br. at 7-9.*) This argument fails because Plaintiff's claims do not arise from Tea's status as a publisher—they arise from **Tea's breach of specific contractual promises** it made in its Terms of Service.

The Ninth Circuit confronted this exact issue in *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009). There, the plaintiff's ex-boyfriend created fake profiles of her on Yahoo, including nude photos. *Id.* at 1099. The plaintiff contacted Yahoo multiple times requesting removal. *Id.* A Yahoo representative specifically promised to remove the profiles but then failed to do so. *Id.*

The court held that while Section 230 barred claims based on Yahoo's status as a publisher, it did **not** bar promissory estoppel claims based on Yahoo's specific promise:

> "Herein lies the fundamental distinction: **Barnes is not suing Yahoo as a publisher or a speaker**. If she were, the claims would be barred by section 230(c)(1). Rather, **Barnes alleges that Yahoo voluntarily undertook a duty by its promise to remove the profiles**. The fact that the **duty is in regard to publishing does not matter** if the duty arises from a source other than the plaintiff's status as a publisher."

> *Id.* at 1107 (emphasis added).

The court explained that the duty to honor a promise "**exists regardless of whether the promisor is a publisher**." *Id.* at 1104. What matters is not whether the conduct involves publishing, but whether the **source of the duty** is something other than publisher status. *Id.*

**This case is even stronger than *Barnes* for three reasons:**

**First**, Yahoo made an informal, one-time oral promise to one person. Here, Tea made **formal, written promises in its Terms of Service** to all users and third parties whose information appears on its platform.

Tea's promises are detailed and specific:

- **Prohibition of specific content categories**: "Your User Generated Posts may not display any personal details... **health information**... Moreover, you should refrain from Submitting User Generated Posts that are... **libelous, defamatory**..." (*Tea TOS § 7*)

- **Promise to monitor**: "we **may monitor or review** your User Generated Post" (*Id.*)

- **Promise to remove violating content**: "we **reserve the right to remove, delete, edit, limit, or block or prevent access to any of User Generated Posts** at any time at our sole discretion" (*Id.*)

- **AI-powered moderation**: "We may utilize artificial intelligence... **to remove any User Generated Posts that violate** Section 7" (*Tea TOS § 8*)

- **Complaint procedure**: Tea provides a specific email address for reporting violations: "accounthelp@teaforwomen.com" (*Tea TOS § 10*)

These are not vague aspirations. They are concrete, actionable promises about:

- What content is prohibited
- How Tea will identify violating content
- What Tea will do when violations occur
- How users can report violations

**Second**, in *Barnes*, the plaintiff simply asked Yahoo to remove content. Here, Plaintiff **followed Tea's own specified procedure** for requesting removal.

Tea cannot establish detailed procedures in its Terms of Service, direct users to submit complaints to a specific email address, and then claim Section 230 immunity when it ignores those complaints. If Tea's procedure is meaningless, Tea has perpetrated a fraud on users and third parties who rely on these representations.

16

**Third**, Yahoo made a single promise to remove specific profiles. Tea's promises are broader and more systemic:

- Tea **categorically prohibits** health information and defamatory content
- Tea claims it **actively monitors** all posts
- Tea represents it uses **AI to automatically remove** violating content
- Tea **invites reports** of violations

  By making these promises, Tea created reasonable expectations that:

  (a) certain categories of harmful content would not appear on Tea's platform, or

  (b) if such content did appear, it would be removed when reported

When Plaintiff discovered content that violated Tea's stated prohibitions, he reasonably relied on Tea's promises by submitting formal removal requests through Tea's designated channels. Tea's failure to act constitutes breach of these promises.

**b. Plaintiff Relied on These Promises**

Tea argues Plaintiff did not rely on its representations because he is not a Tea user. (*Def. Br. at 14*.) This argument fails on the facts.

**Plaintiff specifically relied on Tea's Terms of Service by:**

1. **Reading Tea's TOS** provisions on prohibited content (*Manning Decl. ¶¶ 6-7*)

2. **Identifying that the posts violated Tea's own rules**: The false STI allegations constituted prohibited "health information," and the misleading characterizations constituted prohibited "libelous, defamatory" content (*Manning Decl. ¶ 9*)

3. **Following Tea's complaint procedure**: Plaintiff sent his removal requests to accounthelp@teaforwomen.com—the exact email address Tea specified in its DMCA procedure (*Manning Decl. ¶ 11; Tea TOS § 10*)

4. **Explicitly invoking Tea's liability**: Plaintiff's cease and desist stated: "**With this legal notice by continuing to allow this content you open your company to liability.**" (*Ex. B*) This directly referenced Tea's Terms of Service prohibitions

17

5. **Taking no other action before filing suit**: Plaintiff gave Tea ten days to comply, demonstrating his reliance on Tea's stated removal procedures (*Manning Decl. ¶ 12*)

This is textbook reliance. Plaintiff did exactly what a reasonable person would do upon discovering that content violating a platform's stated policies had been posted: he invoked those policies and requested removal through the designated channel.

Moreover, Tea's Terms of Service are not limited to "users." The Community Guidelines prohibit posting **"personal details"** and **"health information"** about **any person**—not just Tea users. (*Tea TOS § 7.*)

By prohibiting posts containing others' personal and health information, Tea created reasonable expectations for **third parties** whose information appears on the platform.

Tea cannot simultaneously:

1. Prohibit posts containing others' health information and defamatory content

2. Promise to monitor and remove such content

3. Invite people to report violations

Then claim it owes no duty to the people harmed by its broken promises

**c. Barnes v. Yahoo! Compels Denial of Tea's Motion**

The *Barnes* court made clear that Section 230 "does not bar actions for conduct that can be attributed to something other than the defendant's status or conduct as a publisher or speaker." 570 F.3d at 1107 (emphasis added).

The key question is: What is the source of the duty allegedly breached?

If the duty arises solely from the defendant's role as a publisher of third-party content, Section 230 applies. But if the duty arises from "particular voluntary undertakings"—such as specific promises made by the platform—Section 230 does not apply. Id. at 1102-03.

18

Here, Tea's duty arises from its voluntary undertakings in its Terms of Service:

- Tea chose to prohibit health information and defamatory content

- Tea chose to promise it would monitor content

- Tea chose to represent it uses AI to remove violating content

- Tea chose to provide a complaint procedure

- Tea chose to invite removal requests

These choices created duties independent of Tea's status as a publisher. As *Barnes* held, "the duty to undertake to edit the material is a duty that exists regardless of whether the promisor is a publisher." Id. at 1104 (emphasis added).

Tea breached these duties when it:

- Allowed content that violated its stated prohibitions

- Failed to monitor or remove that content despite its promises

- Ignored Plaintiff's formal removal requests sent through Tea's designated procedure

- Continues to host the violating content today

This breach is actionable under *Barnes*.

**d. Tea Mischaracterizes *Barnes***

Tea argues that *Barnes* doesn't help Plaintiff because "the duty Yahoo allegedly breached derives from Yahoo's conduct as a publisher." (Def. Br. at 9, citing Barnes, 570 F.3d at 1103.) This is a fundamental misreading of *Barnes*.

The *Barnes* court held precisely the opposite. The court explained that Yahoo's duty did NOT derive from its publisher status—it derived from Yahoo's specific promise:

"We conclude that the duty that Barnes alleges Yahoo violated does not derive from

Yahoo's status or conduct as a 'publisher or speaker.' Rather, it derives from Yahoo's manifest intention to make a promise of a specific nature, as determined under applicable common law."

Id. at 1102-03 (emphasis added).

The court continued:

"Section 230 does not bar actions for conduct that can be attributed to something other than the defendant's status or conduct as a publisher or speaker."

Id. at 1107 (emphasis added).

Tea claims the *Barnes* dissent supports its position. *(Def. Br. at 9.)* But the majority rejected the dissent's view, holding that when a platform makes specific promises, breach of those promises creates liability outside Section 230's scope.

Tea's argument would render Barnes meaningless. Under Tea's reading, any promise related to content moderation would automatically trigger Section 230 immunity because content moderation involves "publishing decisions." But that's exactly what *Barnes* rejected.

The *Barnes* majority understood that platforms cannot use Section 230 as both a sword and a shield—making promises to build trust and attract users, then hiding behind Section 230 when they break those promises.

**2. Section 230 Does Not Immunize Intellectual Property Violations**

Section 230 expressly excludes intellectual property claims from its scope:

"Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."

47 U.S.C. § 230(e)(2) (emphasis added).

Plaintiff's appropriation claim is based in part on the unauthorized use of his copyrighted photographs. Plaintiff created these photographs and owns the copyright. (*Manning Decl.* ¶¶ *3, 5.*) The photographs were originally posted on Plaintiff's personal Instagram account. (Id.)

20

Anonymous Tea users uploaded Plaintiff's copyrighted photographs to Tea's platform without authorization. (*Manning Decl. ¶ 5.*) Tea then:

- Displayed these copyrighted photos on its platform

- Associated them with defamatory content

- Claimed a "worldwide, royalty-free, perpetual, irrevocable" license to them (*Tea TOS § 7*)

- Refused to remove them despite Plaintiff's copyright-based removal request

This conduct falls outside Section 230's protection. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118-19 (9th Cir. 2007) (Section 230 does not bar intellectual property claims).

Tea's Terms of Service even **acknowledge** the distinction between third-party content liability and intellectual property rights, providing a detailed DMCA procedure for copyright complaints and directing such complaints to "accounthelp@teaforwomen.com." (*Tea TOS § 10*.)

Plaintiff invoked this procedure. He sent his cease and desist to the exact email address Tea specified, explicitly identifying his copyrighted photographs and demanding removal. (*Ex. B; Manning Decl. ¶¶ 11-13.*) **Tea failed to act**.

Section 230 does not shield Tea from liability for commercially exploiting Plaintiff's copyrighted photographs, particularly after receiving notice of the copyright violation.

## 3. Tea's Terms of Service Demonstrate Material Contribution to Unlawful Content

Tea argues it is a passive platform that merely displays third-party content. (*Def. Br. at 10-11*.) Tea's own Terms of Service prove otherwise.

Section 230 does not protect platforms that "materially contribute" to the development of unlawful content. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008). A platform that is "responsible, in whole or in part, for the creation or development of" the offending content becomes a "content provider" itself and loses immunity. Id. at 1162-63.

**a. Tea's Extensive Editorial Control**

Tea's Terms of Service reveal extensive editorial control and active participation in content management:

Active Monitoring: Tea represents that it "may monitor or review your User Generate Post." (*Tea TOS § 7.*) **This is not passive hosting—it's active editorial oversight**.

AI-Powered Content Curation: Tea uses "artificial intelligence, machine learning tools, or similar technology" and deploys these tools "to remove any User Generated Posts that violate" its policies. (*Tea TOS § 8.*) **This demonstrates Tea actively curates content using automated systems**.

Broad Editorial Rights: Tea claims the right to "remove, delete, edit, limit, or block or prevent access to any of User Generated Posts at any time at our sole discretion." (*Tea TOS § 7.*) (emphasis added). **Tea doesn't just claim the right to remove content—it claims the right to edit it, demonstrating editorial control over substance**.

Commercial Exploitation Rights: Tea claims a "worldwide, royalty-free, perpetual, irrevocable, sublicensable, non-exclusive right and license to translate, reproduce, sell, publish, distribute, modify, adapt, display, perform, promote, link to, use, or authorize others to use, in any form or media, any User Generated Posts." (*Tea TOS § 7*) (emphasis

added). **By claiming rights to modify and sell user content, Tea goes far beyond passive hosting**.

These provisions demonstrate that Tea is not a neutral conduit—it actively shapes, curates, and commercially exploits the content on its platform.

**b. Tea's Content Prohibitions Create Editorial Choices**

By **prohibiting** specific categories of content, Tea makes editorial judgments about what may appear on its platform. Tea's prohibition of "health information" and "libelous, defamatory" content represents a choice to exclude certain types of speech. (*Roommates.com*, 521 F.3d at 1170-71.)

These prohibitions distinguish Tea from truly passive platforms. A genuinely neutral platform would host all legal content without restriction. But Tea has chosen to create a curated environment with specific content standards.

By establishing these standards, Tea created an expectation that such content would not appear—or would be removed when reported. Tea's failure to enforce its own standards while claiming to do so materially contributes to the harm.

**c. Discovery Will Reveal the Extent of Tea's Role**

At the pleading stage, dismissal is inappropriate because discovery will reveal:

- How Tea's algorithm functions: Does it promote certain types of sensational content? Does it reward posts that generate engagement through controversy?

- Whether Tea's AI moderation works as promised: Tea claims to use AI "to remove" violating posts. Does this system actually function? If not, Tea's representation is false.

- How Tea responds to removal requests: Does Tea have a pattern of ignoring complaints? Does it selectively enforce its policies?

- Whether Tea's design encourages harmful posts: Does Tea prompt users to name specific individuals? Does it require categorization that encourages defamatory labels?

Tea asks the Court to dismiss based on the assumption that it is a passive platform. But Plaintiff has alleged facts suggesting Tea actively participates in content management through its policies, AI systems, and editorial rights. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc*., 591 F.3d 250, 260 (4th Cir. 2009) (holding that "the mere possibility" of material contribution was sufficient to deny motion to dismiss and allow discovery).

Dismissal at this stage would deny Plaintiff the opportunity to develop these facts through discovery.

## C. Plaintiff Has Adequately Pled All Elements of His Claims

Even if the Court were to find that Section 230 does not categorically bar Plaintiff's claims (as it should), Tea's alternative arguments for dismissal fail on the merits.

## 1. Negligent Misrepresentation Claim

## a. Rule 9(b) Is Satisfied

Tea argues Plaintiff's negligent misrepresentation claim fails Rule 9(b)'s heightened pleading standard. (*Def. Br. at 13-14*.) Not so.

Rule 9(b) requires plaintiffs to specify: "(1) the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana, 547 F.3d 564, 570* (6th Cir. 2008).

Plaintiff satisfies each element:

(1) The statements: Tea represented that:

- It operates a "safe, moderated community"

24

- User posts "may not display... health information"

- Users should "refrain from Submitting... libelous, defamatory" posts

- Tea "may monitor or review" posts

- Tea reserves the right to "remove, delete, edit, limit, or block" violating posts

- Tea uses AI "to remove any User Generated Posts that violate" its policies

- Users can report violations to "accounthelp@teaforwomen.com"

(2) The speaker: Tea Dating Advice, Inc.

(3) Where and when: Tea's Terms of Service, Section 7, Section 8, and Section 10, effective August 11, 2025 (attached as Exhibit A to Manning Declaration)

(4) Why false: Tea failed to remove content that explicitly violated these representations despite being notified through the complaint procedure Tea itself established. The posts contained:

- Prohibited "health information" (false STI allegations)

- Prohibited "libelous, defamatory" content (misleading characterizations)

- Unauthorized copyrighted photographs

Plaintiff sent formal removal requests to the email address Tea specified (accounthelp@teaforwomen.com) on August 25, 2025, explicitly citing these violations. (*Ex. B; Manning Decl. ¶¶ 11-13.*) Tea never responded and never removed the content. (*Manning Decl. ¶¶ 16-17.*)

This demonstrates that Tea's representations about content moderation were false. Tea either (a) never monitored content as promised, (b) monitored but refused to enforce its stated policies, or (c) systematically fails to respond to removal requests. Any of these scenarios proves the falsity

of Tea's representations.

This exceeds Rule 9(b)'s requirements. *Frank,* 547 F.3d at 570; *Richter v. Seterus, Inc.*, No. 15-CV-12874, 2016 WL 8200520, at *2-3 (E.D. Mich. May 16, 2016).

**b. Reliance Is Adequately Alleged**

Tea argues Plaintiff cannot show reliance because he is not a Tea user. (Def. Br. at 14.) This argument fails for three reasons.

**First**, Plaintiff **did** rely on Tea's representations by:

- Reading Tea's Terms of Service

- Following Tea's complaint procedure

- Sending removal requests to Tea's designated email address

- Invoking Tea's stated prohibitions in his cease and desist

- Giving Tea the opportunity to comply before filing suit

This is direct, detrimental reliance. Plaintiff took specific actions based on Tea's promises and suffered harm when Tea breached those promises.

**Second**, reliance can be shown **through third parties' conduct**. Tea's promises about operating a "safe, moderated community" that prohibits health information and defamation induced users to:

- Post content they might not have posted absent those assurances

- Trust that Tea would remove violating content

- Believe Tea would respond to complaints

This systemic reliance enabled the harm to Plaintiff. Users posted harmful content believing Tea's moderation promises protected them from liability, and third parties like Plaintiff trusted Tea would enforce its policies.

26

**Third**, under Michigan law, reliance may be presumed where material misrepresentations are made. Tea's promises about content moderation are material to anyone whose information might appear on the platform without consent.

Tea cannot escape liability by arguing that the people harmed by its broken promises weren't "users." If that were the rule, platforms could make empty promises with impunity, harming non-users while claiming no duty to them.

**c. Tea Owed Plaintiff a Duty**

Tea argues it owed Plaintiff no duty because he is not a user. (*Def. Br. at 15*.) This misstates Michigan law and ignores Tea's voluntary undertakings.

**First**, duty arises from **foreseeability**, not privity. *Williams v. Polgar*, 215 N.W.2d 149, 155 (Mich. 1974) ("Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law.").

> When Tea:
>
> - Enables users to post others' names, photos, and "health information"
>
> - Prohibits such posts in its Terms of Service
>
> - Promises to monitor and remove violating content
>
> - Provides a complaint procedure

Tea **foresees** that third parties will be harmed if it fails to enforce these policies. The harm to Plaintiff was entirely foreseeable—Tea's own policies acknowledge that posts containing "health information" and "defamatory" content cause harm.

**Second**, Tea's Terms of Service **created the duty** through its voluntary promises. *Barnes*, 570 F.3d at 1107 ("a duty that exists regardless of whether the promisor is a publisher").

27

Tea chose to:

- Prohibit certain harmful content
- Promise active moderation
- Invite complaints
- Establish removal procedures

These voluntary undertakings created reasonable expectations and corresponding duties.

**Third**, Tea's Terms of Service specifically **address third-party content**—prohibiting posts about others' "personal details" and "health information." (*Tea TOS § 7.*) These prohibitions protect non-users whose information appears on the platform.

Tea cannot claim it owes no duty to the very people its Terms of Service purport to protect. If Tea's prohibitions are meaningless, they constitute fraud on the public.

## 2. MCPA Claim

### a. Rule 9(b) Is Satisfied

Tea argues Plaintiff's MCPA claim fails Rule 9(b) because he doesn't identify which MCPA provision was violated. (*Def. Br. at 16-17.*) The Complaint adequately identifies MCL 445.903(1)(s) and (bb). (Compl. ¶ 25.)

The alleged violations are:

**MCL 445.903(1)(s)**: "Representing that services... have... characteristics... that they do not have."

Tea represented its services have the characteristics of:

- Active content monitoring

- AI-powered removal of violating posts

- Prohibition of health information and defamatory content

- Responsive complaint procedures

These representations are false. Tea does not actively monitor content, does not remove violating posts, and does not respond to complaints.

**MCL 445.903(1)(bb)**: "Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is."

Tea's representations about content moderation are material to users deciding whether to post content and to third parties whose information might appear on the platform. These representations create a false impression that Tea operates a safe, moderated environment when it does not.

The fraud elements are satisfied:

- **What**: Tea's promises about moderation, prohibition of health info/defamation, AI removal systems

- **Where**: Terms of Service, Sections 7, 8, 10

- **When**: Effective August 11, 2025

- **Who**: Tea Dating Advice, Inc.

- **Why false**: Tea systematically fails to enforce its stated policies despite multiple complaints

This satisfies Rule 9(b).

**b. MCPA Applies to Plaintiff**

29

Tea argues the MCPA doesn't apply because Plaintiff is not a consumer of Tea's services. (*Def. Br. at 17*.) This argument fails.

The MCPA protects "person[s]" injured by unfair trade practices. MCL 445.911(2). A "person" includes "an individual... whether or not a citizen or domiciliary of this state." MCL 445.902(d).

The MCPA does not require a direct consumer relationship where a plaintiff alleges injury from a defendant's deceptive business practices that affect the public generally.

Tea's false representations about content moderation and user safety:

- Were made "in connection with" trade or commerce (operating the app for profit)
- Injured Plaintiff (by enabling and maintaining defamatory content)
- Constitute "unfair... or deceptive... practice[s]" (MCL 445.903(1))

Moreover, Plaintiff **was** affected by Tea's services—his copyrighted photographs appeared on Tea's platform, content about him was posted and maintained on Tea's platform, and Tea's broken promises directly harmed him.

The MCPA's purpose is to protect the public from deceptive business practices. Tea's systematic failure to enforce its stated content policies is exactly the type of deceptive practice the MCPA targets.

### 3. Appropriation of Name and Likeness

Tea argues Plaintiff's appropriation claim fails because Plaintiff's name lacks commercial value and Tea didn't exploit it. (*Def. Br. at 18-20*.) Both arguments fail.

**First**, "commercial value" is not limited to celebrities. Plaintiff is a business owner and consultant whose professional reputation has commercial value. (*Compl. ¶ 2; Manning Decl. ¶ 29.*) Business professionals rely on their reputations to attract clients and maintain relationships.

**Second**, Tea **did** commercially exploit Plaintiff's identity by:

- **Using his copyrighted photographs** without permission to generate user engagement
- **Associating his image with inflammatory content** designed to attract attention and drive traffic
- **Monetizing the engagement** generated by posts about him through subscription fees and user retention
- **Claiming licensing rights** to all user-uploaded content, including Plaintiff's photographs (*Tea TOS § 7*)

Tea's business model depends on user engagement. Sensational posts about named individuals generate engagement. Tea profits from this engagement through its subscription services. (*Tea TOS § 3.*)

Posts about Plaintiff—combining his photographs with false health allegations and defamatory characterizations—are exactly the type of content that drives engagement on Tea's platform. Tea monetized this engagement while claiming permanent licensing rights over Plaintiff's copyrighted images.

This is commercial exploitation.

**Third**, Tea's citation to *Hudson v. Datanyze, LLC*, 702 F. Supp. 3d 628 (N.D. Ohio 2023), is inapposite. That case involved scraping publicly available business contact information from

31

LinkedIn—fundamentally different from facilitating defamatory posts combined with copyrighted photographs.

Here, Tea's platform enabled users to:

- Upload Plaintiff's copyrighted photos

- Associate those photos with false health information

- Make defamatory characterizations

- Distribute this content to Tea's user base

Tea then:

- Displayed this content on its platform

- Claimed licensing rights over it

- Refused to remove it despite formal demands

- Continued to profit from the engagement it generated

This is not "incidental publication"—it's active commercial exploitation of Plaintiff's identity for Tea's financial benefit. *Armstrong v. Eagle Rock Ent., Inc.*, 655 F. Supp. 2d 779, 785 (E.D. Mich. 2009); *Binion v. O'Neal*, No. 14-13454, 2015 WL 3544518, at *4 (E.D. Mich. Apr. 2, 2015).

## V. THE POSTS REMAIN LIVE, CAUSING ONGOING HARM

A critical fact distinguishes this case from typical Section 230 disputes: **the defamatory content remains accessible on Tea's platform today**.

More than six weeks after Plaintiff's initial cease and desist letter, Tea has not removed:

- The false STI allegations

- The misleading characterizations

- Plaintiff's copyrighted photographs

(*Manning Decl. ¶ 17.*)

This ongoing publication demonstrates several things:

**First**, it proves Tea's failure to act is not an oversight—it's a deliberate choice. Tea received:

- A detailed cease and desist on August 25, 2025

- A preservation letter on August 26, 2025

- A complaint filed in state court on August 26, 2025

- Notice of federal lawsuit after removal

Despite all this, Tea has taken no action.

**Second**, it shows Tea's Terms of Service promises are false. If Tea truly uses AI to "remove any User Generated Posts that violate" its policies (*Tea TOS § 8*), that system has failed for over six weeks. This proves Tea's representations about content moderation are false.

**Third**, it demonstrates ongoing harm. Every day the posts remain accessible, Plaintiff suffers:

- Continued reputational damage

- Ongoing emotional distress

- Risk of threats or harassment

- Loss of business opportunities

Clients, contacts, and church members continue to see the posts. (*Manning Decl. ¶¶ 30-31.*) New people discover them daily. The harm is not historical—it's current and ongoing.

**Fourth**, it undermines Tea's Section 230 defense. Tea argues it cannot be held liable for "publishing decisions." But Tea has made no decision here—it has simply ignored the problem. This is not editorial discretion; it's systematic failure to enforce stated policies.

If this Court were to dismiss Plaintiff's claims, it would signal to Tea that it can:

- Make detailed promises about content moderation

- Establish complaint procedures

- Ignore formal removal requests

- Continue hosting defamatory content indefinitely

- Claim Section 230 immunity for all of it

This cannot be the law.

## VI. CONCLUSION

This case presents questions at the intersection of innovation and accountability: whether an online platform may make detailed promises about content moderation to attract users and build trust, then systematically fail to honor those promises while claiming absolute immunity under Section 230.

The answer must be no. Section 230 was designed to protect platforms from liability for user-generated content they have no practical ability to police. It was not designed to shield platforms that:

34

- Make specific, enforceable promises in their Terms of Service

- Establish complaint procedures and invite removal requests

- Ignore those requests when submitted

- Continue hosting content that violates their own stated policies

- Claim commercial licensing rights over others' copyrighted works

Tea chose to prohibit health information and defamatory content. Tea chose to promise active monitoring and AI-powered content removal. Tea chose to establish complaint procedures. Tea chose to claim commercial rights over user-uploaded content.

Having made these choices, Tea cannot now hide behind Section 230 when it fails to honor its commitments.

Plaintiff does not seek sympathy; he seeks justice and precedent. The Complaint pleads actionable claims for defamation, negligence, and invasion of privacy based on conduct that falls outside Section 230's scope. Plaintiff has adequately alleged specific promises, reasonable reliance, breach, and damages.

**The Interest of Justice**

The integrity of the justice system depends not only on the correct application of precedent, but on its capacity to address emerging harms in a rapidly evolving digital landscape. When platforms make binding promises to build trust and attract users, then systematically breach those promises, the law must provide a remedy.

Even if this Court were to find some of Plaintiff's arguments ultimately unpersuasive, the claims are substantial enough to warrant discovery. Plaintiff should have the opportunity to develop evidence regarding:

- How Tea's content moderation actually functions

- Whether Tea's AI systems work as promised

- Tea's pattern and practice regarding removal requests

- The extent to which Tea's design choices contribute to harmful content

At minimum, Plaintiff's claims against the Doe Defendants—the actual content creators—should proceed, and Plaintiff should be granted leave to conduct early discovery to identify those defendants.

For the foregoing reasons, Defendant's Motion to Dismiss should be **denied**.

Respectfully submitted,

Dated: October 10, 2025

Antonio Lavon Manning
Plaintiff, appearing in *Propria Persona*
26200 Ford Road, # 753
Dearborn Heights, MI 48127
consultingsmarter@gmail.com

36

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ANTONIO LAVON MANNING,

             Plaintiff,

v.

TEA DATING ADVICE, INC. d/b/a
TEA, JOHN/JANE DOES 1-20,
individuals,

Case Number: **25-cv-13037**

Honorable Brandy R. McMillion
Magistrate Judge Anthony P. Patti

**CERTIFICATE OF SERVICE**

---

**CERTIFICATE OF SERVICE**

     I, Antonio Lavon Manning, hereby certify that on October 10, 2025, I caused a copy of the foregoing **Plaintiff's Opposition to Defendant Tea Dating Advice, Inc.'s Motion to Dismiss** and all accompanying documents, including the Declaration of Antonio Lavon Manning and Exhibits, to be filed electronically via the Court's CM/ECF system, which will send notification of such filing to all counsel of record:

Katherine L. Pullen (P74511) kpullen@wnj.com
Amber J. Krupp (P88317)  akrupp@wnj.com
WARNER NORCROSS + JUDD LLP
2715 Woodward Avenue, Suite 300
Detroit, Michigan 48201

Bethany G. Lukitsch
blukitsch@bakerlaw.com
Baker & Hostetler LLP
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067-4301

Cameron S Friedman  cfriedman@bakerlaw.com
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **October 10, 2025**

_____

Antonio Lavon Manning
Plaintiff, appearing in *Propria Persona*
26200 Ford Road, # 753
Dearborn Heights, MI 48127
consultingsmarter@gmail.com

37