# Exhibit A

Barnes v. Yahoo!, Inc., 570 F.3d 1096 (2009)

2009 Daily Journal D.A.R. 9032

KeyCite Yellow Flag

Declined to Follow by   Hare v. Richie,   D.Md.,   August 29, 2012

570 F.3d 1096

United States Court of Appeals, Ninth Circuit.

Cecilia L. BARNES, Plaintiff–Appellant,

v.

YAHOO!, INC., a Delaware Corp., Defendant–Appellee.

No. 05–36189
|
Argued and Submitted Oct. 14, 2008.
|
Filed May 7, 2009.
|
Amended June 22, 2009.
|
Amended Sept. 28, 2009.

**Synopsis**

**Background:** Plaintiff brought action in state court against interactive computer service provider for provider's failure to remove indecent profiles of plaintiff posted on provider's website by plaintiff's former boyfriend. Provider removed action to federal court and moved to dismiss for failure to state claim. The United States District Court for the District of Oregon, Ann L. Aiken, J., 2005 WL 3005602, granted motion. Plaintiff appealed.

**Holdings:** The Court of Appeals, O'Scannlain, Circuit Judge, held that:

negligent undertaking claim was barred by Communications Decency Act, but

promissory estoppel claim was not barred.

Affirmed in part, reversed in part, and remanded.

Opinion, 565 F.3d 560, superseded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

**\*1097** Thomas R. Rask, III, Kell, Alterman & Runstein LLP, Portland, OR, argued the cause for the appellant and filed briefs. Denise N. Gorrell, Kell, Alterman & Runstein LLP, Portland, OR, was also on the briefs.

Patrick J. Carome, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Washington, D.C., argued the cause for the appellee and filed the brief; Samir Jain and C. Colin Rushing, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Washington, D.C., and Reginald Davis and Eulonda Skyles, of Counsel for Yahoo!, Inc., Sunnyvale, CA, were also on the brief.

Appeal from the United States District Court for the District of Oregon, Ann L. Aiken, District Judge, Presiding. D.C. No. CV–05–00926–AA.

Before: DIARMUID F. O'SCANNLAIN, SUSAN P. GRABER, and CONSUELO M. CALLAHAN, Circuit Judges.

ORDER AMENDING OPINION
AND AMENDED OPINION

**ORDER**

I

The opinion filed in this case on May 7, 2009, 565 F.3d 560, is amended as follows.

Delete Part II.

At page 5318 of the slip opinion, line 5, change to At page 5320 of the slip opinion, replace the text of footnote 4 with the following:

<We limit our restatement of section 230(c)(1) to state law claims because we deal in this case with state law claims only. We have held that the Amendment's protection also extends to federal law causes of action, *see, e.g., Fair Housing Council of San Fernando Valley v. Roommates.Com,* 521 F.3d 1157 (9th Cir.2008) (en banc) (applying the Amendment to a cause of action under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*). Because no federal law cause of action is present in this case, we need not decide how or whether our discussion of section 230(c)(1) would change in the face of such a federal claim.>

At page 5323 of the slip opinion, line 11, change to

At page 5330 of the slip opinion, line 1, change to

At page 5335 of the slip opinion, line 24, change to

II

The motion to become amici curiae and file a brief as amici curiae, filed on May 20, 2009, by Public Citizen, the Center for Democracy and Technology, the Citizen Media Law Project, and the Electronic Frontier Foundation, is GRANTED. The motion for leave to file a brief as amicus **\*1098** brief, filed on June 1, 2009, by Xcentric Ventures, LLC, is GRANTED.

The panel has unanimously voted to deny Plaintiff–Appellant's petition for rehearing or for rehearing en banc. The panel has also unanimously voted to deny Defendant–Appellee's petition for rehearing and for rehearing en banc. The full court has been advised of the petitions for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petitions for rehearing and for rehearing en banc are DENIED. No further petitions for rehearing or rehearing en banc may be filed.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the Communications Decency Act of 1996 protects an internet service provider from suit where it undertook to remove from its website material harmful to the plaintiff but failed to do so.

I

This case stems from a dangerous, cruel, and highly indecent use of the internet for the apparent purpose of revenge. [1]

[1]    The parties agree that, as this appeal comes to us on grant of a motion for dismissal under Federal Rule

of Civil Procedure 12(b)(6), we accept as true the facts alleged in the complaint and construe them in the light most favorable to the plaintiff. *Anderson v. Clow* (*In re Stac Electronics Securities Litig.*), 89 F.3d 1399, 1403 (9th Cir.1996) (also noting that "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim" (internal quotation marks omitted)). Yahoo has indicated that it would "hotly contest[ ]" the factual allegations of the complaint if it is not dismissed.

In late 2004, Cecilia Barnes broke off a lengthy relationship with her boyfriend. For reasons that are unclear, he responded by posting profiles of Barnes on a website run by Yahoo!, Inc. ("Yahoo"). According to Yahoo's Member Directory, "[a] public profile is a page with information about you that other Yahoo! members can view. You[r] profile allows you to publicly post information about yourself that you want to share with the world. Many people post their age, pictures, location, and hobbies on their profiles." Through Yahoo's online service, computer users all over the country and the world can view such profiles.

Barnes did not authorize her now former boyfriend to post the profiles, which is hardly surprising considering their content. The profiles contained nude photographs of Barnes and her boyfriend, taken without her knowledge, and some kind of open solicitation, whether express or implied is unclear, to engage in sexual intercourse. The ex-boyfriend then conducted discussions in Yahoo's online "chat rooms," posing as Barnes and directing male correspondents to the fraudulent profiles he had created. The profiles also included the addresses, real and electronic, and telephone number at Barnes' place of employment. Before long, men whom Barnes did not know were peppering her office with emails, phone calls, and personal visits, all in the expectation of sex.

In accordance with Yahoo policy, Barnes mailed Yahoo a copy of her photo ID and a signed statement denying her involvement with the profiles and requesting their removal. One month later, Yahoo had not responded but the undesired advances from unknown men continued; Barnes again asked Yahoo by mail to remove the profiles. Nothing happened. The following month, Barnes sent Yahoo two more mailings. During the same period, a local news program was preparing to broadcast a report on the incident. A day before the **\*1099** initial air date of the broadcast, Yahoo broke its silence; its Director of Communications, a Ms. Osako, called Barnes and asked her to fax directly the previous statements she had

mailed. Ms. Osako told Barnes that she would "personally walk the statements over to the division responsible for stopping unauthorized profiles and they would take care of it." Barnes claims to have relied on this statement and took no further action regarding the profiles and the trouble they had caused. Approximately two months passed without word from Yahoo, at which point Barnes filed this lawsuit against Yahoo in Oregon state court. Shortly thereafter, the profiles disappeared from Yahoo's website, apparently never to return.

Barnes' complaint against Yahoo is somewhat unclear, but it appears to allege two causes of action under Oregon law. First, the complaint suggests a tort for the negligent provision or non-provision of services which Yahoo undertook to provide. As Barnes pointed out in her briefs, Oregon has adopted section 323 of the Restatement (Second) of Torts (1965), which describes the elements of this claim. For the sake of brevity, we refer to this tort, which is really a species of negligence, as a "negligent undertaking." Barnes also refers in her complaint and in her briefs to Yahoo's "promise" to remove the indecent profiles and her reliance thereon to her detriment. We construe such references to allege a cause of action under section 90 of the Restatement (Second) of Contracts (1981).

After Yahoo removed the action to federal court, it moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Yahoo contended that section 230(c)(1) of the Communications Decency Act ("the Act") renders it immune from liability in this case. *See* 47 U.S.C. § 230(c)(1). The district court granted the motion to dismiss, finding that the Act did in fact protect Yahoo from liability as a matter of law. Barnes timely appealed, claiming that, in the first place, the so-called immunity under section 230(c) did not apply to the cause of action she has brought and that, even if it did, Yahoo did not fit under the terms of such immunity.

II

The district court dismissed Barnes' claim on the ground that section 230(c)(1) makes Yahoo "immune" against any liability for the content that Barnes' former boyfriend had posted. We begin by analyzing the structure and reach of the statute itself.

A

Section 230 of the Act, also known as the Cox–Wyden Amendment ("the Amendment"), protects certain internet-based actors from certain kinds of lawsuits. The Amendment begins with a statement of findings and a statement of policy, in subsections 230(a) and (b), respectively. These are rather general, but they illustrate Congress' appreciation for the internet as a "forum for a true diversity of ... myriad avenues for intellectual activity," which "ha[s] flourished ... with a minimum of government regulation." § 230(a)(3)-(4). The statute's "policy" includes the promotion of interactive computer services and the "vibrant and competitive free market" for such services, as well as the encouragement of "blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." § 230(b)(1)-(2) & (4)-(5). We have recognized in this declaration of statutory purpose two parallel goals. The statute is designed at once "to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene **\*1100** material." *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1122 (9th Cir.2003).

Though we keep these goals, which the statutory language declares, in mind, we must closely hew to the text of the statutory bar on liability in construing its extent. The operative section of the Amendment is section 230(c), which states in full:

(c) Protection for "good samaritan" blocking and screening of offensive material

(1) Treatment of publisher or speaker No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

Section 230(c) has two parts. Yahoo relies exclusively on the first part, which bars courts from treating certain internet service providers as publishers or speakers. Looking at the text, it appears clear that neither this subsection nor any other declares a general immunity from liability deriving from third-party content, as Yahoo argues it does. "Subsection (c)(1) does not mention 'immunity' or any synonym." *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.,* 519 F.3d 666, 669 (7th Cir.2008). Our recent *en banc* decision in *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC,* rested not on broad statements of immunity but rather on a careful exegesis of the statutory language. 521 F.3d 1157, 1171 (9th Cir.2008) (en banc) (noting that to "provid[e] immunity every time a website uses data initially obtained from third parties would eviscerate [the statute]"[2] ).

[2]    *Roommates* interpreted a different subsection of the Amendment, § 203(f)(3), but its approach remains instructive.

Following this approach, one notices that subsection (c)(1), which after all is captioned "Treatment of publisher or speaker," precludes liability only by means of a definition. "No provider or user of an interactive computer service," it says, "*shall be treated* as the publisher or speaker of any information provided by another information content provider." § 230(c)(1) (emphasis added). Subsection 230(e)(3) makes explicit the relevance of this definition, for it cautions that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."[3] Bringing these two subsections together, it appears that subsection (c)(1) only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action,[4] as a publisher or speaker  **\*1101** (3) of information provided by another information content provider.

[3]    Conversely, "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." § 230(e)(3).

[4]    We limit our restatement of section 230(c)(1) to state law claims because we deal in this case with state law claims only. We have held that the Amendment's protection also extends to federal law causes of action, *see, e.g., Fair Housing Council of San Fernando Valley v. Roommates.Com,* 521 F.3d 1157 (9th Cir.2008) (en banc) (applying the Amendment to a cause of action under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*). Because no federal law cause of action is present in this case, we need not decide how or whether our discussion of section 230(c)(1) would change in the face of such a federal claim.

Barnes did not contest in the district court that Yahoo is a provider of an interactive computer service, and we have no trouble concluding that it qualifies as one.[5] Nor is there any dispute that the "information content"—such as it is—at issue in this case was provided by another "information content provider."[6] The flashpoint in this case is the meaning of the "publisher or speaker" part of subsection (c)(1), and that is where we train our sights.

[5]    Section 230 helpfully defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." § 230(f)(2).

[6]    The statute also tells us that this term "means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3). We have recently reiterated that "providing *neutral* tools to carry out what may be unlawful or illicit ... does not amount to 'development' " for these purposes, *Roommates,* 521 F.3d at 1169; thus it is crystal clear that Yahoo is not an "information content provider" of the profiles.

B

By its terms, then, section (c)(1) only ensures that in certain cases an internet service provider[7] will not be "treated" as the

"publisher or speaker" of third-party content for the purposes of another cause of action. The question before us is how to determine when, for purposes of this statute, a plaintiff's theory of liability would treat a defendant as a publisher or speaker of third-party content.

[7]   Subsection 230(c)(1) also refers to interactive computer service users, which we do not mention further because such reference is irrelevant to this case.

The cause of action most frequently associated with the cases on section 230 is defamation. *See, e.g., Carafano,* 339 F.3d 1119; *Batzel v. Smith,* 333 F.3d 1018 (9th Cir.2003). This is not surprising, because, as we and some of our sister circuits have recognized, Congress enacted the Amendment in part to respond to a New York state court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.,* 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995) (unpublished), which held that an internet service provider could be liable for defamation. *See e.g., Roommates,* 521 F.3d at 1163; *see also Zeran v. Am. Online, Inc.,* 129 F.3d 327, 331 (4th Cir.1997).

But "a law's scope often differs from its genesis," *Craigslist,* 519 F.3d at 671, and the language of the statute does not limit its application to defamation cases. Indeed, many causes of action might be premised on the publication or speaking of what one might call "information content." A provider of information services might get sued for violating anti-discrimination laws, *see, e.g., Roommates,* 521 F.3d 1157; for fraud, negligent misrepresentation, and ordinary negligence, *see, e.g., Doe v. MySpace, Inc.,* 528 F.3d 413 (5th Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 600, 172 L.Ed.2d 456; for false light, *see, e.g., Flowers v. Carville,* 310 F.3d 1118 (9th Cir.2002); or even for negligent publication of advertisements that cause harm to third parties, *see Braun v. Soldier of Fortune Magazine, Inc.,* 968 F.2d 1110 (11th Cir.1992). Thus, what matters is not the name of the cause of action—defamation versus negligence **\*1102** versus intentional infliction of emotional distress—what matters is whether the cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another. To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a "publisher or speaker." If it does, section 230(c)(1) precludes liability.

We have indicated that publication involves reviewing, editing, and deciding whether to publish or to withdraw

from publication third-party content. *See Roommates,* 521 F.3d at 1170–71 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."). We need not perform any intellectual gymnastics to arrive at this result, for it is rooted in the common sense and common definition of what a publisher does. One dictionary defines "publisher," in relevant part, as "the reproducer of a work intended for public consumption" and also as "one whose business is publication." *See* Webster's Third New International Dictionary 1837 (Philip Babcock Gove ed., 1986). Thus, a publisher reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it. [8] *See also Zeran,* 129 F.3d at 330 (listing "deciding whether to publish, withdraw, postpone or alter content" as examples of "a publisher's traditional editorial functions").

[8]   As we pointed out in *Batzel,* it is immaterial whether this decision comes in the form of deciding what to publish in the first place or what to remove among the published material. 333 F.3d at 1032. This is particularly so in the context of the internet, where material can be "posted" and "unposted" with ease.

### III

Which leads us to whether Barnes, in her negligent undertaking claim, seeks to treat Yahoo as a "publisher or speaker" of the indecent profiles in order to hold Yahoo liable.

### A

The Oregon law tort that Barnes claims Yahoo committed derives from section 323 [9] of the Restatement (Second) of Torts, which states: One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

[9]   We do not decide in this appeal whether Barnes has properly alleged this cause of action under Oregon law.

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Barnes argues that this tort claim would not treat Yahoo as a publisher. She points to her complaint, which acknowledges that although Yahoo "may have had no initial responsibility to act, once [Yahoo,] through its agent, undertook to act, [it] must do so reasonably." According to Barnes, this makes the undertaking, not the publishing or failure to withdraw from publication, the source of liability. Under this theory, Barnes' cause of action would evade the reach of section 230(c) entirely because it treats Yahoo not as a publisher, but rather as one who undertook to perform a service and did it negligently.

We are not persuaded. As we implied above, a plaintiff cannot sue someone for publishing third-party content simply by changing the name of the theory from defamation to negligence. Nor can he or **\*1103** she escape section 230(c) by labeling as a "negligent undertaking" an action that is quintessentially that of a publisher. The word "undertaking," after all, is meaningless without the following verb. That is, one does not merely undertake; one undertakes *to do* something. And what is the undertaking that Barnes alleges Yahoo failed to perform with due care? The removal of the indecent profiles that her former boyfriend posted on Yahoo's website. But removing content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove. *See Craigslist*, 519 F.3d at 671 (finding defendant protected because "only in a capacity as publisher could[the defendant] be liable under § 3604(c) [of the Fair Housing Act]"). In other words, the duty that Barnes claims Yahoo violated derives from Yahoo's conduct as a publisher—the steps it allegedly took, but later supposedly abandoned, to de-publish the offensive profiles. It is because such conduct is *publishing conduct* that we have insisted that section 230 protects from liability "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Roommates*, 521 F.3d at 1170–71.

Although the tort of defamation is not the only form of liability for publishers to which subsection (c)(1) applies, its reach confirms our conclusion. Indeed, we note that Yahoo could be liable for defamation for precisely the conduct of which Barnes accuses it. Defamation law sometimes imposes "an affirmative duty to remove a publication made

by another." Prosser and Keaton on Torts § 113, at 803. Courts have applied this principle, including in a case that reads like a low-tech version of the situation before us. In *Hellar v. Bianco,* 111 Cal.App.2d 424, 244 P.2d 757, 758 (Cal.Ct.App.1952), a woman received a phone call from a man who sought to arrange an unconventional, and apparently amorous, liaison. *Id.* at 758. After being rebuffed, the man informed the woman that her phone number appeared on the bathroom wall of a local bar along with writing indicating that she "was an unchaste woman who indulged in illicit amatory ventures." *Id.* The woman's husband promptly called the bartender and demanded he remove the defamatory graffito, which the bartender said he would do when he got around to it. *Id.* at 758–59. Shortly thereafter, the husband marched to the bar, policeman in tow, and discovered the offending scrawl still gracing the wall. *Id.* at 759. He defended his wife's honor by suing the bar's owner.

The California Court of Appeal held that it was "a question for the jury whether, after knowledge of its existence, [the bar owner] negligently allowed the defamatory matter to remain for so long a time as to be chargeable with its republication." *Id.* at 759. This holding suggests that Yahoo could have been sued under our facts for defamation, one of the elements of which is publication, which strongly confirms our view that section 230(c)(1) bars this lawsuit. [10]

[10]    *Hellar* is not an anomaly, but of a piece with a longstanding theory of defamation liability. *See Byrne v. Dean,* (1937) 1 K.B. 818; *Tidmore v. Mills,* 33 Ala.App. 243, 32 So.2d 769 (Ala.Ct.App.1947). *Contra Scott v. Hull,* 22 Ohio App.2d 141, 259 N.E.2d 160 (1970) (accepting the *Byrne* line of cases but distinguishing it on the ground that the writing was on the outside of the proprietor's building and, thus, not [the tenant's] responsibility to remove).

B

Barnes argues that, even if subsection 230(c)(1) applies to this tort in a general sense, it does not cover her claim because **\*1104** she is suing Yahoo as a distributor, not as a publisher. This argument asks us to join an ongoing academic debate, which has developed in response to the Fourth Circuit's *Zeran* opinion, on whether "publisher" in subsection 230(c)(1) means only "primary publisher" or both "primary publisher"

2009 Daily Journal D.A.R. 9032

and "distributor," also known as a "secondary publisher," for purposes of defamation liability.

To understand this debate, we briefly sketch the liability of publishers and distributors in defamation law. One of the elements of the tort of defamation is "publication" of the defamatory matter, which simply means "communication intentionally or by a negligent act to one other than the person defamed." Restatement (Second) of Torts § 577(1) (1965). It is well established that "[e]very repetition of the defamation is a publication in itself," whether or not the person repeating the defamation attributes it to its source. Prosser & Keaton § 113, at 799. "[E]veryone who takes part in the publication, as in the case of the owner, editor, printer, vendor, or even carrier of a newspaper is charged with publication." *Id.; see also Cianci v. New Times Publ'g Co.,* 639 F.2d 54, 60–61 (2d Cir.1980) (noting the "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally" (internal quotation marks omitted)). However, defamation law assigns different requirements of fault in order to hold someone liable for different forms of publication. Hence, it became "necessary to classify participants into three categories: primary publishers, secondary publishers or disseminators, and those who are suppliers of equipment and facilities and are not publishers at all." Prosser & Keaton, § 113 at 803. Primary publishers were held to a strict liability standard, whereas secondary publishers were only liable for publishing defamation with actual or constructive knowledge of its defamatory character. *Id.* at 810–11. Secondary publishers came to be known as distributors, *see, e.g., Cubby, Inc. v. CompuServe, Inc.,* 776 F.Supp. 135, 139 (S.D.N.Y.1991).

Pointing to this legal background, Barnes argues that the term "publisher" in section 230(c)(1) refers only to primary publishers and not to secondary publishers or distributors. She argues that because Congress enacted section 230 to overrule *Stratton Oakmont,* which held an internet service provider liable as a primary publisher, not a distributor, the statute does no more than overrule that decision's application of publisher liability. In *Zeran,* the Fourth Circuit rejected a similar argument, concluding that so-called distributor liability is merely a subset of publisher liability for purposes of defamation law. 129 F.3d at 332. We have taken note of this issue before, but have not yet had to rule on it for ourselves. *See Batzel,* 333 F.3d at 1027 n. 10 ("We ... need not decide whether § 230(c)(1) encompasses both publishers and distributors.").

In our view, however, we need not resolve the dispute at all, because it has little to do with the meaning of the statutory language. As noted above, section 230(c)(1) precludes courts from treating internet service providers as publishers not just for the purposes of defamation law, with its particular distinction between primary and secondary publishers, but in general. The statute does not mention defamation, and we decline to read the principles of defamation law into it. In any event, if the reach of section 230(c)(1) were fastened so tightly to the nuances of defamation law, our *Roommates* opinion, which dealt with a lawsuit under the Fair Housing Act, would simply have declared that the provision did not apply because there was no claim of defamation. We will not engage in an analysis so contrary to **\*1105** the reasoning, and even some of the holding, of our precedent.

Nor do we find particularly edifying the debate over the exact reach of *Stratton Oakmont,* the New York case Congress apparently meant to overrule. As the Seventh Circuit has recognized,

> [a]lthough the impetus for the enactment of § 230(c) as a whole was a [decision] holding an information content provider liable, as a publisher, because it had exercised some selectivity with respect to the sexually oriented material it would host for customers, a law's scope often differs from its genesis. Once the legislative process gets rolling, interest groups seek (and often obtain) other provisions.

*Craigslist,* 519 F.3d at 671. Both parties make a lot of sound and fury on the congressional intent of the immunity under section 230, but such noise ultimately signifies nothing. It is the language of the statute that defines and enacts the concerns and aims of Congress; a particular concern does not rewrite the language.

C

Leaving no stone unturned, Barnes reminds us that the statutory purpose of the Amendment is to encourage websites affirmatively to police themselves, not to provide an excuse

for doing nothing. This argument from statutory purpose has more force to it, because section 230(c) is, after all, captioned "Protection for 'good samaritan' blocking and screening of offensive material." *Cf. Roommates,* 521 F.3d at 1163–64. It would indeed be strange for a provision so captioned to provide equal protection as between internet service providers who do nothing and those who attempt to block and screen offensive material. As the Seventh Circuit has recognized, if section (c) did provide equal protection, then "[internet service providers] may be expected to take the do-nothing option and enjoy immunity" because "precautions are costly." *GTE Corp.,* 347 F.3d at 660.

A closer look at the whole of section 230(c), we believe, makes sense of this apparent contradiction. Subsection (c)(1), by itself, shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties. Subsection (c)(2), for its part, provides an additional shield from liability, but only for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider ... considers to be obscene ... or otherwise objectionable." § 230(c)(2)(A). Crucially, the persons who can take advantage of this liability shield are not merely those whom subsection (c)(1) already protects, but *any* provider of an interactive computer service. *See* § 230(c)(2). Thus, even those who cannot take advantage of subsection (c)(1), perhaps because they developed, even in part, the content at issue, *see Roommates,* 521 F.3d at 1162–63, can take advantage of subsection (c)(2) if they act to restrict access to the content because they consider it obscene or otherwise objectionable. Additionally, subsection (c)(2) also protects internet service providers from liability not for publishing or speaking, but rather for actions taken to restrict access to obscene or otherwise objectionable content. [11]

[11] It might be more straightforward to narrow the meaning of "publisher" liability to include only affirmative acts of publication but not the refusal to remove obscene material. That path, however, is closed to us. *Batzel,* 333 F.3d at 1032.

Thus, we must reject Barnes' contention that it does violence to the statutory scheme to bar her suit for negligent undertaking. To summarize, we hold that section 230(c)(1) bars Barnes' claim, under Oregon law, for negligent provision of services that Yahoo undertook to provide. **\*1106** The district court properly granted Yahoo's motion to dismiss that cause of action.

IV

As we indicated above, Barnes' complaint could also be read to base liability on section 90 of the Restatement (Second) of Contracts, which describes a theory of recovery often known as promissory estoppel. At oral argument, counsel for Barnes acknowledged that its tort claim might be "recast" in terms of promissory estoppel. We think it might, and in analyzing it as such now we add that liability for breach of promise is different from, and not merely a rephrasing of, liability for negligent undertaking.

A

Oregon has accepted promissory estoppel as a theory of recovery. *Bixler v. First Nat'l Bank of Or.,* 49 Or.App. 195, 619 P.2d 895, 898 (1980) (citing *Schafer v. Fraser,* 206 Or. 446, 290 P.2d 190, 199–206 (1955)). The "principal criteria" that determine "when action renders a promise enforceable" under this doctrine are: "(1) a promise[;] (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred[;] (3) actual reliance on the promise[;] (4) resulting in a substantial change in position." *Id.* at 899. [12]

[12] As we analyze here the reach of a federal statute that applies to all fifty states, we discuss the law of contracts generally. However, Oregon law applies to Barnes' contract claim. Any conflict between this discussion and Oregon law is to be resolved, on remand, in favor of Oregon law.

In most states, including Oregon, " '[p]romissory estoppel' is not a 'cause of action' in itself; rather it is a subset of a theory of recovery based on a breach of contract and serves as a substitute for consideration." *Rick Franklin Corp. v. State ex rel. Dep't of Transp.,* 207 Or.App. 183, 140 P.3d 1136, 1140 n. 5 (2006). "A promise binding under [section 90 of the Restatement] *is* a contract...." Restatement (Second) of Contracts § 90 cmt. d (emphasis added).

Thus, aside from consideration, ordinary contract principles usually apply. [13] Just as "[c]ontract law is designed to protect the expectations of the contracting parties," 1 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 1.1 (4th ed.2007), so is promissory estoppel. Similarly, the majority rule in this country is that "any promise which is to serve as the basis for a promissory estoppel claim

or defense [ ] be as clear and well defined as a promise that could serve as an offer, or that otherwise might be sufficient to give rise to a traditional contract supported by consideration." 1 Williston & Lord, *supra* § 8.7; *see also id.* § 8.6 ("there must be a promise, gratuitous at least in the sense that there is no consideration to make it binding").

[13]     One area where promissory estoppel does vary ordinary contract principles is in the damages. Although "full-scale enforcement" by normal remedies is often appropriate," Restatement (Second) of Contracts § 90 comment d, some courts have awarded damages to compensate the promisee for his expected benefit (ordinary contract damages), while others have awarded damages to compensate the promisee for his detrimental reliance, *see Jackson v. Morse,* 152 N.H. 48, 871 A.2d 47, 52–53 (2005) (collecting cases).

This philosophy is reflected in the so-called "promissory nature" of contract. *Id.* It is no small thing for courts to enforce private bargains. The law justifies such intervention only because the parties manifest, ex ante, their mutual desire that each be able to call upon a judicial remedy if the other should breach. Thus the Restatement defines a promise as "a *manifestation of intention* to act or refrain from acting in a specified way, so made as **\*1107** to justify a promise in understanding that a commitment has been made." Restatement (Second) of Contracts § 2(1) (emphasis added). "A promisor manifests an intention if he believes or has reason to believe that the promisee will infer that intention from his words or conduct." *Id.* § 2 cmt. b.

Such, then, is the promise that promissory estoppel requires: one that the promissor intends, actually or constructively, to induce reliance on the part of the promisee. From such intention courts infer the intention that the promise be legally enforceable. Thus, when A sues B for breach of contract, A is alleging that B violated an obligation that B intended to be legally enforceable. In promissory estoppel cases, courts simply infer that intention not from consideration but from a promise that B could have foreseen would induce A's reliance.

B

Against this background, we inquire whether Barnes' theory of recovery under promissory estoppel would treat Yahoo as a "publisher or speaker" under the Act.

As we explained above, subsection 230(c)(1) precludes liability when the duty the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker. In a promissory estoppel case, as in any other contract case, the duty the defendant allegedly violated springs from a contract—an enforceable promise—not from any non-contractual conduct or capacity of the defendant. *See GTE Corp.,* 347 F.3d at 662 ("Maybe [the] plaintiffs would have a better argument that, *by its contracts* ..., [the defendant] assumed a duty to protect them."). Barnes does not seek to hold Yahoo liable as a publisher or speaker of third-party content, but rather as the counter-party to a contract, as a promisor who has breached.

How does this analysis differ from our discussion of liability for the tort of negligent undertaking? *See supra* pp. at 1101–03. After all, even if Yahoo did make a promise, it promised to take down third-party content from its website, which is quintessential publisher conduct, just as what Yahoo allegedly undertook to do consisted in publishing activity. The difference is that the various torts we referred to above each derive liability from behavior that is identical to publishing or speaking: publishing defamatory material; publishing material that inflicts emotional distress; or indeed attempting to de-publish hurtful material but doing it badly. To undertake a thing, within the meaning of the tort, *is* to do it.

Promising is different because it is not synonymous with the performance of the action promised. That is, whereas one cannot undertake to do something without simultaneously doing it, one can, and often does, promise to do something without actually doing it at the same time. Contract liability here would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication. Contract law treats the outwardly manifested intention to create an expectation on the part of another as a legally significant event. That event generates a legal duty distinct from the conduct at hand, be it the conduct of a publisher, of a doctor, or of an overzealous uncle. [14]

[14]     We are aware of some potentially countervailing history. Both promissory estoppel and ordinary breach of contract actions evolved from the common law writ of assumpsit. J.B. Ames, *The*

*History of Assumpsit,* 2 Harv. L.Rev. 1, 2–4 (1888). Assumpsit originally sounded in tort, for only formal contracts were enforceable as such until the refinement of the doctrine of consideration. *Id.* at 15–17; 1 Williston & Lord, *supra* § 1.16. The tort of negligent undertaking is the vestige of this original tort; promissory estoppel, too, retains some of the originally delictual nature of assumpsit. *Cf. Schafer v. Fraser,* 290 P.2d at 205–06; 1 Williston & Lord, *supra* § 8.1. Indeed, "it is not uncommon under modern rules of pleading for a plaintiff to assert one count based upon negligent failure to perform a gratuitous undertaking [under Restatement (Second) of Torts section 323] and another based upon promissory estoppel." 1 Williston & Lord, *supra* § 8.1.

All the same, we believe the distinction we draw is sound. Though promissory estoppel lurks on the sometimes blurry boundary between contract and tort, its *promissory* character distinguishes it from tort. That character drives our analysis here and places promissory estoppel beyond the reach of subsection 230(c)(1).

**\*1108** Furthermore, a court cannot simply infer a promise from an attempt to de-publish of the sort that might support tort liability under section 323 of the Restatement (Second) of Torts. For, as a matter of contract law, the promise must "be as clear and well defined as a promise that could serve as an offer, or that otherwise might be sufficient to give rise to a traditional contract supported by consideration." 1 Williston & Lord, *supra* § 8.7. "The formation of a contract," indeed, "requires a meeting of the minds of the parties, a standard that is measured by the objective manifestations of intent by both parties to bind themselves to an agreement." *Rick Franklin Corp.,* 140 P.3d at 1140; *see also Cosgrove v. Bartolotta,* 150 F.3d 729, 733 (7th Cir.1998) (noting that if "[a] promise [ ] is vague and hedged about with conditions .... [the promisee] cannot plead promissory estoppel."). Thus a general monitoring policy, or even an attempt to help a particular person, on the part of an interactive computer service such as Yahoo does not suffice for contract liability. This makes it easy for Yahoo to avoid liability: it need only disclaim any intention to be bound. *See Workman v. United Parcel Serv. Inc.,* 234 F.3d 998, 1001 (7th Cir.2000) ("[C]onsideration or reliance is a necessary but not a sufficient condition of the enforceability of a promise. Another necessary condition is that the promise be worded consistently with its being intended to be enforceable.").

One might also approach this question from the perspective of waiver. [15] The objective intention to be bound by a promise— which, again, promissory estoppel derives from a promise that induces reasonably foreseeable, detrimental reliance—also signifies the waiver of certain defenses. A putative promisor might defend on grounds that show that the contract was never formed (the lack of acceptance or a meeting of the minds, for example) or that he could not have intended as the evidence at first suggests he did (unconscionability, duress, or incapacity, for example). Such defenses go to the integrity of the promise and the intention it signifies; they usually cannot be waived by the agreement they purport to undermine. But once a court concludes a promise is legally enforceable according to contract law, it has implicitly concluded that the promisor has manifestly intended that the court enforce his promise. By so intending, he has agreed to depart from the baseline rules (usually derived from tort or statute) that govern the mine-run of relationships between strangers. Subsection 230(c)(1) creates a baseline rule: no liability for publishing or speaking the content of other information service providers. Insofar as Yahoo made a promise with the constructive intent that it be enforceable, it has implicitly **\*1109** agreed to an alteration in such baseline.

[15] Indeed, promissory estoppel developed in part out of cases in which "[p]romises of future action ... relate[d] to an intended abandonment of an existing right." 1 Williston & Lord, *supra* § 8.4.

Therefore, we conclude that, insofar as Barnes alleges a breach of contract claim under the theory of promissory estoppel, subsection 230(c)(1) of the Act does not preclude her cause of action. Because we have only reviewed the affirmative defense that Yahoo raised in this appeal, we do not reach the question whether Barnes has a viable contract claim or whether Yahoo has an affirmative defense under subsection 230(c)(2) of the Act.

V

For the foregoing reasons, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings. Each party shall bear its own costs.

**All Citations**

570 F.3d 1096, 2009 Daily Journal D.A.R. 9032

2009 Daily Journal D.A.R. 9032

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:25-cv-13037-BRM-APP ECF No. 19-1, PageID.407 Filed 10/24/25 Page 13 of 73

Eggleston v. Daniels, Not Reported in Fed. Supp. (2016)

2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

2016 WL 4363013
United States District Court, E.D.
Michigan, Southern Division.

Sophia EGGLESTON, Plaintiffs,
v.
Lee DANIELS, et al., Defendants.

Case No. 15-11893
|
Signed 08/16/2016

**Attorneys and Law Firms**

James S. Lawrence, Mt. Clemens, MI, Thomas P. Heed, Heed
Law Group PLLC, Novi, MI, for Plaintiffs.

J. Michael Huget, Sarah E. Waidelich, Honigman Miller
Schwartz and Cohn LLP, Ann Arbor, MI, for Defendants.

**ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM (DKT.
46) AND DENYING WITHOUT PREJUDICE
DEFENDANTS DANIELS, SPELLMAN, AND
STRONG'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION (DKT. 48)**

TERRENCE G. BERG, UNITED STATES DISTRICT
JUDGE

*1 In this copyright infringement case, Plaintiff Sophia
Eggleston ("Plaintiff" or "Eggleston") alleges that her self-
characterization in her 2009 memoir *The Hidden Hand* was
the uncredited inspiration for the character Loretha "Cookie"
Lyon on the FOX television series *Empire*. (Dkt. 1, ¶¶ 73-80.)
Two motions are before the Court. First, all Defendants seek
to dismiss Plaintiff's First Amended Complaint pursuant to
Federal Rule of Civil Procedure 12(b)(6) for failure to state
a claim upon which relief can be granted. (Dkt. 46.) Second,
Defendants Lee Daniels, Malcolm Spellman, and Daniel
Strong (the "Individual Defendants") assert, pursuant to
Federal Rule of Civil Procedure 12(b)(2), that this Court lacks
personal jurisdiction over them. (Dkt. 48.) The motions are
fully briefed, but Defendants have filed objections to several
declarations Plaintiff submitted as exhibits to her response
briefs. (Dkt. 56.) Plaintiff has responded to Defendants'
objections. (Dkt. 57.)

On May 18, 2016, a hearing was held on these motions
in Detroit, Michigan. (*See* Dkt. 58.) For the reasons stated
below, Defendants' motion to dismiss will be **GRANTED IN
PART** as to Count II only and **DENIED** as to the remaining
Counts. The Individual Defendants' motion to dismiss for
lack of personal jurisdiction (Dkt. 48) will be **DENIED
WITHOUT PREJUDICE**. The Court will order the parties
to conduct **THIRTY DAYS** of jurisdictional discovery. The
Individual Defendants may re-file their motion to dismiss for
lack of personal jurisdiction once this jurisdictional discovery
is complete.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

On May 27, 2015, Plaintiff filed a pro se complaint alleging
that the television series *Empire*, and in particular the
character Loretha "Cookie" Lyon ("Cookie Lyon"), was
inspired by Plaintiff's 2009 memoir *The Hidden Hand*.
(*See* Dkt. 1.) A copy of the memoir was attached to the
complaint. (*Id.*) After Plaintiff retained an attorney, she filed
her First Amended Complaint on November 20, 2015, and
again attached a copy of *The Hidden Hand*. (Dkt. 43.) The
First Amended Complaint contains two counts: copyright
infringement in violation of 17 U.S.C. § 101 et seq. (Count I),
and the unlawful appropriation of Plaintiff's right to publicity
in violation of Michigan common law (Count II). (*Id.* at ¶¶
75-96.)

**A. Plaintiff's Memoir *The Hidden Hand***
In 2009, Plaintiff self-published her memoir entitled *The
Hidden Hand*. (*Id.* at ¶¶ 31-32.) Composed between 2005 and
2007, with additional material added in 2009, *The Hidden
Hand* details Plaintiff's "life of crime, her time in prison,
and her subsequent redemption." (*Id.* at ¶ 35.) The title is a
reference to the hidden hand of God that Plaintiff believes has
been guiding and protecting her throughout her tumultuous
life. (Dkt. 43-1, p. 5-7.) Plaintiff registered her memoir
with the copyright office on or about November 16, 2009,
and received copyright registration number TXu001656874.
(Dkt. 43, ¶¶ 33-34.)

*The Hidden Hand*, set primarily in Detroit, is a thorough
retelling of Plaintiff's life beginning with her birth in 1966 and
her earliest memories. (Dkt. 43-1, p. 20.) Plaintiff describes
herself as a person who was born "ready to fight" and who
suffered an abusive father throughout her childhood. (*Id.* at

2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

20-23.) By the age of eight, Plaintiff asserts that she was leading her first gang and had developed an uncontrollable temper. (*Id.* at 27-28.) At fifteen, Plaintiff started selling drugs and moved into the home of Robert Lucas, with whom she began a romantic relationship. (Dkt. 43-2, pp. 3-11.) Plaintiff became addicted to drugs, and struggled with that addiction throughout her adult life. (*See, e.g,* dkt. 43-9, pp. 25-30.) She recounts how she committed crimes, was convicted of several offenses, and went to jail, but was eventually able to maintain her sobriety after serving her second prison term. (Dkt. 43-2, pp. 10, 32-45; Dkt. 43-3, pp. 9-10.)

 **\*2** Many significant events in Plaintiff's life are detailed in *The Hidden Hand.* Plaintiff recounts the attempted kidnapping of her youngest daughter (Dkt 43-10, pp. 44-46), and coming to terms with her brother's homosexuality, which he revealed to her while she was in prison (Dkt. 43-9, pp. 3-4). Plaintiff survived numerous incidents where she was threatened with guns. (Dkt. 43-8, p. 2; Dkt. 43-11, pp. 12-13; Dkt. 43-12, pp. 4-6, 21.) The memoir also includes stories about Plaintiff's two sisters, both of whom were murdered. (Dkt. 43-4, pp. 19-31; Dkt. 43-5, pp. 26-43.)

After her first sister's passing, Plaintiff met Eddie Hodge at a Johnnie Taylor show. (Dkt. 43-4, p. 37.) Eddie and Plaintiff became romantically involved, and it is through Eddie's contacts in the music business that Plaintiff met many famous musicians, including Taylor, B.B. King, and George Clinton. (Dkt. 43-4, pp. 37-50; Dkt. 43-5, pp. 1-2.) Plaintiff and Eddie eventually had a daughter. (Dkt. 43-5, p. 3.) The couple would separate and reconcile several times throughout Plaintiff's life until Eddie's death from cancer. (Dkt. 43-11, pp. 38-46.)

Prior to Eddie's death, Plaintiff had a romantic relationship with Rodney Meeks that was marred by drugs and violence. (Dkt. 43-5, pp. 37-50.) In 1992, after a particularly violent argument, Plaintiff shot and killed Rodney. (Dkt. 43-8, pp. 5-27; Dkt. 43-9, p. 2.) Plaintiff refused a plea deal and was tried for second-degree murder, but found guilty by jury of voluntary manslaughter and sentenced to one to fifteen years' imprisonment. (Dkt. 43-8, pp. 5-27.) Plaintiff claims that she was not initially able to remember the incident, but suffered a mental breakdown in prison when her memories finally returned, resulting in her temporary placement in the prison psychiatric unit. (Dkt. 43-9, pp. 2-3.) Plaintiff was released in 1995, but she failed several drug tests and had to complete a thirty-day drug rehabilitation program to avoid returning to prison. (*Id.* at 14-15, 23-27.) After completing the program,

Plaintiff founded a Christian ministry called Jesus Freedom that includes a radio and television program. (Dkt. 43-9, pp. 29-33; Dkt. 43-10, p. 28.)

In 1996, Plaintiff learned about prisoner Felix Walls from Eddie's oldest son, who believed that Plaintiff's ministry could help Walls. (Dkt. 43-10, p. 27.) Plaintiff visited Walls at the Wayne County jail and soon fell in love with him. (*Id.* at 28.) Plaintiff believes that Walls' conviction is the result of a conspiracy against him and supported him throughout his retrial, even petitioning a federal judge and then United States Attorney General Janet Reno for assistance. (*Id.* at 29-44.) Walls was convicted a second time, however, which led Plaintiff to believe that God introduced her to Walls to inspire her to expose police corruption rather than to fulfill her own personal desires. (*Id.*) As a result of this revelation, Plaintiff had a series of altercations with the police. (Dkt. 43-11, pp. 6-8, 12-15, 46-47.)

In 2005, Plaintiff returned to prison for violating probation and marijuana possession when the police found a large quantity of the drug in her home. (Dkt. 43-12, pp. 39-46.) While serving this second prison sentence, Plaintiff began writing *The Hidden Hand.* (*Id.* at 44-45.) Plaintiff was released in 2007 (*Id.* at 47), but she had a health scare in 2009 that prompted her to write the final chapter. (Dkt. 43-13, pp. 1-4.) The final chapter details how Plaintiff began working as a community liaison for a home health care provider after serving her prison time. (*Id.* at 17-18.) She then founded her own home health care company that brings doctors to the residences of homebound individuals. (*Id.* at 18.) Plaintiff writes that she found redemption in ensuring that seniors and the disabled receive quality health care and are treated with dignity. (*Id.* at 18-20.) The memoir ends after Plaintiff succeeds in restoring the utilities of one of her elderly clients who could not afford to pay those bills. (*Id.* at 31.) Plaintiff concludes by imploring her readers to trust in the power and presence of God's hidden hand in their own lives. (*Id.* at 32.)

### B. Plaintiff's Meeting with Rita Grant Miller

 **\*3** According to the First Amended Complaint, in 2011, approximately two years after completing *The Hidden Hand*, Plaintiff was introduced to Rita Grant Miller through a mutual acquaintance, producer Richard "Rick" Appling. [1] (Dkt. 43, ¶¶ 36-40.) Miller has worked as a screenwriter and has been involved in the production of several films. (*Id.* at ¶ 37.) Appling arranged for Plaintiff to visit Miller's residence in California for a meeting where Plaintiff and Miller discussed

Case 2:25-cv-13037-BRM-APP ECF No. 19-1, PageID.409 Filed 10/24/25 Page 15 of 73

Eggleston v. Daniels, Not Reported in Fed. Supp. (2016)

2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

adapting *The Hidden Hand* into a screenplay.[2] (*Id.* at ¶ 40.) At the meeting, Plaintiff gave Miller a copy of *The Hidden Hand* and was interviewed at length by Miller, who took notes. (*Id.* at ¶¶ 42-43.) Miller told Plaintiff and Appling that Miller would adapt *The Hidden Hand* into a screenplay and pitch the idea to Defendant Lee Daniels. (*Id.* at ¶¶ 44-45.) Miller showed Plaintiff the 2013 movie *The Butler*, directed by Defendant Daniels and written and produced by Defendant Daniel Strong, to familiarize Plaintiff with Defendant Daniels' work. (*Id.* at ¶ 46.)

[1]    No party has filed a deposition, declaration, or affidavit from Rita Grant Miller and, as they clarified at the motion hearing, Defendants do not challenge Plaintiff's version of her interactions with Miller or of Miller's interactions with them. At this stage, the Court will therefore accept Plaintiff's well-plead allegations with respect to Miller and the Individual Defendants as true.

[2]    Plaintiff references her desire to make a movie about her life several times in *The Hidden Hand*. (*See, e.g.*, dkt. 43-1, pp. 12-13; dkt. 43-10, p. 8.)

Plaintiff alleges that, on information and belief, Miller wrote a script or a treatment of *The Hidden Hand*. (*Id.* at ¶ 47.) After Plaintiff returned to Michigan, Miller called Plaintiff from New Jersey and told Plaintiff that Miller was meeting with Defendant Daniels and would pitch the adaptation of *The Hidden Hand* to him. (*Id.* at ¶¶ 48-52.) Plaintiff asserts that, as part of this pitch meeting, Miller gave Defendant Daniels a copy of *The Hidden Hand*, Miller's adaptation or treatment of *The Hidden Hand*, and Miller's interview notes. (*Id.* at ¶¶ 53-55.) Defendant Daniels, according to Plaintiff, then shared these materials with Defendants Malcolm Spellman and Strong, among others. (*Id.* at ¶ 56.) After meeting with Defendant Daniels, Miller avoided all further contact with Plaintiff. (*Id.* at ¶ 57.)

### C. The FOX Television Series *Empire*

Defendants include the creators, writers, producers, directors, broadcasters, and distributors of the FOX network television series *Empire*, which debuted on January 7, 2015 and has been renewed for a third season. The series is set in present-day New York City and chronicles the saga of the Lyon family's struggle for control of their music and entertainment company, Empire Entertainment.[3] The family patriarch is rapper and music mogul Lucious Lyon, a former drug dealer who learns he has been diagnosed with a fatal disease. With

only three years to live, Lucious contemplates the fate of his empire, and begins to consider which of his family members is most qualified to succeed him.

[3]    The following two-paragraph summary of *Empire* is taken from DVD recordings of the first season submitted by Defendants as an exhibit to their Rule 12(b)(6) motion. (Dkt. 43, Ex. A.) Because Plaintiff repeatedly references the television series in her First Amended Complaint, the Court will consider those recordings as if they are incorporated by reference. *See Weiner v. Klais and Co.*, 108 F.3d 86, 89 (6th Cir. 1997). Whenever possible, the Court will try to avoid spoiling significant plot developments.

When the series opens, Lucious is in full control of Empire Entertainment, a privately-held music and entertainment company that was founded by Lucious and his ex-wife, Cookie Lyon, with the help of money Cookie earned from her drug dealing operations. In the first episode, Cookie is about halfway through serving a thirty-year prison sentence, which she received after taking the fall for a drug deal gone wrong. Unexpectedly, Cookie gains release after seventeen years and confronts Lucious, demanding her share of the company. Thus begins the struggle for control of Empire Entertainment between Lucious, Cookie, and their three sons: Andre, a married businessman with bipolar disorder, Jamal, a gay singer rejected by his homophobic father, and Hakeem, a talented but unfocused rapper. Defendants compare the shifting alliances within and without the Lyon family to those in William Shakespeare's play *King Lear* or to those typically depicted in prime-time television soap operas about the rich and famous, such as *Dallas* and *Dynasty*. (Dkt. 46, pp. 16-17.)

### D. Substantial Similarities

**\*4** Plaintiff alleges that are many "striking and shocking similarities" between the way she depicted herself in *The Hidden Hand* and the character of Cookie Lyon. (Dkt. 43, ¶ 67.) In her First Amended Complaint, Plaintiff gives a list of twenty-three such similarities. These include the fact that Plaintiff and Cookie Lyon are both light-skinned African-American women who wear expensive clothing, lead gangs, have placed hits on men and sold drugs, have gay family members, have two family members who were murdered, have served prison sentences, and are known for their "vicious insults" and propensity to slap people. (*Id.*) Moreover, both Plaintiff and Cookie Lyon have shielded others by stepping in front of a loaded gun, have endured the kidnapping or

Eggleston v. Daniels, Not Reported in Fed. Supp. (2016)

2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

attempted kidnapping of one of their children, lost their lovers while in prison, and attacked their former lovers' new lovers upon release from prison. (*Id.*) The complaint further notes that they both have a tendency to use the words "hoe" and "bitch". (*Id.*)

Defendants argue that these similarities are coincidental rather than substantial, and represent "unprotectable biographical facts, ideas, stock themes, and elements commonplace in drug and violence stories." (Dkt. 46, p. 11.) Plaintiff maintains that these similarities speak to the "expression and portrayal of a character" and are not mere biographical facts. (Dkt. 52, pp. 14-15.)

## II. ANALYSIS

The motions before the Court raise three matters to resolve. First are Defendants' evidentiary objections to the declarations that Plaintiff has attached to her two response briefs. (Dkt. 56.) Second, there is Defendants' motion to dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(6). (Dkt. 46.) And third, the Individual Defendants have filed a motion to dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(2). (Dkt. 48.) The Court will now address each issue in turn.

### A. Defendants' Evidentiary Objections

As a threshold matter, Defendants have filed evidentiary objections to the declarations that Plaintiff submitted in support of her response briefs as containing hearsay or improper expert testimony. (Dkt. 56.) In particular, Defendants object to the declaration of Plaintiff's attorney, Thomas Heed, filed in support of Plaintiff's response to the Individual Defendants' Rule 12(b)(2) motion. (*Id.* at 1.) Defendants argue that Heed's declaration "improperly relies on hearsay references" to the contents of a contract between Defendant Daniels and FOX. (*Id.* at 8.) The Court finds that the record is insufficient to permit a determination on the question of personal jurisdiction. Consequently, the parties will be allowed to conduct thirty days of jurisdictional discovery, and the motion to dismiss will be denied without prejudice at this time. It is therefore premature to rule on the objection to Heed's declaration, which will also be overruled without prejudice.

The Court will also deny without prejudice Defendants' objections to the declarations of Plaintiff, Appling, and Paula

Taylor that Plaintiff attached as exhibits in support of her response to Defendants' Rule 12(b)(6) motion. Defendants argue that Plaintiff's declaration relies on inadmissible hearsay by referencing, and mischaracterizing, statements made by a judge during a television news program that Plaintiff appeared on after she filed this case. (*Id.* at 9.) As for the declarations of Appling and Taylor, Defendants argue that they contain inadmissible expert testimony because the declarants "opine on the ultimate legal issue" of this case without having been qualified as experts. (*Id.* at 10-14.)

As noted below, when deciding a motion to dismiss, the Court's inquiry is limited to an examination of the complaint. *Weiner v. Klais and Co.*, 108 F.3d 86, 88 (6th Cir. 1997). The Court is not to consider matters outside the pleadings, and may only consider those documents attached to a motion to dismiss, such as a video recording of the *Empire* television show, that are referred to in the complaint and are central to Plaintiff's claims. [4] *Id.* at 89. To do otherwise would be to risk converting the motion to dismiss into a motion for summary judgment prior to any discovery. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")

[4]  In her response brief filed in opposition to Defendants' Rule 12(b)(6) motion, Plaintiff requests that the Court exclude Defendants' exhibit video recording of the first season of *Empire* attached to its Rule 12(b)(6) motion. (Dkt. 52, p. 16.) In the alternative, Plaintiff requests that the declarations she has filed be considered and Defendants' Rule 12(b)(6) motion converted to a motion for summary judgment. (*Id.*) The Court has broad discretion to decide whether to consider matters outside the pleadings and convert the motion. *See Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010) (applying an abuse of discretion standard to district court's decision to convert a 12(b)(6) motion to dismiss into a motion for summary judgment). The Court will decline to exercise its discretion here because no discovery has been conducted in this case and questions remain with respect to its jurisdiction over the Individual Defendants, but the Court will consider the video recording of *Empire* because it is clearly central to Plaintiff's claims and referenced throughout her First Amended

**Eggleston v. Daniels, Not Reported in Fed. Supp. (2016)**

2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

Complaint. Indeed, determining whether Plaintiff's claims are plausible requires comparing the two works. The declarations in question, by contrast, are not necessary to decide Defendants' Rule 12(b)(6) motion.

**\*5** With the narrow scope of its inquiry in mind, the Court will not rely on the declarations attached to Plaintiff's response briefs. Accordingly, any objections thereto will be denied without prejudice. If Plaintiff attempts to rely on these declarations at the summary judgment phase, then Defendants may renew their objections at that time.

### B. Defendants' Rule 12(b)(6) Motion

Defendants challenge Plaintiff's First Amended Complaint as insufficient to state a claim and argue that it must be dismissed pursuant to Rule 12(b)(6). (Dkt. 46.) Both in their motion and at the hearing, Defendants did not contest Plaintiff's allegations that the Defendants had access to *The Hidden Hand.* Instead, Defendants focus exclusively on Plaintiff's allegations of substantial similarity. (*Id.* at 19-32.) Defendants also argue that Plaintiff's state law claim must be dismissed because Plaintiff has not plead any facts alleging that she has a pecuniary interest or commercial value in her identity. (*Id.* at 32-34.) Plaintiff disputes these arguments. (Dkt. 52.)

### 1. Legal Standard for a Rule 12(b)(6) Motion

A motion to dismiss only tests the sufficiency of a complaint. In a light most favorable to the plaintiff, the Court must assume that the factual allegations are true and determine whether the complaint states a valid claim for relief. *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996). To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and emphasis omitted); *see also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007). "[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 679 (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* "Determining whether a complaint states a plausible claim for relief will...be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown —that the pleader is entitled to relief." *Id.* (internal quotation marks and citation omitted). In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 678 (internal quotation marks and citation omitted).

When ruling on a motion to dismiss, a court may not consider matters outside the pleadings. *Weiner*, 108 F.3d 86, 88 (6th Cir. 1997). However, "a court may consider any matters of which a court may take judicial notice without converting a party's motion to dismiss into a motion for summary judgment." *Id.* Additionally, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Id.* at 89.

### 2. Plaintiff's Copyright Infringement Claim

**\*6** Count I of Plaintiff's First Amended Complaint alleges a copyright infringement claim against Defendants under 17 U.S.C. § 101 *et seq.* (Dkt. 43, ¶¶ 75-86.) Plaintiff asserts that Defendants have willfully violated Plaintiff's copyright by "writing, producing, and broadcasting" *Empire*, the infringement has occurred in Michigan because the show is broadcast and sold there, and Defendants have made, and will continue to make, unjust and substantial monetary gains. (*Id.*)

Because "copyright infringement lends itself readily to abusive litigation, since the high cost of trying such a case can force a defendant who might otherwise be successful in trial to settle in order to avoid the time and expenditure of a resource intensive case ... greater particularity in pleading, through showing 'plausible grounds', is required." *Nat'l Bus. Dev. Servs., Inc. v. Am. Credit Educ. & Consulting Inc.*, 299 Fed.Appx. 509, 512 (6th Cir. 2008). Showing plausible grounds means pleading "enough fact[s] to raise a reasonable

Case 2:25-cv-13037-BRM-APP ECF No. 19-1, PageID.412 Filed 10/24/25 Page 18 of 73
Eggleston v. Daniels, Not Reported in Fed. Supp. (2016)
2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

expectation that discovery will reveal evidence of [copyright infringement]." *Id.* (internal citation omitted).

"The elements of a copyright-infringement claim are (1) ownership of the copyright by the plaintiff and (2) copying by the defendant." *Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 581 (6th Cir. 2007). The first element is satisfied in this case, as Defendants do not dispute Plaintiff's allegation that she holds the copyright to *The Hidden Hand*. The essential question is thus whether Defendants unlawfully copied any elements of Plaintiff's memoir.

To establish that *The Hidden Hand* has been copied, Plaintiff must either introduce direct evidence of Defendants' copying or prove it indirectly by showing that Defendants had access to Plaintiff's work *and* that there is a substantial similarity between it and *Empire*, and in particular between Plaintiff as she depicts herself in the memoir and the character of Cookie Lyon, thus giving rise to an inference of copying. *See Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999).

For purposes of their Rule 12(b)(6) motion, Defendants do not contest Plaintiff's allegations that Defendants had access to *The Hidden Hand* through Rita Grant Miller. (Dkt. 46, p. 9 n.6; Dkt. 54, p. 3.) The dispute at this stage is therefore about whether substantial similarities exist between these works.

Although access is not in dispute, the Sixth Circuit has indicated that proof of access can affect the degree of proof of similarity required to show copyright infringement and vice versa:

> [I]n some cases[,] the relationship between the degree of proof required for similarity and access may be inversely proportional: where the similarity between the two works is strong, less compelling proof of access may suffice. [Citing *Ellis v. Diffie*, 177 F.3d 503, 507 (6th Cir. 2004).] *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) (stating that under the "inverse ratio rule," a lower standard of proof of similarity is required where a high degree of access is shown); *Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir. 1946) (stating that "a case could occur in which the similarities were so striking that we would reverse a finding of no access, despite weak evidence of access (or no evidence thereof other than the similarities).")

*Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004) (emphasis added); *see also Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996) ("[W]e require a lower standard of

proof on substantial similarity when a high degree of access is shown.").

#### a. Determining Substantial Similarity

**\*7** When determining whether two works are substantially similar, the Court engages in a two-step analysis. First, "the court must 'filter' out elements of the work that are not original to the author." *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009) (quoting *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 318 (6th Cir. 2004)). Copyright protection is limited to the "expression of ideas" in a work – those aspects "that display the stamp of the author's originality" – and does not extend to ideas themselves. *Stromback*, 384 F.3d at 296 (internal citations omitted).

To be original, "the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Murray Hill*, 361 F.3d at 318 (quoting *Feist v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)). While facts themselves are not protectable, "it is beyond dispute that compilations of facts are within the subject matter of copyright" even though "copyright in a factual compilation is thin." *Feist*, 499 U.S. 340, 345, 349. To the extent that a "compilation author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression." *Id.* In short, an author's selection and arrangement of facts, as well as her observations, if original, are protectable. *See id.* at 348.

Scènes à faire, or "scenes of action," "the indispensable or standard aspects of a work, or those that 'follow directly from unprotectable ideas' should be filtered out as well." *Bridgeport Music*, 585 F.3d at 274 (footnote omitted) (quoting *Murray Hill*, 361 F.3d at 320). "[N]atural elements in a story about a college fraternity," for example, include "parties, alcohol, co-eds, and wild behavior." *Stromback*, 384 F.3d at 298. "Elements such as drunks, prostitutes, vermin and derelict cars" would similarly not be afforded copyright protection "in any realistic work about [...] policemen in the South Bronx." *Id.* (quoting *Walker v. Time Life Films*, 784 F.2d 44, 50 (2nd Cir. 1986)).

After filtering out the unprotectable elements, the works in question must be compared for substantial similarity.

"Substantial similarity exists where the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable [sic] expression by taking material of substance and value." *Stromback*, 384 F.3d at 297 (internal quotation omitted). "[T]he copying of a relatively small but qualitatively important or crucial element can be an appropriate basis upon which to find substantial similarity." *Bridgestone*, 585 F.3d at 275; *see also Stromback*, 384 F.3d at 297 ("The misappropriation of even a small portion of a copyrighted work may constitute an infringement under certain circumstances. Even if a copied portion [is] relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity."). "[R]andom similarities scattered throughout the works are not a proper basis for a finding of substantial similarity." *Stromback*, 384 F.3d at 297 (internal quotation omitted).

As Defendants have filed a Rule 12(b)(6) motion, the Court's role at this stage is necessarily limited to deciding whether Plaintiff has plausibly established that copyrightable elements of her self-portrayal in *The Hidden Hand* are "substantially similar" enough to copyrightable elements of the character Cookie Lyon so as to raise an inference of copying.[5] *See Bowen v. Paisley*, No. 3:13-0414, 2013 WL 6237469, at *6 (M.D. Tenn. Dec. 3, 2013).

[5]    The Sixth Circuit has cautioned that granting summary judgment motions in copyright infringement cases is generally disfavored because the issue of "substantial similarity" can present a close factual question:

   In copyright infringement cases, "summary judgment, particularly in favor of a defendant, is a practice to be used sparingly" because substantial similarity is often an extremely close question of fact, but "a court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity."

   *Jones v. Blige*, 558 F.3d 485, 490 (6th Cir. 2009) (quoting *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003)). Summary judgment motions, unlike Rule 12(b)(6) motions, are premised on a developed record—often with the benefit of expert testimony. If summary judgment motions in these kinds of cases are to be granted "sparingly,"

it is not surprising that this Court identified only a handful of cases within this circuit in which a district court granted a Rule 12 motion involving a copyright claim after conducting a substantial similarity analysis. *See, e.g., Ford Motor Company v. Autel US Inc.*, 2015 WL 5729067, at *5 (E.D. Mich., 2015) (Rule 12 motion granted without prejudice, plaintiff granted leave to amend complaint); *Dorchen/Martin Associates, Inc. v. Brook of Cheboygan, Inc.*, 838 F.Supp.2d 607, 613 (E.D. Mich., 2012) (same); *Pollick v. Kimberly Clark–Corp.*, 817 F.Supp.2d 1005 (E.D. Mich., 2011) (Rule 12 motion granted in favor of the defendant manufacturer of Huggies "jeans diapers" against the plaintiff holder of a copyright for "diaper jeans."); *National Business Development Services, Inc. v. American Credit Educ. & Consulting, Inc.*, 2007 WL 2318752, at *3 (E.D. Mich., 2007) (Motion to dismiss granted because Plaintiff's complaint contained a blanket assertion of entitlement to relief, but no factual allegations supporting that assertion.").

### b. Substantial Similarity between Plaintiff and Cookie Lyon

**\*8** Here, the dispute is over whether two characters are substantially similar. Plaintiff alleges that the character of Sophia Eggleston in *The Hidden Hand* was copied and used as the basis for the character of Cookie Lyon on *Empire* in violation of Plaintiff's copyright.

In *National Business Development Services, Inc. v. American Credit Education and Consulting, Inc.*, 299 Fed.Appx. 509 (6th Cir. 2008), the Sixth Circuit upheld the dismissal of the plaintiff's complaint because it contained a "blanket assertion of entitlement to relief" without "any factual allegations supporting that assertion." 299 Fed.Appx. at 512. There was neither an identification of a work produced by the defendants that infringed upon the plaintiff's copyrighted work, nor a description of the manner in which the defendants' works infringed upon the plaintiff's work. *Id.* The Sixth Circuit agreed with the district court that the plaintiff's complaint amounted to no more than a speculative claim that the defendants may have produced some work that in some way infringed upon the plaintiff's works and therefore was an insufficient pleading. *Id.*

Case 2:25-cv-13037-BRM-APP ECF No. 19-1, PageID.414 Filed 10/24/25 Page 20 of 73

Eggleston v. Daniels, Not Reported in Fed. Supp. (2016)

2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

**\*9** In her First Amended Complaint, Plaintiff lists twenty-three elements of her character in *The Hidden Hand* that she alleges have been copied by Defendants and used to create the character of Cookie Lyon on *Empire*. (Dkt. 43, ¶ 67.) Defendants argue that these elements are insufficient to establish substantial similarity between Plaintiff and Cookie Lyon because these elements are unprotectable "bare facts" from Plaintiff's life story. [6] (Dkt. 46, p. 22.) Plaintiff responds that what Defendants characterize as "bare facts" are "expressive characteristics" that define a character and represent a protectable compilation of experiences and traits. (Dkt 52, pp. 22-23.) In short, Defendants assert that these twenty-three elements are distinct events, traits, or experiences that are unoriginal and unprotectable while Plaintiff argues that a character is more than the sum of its parts.

[6]    Defendants also argue that the plot, storyline, setting, pace, themes, and sequence of events are dissimilar between the two works. (Dkt. 46, pp. 22-32.) Because Plaintiff's First Amended Complaint only contains the alleged similarities between Plaintiff as she depicted herself in her memoir and Cookie Lyon, the Court will focus its analysis on the similarities between these two characters only.

At first glance, many of the elements Plaintiff alleges were copied by Defendants seem like elements typical to stories about those involved in drugs and violence. It would not be atypical, for example, for the boss-type character of such a story to have sold drugs, to be a gang leader, to own firearms, to wear expensive clothing, to have an assertive or abrasive personality, to have been incarcerated, to have ordered a hit on someone else, or to have experienced the murder of a friend or family member. In this case, however, Plaintiff's memoir features a woman in the dominant role as drug dealer, gang leader, and perpetrator of violence. This is not the stock and trade of the average drug gangster potboiler. More commonly, the gang leader, drug dealer, or boss-like figure is a man; here however, both Plaintiff and Cookie Lyon are light-skinned, African-American women. [7]

[7]    At the motion hearing, Defense counsel could not offer examples of other works in this narrative genre that featured female characters in the "drug or organized crime boss-like" role. Other than the 2011 telenovela series *La reina del Sur* produced by

Telemundo or the 1999 Jorge Franco novel *Rosario Tijeras*, neither can this Court.

Some of the other alleged elements found in common between Eggleston and Cookie Lyon are also not obviously of the stock-standard variety, regardless of a character's gender. For example, Plaintiff alleges that an element in common between herself and Cookie Lyon is that both have a gay family member. Plaintiff's brother is gay, as is Cookie's son, Jamal. Other unusual commonalities are that both Plaintiff and Cookie have experienced the kidnapping of one of their children, have had two close family members murdered, have lost their lovers while serving time in jail, and have shielded others by stepping between them and a loaded gun. Taken together, these elements are arguably original and substantially similar.

In addition to alleging that substantial similarities exist between herself and Cookie Lyon, Plaintiff also presents strong and, for purposes of this motion, unchallenged, allegations that Defendants had access to her work through Rita Grant Miller. Plaintiff alleges that she met with Miller, that they discussed adapting *The Hidden Hand*, that a treatment was drafted, and that Defendants had access to her work, the treatment, and Rita Grant Miller's interview notes when Miller met with Defendant Daniels to pitch the adaptation of *The Hidden Hand*.

As this is a Rule 12(b)(6) motion, the Court is not reaching the merits of Plaintiff's claim but is strictly limiting its inquiry to the sufficiency of the First Amended Complaint. Based on the record at this stage of litigation, Plaintiff has satisfied the "greater particularity in pleading" requirement for copyright actions. Plaintiff alleges that there are twenty-three elements in common between Sophia Eggleston as depicted in *The Hidden Hand* and Cookie Lyon as portrayed on *Empire*. While Defendants argue that the two works in question have little-to-nothing in common with respect to setting, pace, narrative structure, or other characters, Plaintiff is not alleging otherwise. Plaintiff has thus sufficiently identified a work product that allegedly infringed on her copyrighted work and has described the manner in which Defendants' work infringed upon Plaintiff's product with adequate specificity to give Defendants notice of the claim against them.

**\*10** Accordingly, Plaintiff's allegation that there are substantial similarities between these two works with respect to the characterization of Sophia Eggleston as depicted in the *Hidden Hand* and the fictional character Cookie Lyon as depicted on *Empire* is plead with sufficient facts to make it

Case 2:25-cv-13037-BRM-APP ECF No. 19-1, PageID.415 Filed 10/24/25 Page 21 of 73

Eggleston v. Daniels, Not Reported in Fed. Supp. (2016)

2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

reasonable to expect that discovery may reveal evidence of copyright infringement and is therefore sufficiently plausible to survive a motion to dismiss.

### 3. Plaintiff's State Law Right of Publicity Claim

Count II, however, is another story. Count II of Plaintiff's First Amended Complaint alleges, under Michigan common law, that Defendants appropriated her right to publicity. (Dkt. 43, ¶¶ 87-96). In particular, Plaintiff alleges that the portrayal of Cookie Lyon "uses the Plaintiff's likeness, actions, attributes, speech, habits, and other identifiable characteristics" and that, as a result, Plaintiff "has suffered, and continues to suffer, economic damages." (*Id.* at ¶¶ 89, 96.)

Plaintiff has not plead sufficient facts to state a claim for the appropriation of her right to publicity in violation of Michigan common law and this claim will therefore be dismissed. The right of publicity protects the identity of a celebrity from exploitive commercial use. *Parks v. LaFace Records*, 329 F.3d 437, 459 (6th Cir. 2003). This right is governed by state law, and Michigan has recognized such a right. *See Pallas v. Crowley, Milner & Co.*, 322 Mich. 411, 417 (1948). "A right of publicity claim is similar to a false advertising claim in that it grants a celebrity the right to protect an economic interest in his or her name." *Parks*, 329 F.3d at 460. All that a plaintiff must prove in a right of publicity action is (1) that she has a pecuniary interest in her identity, and (2) that her identity has been commercially exploited by a defendant. *Id.*

Here, Plaintiff has not alleged any facts in the second version of her complaint establishing that she has a pecuniary interest or any commercial value in her identity. At the motion hearing, Plaintiff's counsel argued that Plaintiff's efforts to establish a pecuniary interest in her identity are sufficient to establish a protected right of publicity in that identity. While Plaintiff "need not be a national celebrity to prevail," Plaintiff "must demonstrate that there is value in associating an item of commerce with [her] identity" in that "a merchant would gain significant commercial value by associating an article of commerce with [her]." *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 624 (6th Cir. 2000). Plaintiff has made no such allegation, and the Court is satisfied that allowing Plaintiff to amend her complaint a second time would not cure this defect. Count II of the First Amended Complaint will therefore be dismissed.

### C. Defendant Daniels, Strong, and Spellman's Rule 12(b)(2) Motion

The Individual Defendants have filed a motion to dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(2), arguing that Plaintiff has failed to establish this Court's jurisdiction over them. (Dkt. 48.) In particular, the Individual Defendants assert that they lack minimum contacts with Michigan and the Eastern District of Michigan and they cannot be fairly hailed into court in this state. (*Id.* at 1.) Plaintiff asserts in her response to the Individual Defendants' motion that sufficient minimum contacts exist because *Empire* is broadcast in Michigan, video recordings of the show are sold in Michigan, and that several entertainment industry publications have reported that Defendant Daniels signed a contract with FOX to distribute the show nationally. (Dkt. 51, pp. 10-11.) As discovery has not yet taken place in this case, no such contract has been produced.

### 1. Legal Standard

**\*11** If a district court lacks jurisdiction over the defendants, dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(2). "The burden of establishing jurisdiction is on the plaintiff." *Tobin v. Astra Pharm. Prod., Inc.*, 993 F.2d 528, 543 (6th Cir. 1993). "A district court, in its discretion 'may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions.' " *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 449 (6th Cir. 2012) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)).

A federal court's exercise of jurisdiction over litigants must be both "(1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 888 (6th Cir. 2002). For Michigan, the courts have determined Michigan's long-arm statute gives the "maximum scope of personal jurisdiction permitted by the due process clause of the Fourteenth Amendment." *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1236 (6th Cir. 1981). Due process is satisfied if a defendant has "sufficient minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fairplay and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). "But the plaintiff cannot be the only link between

2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)).

Personal jurisdiction issues in Michigan courts are governed by the state's long-arm statute, Mich. Comp. Laws §§ 600.715 (corporations) and 600.705 (individuals). Further, Michigan courts and courts within this Circuit have consistently held that Michigan's long-arm statute extends as far as the Fourteenth Amendment's Due Process Clause allows. *See Neogen Corp.*, 282 F.3d at 888; *see also Viches v. MLT, Inc.*, 127 F. Supp. 2d 828, 830 (E.D. Mich. 2000)). Accordingly, if jurisdiction over the Individual Defendants in this Court is proper under the Fourteenth Amendment, it is also proper under Michigan's long-arm statute.

Due process is satisfied if the defendants have "sufficient minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). In order to find limited personal jurisdiction, a plaintiff needs to demonstrate three key factors: (1) the defendant must "purposefully avail himself of the privilege of acting in the forum state;" (2) "the cause of action must arise from the defendant's activities there;" and (3) "the acts of the defendant...must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). All three factors must be present to allow for a finding of limited personal jurisdiction.

## 2. Jurisdictional Discovery Warranted

Plaintiff argues in her response brief that the Individual Defendants have entered into a nationwide distribution contract and the product in question has been distributed nationwide, therefore personal jurisdiction has been established in any forum where the product in question is sold. (Dkt. 51, p. 18.) In sum, Plaintiff asserts that there is personal jurisdiction in this case because the Individual Defendants themselves, through a distributor, have broadcast and sold *Empire* in Michigan. They have not only introduced *Empire* into the stream of commerce, but have also directed it toward Michigan. The Individual Defendants maintain that Plaintiff's

argument consists of factual misrepresentations supported by inadmissible hearsay. (Dkt. 55, pp. 2-4.)

**\*12** As this Circuit has explained, "the stumbling block for a plaintiff alleging jurisdiction on the basis of a product's availability in the forum state has ordinarily been that 'minimum contacts' includes not just the placement of the product in the stream of commerce, but '[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum State....' " *Palnik v. Westlake Entertainment, Inc.*, 344 Fed.Appx. 249, 252 (2009) (quoting *Asahi Metal Industry Co., Ltd. v. Superior Court*, 480 U.S. 102, 112 (1987) (O'Connor, J., plurality opinion)). Accordingly, the Sixth Circuit has focused on the distribution relationship in determining whether a producer has sufficient connection to a forum state for jurisdiction to be consistent with the due process clause. *Id.*

For example, in *Bridgeport Music, Inc. v. Still N the Water Publishing*, 327 F.3d 472 (6th Cir. 2003), the Sixth Circuit found that where a defendant was "merely aware" of the fact of nationwide distribution without control over said distribution, dismissal was appropriate. 327 F.3d at 480. By contrast, where a defendant sought nationwide distribution by contracting with a distributor for nationwide sales, the Sixth Circuit has found that a prima facie finding of jurisdiction exists. *Id.* at 483; *see also Tobin v. Astra Pharm. Prods.*, Inc., 993 F.2d 528, 543 (6th Cir. 1993) (personal jurisdiction appropriate because the defendant "made a deliberate decision to market [its product] in all 50 states...."); *Poyner v. Erma Werke Gmbh*, 618 F.2d 1186, 1190–91 (6th Cir. 1980).

Plaintiff alleges in her First Amended Complaint that (1) the Individual Defendants "helped write, create, develop, produce, or otherwise make" *Empire*; and (2) Defendants Daniels and Strong direct *Empire*. (Dkt. 43, ¶¶ 29, 61.) Defendants collectively produced and earned money from the creation and distribution of *Empire*, which has been broadcast and distributed in Michigan. (*See id.* at ¶¶ 23, 73, 82, 88.) Drawing inferences in Plaintiff's favor, as the Court must at this stage of the litigation, the allegations in the complaint suggest that either the Individual Defendants, after making *Empire*, caused it to be distributed in Michigan through a national or regional distribution contract, or they were not necessarily responsible for *Empire* appearing in Michigan, perhaps because they do not own the distribution rights, or deferred to a third-party distributor.

2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

The first scenario may permit personal jurisdiction, while the second scenario may not. *See Palnik v. Westlake Entertainment, Inc.*, 344 Fed.Appx. 249, 252 (2009). Because no discovery has yet been conducted in this case, it is unknown which scenario is more accurate. Consequently, the parties will be ordered to conduct thirty days of jurisdictional discovery. The Individual Defendants' Rule 12(b)(2) motion will therefore be denied without prejudice, but may be renewed once this jurisdictional discovery is complete.

### III. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted (Dkt. 46) is **GRANTED IN PART** with respect to Count II of Plaintiff's First Amended Complaint and **DENIED IN PART** with respect to Count I. Accordingly, Count II of Plaintiff's First Amended Complaint is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the parties will conduct limited jurisdictional discovery for no more than **THIRTY DAYS** from the date of this Opinion and Order. Such discovery must be limited to jurisdictional issues raised in or relevant to Defendant's motion to dismiss for lack of personal jurisdiction. Any party that believes the opposing party's discovery requests exceed the scope and purpose of limited jurisdictional discovery is instructed to contact the Court to arrange a telephone status conference.

**\*13** Because the parties will conduct jurisdictional discovery, **IT IS FURTHER ORDERED** that Defendant Lee Daniels, Malcolm Spellman, and Daniel Strong's motion to dismiss Plaintiff's Complaint for lack of personal jurisdiction (Dkt. 48) is **DENIED WITHOUT PREJUDICE**. These defendants may re-file this motion after jurisdictional discovery is complete.

Defendants' evidentiary objections (Dkt. 56) are **DENIED WITHOUT PREJUDICE** and may be renewed at the summary judgment phase.

**SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2016 WL 4363013, 2016 Copr.L.Dec. P 30,974, 119 U.S.P.Q.2d 1796

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag

Declined to Follow by   Anderson v. TikTok, Inc.,   3rd Cir.(Pa.),   August 27, 2024

755 F.3d 398
United States Court of Appeals, Sixth Circuit.

Sarah JONES, Plaintiff–Appellee,

v.

DIRTY WORLD ENTERTAINMENT
RECORDINGS LLC, et al., Defendants,
Hooman Karamian, aka Nik Richie, aka
Corbin Grimes; Dirty World, LLC, dba
thedirty.com, Defendants–Appellants.

No. 13–5946
|
Argued: May 1, 2014.
|
Decided and Filed: June 16, 2014.

**Synopsis**

**Background:** Cheerleader for professional football team brought action asserting state-law defamation claims against operators of user-generated, online tabloid. After judgment was entered on jury verdict in cheerleader's favor, the United States District Court for the Eastern District of Kentucky, William O. Bertelsman, J., 965 F.Supp.2d 818, denied defendants' motion for judgment as matter of law. Defendants appealed.

**Holdings:** The Court of Appeals, Julia Smith Gibbons, Circuit Judge, held that:

on an issue of first impression in the Circuit, material contribution test applies to determine whether website operator does not have immunity under Communications Decency Act (CDA), and

defendants had immunity under the CDA from plaintiff's claims.

Vacated and reversed with instructions.

**Procedural Posture(s):** On Appeal; Motion for Judgment as a Matter of Law (JMOL)/Directed Verdict.

**Attorneys and Law Firms**

**\*401** ARGUED: David S. Gingras, Gingras Law Office, PLLC, Phoenix, Arizona, for Appellants. Christopher D. Roach, Eric C. Deters & Partners, P.S.C., Independence, Kentucky, for Appellee. ON BRIEF: David S. Gingras, Gingras Law Office, PLLC, Phoenix, Arizona, Alexander C. Ward, Alexis B. Mattingly, Huddleston Bolen, LLP, Ashland, Kentucky, for Appellants. Eric C. Deters, Eric C. Deters & Partners, P.S.C., Independence, Kentucky, for Appellee. Marc J. Randazza, Randazza Legal Group, Las Vegas, Nevada, John C. Greiner, Graydon Head & Ritchey LLP, Cincinnati, Ohio, Patrick J. Carome, Samir C. Jain, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., Junis L. Baldon, Frost Brown Todd LLC, Louisville, Kentucky, William E. Sharp, ACLU of Kentucky, Louisville, Kentucky for Amici Curiae.

Before GUY, GIBBONS, and GRIFFIN, Circuit Judges.

**OPINION**

JULIA SMITH GIBBONS, Circuit Judge.

This case presents the issue of whether the Communications Decency Act of 1996 (CDA), 47 U.S.C. § 230, bars the state-law defamation claims of plaintiff-appellee Sarah Jones. Jones was the unwelcome subject of several posts anonymously uploaded to www.TheDirty.com, a popular website operated by defendants-appellants Nik Lamas–Richie and DIRTY WORLD, LLC ("Dirty World"), and of remarks Richie posted on the site. The website enables users to anonymously upload comments, photographs, and video, which Richie then selects and publishes along with his own distinct, editorial comments. In short, the website is a user-generated tabloid primarily targeting nonpublic figures.

In response to the posts appearing on www.TheDirty.com, Jones brought an action in federal district court alleging state **\*402** tort claims of defamation, libel *per se,* false light, and intentional infliction of emotional distress. Richie and Dirty World claimed that § 230(c)(1) barred these claims. The district court rejected this argument and denied defendants-appellants' motion to dismiss, motion for summary judgment, motion to revise judgment, and motion for judgment as a matter of law. The district court also denied Richie's and Dirty World's motion for leave to file an interlocutory appeal. The case was submitted to a jury, twice. The first trial ended

in a mistrial upon a joint motion. The second trial resulted in a verdict in favor of Jones for $38,000 in compensatory damages and $300,000 in punitive damages. On appeal, Richie and Dirty World maintain that § 230(c)(1) barred Jones's claims.

This is a case of first impression in this circuit. In *Doe v. SexSearch.com,* we "explicitly reserve[d] the question of [the] scope [of the CDA] for another day." 551 F.3d 412, 416 (6th Cir.2008). We now consider when a website is not an "information content provider" under 47 U.S.C. § 230(f)(3) with respect to information it publishes such that § 230(c)(1) bars state-law tort claims predicated on that information.

Jones was found to be the object of defamatory content published on a user-generated, online tabloid; however, the judgment in her favor cannot stand. Under the CDA, Richie and Dirty World were neither the creators nor the developers of the challenged defamatory content that was published on the website. Jones's tort claims are grounded on the statements of another content provider yet seek to impose liability on Dirty World and Richie as if they were the publishers or speakers of those statements. Section 230(c)(1) therefore bars Jones's claims. Accordingly, we vacate the judgment in favor of Jones and reverse the district court's denial of Dirty World's and Richie's motion for judgment as a matter of law with instructions to enter judgment as a matter of law in their favor.

## I.

Richie is currently employed as the manager of DIRTY WORLD, LLC ("Dirty World"), which owns and operates the website www.TheDirty.com. Richie is also the founder of www.DirtyScottsdale.com, which he started in March 2007. Richie created www.DirtyScottsdale.com as a forum to post comments and observations about residents of Scottsdale who he believed warranted comment. Richie's website garnered attention from national media, and, as the site increased in popularity, it branched out to cover more than seventy different cities in the United States and Canada. The site then adopted a geographically neutral name—www.TheDirty.com. The website receives approximately six hundred thousand visits each day and eighteen million visits each month.

As the website grew, its focus and format changed. In the beginning, Richie created nearly all the content on the site, and users could not directly upload content. This is no longer

true. For the past several years and currently, users of the site, who colloquially refer to themselves as "The Dirty Army," may submit "dirt"—*i.e.,* content that may include text, photographs, or video about any subject. Users may also post comments about the content submitted by others. The vast majority of the content appearing on www.TheDirty.com is comprised of submissions uploaded directly by third-party users.

The content submission form instructs users to "Tell us what's happening. Remember to tell us who, what, when, where, why." The content submission **\*403** form requires users to submit a title and category for their submission as well as their city or college for indexing. Submissions appear on the website as though they were authored by a single, anonymous author—"THE DIRTY ARMY." This eponymous introduction is automatically added to every post that Richie receives from a third-party user. Many, but not all, of the submissions and commentaries appearing on the website relate to stories, news, and gossip about local individuals who are not public figures. The site receives thousands of new submissions each day. Richie or his staff selects and edits approximately 150 to 200 submissions for publication each day. The editing done to published submissions only consists of deletion. Richie or his staff briefly reviews each submission selected for publication to ensure that nudity, obscenity, threats of violence, profanity, and racial slurs are removed. Richie typically adds a short, one-line comment about the post with "some sort of humorous or satirical observation." Richie, however, does not materially change, create, or modify any part of the user-generated submission, nor does he fact-check submissions for accuracy. Apart from his clearly denoted comments appended at the end of each submission, which appear in bold-face text and are signed "-nik," Richie does not create any of the posts that appear on www.TheDirty.com. The bold-face text and signature are designed to distinguish editorial remarks from third-party submissions. Comments that appear in bold face and are signed "-nik" are only written and published by Richie.

Sarah Jones is a resident of northern Kentucky. Jones was a teacher at Dixie Heights High School in Edgewood, Kentucky, and a member of the Cincinnati BenGals, the cheerleading squad for the Cincinnati Bengals professional football team. From October 2009 to January 2010, Jones was the subject of several submissions posted by anonymous users on www.TheDirty.com and of editorial remarks posted by Richie.

First, on October 27, 2009, a visitor to www.TheDirty.com submitted two photographs of Jones and a male companion and the following post:

> THE DIRTY ARMY: Nik, this is Sara J, Cincinnati Bengal Cheerleader. She's been spotted around town lately with the infamous Shayne Graham. She has also slept with every other Bengal Football player. This girl is a teacher too!! You would think with Graham's paycheck he could attract something a little easier on the eyes Nik!

Appearing directly beneath this post, Richie added:

> Everyone in Cincinnati knows this kicker is a Sex Addict. It is no secret ... he can't even keep relationships because his Red Rocket has freckles that need to be touched constantly.—nik

Jones requested that the post be removed. Richie informed Jones that the post would not be removed.

Second, on December 7, 2009, a visitor submitted a photograph of Jones and the following post:

> THE DIRTY ARMY: Nik, here we have Sarah J, captain cheerleader of the playoff bound cinci bengals.. Most ppl see Sarah has [*sic*] a gorgeous cheerleader AND highschool teacher.. yes she's also a teacher.. but what most of you don't know is.. Her ex Nate.. cheated on her with over 50 girls in 4 yrs.. in that time he tested positive for Chlamydia Infection and Gonorrhea.. so im sure Sarah also has both.. whats worse is he brags about doing sarah in

the gym.. football field.. her class room at the school she teaches at DIXIE Heights.

**\*404**  Appearing directly after this post, Richie remarked: "Why are all high school teachers freaks in the sack?nik"

Third, on December 9, 2009, a visitor submitted another photograph of Jones and a male companion and the following post:

> THE DIRTY ARMY: Nik, ok you all seen the past posting of the dirty Bengals cheerleader/teacher ... well here is her main man Nate. Posted a few pics of the infected couple. Oh an for everyone saying sarah is so gorgeous check her out in these non photoshopped pics.

Appearing directly after this post, Richie added:

> Cool tribal tat man. For a second yesterday I was jealous of those high school kids for having a cheerleader teacher, but not anymore.—nik

Jones sent Richie over twenty-seven emails, pleading for Richie to remove these posts from the website, to no avail. Jones's father similarly wrote to Richie, also to no avail. She then sought legal help, and her attorney informed Richie that if the posts were not removed by December 14, 2009, Jones would file suit. The posts were not removed. Jones, *qua* Jane Doe, filed in federal district court this action on December 23, 2009, against Dirty World Entertainment Recordings, LLC, which operated a website called www.thedirt.com. Apparently, Jones sued the wrong party, as neither Richie nor Dirty World has or ever had any relationship with either Dirty World Entertainment Recordings, LLC, or www.thedirt.com. [1] Nevertheless, the lawsuit sparked national media attention, which precipitated further postings on www.TheDirty.com regarding Jones.

1    In his affidavit, Richie stated that www.thedirty.com is owned and operated by Dirty World, LLC, not Dirty World Entertainment Recordings, LLC. In her second amended complaint, Jones properly added Dirty World, LLC dba Thedirty.com as a party.

For instance, on December 29, a visitor submitted a photograph and the following post:

> THE DIRTY ARMY: Nik, i just saw the Huffington Post and I just [*sic* ] the latest post on beat Bang–GALS cheer squad and back in May I was out clubbing in Cinci and those cheer chicks were hosting the club and i could not believe how ugly they were, here is some pics of them from that night.

Richie added:

> I think they all need to be kicked off and the Cincinnati Bengals should start over. Note to self: Never try to battle the DIRTY ARMY.—nik

Also, on December 29, 2009, a visitor to the website published two photographs and the following post:

> THE DIRTY ARMY: Nik since the Bengals organization loves you so much i decided to submit some pics from a recent cheerleader calendar release party I went to, to show how beat there squad is with out make up and being half naked. Reality is their cheerleaders are FUGLY and the whole NFL thinks they are beat.

Richie added:

> I love how the DIRTY ARMY has a war mentality ... why go after one ugly cheerleader when you can go after all the brown baggers. (Sorry Cleveland Browns that was not a stab at your girls.)—nik

On January 9, 2010, the October 27, 2009, submission was reposted after Richie added an additional comment, which specifically related to the 2009 NFL playoffs. After the litigation commenced, Richie posted a public letter to Jones:

> **\*405** If you know the truth then why do you care? With all the media attention this is only going to get worse for you. Your lawyer is trying to make a name for himself using you as his pawn. If anything me just seeing your face on the news right now will get you fired from your job. All you had to do is read the FAQ section like every other normal person to get stuff removed. You dug your own grave here Sarah. I am a very reasonable person ... hope it was worth it.nik.

He also removed the first three posts regarding Jones. The posts on www.The Dirty.com humiliated Jones, allegedly undermining her position as an educator, her membership in the Cincinnati BenGals, and her personal life.

Jones amended her action to proceed against Dirty World Entertainment Recordings, LLC, dba www.thedirt.com; Hooman Karamian, aka Nik Richie, aka Corbin Grimes; Dirty World, LLC, dba www.TheDirty.com; and Dirty World Entertainment, LLC, dba www.TheDirty.com, alleging claims of defamation, libel *per se,* false light, and intentional inflection of emotional distress. Dirty World moved to dismiss, arguing that the district court lacked jurisdiction over Dirty World and that Jones failed to state a claim upon which relief may be granted. Richie (formerly known as Hooman Karamian) also moved to dismiss, arguing insufficiency of service of process, lack of personal jurisdiction, and failure to state a claim upon which relief may be granted. The

district court denied both motions. *See Jones v. Dirty World Entm't Recordings, LLC (Jones II),* No. 2009–219, 2011 WL 1457343, at *1–2 (E.D.Ky. Apr. 15, 2011); *Jones v. Dirty World Entm't Recordings, LLC (Jones I),* 766 F.Supp.2d 828, 828–36 (E.D.Ky.2011). In their motions to dismiss, both Dirty World and Richie argued that under the CDA, 47 U.S.C. § 230(c), they are immune from suit. The district court treated the CDA argument as a motion for summary judgment and granted Jones's oral motion for a period of discovery to respond. *Jones II,* 2011 WL 1457343, at *2; *Jones I,* 766 F.Supp.2d at 836.

Dirty World and Richie then moved for summary judgment, arguing that § 230(c)(1) affords them immunity from liability for content created by third parties and that the content they created, as opposed to that created by third parties, constitutes non-actionable expressions of opinion that are non-defamatory as a matter of law. The district court denied the motion, holding that Dirty World and Richie are not entitled to immunity under the CDA. *Jones v. Dirty World Entm't Recordings, LLC (Jones III),* 840 F.Supp.2d 1008, 1010–13 (E.D.Ky.2012). The case was tried and submitted to a jury, but upon a joint motion by both parties, the court declared a mistrial.

Dirty World and Richie then filed a motion under Federal Rule of Civil Procedure 54(b), requesting that the court change its order holding that Dirty World and Richie were not entitled to immunity under the CDA. In the alternative, Dirty World and Richie moved for an order certifying the issue for an immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court treated the motion as a second motion for summary judgment and denied it. The district court also denied the alternative motion for leave to file an interlocutory appeal. The case was again tried. *See Jones v. Dirty World Entm't Recordings, LLC (Jones IV),* 965 F.Supp.2d 818, 819 (E.D.Ky.2013). At the conclusion of the presentation of evidence in the second trial, Dirty World and Richie made a timely motion for judgment as a matter of law pursuant to **\*406** Federal Rule of Civil Procedure 50. Their Rule 50 motion again claimed immunity. *See id.* The district court denied the motion, holding that "a website owner who intentionally encourages illegal or actionable third-party postings to which he adds his own comments ratifying or adopting the posts becomes a 'creator' or 'developer' of that content and is not entitled to immunity." *Id.* at 821. Thus, the district court concluded that "[d]efendants, when they republished the matters in evidence, had the same duties and

liabilities for re-publishing libelous material as the author of such materials."

The case was submitted to the second jury, which returned a verdict in favor of Jones for $38,000 in compensatory damages and $300,000 in punitive damages. The district court entered a judgment in favor of Jones. Dirty World and Richie timely filed a notice of appeal from the district court's (1) entry of final judgment in favor of Jones, (2) denial of their motions to dismiss for lack of personal jurisdiction, and (3) denial of their motion for judgment as a matter of law. The sole issue on appeal is whether the district court erred in denying Dirty World's and Richie's motion for judgment as a matter of law by holding that the CDA does not bar Jones's state tort claims.

## II.

### A.

"We review a district court's denial of a motion for judgment as a matter of law or a renewed motion for judgment as a matter of law *de novo.*" *Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 720 (6th Cir.2004) (citing *United States v. Alpine Indus., Inc.,* 352 F.3d 1017, 1022 (6th Cir.2003)). The only claim that Dirty World and Richie raise on appeal is entitlement to immunity under the CDA. Appellants argued immunity under the CDA several times before the district court; hence, the claim is properly presented on appeal, *cf. Dunlap v. Mich. Dep't of Corr.,* 65 Fed.Appx. 971, 972 (6th Cir.2003), and reviewed *de novo, Smith v. Leis,* 407 Fed.Appx. 918, 927 (6th Cir.2011) ( "Claims of entitlement to immunity are questions of law, therefore they are reviewed de novo."). Any other claim or defense that they argued before the district court is waived. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol,* 308 F.3d 523, 544 n. 8 (6th Cir.2002) ("It is well established that an issue not raised in a party's briefs on appeal may be deemed waived." (citing *Ahlers v. Schebil,* 188 F.3d 365, 374 (6th Cir.1999))).

### B.

We begin with a discussion of § 230 of the CDA. Section 230 of the CDA immunizes providers of interactive computer services [2] against liability arising from content created by third parties. Section 230(c)(1) provides that "[n]o provider

or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Although § 230(c)(1) does not explicitly mention immunity or a synonym thereof, this and other circuits have recognized the provision to protect internet service providers for the display of content created by someone else. *Seaton v. TripAdvisor LLC,* 728 F.3d 592, 599 n. 8 (6th Cir.2013) (recognizing **\*407** that § 230(c)(1) provides immunity); *see also Almeida v. Amazon.com, Inc.,* 456 F.3d 1316, 1321 (11th Cir.2006) ( "The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.") (internal citations and quotations omitted); *accord Johnson v. Arden,* 614 F.3d 785, 791 (8th Cir.2010); *Doe v. MySpace, Inc.,* 528 F.3d 413, 418 (5th Cir.2008); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.,* 519 F.3d 666, 671 (7th Cir.2008); *Universal Commc'n Sys., Inc. v. Lycos, Inc.,* 478 F.3d 413, 418–19 (1st Cir.2007); *Batzel v. Smith,* 333 F.3d 1018, 1026–30 (9th Cir.2003); *Green v. Am. Online (AOL),* 318 F.3d 465, 471 (3d Cir.2003); *Ben Ezra, Weinstein, & Co., Inc. v. AOL,* 206 F.3d 980, 984–85 (10th Cir.2000); *Zeran v. AOL,* 129 F.3d 327, 328 (4th Cir.1997). Furthermore, § 230(e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

2      "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). These providers include broadband providers, hosting companies, and website operators like Dirty World and Richie.

Section 230 marks a departure from the common-law rule that allocates liability to publishers or distributors of tortious material written or prepared by others. *See Batzel,* 333 F.3d at 1026–27. "Absent § 230, a person who published or distributed speech over the Internet could be held liable for defamation even if he or she was not the author of the defamatory text, and, indeed, at least with regard to publishers, even if unaware of the statement." *Id.* (citing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.,* 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995) (pre-CDA case holding

internet service provider liable for posting by third party on one of its electronic bulletin boards)). Congress, however, decided to treat the internet differently. *Id.*

At its core, § 230 bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Zeran,* 129 F.3d at 330. In *Zeran,* a case arising shortly after the enactment of the CDA, the panel considered a defamation claim against America Online (AOL) alleging "that AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter." *Id.* at 328. The *Zeran* court explained that the CDA squarely barred this claim. *See id.* at 330–35.

By barring publisher-liability and notice-liability defamation claims lodged against interactive computer service providers, § 230 serves three main purposes. First, it "maintain[s] the robust nature of Internet communication and, accordingly, ... keep[s] government interference in the medium to a minimum." *Id.* at 330; *see also* 47 U.S.C. § 230(b)(2) ("It is the policy of the United States ... to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."). Second, the immunity provided by § 230 protects against the "heckler's veto" that would chill free speech. Without § 230, persons who perceive themselves as the objects of unwelcome speech on the internet could threaten litigation against interactive computer service providers, who would then face a choice: remove the content or face litigation costs and potential liability. *See Zeran,* 129 F.3d at 331 ("The specter of tort liability in an area of such prolific speech would have an obvious chilling effect."). Immunity shields service providers **\*408** from this choice. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 254 (4th Cir.2009) ("[I]mmunity is an immunity from suit rather than a mere defense to liability and ... is effectively lost if a case is erroneously permitted to go to trial." (internal quotation marks omitted)). Third, § 230 encourages interactive computer service providers to self-regulate. An early internet case, *Stratton Oakmont,* held that at common law the provider of an electronic message-board service was potentially liable for its user's defamatory message because it had engaged in voluntary self-policing of the third-party content made available through its service. 1995 WL 323710, at \*4. Section 230 set out to abrogate this precedent. *See* S.Rep. No. 104–230, at 194 (1996) ("One

Case 2:25-cv-13037-BRM-APP   ECF No. 19-1, PageID.424   Filed 10/24/25   Page 30 of 73
Jones v. Dirty World Entertainment Recordings LLC, 755 F.3d 398 (2014)

42 Media L. Rep. 1984

of the specific purposes of [§ 230] is to overrule *Stratton Oakmont v. Prodigy* and any other similar decisions...."); *see also, e.g., Zeran,* 129 F.3d at 331 ("Another important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services. In this respect, § 230 responded to [*Stratton Oakmont* ].").

The protection provided by § 230 has been understood to merit expansion. Congress has extended the protection of § 230 into new areas. *See* 28 U.S.C. § 4102(c)(1) (providing that U.S. courts "shall not recognize or enforce" foreign defamation judgments that are inconsistent with § 230); 47 U.S.C. § 941(e)(1) (extending § 230 protection to new class of entities). And courts have construed the immunity provisions in § 230 broadly. *See, e.g., Nemet,* 591 F.3d at 254 (collecting cases). Moreover, "close cases ... must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157, 1174 (9th Cir.2008) (en banc).

Section 230(c)(1)'s grant of immunity is not without limits, however. [3] It applies only to the extent that an interactive computer service provider is not also the information content provider of the content at issue. An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). A website operator can simultaneously act as both a service provider and a content provider. If a website displays content that is created entirely by third parties, then it is only a service provider with respect to that content—and thus is immune from claims predicated on that content. But if a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content—and is not immune from claims predicated on it. *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1123 (9th Cir.2003) ("Under the statutory scheme, an 'interactive computer service' qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue."). Thus, a website may be immune from liability for some of the third-party content it publishes but subject to liability for the content that it is responsible for as **\*409** a creator or developer. *See Roommates,* 521 F.3d at 1162–63, 1165; *see also Batzel,* 333 F.3d at 1033. In short, immunity

under the CDA depends on the pedigree of the content at issue.

[3]    Section 230(e) outlines a few exceptions, such as for claims under intellectual property laws. *See* 47 U.S.C. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."). These exceptions to § 230(c) immunity are inapplicable in this case.

Aware of this limit on § 230 immunity, courts have recognized that § 230 bars a claim if (1) the defendant asserting immunity is an interactive computer service provider, (2) the particular information at issue was provided by another information content provider, and (3) the claim seeks to treat the defendant as a publisher or speaker of that information. *See, e.g., Universal Commc'n Sys.,* 478 F.3d at 418. By contrast, a defendant is not entitled to protection from claims based on the publication of information if the defendant is "responsible, in whole or in part, for the creation or development of [the] information." 47 U.S.C. § 230(f)(3).

### C.

This case turns on how narrowly or capaciously the statutory term "development" in § 230(f)(3) is read. The district court held, and Jones maintains on appeal, that Dirty World and Richie are not immune under the CDA because Dirty World and Richie are information content providers with respect to the information underlying Jones's defamation claims because they *developed* that information. *See Jones IV,* 965 F.Supp.2d at 823. The district court set forth a test to measure whether a defendant is responsible for the development of the information grounding a plaintiff's state tort claim. According to the district court, "a website owner who intentionally encourages illegal or actionable third-party postings to which he adds his own comments ratifying or adopting the posts becomes a 'creator' or 'developer' of that content and is not entitled to immunity." *Id.* at 821. Dirty World and Richie argue that the district court's test of development is erroneous, swallowing the protection provided by § 230(c)(1) and undermining the purposes served by the CDA. They maintain that, properly understood, they did not develop the statements forming the basis of Jones's defamation claims.

In our two opinions addressing the CDA, this court has neither expounded the meaning of "development" in § 230(f)(3) nor addressed the scope of immunity that § 230(c)

provides. *See Seaton,* 728 F.3d at 599 n. 8; *Doe,* 551 F.3d at 416. Nevertheless, drawing inferences from these cases, it is not difficult to identify an overly inclusive and exclusive reading of "development." An overly inclusive interpretation of "development" in § 230(f)(3) would posit that a website operator is responsible for the development of content created by a third party merely by displaying or allowing access to it. *Cf. Roommates,* 521 F.3d at 1167 ("It's true that the broadest sense of the term 'develop' could include the functions of an ordinary search engine—indeed, just about any function performed by a website."). But to read the term so broadly would defeat the purposes of the CDA and swallow the core immunity that § 230(c) provides for the "exercise of a publisher's traditional editorial functions." *See Zeran,* 129 F.3d at 330; *see also Roommates,* 521 F.3d at 1167 (stating that "development" cannot be read to swallow § 230 immunity). Our recognition that the CDA affords immunity forecloses this overbroad reading of "development."

By contrast, an overly exclusive interpretation of "development" would exclude all the publishing, editorial, and screening functions of a website operator from the set of actions that the term denotes. Some courts have implied this interpretation, however. *See, e.g., Doe v. SexSearch.com,* 502 F.Supp.2d 719, 727 (N.D.Ohio 2007), *af'd,* 551 F.3d 412 (6th Cir.2008). But we have refused to adopt **\*410** it. *See Doe,* 551 F.3d at 415 ("[W]e do not reach the question of whether the [CDA] provides SexSearch with immunity from suit. We do not adopt the district court's discussion of the Act, which would read § 230 more broadly than any previous Court of Appeals decision has read it, potentially abrogating all state- or common-law causes of action brought against interactive Internet services."). We have maintained that, despite the CDA, *some* state tort claims will lie against website operators acting in their publishing, editorial, or screening capacities.

Therefore, limited circuit precedent suggests the proper interpretation of "*development* of information provided through the Internet," § 230(f)(3), means something more involved than merely displaying or allowing access to content created by a third party; otherwise § 230(c)(1) would be meaningless. And instances of development *may* include some functions a website operator may conduct with respect to content originating from a third party. *See SexSearch.com,* 551 F.3d at 415.

Beyond providing a basis to identify overly inclusive and exclusive interpretations of "development" in § 230(f)(3), our cases have not further illuminated the scope of the immunity

furnished by the CDA. Decisions from our sister circuits, however, provide a workable measure of "development" that not only preserves the broad immunity the CDA provides for website operators' exercise of traditional publisher functions but also highlights the limited circumstances under which exercises of those functions are not protected. The leading case is *Roommates.* There, the Ninth Circuit sitting *en banc* discussed the meaning of "development" at length. *See* 521 F.3d at 1167–68. In *Roommates,* as a condition for using an online roommate-finding service, a website required each user seeking to offer living space to create a profile describing his desired roommate and, in so doing, required that user "to disclose his sex, sexual orientation and whether he would bring children to a household." *Id.* at 1161. The website also encouraged its users to provide additional comments describing themselves and their desired roommate. *Id.* The fair housing councils of San Fernando Valley and San Diego sued, alleging that the website violated the Fair Housing Act and state housing discrimination laws. *Id.* at 1162. The court held that a website operator was not entitled to immunity with respect to allegedly unlawful content that it *required* its users to submit and with respect to the search engine that was built on that content. *Id.* at 1165–68. But the court also held that the website was immune as to claims based on the website's encouragement that users provide additional comments, some of which were alleged to be discriminatory. *Id.* at 1173–75. To arrive at these divergent holdings, the court applied a specific measure of development:

> [W]e interpret the term "development" as referring not merely to augmenting the content generally, but *to materially contributing to its alleged unlawfulness.* In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, *if it contributes materially to the alleged illegality of the conduct.*

521 F.3d at 1167–68 (emphasis added). A material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible for what makes the displayed content allegedly unlawful. *Cf. Chicago Lawyers' Comm.,* 519 F.3d at 671 ("Causation ... must refer to causing a particular statement to be made, or

perhaps the discriminatory content of a statement. That's the sense in which a non-publisher can cause a discriminatory ad, **\*411** while one who causes the forbidden content may not be a publisher."). "In an abundance of caution," the *Roommates* court gave several examples of applications of the "material contribution" test. For example:

> If an individual uses an ordinary search engine to query for a "white roommate," the search engine has not contributed to any alleged unlawfulness in the individual's conduct; providing *neutral* tools to carry out what may be unlawful or illicit searches does not amount to "development" for purposes of the immunity exception. A dating website that requires users to enter their sex, race, religion and marital status through drop-down menus, and that provides means for users to search along the same lines, retains its CDA immunity insofar as it does not contribute to any alleged illegality.

521 F.3d at 1169. In contrast to this example, the court observed that Roommates required subscribers to disclose information about protected characteristics as a condition of accessing its service and "designed its search and email systems to limit the listings available to subscribers based on sex, sexual orientation and presence of children." *Id.* at 1166, 1169. Because Roommates required information about protected characteristics and engineered its search and email systems to limit access to housing listings based on those protected characteristics, the court held that the website materially contributed to the alleged illegality of hiding certain listings. *See id.* at 1166–69, 1172.

The court also gave specific examples of the application of the material contribution test for a website that solicits, edits, and displays content originating from third parties (*i.e.,* a website akin to www.TheDirty.com). For example:

> A website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his immunity for any illegality in the user-created content, provided that the edits are unrelated

to the illegality. However, a website operator who edits in a manner that contributes to the alleged illegality—such as by removing the word "not" from a user's message reading "[Name] did *not* steal the artwork" in order to transform an innocent message into a libelous one—is directly involved in the alleged illegality and thus not immune.

*Id.* at 1169 (alteration in original); *see also Batzel,* 333 F.3d at 1035 (holding that an editor of an email newsletter who received and published allegedly actionable information, adding a short headnote, was immune under § 230 because an editor's changes to the length and spelling of third-party content do not contribute to the libelousness of the message). The *Roommates* court further explained:

> And any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230. But if the editor publishes material that he does not believe was tendered to him for posting online, then he is the one making the affirmative decision to publish, and so he contributes materially to its allegedly unlawful dissemination. He is thus properly deemed a developer and not entitled to CDA immunity.

521 F.3d at 1170–71 (internal citations omitted).

Accordingly, the *Roommates* court held that § 230 barred the fair housing councils' claims grounded on the allegedly discriminatory statements displayed through Roommate's operation of the "additional comments" section of its website. *Id.* at 1173. The court explained:

> **\*412** Roommate publishes these comments as written. It does not provide any specific guidance as to what the essay should contain, nor does it urge subscribers to input discriminatory preferences. Roommate is not responsible, in whole or in part, for the development of this content, which comes entirely

from subscribers and is passively displayed by Roommate. Without reviewing every essay, Roommate would have no way to distinguish unlawful discriminatory preferences from perfectly legitimate statements. Nor can there be any doubt that this information was tendered to Roommate for publication online. This is precisely the kind of situation for which section 230 was designed to provide immunity.

*Id.* at 1173–74 (internal citation omitted). Furthermore, the court rejected the argument made by the fair housing councils that the website developed the allegedly illegal content displayed in the additional comments section because the website encouraged the submission of discriminatory preferences. *Id.* at 1174. The court reasoned that "[t]he fact that Roommate encourages subscribers to provide *something* in response to the prompt is not enough to make it a 'develop[er]' of the information." *Id.* (second alteration in original). Because "Roommate does not tell subscribers what kind of information they should or must include as 'Additional Comments,' and certainly does not encourage or enhance any discriminatory content created by users," the court held that the operation of the additional comments section did not materially contribute to the alleged unlawfulness of the content displayed on the website's comments section. *Id.*

The material contribution test has been adopted and applied by other circuits, with instructive effect. *Compare Nemet,* 591 F.3d at 257–58 (holding that a website *did not* contribute to alleged illegality), *with Accusearch,* 570 F.3d at 1200–01 (holding that a website *did* contribute to alleged illegality). In *Nemet,* Nemet, the owner of a Chevrolet dealership, sued Consumeraffairs.com, a website allowing users to comment on the quality of goods and services, after various allegedly tortious, third-party posts appeared on the website relating to automobiles sold or serviced by him. 591 F.3d at 252. The website claimed immunity under the CDA. Nemet responded that the website was, in fact, an information content provider under § 230(f)(3), and was thus liable as a co-developer, because of the "structure and design of its website" and because "Consumeraffiars.com solicit[ed] its customers' complaints [and] steered them into specific categor[ies]." *Id.* at 256 (first and third alterations in original) (quotation marks

omitted). The panel affirmed the district court's grant of the website's motion to dismiss because "[e]ven accepting as true all of the facts Nemet pled as to Consumeraffairs.com's liability for the structure and design of its website, the amended complaint does not show, or even intimate, that Consumeraffairs.com contributed to the allegedly fraudulent nature of the comments at issue." *Id.* at 257 (internal quotation marks omitted).

In *Accusearch,* Accusearch operated a website that sold the confidential information of individuals, including their telephone records, which the website paid researchers to obtain. 570 F.3d at 1190. The Federal Trade Commission brought suit against the website operator to curtail its sale of confidential information and to disgorge its profits from the sale of information in telephone records. *Id.* Accusearch claimed immunity under the CDA, arguing that it merely displayed the allegedly illegal conduct that originated from its third-party researchers. *Id.* The panel rejected this argument and held that the **\*413** website operator developed the confidential telephone records within the meaning of the CDA. The panel cited *Roommates's* material contribution test and found "[t]hat language applies to Accusearch's role in this case." *Id.* at 1200 (citing *Roommates,* 521 F.3d at 1168). The *Accusearch* panel reasoned that "[b]y paying its researchers to acquire telephone records, knowing that the confidentiality of the records was protected by law, it contributed mightily to the unlawful conduct of its researchers." *Id.* The panel noted that "the offensive postings were Accusearch's *raison d'etre* and it affirmatively solicited them." *Id.* It thus found that "Accusearch's actions were not 'neutral' with respect to generating offensive content; on the contrary, its actions were intended to generate such content." *Id.* at 1201. Accordingly, the panel held that "Accusearch is not entitled to immunity under the CDA." *Id.*

Other circuits, while not explicitly relying on *Roommates's* material contribution test, have issued decisions consistent with it. *See, e.g., Johnson,* 614 F.3d at 791 (holding that a website hosting company was immune to state tort claims grounded on unwelcome content posted to a client's website); *Chicago Lawyers' Comm.,* 519 F.3d at 671 (holding that craigslist.com was immune to fair housing claims based on discriminatory listings posted by third parties); *Green,* 318 F.3d at 471 (holding that AOL was immune to state tort claims grounded on third-party content); *Ben Ezra,* 206 F.3d at 984–85 (holding that defendant was immune to the defamation claim when it made its own editorial decisions with respect to

third-party information published on its website); *Zeran,* 129 F.3d at 330–35.

D.

Consistent with our sister circuits, we adopt the material contribution test to determine whether a website operator is "responsible, in whole or in part, for the creation or development of [allegedly tortious] information." 47 U.S.C. § 230(f)(3). And we expressly decline to adopt the definition of "development" set forth by the district court.

The district court read the foregoing decisions, identified *Roommates* as the guiding precedent, but derived a different rule. In its memorandum opinion explaining the denial of Dirty World's and Richie's Rule 50 motion, the district court gave two formulations of a rule providing when the CDA does not bar a plaintiff's claim. First, the district court said that a "website owner who intentionally encourages illegal or actionable third-party postings to which he adds his own comments ratifying or adopting the posts becomes a 'creator' or 'developer' of that content and is not entitled to immunity." *Jones IV,* 965 F.Supp.2d at 821. Second, in a different formulation, the district court said that "if ... [website] owners, as in the instant case, invite invidious postings, elaborate on them with comments of their own, and call upon others to respond in kind, the immunity does not apply." *Id.* at 822. The district court arrived at these rules by over-reading the operative language contained in the analytic parts of *Johnson, Accusearch*, and *Chicago Lawyers' Committee. See id.* at 820 (finding that the *Johnson* "ruling was based on the fact that 'the record contains no evidence that [the internet service provider] designed its website to be a portal for defamatory material or [did] anything to induce defamatory postings' " (alterations in original) (quoting *Johnson,* 614 F.3d at 792)); *id.* (finding that the *Accusearch* court "held that one is not 'responsible' for 'developing' allegedly actionable information only 'if one's conduct was neutral with respect **\*414** to the offensiveness of the content' ") (quoting *Accusearch,* 570 F.3d at 1199); *id.* at 820 (finding that *Chicago Lawyers' Committee* "noted that '[n]othing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination' " (alteration in original) (quoting *Chicago Lawyers' Comm.,* 519 F.3d at 671–72)). The district court read "inducement" to mean invitation and "neutral with respect to the offensiveness of the content" as a description of a website's orientation, not of a condition that users upload unlawful content, *cf. Roommates,*

521 F.3d at 1166–69, or that contractors conduct unlawful action, *cf. Accusearch,* 570 F.3d at 1200–01.

We do not adopt the district court's encouragement test of immunity under the CDA. The district court misapprehended how other circuits, particularly the Ninth Circuit in *Roommates,* have separated what constitutes "development" in § 230(f)(3) from what does not. The district court elided the crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable. *See Roommates,* 521 F.3d at 1169–74. This is the distinction that divides the holdings in *Roommates* and *Accusearch,* which stripped the respective defendants of the CDA's protection, from the holdings in *Roommates, Chicago Lawyers' Committee, Johnson, Batzel, Nemet,* and *Zeran,* which barred the respective plaintiffs' claims. In *Roommates,* the website was responsible for the alleged discrimination by requiring users to submit protected characteristics and hiding listings based on those submissions. 521 F.3d at 1165–68. In *Accusearch,* the website was responsible for the illegal purchase and resale of confidential telephone records. 570 F.3d at 1200–01. But in *Chicago Lawyers' Committee,* 519 F.3d at 671–72, and *Nemet,* 591 F.3d at 256–57, for example, the website operators provided a forum for user posts, did not require users to violate the law as a condition of posting, did not compensate for the posting of actionable speech, did not post actionable content themselves, and therefore were not responsible for the actionable speech that was displayed on their websites. The district court's rule does not neatly divide these cases. An encouragement theory of "development" does not obviously capture what was allegedly unlawful about the design of Roommate's website, particularly its search engine, or Accusearch's payment for unlawful conduct. And it does not obviously leave out the neutral fora created by the commercially oriented websites targeted by the claims in *Chicago Lawyers' Committee* and *Nemet* (craigslist.com and www.consumeraffairs.com, respectively).

More importantly, an encouragement test would inflate the meaning of "development" to the point of eclipsing the immunity from publisher-liability that Congress established. Many websites not only allow but also actively invite and encourage users to post particular types of content. Some of this content will be unwelcome to others—*e.g.,* unfavorable reviews of consumer products and services, allegations of price gouging, complaints of fraud on consumers, reports of bed bugs, collections of cease-and-desist notices relating

to online speech. And much of this content is commented upon by the website operators who make the forum available. Indeed, much of it is "adopted" by website operators, gathered into reports, and republished online. Under an encouragement test of development, these websites would lose the immunity under the CDA and be subject to hecklers' suits aimed at the publisher. Moreover, under the district court's rule, **\*415** courts would then have to decide what constitutes "encouragement" in order to determine immunity under the CDA—a concept that is certainly more difficult to define and apply than the Ninth Circuit's material contribution test. *See Zeran,* 129 F.3d at 333. Congress envisioned an uninhibited, robust, and wide-open internet, *see* § 230(a)(1)-(5), but the muddiness of an encouragement rule would cloud that vision. Accordingly, other courts have declined to hold that websites were not entitled to the immunity furnished by the CDA because they selected and edited content for display, thereby encouraging the posting of similar content. *See, e.g., Roommates,* 521 F.3d at 1174 ("Such weak encouragement cannot strip a website of its section 230 immunity, lest immunity be rendered meaningless as a practical matter."); *Batzel,* 333 F.3d at 1031. We do the same.

The district court also suggested that when an interactive computer service provider adds commentary to third-party content that "ratifies or adopts" that content, then the provider becomes a "creator" or "developer" of that content and is not entitled to the CDA's protection. *Jones IV,* 965 F.Supp.2d at 821; *see also id.* at 823 ("Thus, Richie's conduct cannot be said to have been 'neutral with respect to the offensiveness of the content,' such that he is not 'responsible' for it within the meaning of 47 U.S.C. § 230(f)(3)."). An adoption or ratification theory, however, is not only inconsistent with the material contribution standard of "development" but also abuses the concept of responsibility. A website operator cannot be responsible for what makes another party's statement actionable by commenting on that statement *post hoc.* To be sure, a website operator's previous comments on prior postings could encourage subsequent invidious postings, but that loose understanding of responsibility collapses into the encouragement measure of "development," which we reject. *See, e.g., Roommates,* 521 F.3d at 1174; *Batzel,* 333 F.3d at 1031. As other courts have recognized, the adoption theory of "development" would undermine the CDA for the same reasons as an encouragement theory. *See Parisi v. Sinclair,* 774 F.Supp.2d 310, 316 (D.D.C.2011) (dismissing plaintiffs' claims as barred by the CDA despite their argument that defendant "adopted" the statements at issue as its own and finding that "it would be contrary to the purpose of the

CDA, which sought to encourage the vibrant and competitive free market of ideas on the Internet, by establishing immunity for internet publication of third-party content to require a fact-based analysis of if and when a defendant adopted particular statements and revoke immunity on that basis" (internal citations and quotation marks omitted)).

### III.

We now apply the material contribution measure of "development" to the facts of this case. Jones's defamation claims target the statements that were posted by a third party on October 27 and December 7, 2009. Because Dirty World and Richie did not materially contribute to the illegality of those statements, the CDA bars Jones's claims. *See Nemet,* 591 F.3d at 260 (affirming dismissal where plaintiff failed to show defendant "was responsible for the creation or development of the allegedly defamatory content *at issue*" (emphasis added)).

Dirty World and Richie did not author the statements at issue; however, they did select the statements for publication. But Richie and Dirty World cannot be found to have materially contributed to the defamatory content of the statements posted on October 27 and December 7, **\*416** 2009, simply because those posts were selected for publication. *See Batzel,* 333 F.3d at 1035 (holding that an editor of an email newsletter who received and published allegedly actionable information, adding a short headnote, was immune under § 230 because an editor's changes to the length and spelling of third-party content do not contribute to the libelousness of the message). Nor can they be found to have materially contributed to the defamatory content through the decision not to remove the posts. *See Zeran,* 129 F.3d at 330 (holding CDA immunity applied even though "AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter"). The CDA expressly bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Id.*

Unlike in *Roommates,* the website that Richie operated did not require users to post illegal or actionable content as a condition of use. *Cf. Roommates,* 521 F.3d at 1165–68. Nor does the name of the website, www. TheDirty.com, suggest that only illegal or actionable content will be

published. Unlike in *Accusearch,* Richie or Dirty World did not compensate users for the submission of unlawful content. *Cf. Accusearch,* 570 F.3d at 1200–01. The website's content submission form simply instructs users to "[t]ell us what's happening. Remember to tell us who, what, when, where, why." The form additionally provides labels by which to categorize the submission. These tools, neutral (both in orientation and design) as to what third parties submit, do not constitute a material contribution to any defamatory speech that is uploaded. *See Nemet,* 591 F.3d at 256 (finding that the "structure and design of [defendant's] website" and the website's "solicit[ion of] its customers' complaints [and] steer[ing] them into specific categor[ies]" did not constitute development under § 230(f)(3)" (fifth alteration in original) (internal quotation marks omitted)); *Roommates,* 521 F.3d at 1173–74 (holding that § 230 barred the fair housing councils' claims grounded on the discriminatory statements displayed through Roommate's operation of the "additional comments" section of its website).

Further, Richie's comment on the December 7 post—*viz.,* "Why are all high school teachers freaks in the sack?"—although absurd, did not materially contribute to the defamatory content of the statements uploaded on October 27 and December 7, 2009. Richie's remark was made after each of the defamatory postings had already been displayed. It would break the concepts of responsibility and material contribution to hold Richie responsible for the defamatory content of speech because he later commented on that speech. Although ludicrous, Richie's remarks did not materially contribute to the defamatory content of the posts appearing on the website. More importantly, the CDA bars claims lodged against website operators for their editorial functions, such as the posting of comments concerning third-party posts, so long as those comments are not themselves actionable. *See Zeran,* 129 F.3d at 330; *see also* 47 U.S.C. § 230(f)(3).

To be sure, Richie was an information content provider as to his comment on the December 7 post. But Jones did not allege that *Richie's* comments were defamatory. And the district court did not hold that Richie's comments were themselves tortious. Rather, the court concluded that those comments "effectively ratified and adopted the defamatory third-party post" and thereby developed the defamatory statements, thus ruling that the CDA did **\*417** not bar Jones's claims. *Jones IV,* 965 F.Supp.2d at 823 ("Defendants are mistaken, for the salient point about Richie's tagline is not that it was defamatory itself and thus outside CDA immunity, but rather that it effectively ratified and adopted the

defamatory third-party post."). The district court's adoption or ratification test, however, is inconsistent with the material contribution standard of "development" and, if established, would undermine the CDA. Therefore, Dirty World and Richie did not develop the statements forming the basis of Jones's tort claims and accordingly are not information content providers as to them.

Because (1) the defendants are interactive service providers, (2) the statements at issue were provided by another information content provider, and (3) Jones's claim seeks to treat the defendants as a publisher or speaker of those statements, the CDA bars Jones's claims. *See Universal Commc'n Sys.,* 478 F.3d at 418. Given the role that the CDA plays in an open and robust internet by preventing the speech-chilling threat of the heckler's veto, we point out that determinations of immunity under the CDA should be resolved at an earlier stage of litigation. [4] *See Nemet,* 591 F.3d at 254 ("[I]mmunity is an *immunity from suit* rather than a mere defense to liability [and] is effectively lost if a case is erroneously permitted to go to trial.").

[4]    Certification of the interlocutory appeal sought by Dirty World and Richie could have obviated the need for the second trial. An even earlier interlocutory appeal would have resolved the case prior to trial.

IV.

We note that the broad immunity furnished by the CDA does not necessarily leave persons who are the objects of anonymously posted, online, defamatory content without a remedy. In this case, Jones conceded that she did not attempt to recover from the person(s) whose comments Richie elected to publish. She conceded that she did not attempt to subpoena Richie or Dirty World to discover who authored the defamatory posts. Instead, she sued Dirty World and Richie. But, under the CDA, Jones cannot seek her recovery from the online publisher where that publisher did not materially contribute to the tortious content. Congress envisioned a free and open internet, *see* § 230(a)(1)-(5), and the immunity provision of § 230(c)(1), which subverts common-law publisher-liability, serves that purpose. While some exercises of the considerable freedom that Congress allowed online publishers are regrettable, freedom and its uses are distinct. Congress enacted § 230(c)(1) to preserve a free internet, and that enactment resolves this case.

**Jones v. Dirty World Entertainment Recordings LLC, 755 F.3d 398 (2014)**

42 Media L. Rep. 1984

For the foregoing reasons, we vacate the judgment in favor of Jones and reverse the district court's denial of Dirty World's and Richie's motion for judgment as a matter of law with instructions to enter judgment as a matter of law in their favor.

**All Citations**

755 F.3d 398, 42 Media L. Rep. 1984

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

996 F.Supp.2d 574
United States District Court, E.D.
Michigan, Northern Division.

Alfred R. KLOSS Diana C. Kloss, Plaintiffs,

v.

RBS CITIZENS, N.A., Successor in Interest
to CCO Mortgage Corp., Defendant.

Case No. 13–12833

|

Feb. 6, 2014.

**Synopsis**

**Background:** Mortgagors brought action against mortgagee's successor in interest, alleging that successor improperly foreclosed upon and took title to their home. Successor moved to dismiss and mortgagors moved for preliminary injunction.

**Holdings:** The District Court, Thomas L. Ludington, adopting report and recommendation of Charles E. Binder, United States Magistrate Judge, held that:

successor's alleged actions in failing to provide loan modification and engaging in practice of "dual tracking" did not demonstrate fraud or irregularity in foreclosure proceedings;

mortgagors did not plead fraud with sufficient particularity;

mortgagors failed to show that they would have been prejudiced by any fraud or irregularity relating to foreclosure;

successor was not debt collector under Fair Debt Collection Practices Act (FDCPA); and

successor was not state actor for purposes of due process claim.

Defendant's motion granted; plaintiffs' motion denied.

**Procedural Posture(s):** Motion to Dismiss; Motion for Preliminary Injunction; Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

**\*580** Alfred R. Kloss, Birch Run Township, MI, pro se.

Diana C. Kloss, Birch Run Township, MI, pro se.

Jeffrey E. Ammons, Salina M. Hamilton, Scott A. Petz, Dickinson Wright, Detroit, MI, for Defendant.

Alfred R. Kloss, Birch Run Township, MI, pro se.

Diana C. Kloss, Birch Run Township, MI, pro se.

Jeffrey E. Ammons, Salina M. Hamilton, Scott A. Petz, Dickinson Wright, Detroit, MI, for Defendant.

**OPINION AND ORDER OVERRULING PLAINTIFFS' OBJECTIONS, ADOPTING MAGISTRATE'S REPORT AND RECOMMENDATION, GRANTING DEFENDANT'S MOTION TO DISMISS THE COMPLAINT, DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, AND DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION**

THOMAS L. LUDINGTON, District Judge.

Plaintiffs Alfred R. Kloss and Diana C. Kloss commenced this case against Defendant RBS Citizens N.A., successor in interest to CCO Mortgage Corp. They allege that Defendant has improperly foreclosed upon and taken title to their home.

Plaintiffs filed their complaint on June 28, 2013, followed by a motion for a preliminary injunction on July 11. On July 15, the Court referred the case to United States Magistrate Judge Charles Binder for general case management. Four days later, Defendant filed a motion to dismiss. Plaintiffs responded to the motion on August 16, and Defendant replied on September 6.

On September 18, 2013, Judge Binder issued a report recommending that the Court grant Defendant's motion to dismiss Plaintiffs' complaint and deny Plaintiffs' motion for a preliminary injunction. *See* Report & Rec., ECF No. 15. Plaintiffs were given fourteen days to file any objections to the report, which they did. In addition to their objections, Plaintiffs assert that their right to due process and their right to a jury trial have been violated by this Court. Furthermore, Plaintiffs request that the "final judgment of this Court should

be vacated under [Federal Rules of Civil Procedure] Rule 60(B)." Pls.' Objs. Report & Rec. 15, ECF No. 17.

The Court reviews Judge Binder's report and recommendation de novo. *See* Fed.R.Civ.P. 72(b)(3). Upon review, Judge Binder correctly determined that because the statutory redemption period has expired, Plaintiffs no longer have any interest in the property and may not make any claims related to the property. Judge Binder was also correct in that Plaintiffs have failed to meet the high bar set by state law for extending the statutory redemption period, and that even if Plaintiffs could make any claims against Defendant, they have failed to state any claims upon which the Court could grant relief. In addition, Judge Binder's other conclusions— that the Court should grant Defendant's motion to dismiss and that the Court should deny Plaintiffs' motion for a preliminary injunction—are sound. Accordingly, the Court will overrule Plaintiffs' objections, adopt Judge Binder's report and recommendation, grant Defendant's motion to dismiss, and deny **\*581** Plaintiffs' motion for a preliminary injunction. Furthermore, the Court finds that Plaintiffs' right to due process and right to a jury trial were not violated. Finally, because Plaintiffs' motion for reconsideration comes before there is a final judgment, the motion is premature and will be denied.

**I**

Plaintiffs' property is located at 7273 Birch Run Road in Birch Run Township, Michigan. Pls.' Compl. Ex. B at 4, ECF No. 1. On October 21, 2005, Plaintiffs entered into a mortgage and executed a promissory note with CCO Mortgage Corp. for $825,000. Def.'s Mot. Dismiss Exs. 1, 2, ECF No. 9. On September 1, 2007, Defendant became the successor to CCO Mortgage Corp. through a merger of various banking institutions. Def.'s Mot. Dismiss Ex. 3.

Plaintiffs defaulted, foreclosure by advertisement proceedings were commenced, and Defendant purchased the subject property on January 27, 2012. Def.'s Mot. Dismiss at 12, Ex. 4 at 1. The one-year statutory redemption period expired on January 27, 2013, without Plaintiffs' having redeemed the property.

On February 19, 2013, Defendant filed an action in the 70th District Court for the State of Michigan to gain possession of the subject property. Def.'s Mot. Dismiss Ex. 5. After a hearing, the 70th District Court entered a judgment of

possession in favor of Defendant. Def.'s Mot. Dismiss Ex. 6. On March 5, Plaintiffs appealed to the 10th Circuit Court for the State of Michigan, i.e., the Saginaw County Circuit Court, and on that same day, the court stayed the judgment of possession. Def.'s Mot. Dismiss at 13, Exs. 7–9.

On March 6, 2013, Plaintiffs filed a complaint in this Court. E.D. Mich. Case No. 1:13–cv–11025. The following month, Plaintiffs filed a similar action in the Saginaw County Circuit Court, which Defendant removed to this Court. E.D. Mich. Case No. 1:13–cv–11903. The actions were consolidated on May 13, 2013, by stipulation and later dismissed without prejudice. Def.'s Mot. Dismiss 14. Therefore, this action is the only action between the parties regarding this subject property.

**II**

The standard of review applicable to a magistrate judge's report and recommendation depends on whether a party files objections. The Court need not review portions of a report to which a party does not object. *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). The Court, however, "must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b) (3). De novo review requires at least a review of the evidence before the magistrate judge; the Court may not act solely on the basis of a magistrate judge's report and recommendation. *See* Hill v. Duriron Co., 656 F.2d 1208, 1215 (6th Cir.1981). If the Court accepts a report and recommendation, the Court is not required to state with specificity what it reviewed; it is sufficient for the Court to state that it engaged in a de novo review of the record. *Lardie v. Birkett,* 221 F.Supp.2d 806, 807 (E.D.Mich.2002).

Overly broad objections do not satisfy the objections requirement. *Spencer v. Bouchard,* 449 F.3d 721, 725 (6th Cir.2006), *abrogated on other grounds by* Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). The objections must be clear enough that the Court can "discern those issues that are dispositive **\*582** and contentious." *Id.* Objections that merely challenge the correctness of the magistrate's recommendation but fail to specify what findings were erroneous are insufficient. *Id.*

In addition, parties may not add new claims in an objection to a report and recommendation: "[W]hile the Magistrate Judge Act, 28 U.S.C. § 631 et seq., permits de novo review by the district court if timely objections are filed, ... it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate." *Murr v. United States,* 200 F.3d 895, 902 n. 1 (6th Cir.2000).

Federal Rule of Civil Procedure 12(b)(6) requires the Court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted...." In deciding such a motion to dismiss, the Court must treat all well-pleaded allegations in the complaint as true and draw all reasonable inferences from those allegations in favor of the nonmoving party. *Lambert v. Hartman,* 517 F.3d 433, 439 (6th Cir.2008). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim survives this motion where its factual allegations are enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Zaluski v. United Am. Healthcare Corp.,* 527 F.3d 564, 570 (6th Cir.2008) (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955) (internal quotation marks omitted) (alterations omitted). Although it must accept well-pleaded facts as true, the Court is not required to accept a plaintiff's legal conclusions. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (noting "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

If parties present matters outside of the pleadings to the Court in a Rule 12(b)(6) motion, under Rule 12(d), the motion must be treated as a Rule 56 motion for summary judgment. However, documents attached to a motion to dismiss that are referred to in the complaint and central to the claims are deemed to form part of the pleadings. *Greenberg v. Life Ins. Co. of Va.,* 177 F.3d 507, 514 (6th Cir.1999); *Armengau v. Cline,* 7 Fed.Appx. 336, 344 (6th Cir.2001). Furthermore, a court "may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.,* 508 F.3d 327, 336 (6th Cir.2007).

**III**

After reviewing Plaintiffs' objections, it appears Plaintiffs have not formally objected to Judge Binder's determination that the statutory redemption period has expired, and thus their interest in the property has been extinguished. However, Plaintiffs challenge the foreclosure on the merits, and so the Court will review their argument that the statutory redemption period should be extended.

Plaintiffs objected to Judge Binder's finding that Defendant is entitled to dismissal of the following claims: those related to the laws against fraud and "dual tracking," the home affordable mortgage program (HAMP), the law governing real estate mortgage investment conduit (REMICs), the Truth in Lending Act (TILA), the Fair Debt Collection Practices Act (FDCPA), section 750.249(3) of the Michigan Compiled Laws, section 750.248(4) of the Michigan Compiled Laws, and section 2.149(c) of the Michigan Compiled Laws. Plaintiffs also assert that their **\*583** right to due process has been violated by Defendant and by this Court, and that Plaintiffs are entitled to a jury trial. Pls.' Objs. Report & Rec. 15. The Court will address each of these objections in turn.

**A**

Michigan law grants a mortgagor of residential property that has been foreclosed by advertisement a statutory redemption period of one year. [1] Mich. Comp. Laws § 600.3240(13). "When the redemption period expires, the purchaser of the sheriff's deed is vested with 'all the right, title, and interest' in the property," *Carmack v. Bank of N.Y. Mellon,* No. 12–cv–11669, 2012 WL 2389863, at \*2 (E.D.Mich. June 25, 2012) (quoting Mich. Comp. Laws § 600.3236), and "all of [the] plaintiff's rights and title in and to the property [are] extinguished," *Overton v. Mortg. Elec. Registration Sys.,* No. 284950, 2009 WL 1507342, at \*1 (Mich.Ct.App. May 28, 2009). After the expiration of the redemption period, Michigan law does not permit property owners to make claims related to the foreclosed property. *Mitan v. Fed. Home Loan Mortg. Corp.,* 703 F.3d 949, 952 (6th Cir.) (citing *Piotrowski v. State Land Office Bd.,* 302 Mich. 179, 4 N.W.2d 514, 517 (.1942); *Overton,* 2009 WL 1507342, at \*1), *abrogated on other grounds by Kim v. JPMorgan Chase Bank, N.A.,* 493 Mich. 98, 825 N.W.2d 329 (2012). In addition, the redemption period may not be extended unless there is a "clear showing of fraud[ ] or irregularity." *Overton,* 2009 WL 1507342, at \*1 (citing *Schulthies v. Barron,* 16 Mich.App. 246, 167 N.W.2d 784, 785 (1969)).

1

The general statutory redemption period is one year. Mich. Comp. Laws § 600.3240(13). But "if the amount claimed to be due on the mortgage at the date of the notice of foreclosure is more than 66–2/3% of the original indebtedness secured by the mortgage, the redemption period is 6 months." *Id.* § 600.3240(8). From a review of the exhibits, it is unclear whether the proper redemption period here is six months or one year. However, the Court notes that Defendant, which presumably would prefer a six-month redemption period over a one-year redemption period, implies that the redemption period is one year. *See* Def.'s Mot. Dismiss 2, 9 ("Defendant purchased the Property at a Sheriff's Sale on January 27, 2012.... Here, the statutory redemption period expired on January 27, 2013."). But whether the redemption period is six months or one year does not change the relevant analysis.

Some courts have framed the requirement that mortgagors redeem their property within the statutory period as an issue of standing. *See, e.g., id.* Other courts have instead characterized the requirement as a merits issue. *See Langley v. Chase Home Fin. LLC,* No. 1:10–cv–604, 2011 WL 1130926, at *2 n. 2 (W.D.Mich. Mar. 28, 2011) (noting that a plaintiff in such a situation "certainly seems" to have standing for purposes of Article III of the Federal Constitution and characterizing the state-law redemption period as a merits issue); *Evans v. LNV Corp.,* No. 12–12287, 2012 WL 4048880, at *3 (E.D.Mich. Sept. 13, 2012) (citing *Langley*). A subsequent unpublished Sixth Circuit opinion supports the latter view: "[The Michigan holdings] do [ ] not turn on [the] standing doctrine"; rather, "[i]t is more accurate to say that the 'fraud or irregularity' claims in *Overton,* [*Awad v. General Motors Corp.,* No. 302692, 2012 WL 1415166 (Mich.Ct.App. Apr. 24, 2012) ], and [*Mission of Love v. Evangelist Hutchinson Ministries,* No. 266219, 2007 WL 1094424 (Mich.Ct.App. Apr. 12, 2007),] lacked sufficient merit to meet the high standard imposed by Michigan law on claims to set aside a foreclosure sale." *El–Seblani v. IndyMac Mort. Servs.,* 510 Fed.Appx. 425, 427–29 (6th Cir.2013) (disagreeing with *Overton* and characterizing plaintiff as having a "cause of action" under state law). Because a post-foreclosure suit "test[s] the **\*584** validity of the sale," the Court agrees that the issue is best characterized as one regarding the merits of a plaintiff's case rather than standing. *See Reid v. Nusholtz,* 264 Mich. 220, 249 N.W. 831, 832 (1933).

In addition, regardless of "[w]hether the failure to make this showing is best classified as a standing issue or as a merits

determination, one thing is clear: a plaintiff-mortgagor must meet this high standard" of fraud or irregularity "in order to have a foreclosure set aside after the lapse of the statutory redemption period." *Conlin v. Mortg. Elec. Registration Sys., Inc.,* 714 F.3d 355, 359–60 (6th Cir.2013) (internal quotation marks omitted). Furthermore, the fraud or irregularity must relate to the foreclosure proceeding itself. *El–Seblani,* 510 Fed.Appx. at 429 (citing *Freeman v. Wozniak,* 241 Mich.App. 633, 617 N.W.2d 46, 49 (2000)).

Moreover, even if a plaintiff can show that there has been fraud or irregularity in the foreclosure proceeding, such a defect renders the foreclosure voidable rather than void. *Kim v. JPMorgan Chase Bank, N.A.,* 493 Mich. 98, 825 N.W.2d 329, 337 (2012). And because such a sale is voidable, in order to set aside the foreclosure, a plaintiff must demonstrate that he or she was "prejudiced by defendant's failure to comply with MCL 600.3204. To demonstrate such prejudice," a plaintiff must show that he or she "would have been in a better position to preserve [his or her] interest in the property absent defendant's noncompliance with the statute." *Id.*

## B

### 1

Here, Plaintiffs have not challenged the fact that they defaulted, that Defendant properly instituted foreclosure by advertisement proceedings against them, or that Defendant purchased the subject property on January 27, 2012. Plaintiffs also did not redeem the property before the expiration of the one-year statutory redemption period.[2] Thus, absent extenuating circumstances, any interest Plaintiffs had in the property has been extinguished.

2

Although Plaintiffs claim that they did attempt to make an agreement to redeem the property, Plaintiffs made these factual allegations in their objection to Defendant's motion to dismiss. *See* Pls.' Obj. Def.'s Mot. Dismiss Aff. 2, ¶ 8; 3, ¶ 133. "However, it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984). Because Plaintiffs did not allege these facts in their complaint, the allegation is waived. In addition, even if Plaintiffs had alleged these facts

in their complaint, the statute of frauds prohibits oral agreements for the purchase of real estate. *See* Mich. Comp. Laws § 566.108. Finally, even if the agreement were alleged in the complaint, insofar as Plaintiffs allege the agreement was written, they have failed to attach the written agreement to any pleading submitted to the Court. The Court cannot consider the contents of a written agreement without viewing the written agreement. *See Abbas v. Bank of Am. N.A.,* No. 1:12–CV–607, 2013 WL 1340309, at *5 (E.D.Mich. Mar. 29, 2013).

**2**

As previously noted, the statutory redemption period may be extended if Plaintiffs can show that there was fraud or irregularity in the foreclosure proceeding. *See Schulthies v. Barron,* 16 Mich.App. 246, 167 N.W.2d 784, 785 (1969). Under Michigan law, in order to establish a claim for fraud, a plaintiff must demonstrate that (1) the defendant made a material misrepresentation; (2) it was false; (3) when the defendant made it, he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive **\*585** assertion; (4) he made it with the intention that it should be acted upon by the plaintiff; (5) the plaintiff acted in reliance upon the false misrepresentation; and (6) the plaintiff thereby suffered injury. *Hi–Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813, 816 (1976). Each element must be proved by the plaintiff by clear, satisfactory, and convincing evidence. *Youngs v. Tuttle Hill Corp.,* 373 Mich. 145, 128 N.W.2d 472, 473 (1964).

Furthermore, besides meeting the high standard of showing fraud or irregularity under state law, alleging fraud is subject to a heightened pleading standard under federal law. Under Federal Rule of Civil Procedure 9(b), a plaintiff must plead the circumstances constituting fraud "with particularity." A plaintiff's complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Gupta v. Terra Nitrogen Corp.,* 10 F.Supp.2d 879, 883 (N.D.Ohio 1998). At a minimum, a plaintiff must allege the time, place, and contents of the misrepresentations upon which he or she relied. *Bender v. Southland Corp.,* 749 F.2d 1205, 1216 (6th Cir.1984).

**a**

Here, Plaintiffs have not demonstrated that there was any fraud or irregularity in the foreclosure proceedings. Insofar as Plaintiffs allege a defect, they fail to show that any defect rose to the level of fraud or otherwise relates to the foreclosure process. Plaintiffs argue that they "would have been in better position to preserve the interest in the property absent defendant's Non–Compliance with the [loan modification] statu[t]e." Pls.' Objs. Report & Rec. 5. Plaintiffs also present affidavits and exhibits that in their view show that Plaintiffs dutifully submitted documents requesting a loan modification. *See, e.g.,* Pls.' Compl. Ex. D. But Plaintiffs' evidence relates to Defendant's supposed failure to give Plaintiffs a loan modification, not any irregularity in the foreclosure process, and Defendant has no legal obligation to provide a loan modification. *See Duff v. Fed. Nat'l Mortg. Ass'n,* No. 2:11–CV–12474, 2012 WL 692120, at *5 (E.D.Mich. Feb. 29, 2012) ("HAMP imposes no duty on [a] mortgage lender to modify [a] mortgage even if the borrower meets modification requirements."). At most, Plaintiffs—in their response to Defendant's motion to dismiss, not their complaint—allege the elements of fraud scantily clad in nothing more than legal conclusions. *See* Pls.' Obj. Def.'s Mot. Dismiss 11, ECF No. 13. These bare legal conclusions are insufficient to show that there was any fraud or irregularity in the foreclosure proceeding.

In addition, although Plaintiffs spend many pages alleging that Defendant has violated "dual tracking," any such violations relate to the loan modification process rather than the foreclosure process. Dual tracking refers to a common tactic by banks that institute foreclosure proceedings at the same time that a borrower in default seeks a loan modification. *See Jolley v. Chase Home Finance, LLC,* 213 Cal.App.4th 872, 153 Cal.Rptr.3d 546 (2013) (discussing dual tracking under California law). "The result is that the borrower does not know where he or she stands, and by the time foreclosure becomes the lender's clear choice, it is too late for the borrower to find options to avoid it." *Id.* at 572.

Michigan has taken steps to ban the practice of dual tracking. In particular, section 600.3205a(e) of the Michigan Compiled Laws requires a lender to wait **\*586** 90 days before commencing foreclosure proceedings against a borrower who has requested a meeting with the lender, which Defendant appears to have complied with. *See* Pls.' Compl. Ex. D. As stated above, however, any alleged dual tracking

violations relate to the loan modification process rather than the foreclosure process. Furthermore, the only remedy for a violation of the loan modification process is a conversion of the foreclosure by advertisement into a judicial foreclosure, which must have occurred before the foreclosure by advertisement was completed. *Adams v. Wells Fargo Bank, N.A.,* No. 11–10150, 2011 WL 3500990, at *4 (E.D.Mich., Aug. 10, 2011) (citing Mich. Comp. Laws § 600.3205c(8)). A borrower may not set aside or avoid a completed foreclosure. *Id.*

Thus, even if Plaintiffs' dual tracking allegations are true, their only remedy would have been for a conversion of the foreclosure by advertisement. But now that the foreclosure is complete, Plaintiffs no longer have a legal remedy. Contrary to Plaintiffs' assertion, "Dual Tracking is" not "enough grounds for a request and relief." *See* Pls.' Obj. Def.'s Mot. Dismiss 7.

### b

Furthermore, Plaintiffs have failed to comply with Federal Rule of Civil Procedure 9(b)'s special requirement for fraud. In their complaint, Plaintiffs allege nothing more than that "the document stating to be the Affidavit of purchase at foreclosure sale and named as such is fraud on its face," and that "inducing Plaintiff to believe that he would get a loan modification was fraudulent inducement by the Defendants[ ]." *See* Pls.' Compl. 4, ¶ 19; 5, ¶ 22. Such allegations fall far short of the heightened pleading standard for fraud. Even Plaintiffs' other briefs fail to meet this heightened pleading standard.

Because Plaintiffs have not shown that any fraud or irregularity relating to the foreclosure process, let alone plead such fraud with particularity, Plaintiffs have not met the high bar to extend the statutory redemption period.

### 3

Importantly, even if there had been fraud or irregularity in the foreclosure proceeding, such a defect would render the foreclosure voidable rather than void. *See Kim v. JPMorgan Chase Bank, N.A.,* 493 Mich. 98, 825 N.W.2d 329, 337 (2012). And because the sale is merely voidable, in order to set aside the foreclosure sale, plaintiffs must show that they were "prejudiced by defendant's failure to comply with MCL

600.3204. To demonstrate such prejudice, they must show that they would have been in a better position to preserve their interest in the property absent defendant's noncompliance with the statute." *Id.* Courts have consistently held that when plaintiffs defaulted on their loans, received proper notice of default, failed to show they had the funds to outbid the highest bidder at the foreclosure sale—let alone pay the entire unpaid balance owing on the loan—and made no attempt to redeem the property during the redemption period, they cannot show prejudice. *See, e.g., Elson v. Deutsche Bank Nat'l Trust Co.,* No. 11–14100, 2012 WL 1902916, at *6 (E.D.Mich. May 25, 2012); *Piccirilli v. Wells Fargo Bank, N.A.,* No. 2:11–cv–10264, 2012 WL 1094333, at *8 (E.D.Mich. Mar. 30, 2012); *Caillouette v. Wells Fargo Bank, N.A.,* No. 11–cv–10204, 2012 WL 1033598, at *8 (E.D.Mich. Mar. 27, 2012).

Here, Plaintiffs have not demonstrated prejudice. Plaintiffs have not challenged the fact that they defaulted on their loan, nor have they contended that they were unaware that their property was scheduled for a foreclosure sale. Furthermore, Plaintiffs have not alleged that they **\*587** attempted to redeem the property, other than advancing a proposed agreement that was never consummated and that they failed to mention in their complaint. *See* Def.'s Reply Pls.' Obj. Def.'s Mot. Dismiss 5, ECF No. 14. Plaintiffs have not shown that they would have been in a better position if Defendant had not allegedly violated the statute governing foreclosure procedures.

In sum, Plaintiffs have failed to show that there was fraud or irregularity in the foreclosure proceeding sufficient to extend the statutory redemption period. They have also failed to plead their claim of fraud with particularity. Furthermore, they have failed to show that they would have been prejudiced by any such fraud or irregularity. Consequently, Plaintiffs have not shown any circumstance that would merit extending the one-year statutory redemption period. Thus, Plaintiffs no longer have any interest in the subject property and may not make any claims regarding the property against Defendant.

### IV

Because Plaintiffs no longer have an interest in the subject property, they may not make any claims regarding the property against Defendant. But even if Plaintiffs had an interest in the property, they have failed state any claims upon which the Court could grant relief.

## A

Plaintiffs object to Judge Binder's recommendation that Defendant's motion to dismiss be granted as to any claim brought under HAMP. Plaintiffs devote many pages of their objection discussing alleged HAMP violations by Defendant. *See* Pls.' Objs. Report & Rec. 6–7, 9–10, 14–15. However, even if these violations are true, HAMP does not create a private cause of action; rather, lawsuits against such purported violations must be brought by the government. *See Hart v. Countrywide Home Loans, Inc.,* 735 F.Supp.2d 741, 748 (E.D.Mich.2010); *Meyer v. Citimortgage, Inc.,* No. 11–13432, 2012 WL 511995, at \*6 (E.D.Mich. Feb. 16, 2012). Thus, Plaintiffs have failed to state a claim upon which the Court could grant relief.

## B

In Plaintiffs' objections under the "REMIC" heading, it is unclear what the objection actually is: "Michigan Comp. Laws Sec 555.5 does not apply here, because the trust did not exist—REMIC Violation—also a true case of a lien that does not exist, is grounds for extinguishing the interest if any, or is invalid." Pls.' Objs. Report & Rec. 7 (no alterations). One reading is that Plaintiffs are agreeing with Judge Binder that there is no trust, and thus, no REMIC violation. Another reading is that Plaintiffs are analogizing Judge Binder's explanation that there is no trust to Plaintiffs' argument that there is no lien. *See* Report & Rec. 14–15. But even assuming there is no lien, section 555.5 of the Michigan Compiled Laws would still be inapplicable because the existence or nonexistence of a lien is outside of the purview of section 555.5.

Although Judge Binder's report and recommendation discusses Defendant's motion to dismiss Plaintiffs' REMIC claims in terms of section 555.5 of the Michigan Compiled Laws, a more thorough analysis would also include 26 U.S.C. §§ 860A–G because these are the sections of the law governing "Tax Violations [s]" to which Plaintiffs refer in their complaint and to which Defendant refers in its motion to dismiss. *See* Pls.' Compl. 5–6; Def.'s Mot. Dismiss 17–18. However, even under these sections, Plaintiffs' REMIC claim fails. "[T]here is no private right of action available to challenge any perceived violation of 26 U.S.C. §§ 860A–G." **\*588** *Mohlman v. Long Beach Mortg.,* 2013 WL 490112, at \*5 (E.D.Mich. Feb. 8, 2013). In any event, "violating

the REMIC rules does not establish a defect in ownership of the mortgage," *see id.* (*citing Livonia Prop. Holdings, L.L.C. v. 12840–12976 Farmington Rd. Holdings, L.L.C.,* 717 F.Supp.2d 724, 748 (E.D.Mich.2010)), and thus, Defendant would still rightfully own the subject property. Consequently, here too Plaintiffs have failed to state a claim upon which the Court could grant relief.

## C

Plaintiffs' objection to Judge Binder's TILA analysis is nearly incomprehensible:

> Defendant states [DUAL TRACKING] is irrelevant [even] if the claim may relate to The National Mortgage Settlement, and then states the "borrowers do not have a cause of action," is misleading". Not that an agreement was reached, and that the statute of fraud prohibits oral agreements regarding loan modifications related to real property. Which means [TILA] is not time barred.

Pls.' Objs. Report & Rec. 4 (no alterations). Some courts have not looked kindly upon incomprehensible briefs. *See, e.g., In re King,* No. 05–56485–C, 2006 WL 581256 (Bankr.W.D.Tex. Feb. 21, 2006) ("The court cannot determine the substance, if any, of the Defendant's legal argument, nor can the court even ascertain the relief that the Defendant is requesting. The Defendant's motion is accordingly denied for being incomprehensible."). Insofar as Plaintiffs made an objection, Judge Binder correctly suggested that Plaintiffs' action falls outside the one-year limitations period for TILA claims. *See* 15 U.S.C. § 1640(e). Plaintiffs entered into a mortgage and signed a promissory note with CCO Mortgage Corp. on October 21, 2005. Def.'s Mot. Dismiss Exs. 1, 2. Defendant became the successor to CCO Mortgage Corp. by merger on September 1, 2007. Def.'s Mot. Dismiss Ex. 3. Based on these dates, Plaintiffs' action falls outside the one-year limitations period. Although the one-year limitations period is subject to equitable tolling, *Jones v. TransOhio Sav. Ass'n,* 747 F.2d 1037, 1041 (6th Cir.1984), such tolling does not apply here. Thus, Plaintiffs' TILA claim is time-barred and will be dismissed.

## D

Plaintiffs also argue that "Defendant is a Debt Collector by definition." Pls.' Objs. Report & Rec. 6. In particular,

Plaintiffs refer to *Glazer v. Chase Home Finance LLC,* 704 F.3d 453 (6th Cir.2013) in support of their argument. In *Glazer,* the court, reversing the district court, held that "mortgage foreclosure is debt collection" under the FDCPA. *See id.* at 455. But the court affirmed the district court's ruling that the defendant bank was not a debt collector under the FDCPA because the defendant obtained the loan before the plaintiff debtor was in default. *See id.* at 457; *cf.* 15 U.S.C. § 1692a(6), (6)(F) ("The term 'debt collector' ... does not include ... any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity ... (iii) concerns a debt which was not in default at the time it was obtained by such person."). Here, Defendant, through a merger involving CCO Mortgage Corp., obtained the debt before Plaintiffs were in default. [3] Thus, Defendant is not a debt collector under the FDCPA, and Plaintiffs have failed to state a claim upon which the Court could grant relief.

[3]   Even if Defendant had obtained the debt via merger after Plaintiffs were in default, it still would not be considered a "debt collector" under the FDCPA. *See Brown v. Morris,* 243 Fed.Appx. 31, 34 (5th Cir.2007).

**\*589 E**

In their objections, Plaintiffs cite to section 750.249(3) of the Michigan Compiled Laws, which refers to the invalidation of forged records and deeds. However, subsection (3) was repealed in 2011. Moreover, subsection (3) simply states that "the circuit court shall enter an order indicating that the document is invalid and requiring a copy of the invalid document and a certified copy of the order to be recorded in the office of the register of deeds of any county where the subject property is located"; it does not prohibit anything per se. Rather, subsection (1) prohibits the uttering of forged records. But even if Plaintiffs are alleging that Defendant has uttered a forged sheriff's deed and thereby violated subsection (1), there is no relevant private civil cause of action. *See Lucido v. Apollo Lanes & Bar, Inc.,* 123 Mich.App. 267, 333 N.W.2d 246, 248 (1983); *Loud v. Lee Twp. Election Comm'n,* Nos. 295836, 298811, 2011 WL 4104956, at \*5 (Mich.Ct.App. Sept. 15, 2011). As a result, Plaintiffs have failed to state a claim upon which the Court could grant relief.

Similarly, Plaintiffs cite to section 750.248(4), which has nearly the same language as section 750.249(3) except that it

refers to making rather than uttering a forged record. Section 750.249(3) was also repealed in 2011. For the same reasons, Plaintiffs have failed to state a claim upon which the Court could grant relief.

Finally, Plaintiffs cite to section 2.149(c) of the Michigan Compiled Laws in alleging that Defendant has violated the requirements of the form of the sheriff's deed. However, there is no section 2.149, and the Court is unable to identify what statute that Plaintiffs could be referring to. [4] Thus, Plaintiffs have failed to state a claim upon which the Court could grant relief.

[4]   The only remotely possible statute is section 565.492 of the Michigan Compiled Laws, which refers to the requirements of indexing a sheriff's deed. But even assuming a violation of this section, it is unlikely that there would be a private civil cause of action. *See Lucido,* 333 N.W.2d at 248.

**V**

Plaintiffs also object to Judge Binder's report and recommendation on the basis that it violates their due process rights under the Fifth Amendment and their right to a jury trial under the Seventh Amendment. In particular, Plaintiffs assert that their Fifth Amendment due process rights have been violated because "a meaningful hearing [has been] denied as in this cause." [5] Pls.' Objs. Report & Rec. 3. In addition, Plaintiffs assert that their Seventh Amendment right to a "jury of peers with the constitutional authority to judge both the facts and law in a case" has been denied. *Id.*

[5]   Plaintiffs state that "[t]he Due Process claim must be dismissed." *Id.* No doubt Plaintiffs actually meant either that their due process claim must *not* be dismissed, or that Defendant's motion to dismiss Plaintiffs' due process claim should be "dismissed" (i.e., denied).

**A**

The Court notes that Plaintiffs' due process claim was previously directed against Defendant; now Plaintiffs raise this claim against the Court. Insofar as Plaintiffs object to Judge Binder's analysis of Plaintiffs' due process claim against Defendant, the Court agrees with Judge Binder: the

Fifth Amendment does not apply to private parties like Defendant; it is not a "state actor." *See Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (The Fifth and Fourteenth Amendments "erect[ ] no shield against merely private conduct, however discriminatory or wrongful."); *cf.* **\*590** *Malinski v. New York,* 324 U.S. 401, 415, 65 S.Ct. 781, 89 L.Ed. 1029 (1945) (Frankfurter, J., concurring) ("Of course the Due Process Clause of the Fourteenth Amendment has the same meaning. To suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection."). Thus, Plaintiffs have failed to state a claim upon which the Court could grant relief.

**B**

In directing their due process claim against the Court, Plaintiffs allege that their due process rights have been denied because a "meaningful hearing [has been] denied as in this cause." Pls.' Objs. Report & Rec. 3. From a review of Plaintiffs' pleadings, it is clear that Plaintiffs' conception of a "meaningful hearing" refers to an oral hearing. *See id.* at 1, 2, 4, 7, 10, 14, 16. But there is no right under the Due Process Clause to an oral hearing on a motion to dismiss. *Goodpasture v. Tenn. Valley Auth.,* 434 F.2d 760, 764 (6th Cir.1970); *Greene v. WCI Holdings Corp.,* 136 F.3d 313, 316 (2d Cir.1998); *see Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 391 (6th Cir.1975) (denial of oral hearing before granting motion for summary judgment does not violate "fundamental notions of fairness and due process of law"); *Yamaha Corp. of Am. v. Stonecipher's Baldwin Pianos & Organs, Inc.,* 975 F.2d 300 (6th Cir.1992); *see also* Fed. R. Civ. Proc. 78(b) (allowing courts to "provide for submitting and determining motions on briefs, without oral hearings"). Although Plaintiffs have requested oral argument, given that Plaintiffs have had ample opportunity to present their arguments to the Court, the lack of an oral hearing does not violate fundamental notions of fairness and due process of law. Consequently, the Court has not violated Plaintiffs' due process rights.

**C**

Plaintiffs also assert that their Seventh Amendment right to a "jury of peers with the constitutional authority to judge both the facts and law in a case" has been denied. Pls.' Objs. Report & Rec. 3. Plaintiffs further allege that "the use of lawyer

rules, judicial rules, court rules, or otherwise trumped-up legal technicalities and instructions ... effectively 'handcuffs' the jury." *Id.* As an initial matter, judges are responsible for identifying the law, while a jury determines the facts. *United States v. Cunningham,* 679 F.3d 355, 375 (6th Cir.2012) (citing *United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)). In fact, this is a bedrock principle of the Anglo–American system of common law, extending back almost 500 years: "For the office of 12 men is no other than to enquire of matters of fact, and not to adjudge what the law is, for that is the office of the Court, and not of the jury...." *Townsend's Case,* (1554) 75 Eng. Rep. 173, 178–79 (K.B.).

In addition, Plaintiffs' challenge to Judge Binder's recommendation that Defendant's Rule 12(b)(6) motion to dismiss be granted without a jury trial demonstrates that Plaintiffs misunderstand their right to a jury trial. The Seventh Amendment *"preserve[s]"* the right to a jury trial as existed during the founding of this nation; it does not grant an unconditional right to a jury in all matters. And it is well settled that dismissal for failure to state a claim does not violate a party's right to a jury trial. *James v. Mann,* 234 F.3d 1268, at \*2 (6th Cir.2000) (unpublished table opinion); *Anderson v. Law Firm of Shorty, Dooley & Hall,* 393 Fed.Appx. 214 (5th Cir.2010); *Henry v. Jones,* 484 Fed.Appx. 290 (11th Cir.2012); *Winslow v. Lehr,* 646 F.Supp. 242 (D.Colo.1986); *Allen v. Biggs,* 62 F.Supp. 229 (E.D.Penn.1945); *see* **\*591** *Perkins v. Spivey,* 911 F.2d 22, 28 n. 6 (8th Cir.1990) ("It is well settled that an otherwise proper ruling is not erroneous merely because it has the incidental effect of precluding a jury trial."); *cf. Fidelity & Deposit Co. of Md. v. United States,* 187 U.S. 315, 23 S.Ct. 120, 47 L.Ed. 194 (1902) (summary judgment does not violate Seventh Amendment right to jury); *Biegas v. Quickway Carriers, Inc.,* 573 F.3d 365 (6th Cir.2009) (same); *Oglesby v. Terminal Transp. Co.,* 543 F.2d 1111 (5th Cir.1976) (same); *Garvie v. City of Ft. Walton Beach,* 366 F.3d 1186 (11th Cir.2004) (same). Thus, the Court has not violated Plaintiffs' right to a jury trial.

**VI**

Plaintiffs have submitted what the Court construes to be a motion for reconsideration to vacate the final judgment of this Court under Rule 60(b). *See* Pls.' Objs. Report & Rec. 15. But because there is not yet a final judgment, the Court will deny the motion.

**VII**

Plaintiffs have no interest in the subject property and may not make any claims regarding the property against Defendant. Plaintiffs have also failed to state a claim upon which relief can be granted. Accordingly:

It is **ORDERED** that Plaintiffs' objections to the report and recommendation, ECF No. 17, are **OVERRULED.**

It is further **ORDERED** that the magistrate judge's report and recommendation, ECF No. 15, is **ADOPTED.**

It is further **ORDERED** that Defendant's motion to dismiss, ECF No. 9, is **GRANTED.**

It is further **ORDERED** that Plaintiffs' motion for a preliminary injunction, ECF No. 4, is **DENIED.**

It is further **ORDERED** that Plaintiffs' motion for reconsideration, ECF No. 17, is **DENIED.**

It is further **ORDERED** that Plaintiffs' complaint, ECF No. 1, is **DISMISSED** with prejudice.

*MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION TO DISMISS* (Docs. 4, 9)

CHARLES E. BINDER, United States Magistrate Judge.

**I. *RECOMMENDATION***

For the reasons set forth below, **IT IS RECOMMENDED** that Plaintiffs' motion for preliminary injunction (Doc. 4) be **DENIED** and Defendant's motion to dismiss (Doc. 9) be **GRANTED.**

**II. *REPORT***

**A. Introduction**

This mortgage foreclosure action was filed on June 28, 2013. The *pro se* complaint alleges the single claim of "[v]oid/voidable sheriff's deed." (Doc. 1 at 4.) Plaintiffs allege that the "affidavit of purchase at the foreclosure sale was sworn to by the attorney/witness for Defendants[ ]." (*Id.*) Plaintiffs

further allege a violation of the Fair Debt Collection Practices Act ("FDCPA"). (*Id.* at 5.) Plaintiffs also complain that "for one year [they have] been trying to get a possible loan modification" from Defendant and that "[d]ocuments have been mailed many, many times to the lender until the alleged lender made sure Plaintiff ran out of time." (Doc. 1 ¶ 22.) Plaintiffs further complain that they "offered to settle with Defendants' [sic] regarding the alleged indebtedness for [sic] and Defendants' [sic] did not concur." (*Id.* ¶ 23.) Some parts of the complaint are difficult to understand.  **\*592**  Plaintiffs state that, "[u]pon inquiring as to the problem, contradictory information, one would be told HAMP paid the loan off to the loan was in default, some even had funds returned and/or foreclosure started at the same time with no warning most end up homeless." (*Id.* ¶ 24 (no alterations from original).)

Under a section entitled "Case Law in Support," Plaintiffs also allege a "violation of REMIC LAW which is a Tax Violation under the IRS ..." and that Defendants "have bifurcated Plaintiff's Note and Mortgage thereby breaking the chain of title; when the security has been broken the contract is voidable if not void." (*Id.* ¶¶ 27–28.) The complaint requests that the court "[d]etermine that Plaintiffs Alfred Kloss and Diana Kloss is [sic] the fee simple Title Holder to the subject property[,]" "[d]etermine those Defendants['] interests, if any are declared invalid and forever Extinguished; and Release of Claim of Interest Pursuant to MCL 656.451a[,]" and "[r]eturn the property to its rightful owner, and double its value of Five Hundred Eight Thousand, Sixty Five Dollars and zero cents for defending the fraudulent action and Void the Sheriff's Deed and Sale." (Doc. 1 at 7.)

The case was referred by United States District Judge Thomas L. Ludington to the undersigned magistrate judge for general case management on July 15, 2013. (Doc. 6.)

On July 19, 2013, Defendant filed the instant motion to dismiss. (Doc. 9.) Plaintiffs responded to the motion on August 16, 2013, and Defendant replied on September 6, 2013. (Docs. 13, 14.) In addition, Plaintiffs filed a motion for a preliminary injunction on July 11, 2013, and Defendant responded on July 23, 2013. (Docs. 4, 12.) Accordingly, the motions are ready for report and recommendation without oral argument pursuant to Local Rule 7.1(f)(2) of the Eastern District of Michigan.

**B. Factual Background**

Plaintiffs' property is commonly known as 7273 Birch Run Road, Birch Run Township, Michigan (the "property"). (Doc.

1 at 2.) On October 21, 2005, Plaintiffs entered into the subject mortgage with CCO Mortgage Corporation in the amount of $825,000.00. (Doc. 1 at Ex. B, Pg ID 12; Doc. 9 at Ex. 2.) On the same date, a promissory note was also executed between the parties. (Doc. 9 at Ex. 1.) On September 1, 2007, Defendant RBS Citizens, N.A., became the successor to CCO Mortgage Corporation by merger of various banking institutions. (Doc. 9 at Ex. 3.)

Plaintiffs defaulted, foreclosure by advertisement proceedings were commenced, and Defendant purchased the subject property on January 27, 2012. (Doc. 9 at 12, Ex. 4.) Nothing occurred during the statutory redemption period of one year, i.e., through January 27, 2013. (Doc. 9 at 13); Mich. Comp. Laws § 600.3240(13). [1] On February 19, 2013, Defendant filed an action in the 70th District Court for the State of Michigan to gain possession of the subject property. (Doc. 9 at Ex. 5.) After a hearing, the 70th District Court entered a judgment of possession in favor of Defendant. (*Id.* at Ex. 6.) On March 5, 2013, Plaintiffs appealed to the 10th Circuit Court for the State of Michigan, i.e., the Saginaw County Circuit Court, and on that same day, the court stayed the judgment of possession. (Doc. 9 at 13, Exs. 7–9.)

[1]     Plaintiffs' complaint does not challenge any of these facts.

On March 6, 2013, Plaintiffs filed a federal complaint with this Court. (E.D. Mich. Case No. 1:13–cv–11025.) In April 2013, Plaintiffs filed a similar action in the **\*593** Saginaw County Circuit Court, which Defendant removed to this Court. (E.D. Mich. Case No. 1:13–cv–11903.) These actions were consolidated and, on May 13, 2013, via stipulation between the parties and court order, the consolidated cases were dismissed without prejudice. (Doc. 9 at 14.) Therefore, this action is the only action between the parties regarding this subject property. Defendant contends, *inter alia,* that the pending state lawsuit and this lawsuit raise virtually identical claims and issues. (*Id.* at 13–14.)

**C. Motion Standards**

Defendants move for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. When deciding a motion to dismiss, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." *Bovee v. Coopers & Lybrand C.P.A.,* 272 F.3d 356, 360 (6th Cir.2001). As the Supreme Court held in *Bell*

*Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), a complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if the complaint does not plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955 (rejecting the traditional Rule 12(b)(6) standard set forth in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (citations omitted). Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

"In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Nieman v. NLO, Inc.,* 108 F.3d 1546, 1554 (6th Cir.1997) (quotation omitted). This circuit has further "held that 'documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim.' " *Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir.1997) (quoting *Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993)); *Yeary v. Goodwill Industries–Knoxville, Inc.,* 107 F.3d 443, 445 (6th Cir.1997) (consideration of other materials that "simply filled in the contours and details of the plaintiff's [second amended] complaint, and added nothing new" did not convert motion to dismiss into motion for summary judgment).

**D. Analysis & Conclusions**

**1. Arguments of the Parties**

Defendant contends that: (1) Plaintiffs' claims are barred by the *Rooker–Feldman* doctrine and *res judicata;* (2) Plaintiffs' claims fail because Plaintiffs did not bring them prior to the expiration of the redemption period and Plaintiffs failed to allege any irregularity in the foreclosure process because failing to provide a loan modification is not a defect and Plaintiffs have no right to loan modification; (3) Plaintiffs' claims are barred by the doctrine of unclean

hands because Plaintiffs received $825,000.00 and failed to pay the debt as agreed upon; (4) Plaintiffs' wrongful **\*594** foreclosure claim fails because Defendants complied with Michigan's foreclosure by advertisement laws; (5) any alleged violation of Michigan's loan modification statute is insufficient to set aside a completed foreclosure sale; (6) Plaintiffs' allegations related to the alleged bifurcation of the note and mortgage and securitization of the mortgage fail to state a claim; (7) Plaintiffs' allegation related to violation of the "Servicer Participation Agreement" or "Servicer Performance Agreement" and the Home Affordable Modification Program ("HAMP") fail as a matter of law; (8) Plaintiffs' allegations related to Real Estate Mortgage Investment Conduits ("REMIC") violations fail as a matter of law; (9) Plaintiffs' FDCPA claims must be dismissed; (10) Plaintiffs' allegations of fraud fail as a matter of law; (11) Plaintiffs' Fair Credit Reporting Act ("FCRA") "claim" must be dismissed; and (12) Plaintiffs' due process "claim" must be dismissed. (Doc. 9.)

Plaintiffs respond, asking the court to "enter an order for Defendant(s) to follow the law and validate the alleged debt if not rule in favor of the Plaintiff(s) and against the Defendant(s) for violations of Sec Code 809 15 U.S.C. 1692(g), also MCL 600.3205(a) which is a Federal Law." (Doc. 13 at 1–2.) Plaintiffs also contend that "Defendant(s) violated MCL 750.248(4) and MCL 750.249(3) by filing a fraudulent Sheriff Deed and stating no way could Plaintiff(s) get a loan Modification because there if was [sic] no valid loan to modify this is a genuine issue of material fact." (Id. at 5.)

Defendant replies that Plaintiffs cannot avoid application of the *Rooker–Feldman* doctrine by asserting that Plaintiffs' claims are for damages and allegations apart from possession. (Doc. 14 at 3.) Defendant also replies that Plaintiffs' response improperly raises new claims related to the conduct of defense counsel that were not included in the original complaint which should not be considered and that, even if they are, they are "so muddled and insufficient, they should be deemed waived." (Id. at 3–4.) Defendant also argues that Plaintiffs' reference to "dual tracking" is irrelevant and even if the claim may relate to the National Mortgage Settlement, that settlement was "entered into between certain mortgage servicers, the U.S. Department of Justice and the attorneys general of forty-nine states and the District of Columbia" and "[n]ot only was Defendant not a party to that Settlement, but individual borrowers do not have a cause of action under it." (Id. at 5.) Defendant also contends that to the extent

that Plaintiffs raise a new breach of contract claim, they argue inconsistent positions, i.e., that Defendant made an agreement for Plaintiffs to purchase the sheriff's deed and that an agreement was reached regarding a loan modification. (Id. at 6.) Defendants note that Plaintiffs' complaint indicates only that Plaintiffs applied for a loan modification, not that one was reached, and that the statute of frauds prohibits oral agreements regarding loan modifications related to real property. (Id.) To the extent Plaintiffs raise a claim under the Truth in Lending Act ("TILA") by making a passing reference to it in their response (Doc. 13 at 9), such a claim would be time barred. (Doc. 14 at 7.)

**2. Standing Under Michigan law**

**a. Governing Standards**

Under Michigan law, "[w]hen the redemption period expires, the purchaser of a sheriff's deed is vested with 'all the right, title, and interest' in the property." *Carmack v. Bank of New York Mellon,* No. 12–cv–11669, 2012 WL 2389863, at *2 (E.D.Mich. June 25, 2012) (citing Mich. Comp. Laws § 600.3236). "The law in Michigan does not allow an equitable extension **\*595** of the period to redeem from a statutory foreclosure sale in connection with a mortgage foreclosed by advertisement and posting of notice in the absence of a clear showing of fraud or irregularity." *Overton v. Mortgage Elec. Reg. Sys.,* No. 07–725429, 2009 WL 1507342, at *1 (Mich.Ct.App. May 28, 2009).

The Michigan Court of Appeals has affirmed the holding in *Overton* even where, as here, the plaintiff filed suit before expiration of the redemption period. *Awad v. General Motors Accept. Corp.,* No. 302692, 2012 WL 1415166, at *3 (Mich.Ct.App. Apr. 24, 2012). The court reiterated that "[u]pon the expiration of the redemption period, [plaintiff] lost all right, title, and interest in the property and therefore, lost her standing to sue." *Id.; accord Williams v. Pledged Property II, LLC,* 508 Fed.Appx. 465, 468 (6th Cir.2012); *Kumar v. U.S. Bank Nat'l Ass'n,* No. 12–cv–12624, 2013 WL 783999, at *2 (E.D.Mich. Mar. 1, 2013); *Costell v. Bank of New York Mellon,* No. 12–cv–15063, 2013 WL 317746, at *3 (E.D.Mich. Jan. 28, 2013) ("The commencement of legal proceedings prior to the expiration of the redemption period does not preserve a mortgagor's standing to challenge the foreclosure sale"); *Allor v. Federal Home Loan Mort. Corp.,* No. 12–12290, 2012 WL 5265738, at *2 (E.D.Mich. Oct. 24, 2012); *Sylvester v. Fannie Mae,* No. 12–13186, 2012 WL 4694348, at *2 (E.D.Mich. Oct. 3, 2012) ("that Plaintiff filed her suit before the redemption period expired does nothing

to advance her claims"); *Chungag v. Wells Fargo Bank, N.A.,* No. 12–11073, 2012 WL 1945483, at *4 (E.D.Mich. May 30, 2012); *Duff v. Federal Nat'l Mort. Ass'n,* No. 11–cv–12474, 2012 WL 692120, at *3 (E.D.Mich. Feb. 29, 2012); *Luster v. Mortgage Elec. Reg. Sys.,* No. 11–CV–14166, 2012 WL 124967, at *2 (E.D.Mich. Jan. 17, 2012). [2]

[2]    *But see Ahmad v. Wells Fargo Bank, N.A.,* 861 F.Supp.2d 818, 823–24 (E.D.Mich. Mar. 19, 2012) (disagreeing with cases finding that plaintiffs lack standing after redemption period expires because plaintiffs are the last owner and possessor of the property and often remain in possession of the property notwithstanding any sheriff's sale, which should satisfy the injury-in-fact requirements for standing, but ultimately concluding that the "court does not need to resolve Plaintiffs' standing ... because, even assuming they have such standing, their claims are still subject to dismissal ...."); and *Moss v. Wells Fargo Bank, N.A.,* No. 11–13429, 2012 WL 1050069, at *3–4 (E.D.Mich. Mar. 28, 2012).

The Sixth Circuit has held in several unpublished decisions that the Michigan "holdings 'do[ ] not turn on [the] standing doctrine[ ]' " but that it is "more accurate to say that the 'fraud or irregularity' claims in *Overton, Awad,* and *Mission of Love* lacked sufficient merit to meet the high standard imposed by Michigan law on claims to set aside a foreclosure sale."*El–Seblani v. IndyMac Mort. Servs.,* 510 Fed.Appx. 425, 429–30 (6th Cir.2013) (citing *Houston v. U.S. Bank Home Mort. Wisc. Serv.,* 505 Fed.Appx. 543, 547–48 (6th Cir.2012)). The high standard referred to by the Sixth Circuit is "whether [the plaintiff] made a sufficient showing of 'fraud or irregularity' in connection with the sheriff's sale of his home to 'undo the divestment of [his] property.' " *El–Seblani,* 510 Fed.Appx. at 429; *Houston,* 505 Fed.Appx. at 548–49.

More recently, the Sixth Circuit has explained in a published opinion that "[w]hether the failure to make this showing is best classified as a standing issue or a merits determination, one thing is clear: a plaintiff-mortgagor must meet this 'high standard' in order to have a foreclosure set aside after the lapse of the statutory redemption period." *Conlin v. MERS,* 714 F.3d 355, 359–60 (6th Cir.2013). Finally, the Sixth Circuit has emphasized that any alleged fraud or irregularity " 'must relate **\*596** to the foreclosure procedure itself.' " *Conlin,* 714 F.3d at 360 (citation omitted).

**b. Application**

Here, the only defect or irregularity implicitly cited by Plaintiffs are the allegations made in their responsive brief that Defendant violated various statutes. Plaintiffs cite the Fair Debt Collection Practices Act, 15 U.S.C. § 1692(g), the Home Affordable Modification Program, 12 U.S.C. § 5201, *et seq.,* and Mich. Comp. Laws § 600.3205(a). (Doc. 13 at 1–2.) Plaintiffs also contend that "Defendant(s) violated MCL 750.248(4) and MCL 750.249(3) by filing a fraudulent Sheriff Deed and stating no way could Plaintiff(s) get a loan Modification because there if was [sic] no valid loan to modify this is a genuine issue of material fact." (Doc. 13 at 5.) Plaintiffs also refer to "MCL 2.14(c)" with respect to the form of the sheriff's deed. (*Id.* at 4.)

I suggest that none of Plaintiffs' allegations or references to code sections establish a defect or irregularity in the foreclosure process sufficient to provide standing under Michigan law to have the foreclosure set aside after the lapse of the redemption period. Plaintiffs have not challenged the fact that they defaulted, that foreclosure by advertisement proceedings were properly commenced, that Defendant purchased the subject property on January 27, 2012, and that no attempts at redemption were made by Plaintiffs during the statutory redemption period of one year, i.e., through January 27, 2013. (Doc. 9 at 12–13; Ex. 4.) Instead, Plaintiffs appear to rely on the mere fact that they were not provided with a loan modification under the HAMP. However, "HAMP imposes no duty on [a] mortgage lender to modify [a] mortgage even if the borrower meets modification requirements." *Duff v. Federal Nat'l Mort. Ass'n,* No. 2:11–cv–12474, 2012 WL 692120, at *5 (E.D.Mich. Feb. 29, 2012); *accord Dixon v. Wells Fargo Bank, NA,* No. 12–10174, 2012 WL 4450502, at *9 (E.D.Mich. Sept. 25, 2012). Therefore, a failure to provide a loan modification does not create a defect or irregularity in the foreclosure process that would allow the foreclosure to be set aside. *See Fannie Mae v. Mandry,* No. 12–13236, 2013 WL 687056, at *7–8 (E.D.Mich. Feb. 26, 2013).

**3. Prejudice Under Michigan Law**

I further suggest that even if there had been a defect or irregularity in the notice of the foreclosure or the foreclosure proceeding itself, any such defect would have rendered the foreclosure voidable and not void. *See Kim v. JPMorgan Chase Bank, N.A.,* 493 Mich. 98, 118, 825 N.W.2d 329 (2012) ("we hold that defects or irregularities in a foreclosure proceeding result in a foreclosure sale that is voidable, not void *ab initio*"); *Jackson Inv. Corp. v. Pittsfield Prod., Inc.,*

162 Mich.App. 750, 755, 413 N.W.2d 99, 101 (1987) ("A defect in notice renders a foreclosure sale voidable and not void."); *Mitan v. Fed. Home Loan Mort. Corp.,* 703 F.3d 949, 952 (6th Cir.2012) ("Notice defects render a foreclosure voidable."). Since the sale is voidable, plaintiffs "must show that they were prejudiced by defendant's failure to comply with MCL 600.3204," i.e., "that they would have been in a better position to preserve their interest in the property absent defendant's noncompliance with the statute." *Kim,* 493 Mich. at 118, 825 N.W.2d 329.

Federal case law has consistently held that where plaintiffs have admitted default, received notice of default, failed to show they had the funds to outbid the highest bidder at the sale, let alone pay the entire unpaid balance owing on the loan, and showed no attempt to redeem the property, they cannot show how any alleged defects in the notice prejudiced them. *See, e.g.,* **\*597** *Harrison v. Bank of America, N.A.,* No. 12–cv–12281, 2013 WL 440163, at \*4 (E.D.Mich. Jan. 17, 2013); *Elson v. Deutsche Bank Nat'l Trust Co.,* No. 11–14100, 2012 WL 1902916, at \*6 (E.D.Mich. May 25, 2012); *Piccirilli v. Wells Fargo Bank, N.A.,* No. 2:11–cv–10264, 2012 WL 1094333, at \*7 (E.D.Mich. Mar. 30, 2012); *Caillouette v. Wells Fargo Bank, N.A.,* No. 11–cv–10204, 2012 WL 1033598, at \*8 (E.D.Mich. Mar. 27, 2012).

I suggest that Plaintiffs in the instant case suffer from the same failure: they have not sufficiently alleged prejudice. Here, Plaintiffs have not challenged the fact that they defaulted on the loan, nor have they contended that they were not aware that the property was scheduled for foreclosure sale. In addition, Plaintiffs have not alleged that they ever attempted to redeem the property, and they have not alleged that they had sufficient funds to outbid the highest bidder at the sale, let alone pay off the entire loan. Thus, even if they could show some defect in notice, I suggest that they cannot show prejudice and cannot receive the relief they request, i.e., "[r]eturn the property to its rightful owner, and double its value of Five Hundred Eight Thousand, Sixty Five Dollars and zero cents for defending the fraudulent action and Void the Sheriff's Deed and Sale." (Doc. 1 at 7.) I therefore suggest that Defendant's motion to dismiss be granted based on Plaintiff's lack of standing (or failure to meet the requirements of fraud or irregularity) and failure to aver the prejudice necessary to render any defect or irregularity voidable.

### 4. Merits of Plaintiffs' Claims

Even if Plaintiffs have standing, I suggest that they have not stated a claim upon which relief could be granted. I therefore

suggest that Defendant's motion to dismiss should be granted on the merits.

#### a. FDCPA

The FDCPA provides that

> "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due to another ... which was not in default at the time it was obtained by such person.

15 U.S.C. § 1692a(6). Thus, "a creditor is not a debt collector under the FDCPA ... [n]or is the assignee of a debt that was not in default at the time it was assigned." *Joyner v. MERS,* 451 Fed.Appx. 505, 507 (6th Cir.2011) (citations omitted). This provision is based on the premise that "[a]n entity that acquires a current, non-defaulted debt in order simply to continue servicing it 'is acting much like the original creditor that created the debt. On the other hand, if it simply acquires the debt for collection, it is acting more like a debt collector.' " *Sullivan v. OcWen Loan Servicing, LLC,* No. 08–cv–02079, 2009 WL 103681, at \*2 (D.Colo. Jan. 14, 2009) (citations omitted) (holding that where the defendant obtained a non-defaulted debt under the mistaken belief that the debt was in default, and where the defendant's subsequent collection activities were based on that mistaken belief, the defendant was a debt collector for purposes of the FDCPA).

Plaintiffs bear the burden of establishing that Defendant is a debt collector. *Golliday v. Chase Home Finance, LLC,* 761 F.Supp.2d 629, 635 (W.D.Mich.2011). I suggest that Plaintiffs in the instant case cannot meet that burden. Defendant RBS Citizens acquired the mortgage interest from CCO Mortgage Corporation via merger on September 1, 2007, rather than through an assignment. (Doc. 9 at Ex. 3.) At least one circuit court has held that when a defendant company acquires **\*598** a debt though its merger with a previous creditor of the plaintiff rather than via a specific assignment, the debt was not "obtained" while it was in default; thus, the

defendant company is not a debt collector under the FDCPA. *Brown v. Morris,* 243 Fed.Appx. 31, 34 (5th Cir.2007) ("ABN AMRO, a mortgage company, was not specifically assigned Brown's mortgage for debt-collection purposes. Rather, ABN AMRO acquired it through its merger with Brown's previous mortgage company. Accordingly, ABN AMRO did not 'obtain' her mortgage while it was in default" and ABN AMRO was therefore "not an FDCPA debt collector"). [3]

[3]    This result would not be altered even if, at the time of the merger, Plaintiffs were already in default. (Doc. 1; Doc. 17 at Ex. C.) *See Janke v. Wells Fargo & Co.,* 805 F.Supp.2d 1278, 1282 n. 2 (M.D.Ala.2011) (citing *Brown, supra* ). However, it appears that in the instant case, Plaintiffs were not in default at the time of the merger.

I suggest that the Fifth Circuit's analysis is supported by the rationale behind the exemption and the law regarding mergers, and thus should be followed. Like the entity "that acquires a current, non-defaulted debt in order simply to continue servicing it" is "acting much like the original creditor that created the debt," Defendant, via the merger, acquired all the assets and debts of BAC Home Loans Servicing and is therefore "much like" the original creditor. *Sullivan, supra.* After a merger, the resulting entity is the "receiving association," which "shall be deemed to be the same corporation as each bank or banking association participating in the merger." 12 U.S.C. § 215a(e). Consequently, after a merger with a creditor bank, the surviving corporation is not only "much like" the original creditor, it *is* the original creditor. Thus, since Defendant was attempting to collect a debt originally owed to CCO Mortgage Corporation after these entities merged, it should not be considered a debt collector. *See Sprague v. Neil,* No. 1:05–CV–1605, 2007 WL 3085604, at *3 (M.D.Pa. Oct. 19, 2007) ("By way of merger ... Citibank assumed all rights and property, including Plaintiff's debt, as its own and thus stands in the shoes of the previous two banks[;] ... it was not collecting a debt owed to a third party as a debt collector.").

Accordingly, I suggest that Defendant should not be considered a debt collector within the meaning of the FDCPA and that Defendant's motion to dismiss should be granted as to this claim.

### b. HAMP

HAMP does not create a private cause of action under which a plaintiff may seek relief. *Meyer,* 2012 WL 511995, at *6;

*Brown v. Bank of New York Mellon,* No. 1:10–cv–550, 2011 WL 206124, at *2 (W.D.Mich. Jan. 21, 2011) (collecting cases). Accordingly, I suggest that Defendant's motion to dismiss should be granted as to any claim purportedly brought under HAMP.

### c. REMIC

Plaintiffs also allege a "violation of REMIC LAW which is a Tax Violation under the IRS ..." and that Defendants "have bifurcated Plaintiff's Note and Mortgage thereby breaking the chain of title...." (Doc. 1 at 5–6.) The statute in question provides that

> [e]very disposition of lands, whether by deed or devise, hereafter made, except as otherwise provided in this chapter, shall be directly to the person in whom the right to possession and the profits shall be intended to be vested, and not to any other, to the use of, or in trust for, such person; and if made to 1 or more persons, in trust for, or to the use of another, no estate or interest, legal or equitable, shall vest in the trustee.

**\*599** Mich. Comp. Laws § 555.5. I suggest that this statute is inapplicable. "[T]he statute does not apply to conveyances to existing trusts, ... rather it pertains to conveyances that purport to create trusts without trust duties." *Carmack v. Bank of New York Mellon,* No. 12–cv–11669, 2012 WL 2389863, at *3 (E.D.Mich. June 26, 2012). There is no allegation that any trust was created here, let alone that an inappropriate passive trust was created. [4] I therefore suggest that Defendant's motion to dismiss should be granted as to these claims.

[4]    Passive trusts are those "where the trustee has no duties, and merely holds title for the beneficiary[;]" thus, legal title is vested in the beneficiary or holders of the trust. *Yousif v. Bank of New York Mellon,* No. 12–12507, 2012 WL 2403472, at *3 (E.D.Mich. June 26, 2012) (citations omitted). On the other hand, Michigan law has held that a trust is "active" where "the trustee is obligated to collect income from lands and pay the proceeds

over to the beneficiaries." *Id.* (citations omitted). Where a defendant "holds title to the property and is required to disburse proceeds to the investors holding pass-through certificates [,] [t]he court [should] conclude[ ] that the trust ... is not a passive trust barred by Michigan Compiled Laws § 555.5." *Id.*

**d. Fraud**

Under Michigan law, a claim of fraud requires the plaintiff to prove: (1) that the defendant made a material misrepresentation; (2) that it was false; (3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intent that the plaintiff rely upon it; (5) that plaintiff relied upon it; and (6) that the plaintiff suffered injury. *Hi–Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813, 816 (1976). " 'There is no fraud where means of knowledge are open to the plaintiff and the degree of their utilization is circumscribed in no respect by defendant.' " *Aron Alan, L.L.C. v. Tanfran, Inc.,* 240 Fed.Appx. 678, 682 (6th Cir.2007) (quoting *Webb v. First of Mich. Corp.,* 195 Mich.App. 470, 491 N.W.2d 851, 853 (1992)).

I suggest that Plaintiffs have not alleged facts that could satisfy the elements of a fraud claim. I therefore suggest that Defendant's motion to dismiss the fraud claims should be granted. [5]

[5]    I also note that "Plaintiff's fraud claims, which sound in tort, are precluded by the rule that prevents pursuing a tort remedy when the parties' relationship is governed by a contract." *Meyer v. Citimortgage, Inc.,* No. 11–13432, 2012 WL 511995, at *9 (E.D.Mich. Feb. 16, 2012) (citing *Sherman v. Sea Ray Boats, Inc.,* 251 Mich.App. 41, 649 N.W.2d 783 (2002)).

I further suggest that Plaintiffs' fraud claims should also be dismissed for failure to meet the special pleading requirements under Rule 9(b) of the Federal Rules of Civil Procedure. Under this rule, a plaintiff must: "(1) specify the statements that [they] contend [ ] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.,* 547 F.3d 564, 569–70 (6th Cir.2008).

Plaintiffs' complaint does not specify any statements at all, let alone when or where they were made. I therefore suggest

that Rule 9(b) requires the grant of Defendant's motion to dismiss Plaintiffs' fraud claims. *See Jarbo v. BAC Home Loan Servicing,* No. 10–12632, 2010 WL 5173825, at *11– 12 (E.D.Mich. Dec. 15, 2010) (finding that the plaintiff's complaint failed to meet specificity requirements under Rule 9(b) for a fraud claim where it merely alleged that the defendants inflated various figures on the loan application but did not refer to any statements made).

**e. Fair Credit Reporting Act**

The purpose of the FCRA is to require that "consumer reporting agencies adopt **\*600** reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). The Sixth Circuit has held that consumers may file actions pursuant to sections 1681n and 1681*o* of the FCRA, claiming that furnishers of information have violated section 1681s–2. *Boggio v. USAA Federal Savings Bank,* 696 F.3d 611, 615 (6th Cir.2012). Section 1681s–2 requires a furnisher to "conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s–2(b)(1)(A). Our circuit also "join[ed] every circuit to have addressed this duty in holding that the investigation an information furnisher undertakes must be a reasonable one." *Boggio,* 696 F.3d at 616. The Sixth Circuit then considered cases discussing how thorough an investigation must be to be considered reasonable.

The *Boggio* court cited *Johnson v. MBNA Am. Bank,* 357 F.3d 426, 429–31 (4th Cir.2004), which held that "electronically confirming only a name and address—as opposed to 'consult[ing] underlying documents, such as account applications'—was unreasonable when the furnisher had received information from the CRA explaining that its consumer was disputing her status as a co-obligor on her husband's debt." *Boggio,* 696 F.3d at 617. The Sixth Circuit contrasted *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1159–61 (9th Cir.2009), where summary judgment was properly granted in favor of the furnisher because, " 'unlike in *Johnson,* [the furnisher] had—albeit earlier—gone outside its own records to investigate the allegations contained in the CRA notice.' " *Boggio* at 617.

There are no allegations in the instant case that Defendant RBS Citizens acted as a furnisher of credit information to a credit reporting source, nor is there any allegation that Plaintiff submitted a dispute that would trigger any duty

on the part of Defendant RBS Citizens to investigate. I therefore suggest that these claims be dismissed. *See Reschke v. CitiMortgage, Inc.,* No. 11–12639, 2013 WL 625755, at *5 (E.D.Mich. Feb. 20, 2013) (dismissing FCRA claim based on mortgage foreclosure where the plaintiffs did not allege that the "defendants furnished credit information to anyone").

### f. Due Process

Defendant contends that any due process claims must fail because "Defendant is not a state actor whose conduct is subject to the Due Process Clause." (Doc. 9 at 32.) I suggest that Defendant is correct and that this claim must also be dismissed. *See Johnson v. Rodrigues,* 293 F.3d 1196, 1201 (10th Cir.2002) ("it is beyond cavil that in order to prevail [on a due process claim], the United States Constitution requires activity by a state"); *accord Colbert v. Federal Nat'l Mortgage Ass'n,* No. 12–13844, 2013 WL 1629305, at *13 (E.D.Mich. Apr. 16, 2013) (finding Fannie Mae was not a state actor and dismissing due process claim).

### g. Truth in Lending Act

Under TILA, any private cause of action must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). The instant complaint was filed on June 28, 2013. (Doc. 1.)[6] The instant mortgage was entered **\*601** into with CCO Mortgage Corporation on October 21, 2005 (Doc. 1 at Ex. B, Pg ID 12) and on September 1, 2007, Defendant RBS Citizens, N.A., became the successor by merger of various banking institutions. (Doc. 9 at Ex. 3.) It is unclear what Plaintiffs intended to allege under this statute, but I note that every relevant date renders the allegations far outside the one-year limitation period. Since Plaintiffs' action falls outside the one year limitations period, I suggest that Defendant's motion to dismiss any TILA claim should be granted.

[6] Even if the dates from the earlier filed cases were used, the result would be the same. Eastern District Case No. 1:13–cv–11025 and 1:13–cv–11903 were filed in March and April of 2013, respectively.

### h. Various Other Statutes

In their responsive brief, Plaintiffs cite to other statutes. Even assuming these citations could be considered claims, I suggest that none of them would provide a claim upon which relief could be granted.

Section 750.248 of Michigan Compiled Laws is the criminal code section for felony alteration, forgery, or counterfeit of certain public records, but it does not contain a subsection (4), as alleged by Plaintiffs. (Doc. 13 at 5.) In addition, this section does not create a private civil cause of action. *Lucido v. Apollo Lanes & Bar, Inc.,* 123 Mich.App. 267, 271–72, 333 N.W.2d 246 (1983) (where criminal statute does not specifically create a cause of action, none exists) (cited with approval in *Loud v. Lee Township Election Comm'n,* No. 295836 and 298811, 2011 WL 4104956, at *5 (Mich.Ct.App. Sept. 15, 2011)).

Plaintiffs also cite Mich. Comp. Laws § 750.249(3), which is the criminal code section for the felony of uttering and publishing a false, forged, altered or counterfeit record, but it does not contain a subsection (3). Nor does this section create a private civil cause of action. *Lucido, supra.*

Finally, Mich. Comp. Laws § 2.14 is the code section that designates the painted turtle (Chrysemys picta) as the official reptile of the State of Michigan, but it does not contain a subsection (c) as alleged by Plaintiffs. Even if it did, it is difficult to imagine how this statute could be relevant to the instant action. Nor does this section create a civil, private cause of action. *Lucido, supra.*

### 5. *Rooker–Feldman* and *Res Judicata*

Defendant contends that the *Rooker–Feldman* doctrine and *res judicata* principles require dismissal. I suggest that these doctrines do not apply on the instant facts. Pursuant to the *Rooker–Feldman* doctrine, this Court has no power to overturn state court judgments. The Sixth Circuit has explained the foundation of the *Rooker–Feldman* doctrine as follows:

> The doctrine originates from two Supreme Court decisions, which were rendered 60 years apart. *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *D.C. Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). In both cases the plaintiffs challenged the validity of state court decisions by filing suit in federal district court. In *Rooker,* the plaintiff asked the district court to render the

state court judgment against him "null and void." *See Rooker,* 263 U.S. at 414–15, 44 S.Ct. 149. In *Feldman,* the plaintiffs filed suit against the actual state court that had rejected the plaintiffs' applications to practice law. *Feldman,* 460 U.S. at 478–79, 103 S.Ct. 1303. In both cases the Supreme Court dismissed the suits for lack of subject-matter jurisdiction, reasoning that pursuant to 28 U.S.C. § 1257, only the Supreme Court, and not the lower federal courts, enjoys appellate **\*602** jurisdiction over state court decisions. *See Rooker,* 263 U.S. at 414–15, 44 S.Ct. 149; *Feldman,* 460 U.S. at 478–79, 103 S.Ct. 1303.

*Coles v. Granville,* 448 F.3d 853, 857 (6th Cir.2006). Lower federal courts also lack jurisdiction to review any federal claims that are "inextricably intertwined" with a state court's decision.*See Feldman,* 460 U.S. at 486–87, 103 S.Ct. 1303. A plaintiff's federal claim is inextricably intertwined if the claim can succeed only to the extent that the state court wrongly decided the issues before it. *Catz v. Chalker,* 142 F.3d 279, 293 (6th Cir.1998) (" 'Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment.' ") (quoting *Keene Corp. v. Cass,* 908 F.2d 293, 296–97 (8th Cir.1990)).

Defendant notes that on February 19, 2013, Defendant filed an action in the 70th District Court for the State of Michigan to gain possession of the subject property. (Doc. 9 at Ex. 5.) After a hearing, the 70th District Court entered a judgment of possession in favor of Defendant. (Doc. 9 at Ex. 6.) On March 5, 2013, Plaintiffs appealed to the 10th Circuit Court for the State of Michigan, i.e., Saginaw County Circuit Court, and on that same day, the court stayed the judgment of possession. (Doc. 9 at 13, Ex. 7–9.) Although Defendant's brief stops there, a review of the docket for the Circuit Court for the County of Saginaw reveals that this appeal from District Court is under advisement as of July 17, 2013. (Saginaw County Circuit Court Case No. 13–019053.) [7] Since there is no state court judgment that Plaintiffs could even conceivably be attempting to appeal or declare null and void, I suggest that *Rooker–Feldman* does not apply and does not provide an alternative basis for granting the motion to dismiss.

[7]     *See* http://www.saginawcounty.com.

*Res judicata* is based on the policy that there be an end to litigation, that parties who have contested an issue be bound by the result of the litigation and the court's decision, and that matters once adjudicated shall be considered forever settled as between the parties. *Federated Dep't Stores v. Moitie,* 452 U.S. 394, 401, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). *Res judicata* consists of issue and claim preclusion. Issue preclusion, or collateral estoppel, refers to the effect of a court's judgment foreclosing relitigation of an issue that has been litigated and decided; claim preclusion refers to the effect of a court's judgment in foreclosing further litigation of a claim that has never been actually litigated by the parties and decided by a court, but which could have been advanced and litigated by the party in the earlier lawsuit. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 77, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). In the instant case, Defendant has raised the issue preclusion form of *res judicata.* (Doc. 5 at 8.)

Issues are precluded from being relitigated under *res judicata* where: (1) a final decision was made on the merits by a court of competent jurisdiction; (2) the subsequent action involves the same parties or their privies; (3) the issue in the subsequent action was litigated or should have been litigated in the prior action; and (4) there is an identity of the causes of action. *Bragg v. Flint Bd. of Educ.,* 570 F.3d 775, 776 (6th Cir.2009).

In the instant case, since there has been no prior decision, even if the parties and issues are the same, I suggest that *res judicata* does not preclude the **\*603** instant action. I therefore suggest that Defendant's motion to dismiss should not be granted upon this ground.

### E. Conclusion

For the reasons stated above, I suggest that Defendant's motion to dismiss should be granted. Since I suggest that Plaintiffs' Complaint fails to state a claim upon which relief could be granted, I also suggest that Plaintiffs' motion for preliminary injunction be denied.

### III. *REVIEW*

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and

file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed.R.Civ.P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Dated: September 18, 2014.

**All Citations**

996 F.Supp.2d 574

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

07 Cal. Daily Op. Serv. 6174, 2007 Daily Journal D.A.R. 8124

KeyCite Yellow Flag

Disagreed With by   Doe v. Friendfinder Network, Inc.,   D.N.H.,   March 27, 2008

488 F.3d 1102
United States Court of Appeals, Ninth Circuit.

PERFECT 10, INC., a California
corporation, Plaintiff–Appellant,

v.

CCBILL LLC, a corporation; Cavecreek
Wholesale Internet Exchange, a corporation
d/b/a CWIE LLC, Defendants–Appellees,

and

Netpass Systems Inc., a corporation, Defendant.
Perfect 10, Inc., a California
corporation, Plaintiff–Appellee,

v.

CCBill LLC, a corporation; Cavecreek
Wholesale Internet Exchange, a corporation
d/b/a CWIE LLC, Defendants–Appellants,
Netpass Systems Inc., a corporation, Defendant.

Nos. 04–57143, 04–57207
|
Argued and Submitted Dec. 4, 2006.
|
Filed March 29, 2007.
|
Amended May 31, 2007.

## Synopsis

**Background:** Publisher brought action against entity that provided web-hosting and related Internet connectivity services to owners of various websites, and entity that allowed consumers to use credit cards or checks to pay for subscriptions or memberships to e-commerce venues, alleging that defendants violated copyright, trademark, and state unfair competition, false advertising and right of publicity laws by providing services to websites that posted images stolen from publisher's magazine and Internet website. The United States District Court for the Central District of California, Lourdes G. Baird, J., 340 F.Supp.2d 1077, granted judgment in part for defendants. Parties appealed.

**Holdings:** The Court of Appeals, Milan D. Smith, Jr., Circuit Judge, held that:

Internet service provider (ISP) "implements" a policy, as required to be eligible for safe harbor under Digital Millennium Copyright Act (DMCA), if it has working notification system, procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications;

some empty fields in notice spreadsheet column, labeled "Webmasters [sic] Name," did not establish that repeat infringer policy had been unreasonably implemented;

publisher did not provide effective notice of infringement;

notices of infringement by other copyright holders, and continued provision of services for websites that infringed non-party copyrights, were relevant to issue of whether repeat infringer policy had been unreasonably implemented;

defendants did not have to determine if photographs actually were legal to benefit from repeat infringer policy safe harbor;

hosting of password-hacking websites is not a per se "red flag" of infringement;

"red flags" raised by third-parties identifying repeat infringers who were not terminated were relevant to issue of whether repeat infringer policy had been unreasonably implemented; and

district court had to determine whether access to website was "standard technical measure."

Affirmed in part, reversed in part, and remanded.

Opinion, 481 F.3d 751, superseded.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*1107** Daniel J. Cooper, General Counsel, Perfect 10, Inc., Beverly Hills, CA, and Jeffrey N. Mausner, Berman, Mausner & Resser, A Law Corporation, Los Angeles, CA, for the plaintiff-appellant/cross-appellee.

Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102 (2007)
07 Cal. Daily Op. Serv. 6174, 2007 Daily Journal D.A.R. 8124

Jay M. Spillane, Fox & Spillane, LLP, Los Angeles, CA, and John P. Flynn, Tiffany & Bosco, P.A., Phoenix, AR, for the defendants-appellees/cross-appellants.

Appeal from the United States District Court for the Central District of California; Lourdes G. Baird, District Judge, Presiding. D.C. Nos. CV–02–07624–LGB, CV–02–07624–LGB.

Before: STEPHEN REINHARDT, ALEX KOZINSKI, MILAN D. SMITH, JR., Circuit Judges.

## ORDER

The opinion filed on March 29, 2007, [481 F.3d 751], is amended as follows:

On slip opinion page 3577, [481 F.3d at 767–68] line 33, after "federal intellectual property." insert the following footnote:

In its petition for rehearing, Perfect 10 claims that our decision on this point conflicts with *Universal Communication Systems, Inc. v. Lycos, Inc.,* 478 F.3d 413 (1st Cir.2007). But neither party in that case raised the question of whether state law counts as "intellectual property" for purposes of § 230 and the court seems to simply have assumed that it does. We thus create no conflict with *Universal Communication.*

We note that *Universal Communication* demonstrates the difficulties inherent in allowing state laws to count as intellectual property for CDA purposes. In that case, the district court struggled with the question of whether the "trademark dilution" claim brought under Florida Law counted as intellectual property for purposes of the CDA, and concluded that it was more like a defamation claim than a trademark claim. *Id.* at 423 n. 7. Rather than decide how to draw the line between defamation and trademark, the First Circuit held that "because of the serious First Amendment issues that would be raised" if Lycos were found liable, defendant had not violated the Florida statute. *Id.* at 423.

The First Circuit was able to sidestep the question of what counted as intellectual property on First Amendment grounds. But we cannot do so here. States have any number of laws that could be characterized as intellectual property laws: trademark, unfair competition, dilution, right of publicity and trade defamation, to name just a few. Because such laws vary widely from state to state, no litigant will know if he is entitled to immunity for

a state claim until a court decides the legal issue. And, of course, defendants that are otherwise entitled to CDA immunity will usually be subject to the law of numerous states. An entity otherwise entitled to § 230 immunity would thus be forced to bear the costs of litigation under a wide variety of state statutes that could arguably be classified as "intellectual **\*1108** property." As a practical matter, inclusion of rights protected by state law within the "intellectual property" exemption would fatally undermine the broad grant of immunity provided by the CDA.

With this amendment, the panel has voted to deny the petition for rehearing and petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on it. The petition for rehearing and petition for rehearing en banc are DENIED. No further petitions for rehearing may be filed.

## AMENDED OPINION

MILAN D. SMITH, JR., Circuit Judge.

Perfect 10, the publisher of an adult entertainment magazine and the owner of the subscription website perfect10.com, alleges that CCBill and CWIE violated copyright, trademark, and state unfair competition, false advertising and right of publicity laws by providing services to websites that posted images stolen from Perfect 10's magazine and website. Perfect 10 appeals the district court's finding that CCBill and CWIE qualified for certain statutory safe harbors from copyright infringement liability under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, and that CCBill and CWIE were immune from liability for state law unfair competition and false advertising claims based on the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1). CCBill and CWIE cross-appeal, arguing that the district court erred in holding that the CDA does not provide immunity against Perfect 10's right of publicity claims and in denying their requests for costs and attorney's fees under the Copyright Act.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.

## BACKGROUND

Perfect 10 is the publisher of the eponymous adult entertainment magazine and the owner of the website, perfect10.com. Perfect10.com is a subscription site where consumers pay a membership fee in order to gain access to content on the website. Perfect 10 has created approximately 5,000 images of models for display in its website and magazine. Many of the models in these images have signed releases assigning their rights of publicity to Perfect 10. Perfect 10 also holds registered U.S. copyrights for these images and owns several related, registered trademark and service marks.

CWIE provides webhosting and related Internet connectivity services to the owners of various websites. For a fee, CWIE provides "ping, power, and pipe," services to their clients by ensuring the "box" or server is on, ensuring power is provided to the server and connecting the client's service or website to the Internet via a data center connection. CCBill allows consumers to use credit cards or checks to pay for subscriptions or memberships to e-commerce venues.

Beginning August 10, 2001, Perfect 10 sent letters and emails to CCBill and CWIE stating that CCBill and CWIE clients were infringing Perfect 10 copyrights. Perfect 10 directed these communications to Thomas A. Fisher, the designated agent to receive notices of infringement. Fisher is also the Executive Vice–President of both CCBill and CWIE. Representatives of celebrities who are not parties to this lawsuit also sent notices of infringement to CCBill and CWIE. On September 30, 2002, Perfect 10 filed the present action alleging copyright and trademark violations, state law claims of violation of right of publicity, unfair competition, false and misleading advertising, as well as RICO claims.

**\*1109  STANDARDS OF REVIEW**

We review a district court's grant of summary judgment de novo. *Rossi v. Motion Picture Ass'n of Am. Inc.,* 391 F.3d 1000, 1002 (9th Cir.2004). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Leever v. Carson City,* 360 F.3d 1014, 1017 (9th Cir.2004). The district court's interpretations of the Copyright Act are also reviewed de novo. *Ellison v. Robertson,* 357 F.3d 1072, 1076 (9th Cir.2004).

We review a district court's decision to grant or deny attorney's fees under the Copyright Act for abuse of discretion. *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.,* 259 F.3d 1186, 1197 (9th Cir.2001).

**DISCUSSION**

**I. SECTION 512 SAFE HARBORS**

The DMCA established certain safe harbors to "provide protection from liability for: (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools." *Ellison,* 357 F.3d at 1076–77 (citing 17 U.S.C. §§ 512(a)-(d)) (footnotes omitted). These safe harbors limit liability but "do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability," *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F.Supp.2d 1146, 1174 (C.D.Cal.2002) (citing H.R. Rep. 105–551(II), at 50 (1998) ("H.R. Rep.")), [1] and "nothing in the language of § 512 indicates that the limitation on liability described therein is exclusive." *CoStar Group, Inc. v. LoopNet, Inc.,* 373 F.3d 544, 552 (4th Cir.2004).

[1]     The relevant portions of H.R. Rep. 105–551(II) (1998) and S. Rep. 105–190 (1998) are largely identical. We cite to H.R. Rep. for purposes of consistency.

**A. Reasonably Implemented Policy: § 512(i)(1)(A)**

To be eligible for any of the four safe harbors at §§ 512(a)-(d), a service provider must first meet the threshold conditions set out in § 512(i), including the requirement that the service provider:

[H]as adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the

service provider's system or network who are repeat infringers.

Section 512(i)(1)(A); *Ellison,* 357 F.3d at 1080. The statute does not define "reasonably implemented." We hold that a service provider "implements" a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications. *Ellison,* 357 F.3d at 1080 (working notification system required); *Corbis Corp. v. Amazon.com, Inc.,* 351 F.Supp.2d 1090, 1102–03 (W.D.Wash.2004) (must adopt procedure for dealing with notifications); *In re Aimster Copyright Litig.,* 252 F.Supp.2d 634, 659 (N.D.Ill.2002) (policy not implemented if service provider actively blocks collection of information). The statute permits service providers to implement a variety of procedures, but an implementation is reasonable if, under "appropriate circumstances," the service provider terminates users who repeatedly or blatantly infringe copyright. *See* **\*1110** 17 U.S.C. § 512(i); *Corbis,* 351 F.Supp.2d at 1102.

*1. "Implementation"*

Perfect 10 argues that there is a genuine issue of material fact whether CCBill and CWIE prevented the implementation of their policies by failing to keep track of repeatedly infringing webmasters. The district court found that there was not, and we agree.

In *Ellison,* Stephen Robertson posted copies of Harlan Ellison's copyrighted short stories on Internet newsgroups available through USENET servers. 357 F.3d at 1075. Ellison asserted that America Online, Inc. ("AOL") had infringed his copyright by providing access to the USENET servers. *Id.* Based on evidence that AOL changed its contact email address for copyright infringement notices from copyright@aol.com to aolcopyright@aol.com in the fall of 1999, but neglected to register the change with the U.S. Copyright Office until April 2000, we held that the district court erred in concluding on summary judgment that AOL satisfied the requirements of § 512(i). *Id.* at 1077. Even though Ellison did not learn of the infringing activity until after AOL had notified the U.S. Copyright Office of the correct email address, we found that "AOL allowed notices of potential copyright infringement to fall into a vacuum and go unheeded; that fact is sufficient for a reasonable jury to conclude that AOL had not reasonably implemented its policy against repeat infringers." *Id.* at 1080.

Similarly, the *Aimster* cases hold that a repeat infringer policy is not implemented under § 512(i)(1)(A) if the service provider prevents copyright holders from providing DMCA-compliant notifications. In *Aimster,* the district court held that Aimster did not reasonably implement its stated repeat infringer policy because "the encryption on Aimster renders it impossible to ascertain which users are transferring which files." 252 F.Supp.2d at 659. The court found that "[a]dopting a repeat infringer policy and then purposely eviscerating any hope that such a policy could ever be carried out is not an 'implementation' as required by § 512(i)." *Id.* The Seventh Circuit affirmed, finding that Aimster did not meet the requirement of § 512(i)(1)(A) because, in part, "by teaching its users how to encrypt their unlawful distribution of copyrighted materials [Aimster] disabled itself from doing anything to prevent infringement." *In re Aimster Copyright Litig.,* 334 F.3d 643, 655 (7th Cir.2003).

Based on *Ellison* and the *Aimster* cases, a substantial failure to record webmasters associated with allegedly infringing websites may raise a genuine issue of material fact as to the implementation of the service provider's repeat infringer policy. In this case, however, the record does not reflect such a failure. Perfect 10 references a single page from CCBill and CWIE's "DMCA Log." Although this page shows some empty fields in the spreadsheet column labeled "Webmasters [sic] Name," Perfect 10's conclusion that the DMCA Log thus "does not reflect any effort to track notices of infringements received by webmaster identity" is not supported by evidence in the record. The remainder of the DMCA Log indicates that the email address and/or name of the webmaster is routinely recorded in CCBill and CWIE's DMCA Log. CCBill's interrogatory responses dated December 11, 2003 also contain a chart indicating that CCBill and CWIE largely kept track of the webmaster for each website.

Unlike *Ellison* and *Aimster,* where the changed email address and the encryption system ensured that *no* information about the repeat infringer was collected, it is undisputed that CCBill and CWIE recorded most webmasters. The district court properly concluded that the DMCA Log **\*1111** does not raise a triable issue of fact that CCBill and CWIE did not implement a repeat infringer policy.

*2. Reasonableness*

A service provider reasonably implements its repeat infringer policy if it terminates users when "appropriate." *See Corbis,* 351 F.Supp.2d at 1104. Section 512(i) itself does not clarify

07 Cal. Daily Op. Serv. 6174, 2007 Daily Journal D.A.R. 8124

when it is "appropriate" for service providers to act. It only requires that a service provider terminate users who are "repeat infringers."

To identify and terminate repeat infringers, a service provider need not affirmatively police its users for evidence of repeat infringement. Section 512(c) states that "[a] service provider shall not be liable for monetary relief" if it does not know of infringement. A service provider is also not liable under § 512(c) if it acts "expeditiously to remove, or disable access to, the material" when it (1) has actual knowledge, (2) is aware of facts or circumstances from which infringing activity is apparent, or (3) has received notification of claimed infringement meeting the requirements of § 512(c)(3). Were we to require service providers to terminate users under circumstances other than those specified in § 512(c), § 512(c)'s grant of immunity would be meaningless. This interpretation of the statute is supported by legislative history. *See* H.R. Rep., at 61 (Section 512(i) is not intended "to undermine the ... knowledge standard of [§ 512](c).").

Perfect 10 claims that CCBill and CWIE unreasonably implemented their repeat infringer policies by tolerating flagrant and blatant copyright infringement by its users despite notice of infringement from Perfect 10, notice of infringement from copyright holders not a party to this litigation and "red flags" of copyright infringement.

*a. Perfect 10's Claimed Notice of Infringement*

Perfect 10 argues that CCBill and CWIE implemented their repeat infringer policy in an unreasonable manner because CCBill and CWIE received notices of infringement from Perfect 10, and yet the infringement identified in these notices continued. The district court found that Perfect 10 did not provide notice that substantially complied with the requirements of § 512(c)(3),[2] and thus did not raise a genuine issue of material fact as to whether CCBill and CWIE reasonably implemented  **\*1112**  their repeat infringer policy. We agree.

[2]    Section 512(c)(3) reads:

(A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

Compliance is not "substantial" if the notice provided complies with only some of the requirements of § 512(c)(3)(A). Section 512(c)(3)(B)(ii) explains that a service provider will not be deemed to have notice of infringement when "the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A)" so long as the service provider responds to the inadequate notice and explains the requirements for substantial compliance. The statute thus signals that substantial compliance means substantial compliance with *all* of § 512(c)(3)' s clauses, not just some of them. *See* H.R. Rep., at 56 (A communication substantially complies even if it contains technical errors such as misspellings or outdated information.). *See also Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.,* 351 F.3d 1229, 1236 (D.C.Cir.2003) (citing H.R. Rep., at 56).[3]

[3]    We do not read the Fourth Circuit's holding in *ALS Scan, Inc. v. RemarQ Communities, Inc.,* 239

F.3d 619, 625 (4th Cir.2001), as holding that *only* location information is required for substantial compliance with the terms of § 512(c)(3).

Perfect 10 claims that it met the requirements of § 512(c)(3) through a combination of three sets of documents. The first set of documents is a 22,185 page bates-stamped production on October 16, 2002 that includes pictures with URLs of Perfect 10 models allegedly posted on CCBill or CWIE client websites. The October 16, 2002 production did not contain a statement under penalty of perjury that the complaining party was authorized to act, as required by § 512(c)(3)(A)(vi). The second set of documents was also not sworn to, and consisted of a spreadsheet emailed to Fisher on July 14, 2003 identifying the Perfect 10 models in the October 16, 2002 production by bates number. On December 2, 2003, Perfect 10 completed interrogatory responses which were signed under penalty of perjury. These responses incorporated the July 14, 2003 spreadsheet by reference.

Taken individually, Perfect 10's communications do not substantially comply with the requirements of § 512(c)(3). Each communication contains more than mere technical errors; often one or more of the required elements are entirely absent. *See Perfect 10, Inc. v. CCBill, LLC,* 340 F.Supp.2d 1077, 1100–01 (C.D.Cal.2004) ("Order"). In order to substantially comply with § 512(c)(3)'s requirements, a notification must do more than identify infringing files. The DMCA requires a complainant to declare, under penalty of perjury, that he is authorized to represent the copyright holder, and that he has a good-faith belief that the use is infringing. This requirement is not superfluous. Accusations of alleged infringement have drastic consequences: A user could have content removed, or may have his access terminated entirely. If the content infringes, justice has been done. But if it does not, speech protected under the First Amendment could be removed. We therefore do not require a service provider to start potentially invasive proceedings if the complainant is unwilling to state under penalty of perjury that he is an authorized representative of the copyright owner, and that he has a good-faith belief that the material is unlicensed.[4]

[4] Perfect 10's argument that its initial notice substantially complied with the DMCA's notice requirements because Fisher, the recipient of that notice, admitted that he could have found the infringing photographs on the basis of the October 16, 2002, bates-stamped production, is thus beside the point. Without the predicate certification under penalty of perjury, Fisher would have had no reason to go looking for the photographs.

**\*1113** Permitting a copyright holder to cobble together adequate notice from separately defective notices also unduly burdens service providers. Indeed, the text of § 512(c)(3) requires that the notice be "*a* written communication." (Emphasis added). Again, this requirement is not a mere technicality. It would have taken Fisher substantial time to piece together the relevant information for each instance of claimed infringement. To do so, Fisher would have to first find the relevant line in the spreadsheet indicating ownership information, then comb the 22,185 pages provided by Perfect 10 in order to find the appropriate image, and finally copy into a browser the location printed at the top of the page—a location which was, in some instances, truncated. The DMCA notice procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright. We decline to shift a substantial burden from the copyright owner to the provider; Perfect 10's separate communications are inadequate.

Since Perfect 10 did not provide effective notice, knowledge of infringement may not be imputed to CCBill or CWIE based on Perfect 10's communications. Perfect 10's attempted notice does not raise a genuine issue of material fact that CCBill and CWIE failed to reasonably implement a repeat infringer policy within the meaning of § 512(i)(1)(A).

### *b. Non–Party Notices*

Perfect 10 also cites to notices of infringement by other copyright holders, and argues that CCBill and CWIE did not reasonably implement their repeat infringer policies because they continued to provide services for websites that infringed non-party copyrights. The district court expressly declined to consider evidence of notices provided by any party other than Perfect 10 on the basis that these notices were irrelevant to Perfect 10's claims. We disagree.

CCBill and CWIE's actions towards copyright holders who are not a party to the litigation are relevant in determining whether CCBill and CWIE reasonably implemented their repeat infringer policy. Section 512(i)(1)(A) requires an assessment of the service provider's "policy," not how the service provider treated a particular copyright holder. *See Ellison,* 357 F.3d at 1080 (AOL's repeat infringer policy was not reasonably implemented because copyright holders other than Ellison could have attempted to notify AOL

07 Cal. Daily Op. Serv. 6174, 2007 Daily Journal D.A.R. 8124

during the time that AOL's email address was incorrectly listed.). Thus, CCBill and CWIE's response to adequate non-party notifications is relevant in determining whether they reasonably implemented their policy against repeat infringers.

A policy is unreasonable only if the service provider failed to respond when it had knowledge of the infringement. The district court in this case did not consider any evidence relating to copyright holders other than Perfect 10. We remand for determination of whether CCBill and/or CWIE implemented its repeat infringer policy in an unreasonable manner with respect to any copyright holder other than Perfect 10.

### c. Apparent Infringing Activity

In importing the knowledge standards of § 512(c) to the analysis of whether a service provider reasonably implemented its **\*1114** § 512(i) repeat infringer policy, Congress also imported the "red flag" test of § 512(c)(1)(A)(ii). Under this section, a service provider may lose immunity if it fails to take action with regard to infringing material even when it is "aware of facts or circumstances from which infringing activity is apparent." § 512(c)(1)(A)(ii). Notice that fails to substantially comply with § 512(c)(3), however, cannot be deemed to impart such awareness. §§ 512(c)(3)(B)(i) & (ii).

Perfect 10 alleges that CCBill and CWIE were aware of a number of "red flags" that signaled apparent infringement. Because CWIE and CCBill provided services to "illegal.net" and "stolencelebritypics.com," Perfect 10 argues that they must have been aware of apparent infringing activity. We disagree. When a website traffics in pictures that are titillating by nature, describing photographs as "illegal" or "stolen" may be an attempt to increase their salacious appeal, rather than an admission that the photographs are actually illegal or stolen. We do not place the burden of determining whether photographs are actually illegal on a service provider.

Perfect 10 also argues that a disclaimer posted on illegal.net made it apparent that infringing activity had taken place. Perfect 10 alleges no facts showing that CWIE and CCBill were aware of that disclaimer, and, in any event, we disagree that the disclaimer made infringement apparent. The disclaimer in question stated: "The copyrights of these files remain the creator's. I do not claim any rights to these files, other than the right to post them." Contrary to Perfect 10's assertion, this disclaimer is not a "red flag" of infringement. The disclaimer specifically states that the webmaster has the right to post the files.

In addition, Perfect 10 argues that password-hacking websites, hosted by CWIE, also obviously infringe. While such sites may not directly infringe on anyone's copyright, they may well contribute to such infringement. The software provided by Grokster in *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005), also did not itself infringe, but did enable users to swap infringing files. *Grokster* held that "instructing [users] how to engage in an infringing use" could constitute contributory infringement. *Id.* at 936, 125 S.Ct. 2764. Similarly, providing passwords that enable users to illegally access websites with copyrighted content may well amount to contributory infringement.

However, in order for a website to qualify as a "red flag" of infringement, it would need to be apparent that the website instructed or enabled users to infringe another's copyright. *See A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 n. 2 (9th Cir.2001). We find that the burden of determining whether passwords on a website enabled infringement is not on the service provider. The website could be a hoax, or out of date. The owner of the protected content may have supplied the passwords as a short-term promotion, or as an attempt to collect information from unsuspecting users. The passwords might be provided to help users maintain anonymity without infringing on copyright. There is simply no way for a service provider to conclude that the passwords enabled infringement without trying the passwords, and verifying that they enabled illegal access to copyrighted material. We impose no such investigative duties on service providers. Password-hacking websites are thus not *per se* "red flags" of infringement.

Perfect 10 also alleges that "red flags" raised by third parties identified repeat infringers who were not terminated. **\*1115** Because the district court did not consider potential red flags raised by third parties, we remand to the district court to determine whether third-party notices made CCBill and CWIE aware that it provided services to repeat infringers, and if so, whether they responded appropriately.

### B. Standard Technical Measures: § 512(i)(1)(B)

Under § 512(i)(1)(B), a service provider that interferes with "standard technical measures" is not entitled to the safe harbors at § 512(a)-(d). "Standard technical measures" refers to a narrow group of technology-based solutions to online copyright infringement:

Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102 (2007)
07 Cal. Daily Op. Serv. 6174, 2007 Daily Journal D.A.R. 8124

[T]he term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and—

(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

§ 512(i)(2). Perfect 10 argues that CCBill does not qualify for any safe harbor because it interfered with "standard technical measures" by blocking Perfect 10's access to CCBill affiliated websites in order to prevent Perfect 10 from discovering whether those websites infringed Perfect 10 copyrights. There are two disputed facts here.

We are unable to determine on this record whether accessing websites is a standard technical measure, which was "developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process." § 512(i)(2)(A). We thus remand to the district court to determine whether access to a website is a "standard technical measure," and if so, whether CCBill interfered with that access.

If allowing access is a standard technical measure, CCBill claims it only blocked Perfect 10's credit card because Perfect 10 had previously reversed charges for subscriptions; Perfect 10 insists it did so in order to prevent Perfect 10 from identifying infringing content. If CCBill is correct, Perfect 10's method of identifying infringement—forcing CCBill to pay the fines and fees associated with chargebacks—may well impose a substantial cost on CCBill. If not, CCBill may well have interfered with Perfect 10's efforts to police the websites in question for possible infringements. Because there are disputed issues of material fact, we remand to the district court for a determination of whether CCBill's refusal to process Perfect 10's transactions interfered with a "standard technical measure" for identifying infringement.

## C. Transitory Digital Network Communications: § 512(a)

Section 512(a) provides safe harbor for service providers who act as conduits for infringing content. In order to qualify for

the safe harbor of § 512(a), a party must be a service provider under a more restrictive definition than applicable to the other safe harbors provided under § 512:

As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the **\*1116** content of the material as sent or received.

Section 512(k)(1)(A). The district court held that CCBill met the requirements of § 512(k)(1)(A) by "provid[ing] a connection to the material on its clients' websites through a system which it operates in order to provide its clients with billing services." Order at 1102. We reject Perfect 10's argument that CCBill is not eligible for immunity under § 512(a) because it does not itself transmit the infringing material. A service provider is "an entity offering the transmission, routing, or providing of connections for digital online communications." § 512(k)(1)(A). There is no requirement in the statute that the communications must themselves be infringing, and we see no reason to import such a requirement. It would be perverse to hold a service provider immune for transmitting information that was infringing on its face, but find it contributorily liable for transmitting information that did not infringe.

Section 512(a) provides a broad grant of immunity to service providers whose connection with the material is transient. When an individual clicks on an Internet link, his computer sends a request for the information. The company receiving that request sends that request on to another computer, which sends it on to another. After a series of such transmissions, the request arrives at the computer that stores the information. The requested information is then returned in milliseconds, not necessarily along the same path. In passing the information along, each intervening computer makes a short-lived copy of the data. A short time later, the information is displayed on the user's computer.

Those intervening computers provide transient connections among users. The Internet as we know it simply cannot exist if

those intervening computers must block indirectly infringing content. We read § 512(a)'s grant of immunity exactly as it is written: Service providers are immune for transmitting all digital online communications, not just those that directly infringe.

CCBill transmits credit card information and proof of payment, both of which are "digital online communications." However, we have little information as to how CCBill sends the payment it receives to its account holders. It is unclear whether such payment is a digital communication, transmitted without modification to the content of the material, or transmitted often enough that CCBill is only a transient holder. On the record before us, we cannot conclude that CCBill is a service provider under § 512(a). Accordingly, we remand to the district court for further consideration the issue of whether CCBill meets the requirements of § 512(a).

**D. Information Location Tools: § 512(d)**

After CCBill processes a consumer's credit card and issues a password granting access to a client website, CCBill displays a hyperlink so that the user may access the client website. CCBill argues that it falls under the safe harbor of § 512(d) by displaying this hyperlink at the conclusion of the consumer transaction. We disagree. Section 512(d) reads:

> A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link.

Even if the hyperlink provided by CCBill could be viewed as an "information location **\*1117** tool," the majority of CCBill's functions would remain outside of the safe harbor of § 512(d). Section 512(d) provides safe harbor only for "infringement of copyright *by reason of* the provider referring or linking users to an online location containing infringing material or infringing activity." (Emphasis added). Perfect

10 does not claim that CCBill infringed its copyrights by providing a hyperlink; rather, Perfect 10 alleges infringement through CCBill's performance of other business services for these websites. Even if CCBill's provision of a hyperlink is immune under § 512(n), CCBill does not receive blanket immunity for its other services.

**E. Information Residing on Systems or Networks at the Direction of Users: § 512(c)**

Section 512(c) "limits the liability of qualifying service providers for claims of direct, vicarious, and contributory infringement for storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." H.R. Rep., at 53. A service provider qualifies for safe harbor under § 512(c) if it meets the requirements of § 512(i) and:

> (A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
>
> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
>
> (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

Section 512(c)(1). As discussed above, Perfect 10 did not provide CWIE with knowledge or awareness within the standard of § 512(c)(1)(A), and Perfect 10 did not provide notice that complies with the requirements of § 512(c)(3). The remaining question is whether Perfect 10 raises a genuine issue of material fact that CWIE does not qualify for safe harbor under § 512(c) because it fails to meet the requirements of § 512(c)(1)(B), namely, that a service provider not receive a direct financial benefit from the infringing activity if the service provider also has the right and ability to control the infringing activity.

Based on the "well-established rule of construction that where Congress uses terms that have accumulated settled meaning under common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms," *Rossi,* 391 F.3d at 1004 n. 4 (9th Cir.2004) (quoting *Neder v. United States,* 527 U.S. 1, 21, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)), we hold that "direct financial benefit" should be interpreted consistent with the similarly-worded common law standard for vicarious copyright liability. *See, e.g., Ellison,* 357 F.3d at 1078 (a vicariously liable copyright infringer "derive[s] a direct financial benefit from the infringement and ha[s] the right and ability to supervise the infringing activity"). Thus, the relevant inquiry is "whether the infringing activity constitutes a draw for subscribers, not just an added benefit." *Id.* at 1079. In *Ellison,* the court held that "no jury could reasonably conclude that **\*1118** AOL received a direct financial benefit from providing access to the infringing material" because "[t]he record lacks evidence that AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement." *Id.*

In this case, Perfect 10 provides almost no evidence about the alleged direct financial benefit to CWIE. Perfect 10 only alleges that "CWIE 'hosts' websites for a fee." This allegation is insufficient to show that the infringing activity was "a draw" as required by *Ellison.* 357 F.3d at 1079. Furthermore, the legislative history expressly states that "receiving a one-time set-up fee and flat, periodic payments for service from a person engaging in infringing activities would not constitute receiving a 'financial benefit directly attributable to the infringing activity.' " H.R. Rep., at 54. Perfect 10 has not raised a genuine issue of material fact that CWIE receives a direct financial benefit from infringing activity. Because CWIE does not receive a direct financial benefit, CWIE meets the requirements of § 512(c).

If the district court finds that CWIE meets the threshold requirements of § 512(i), CWIE is entitled to safe harbor under § 512(c).

## II. COMMUNICATIONS DECENCY ACT

The Communications Decency Act states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," and expressly

preempts any state law to the contrary. 47 U.S.C. §§ 230(c)(1), (e)(3). "The majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.' " *Almeida v. Amazon.com, Inc.,* 456 F.3d 1316, 1321 (11th Cir.2006) (quoting *Zeran v. America Online, Inc.,* 129 F.3d 327, 331 (4th Cir.1997)); *see also Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1122 (9th Cir.2003) (citing *Batzel v. Smith,* 333 F.3d 1018, 1026–27 (9th Cir.2003)).

The immunity created by § 230(c)(1) is limited by § 230(e)(2), which requires the court to "construe Section 230(c)(1) in a manner that would neither 'limit or expand any law pertaining to intellectual property.' " *Gucci Am., Inc. v. Hall & Assocs.,* 135 F.Supp.2d 409, 413 (S.D.N.Y.2001) (quoting § 230(e)(2)). As a result, the CDA does not clothe service providers in immunity from "law[s] pertaining to intellectual property." *See Almeida,* 456 F.3d at 1322.

The CDA does not contain an express definition of "intellectual property," and there are many types of claims in both state and federal law which may—or may not—be characterized as "intellectual property" claims. While the scope of federal intellectual property law is relatively well-established, state laws protecting "intellectual property," however defined, are by no means uniform. Such laws may bear various names, provide for varying causes of action and remedies, and have varying purposes and policy goals. Because material on a website may be viewed across the Internet, and thus in more than one state at a time, permitting the reach of any particular state's definition of intellectual property to dictate the contours of this federal immunity would be contrary to Congress's expressed goal of insulating the development of the Internet from the various state-law regimes. *See* 47 U.S.C. §§ 230(a) and (b); *see also Batzel,* 333 F.3d at 1027 (noting that "courts construing § 230 have recognized as critical in applying the statute the concern that lawsuits **\*1119** could threaten the 'freedom of speech in the new and burgeoning Internet medium' " (quoting *Zeran,* 129 F.3d at 330)). In the absence of a definition from Congress, we construe the term "intellectual property" to mean "federal intellectual property."[5]

[5]    In its petition for rehearing, Perfect 10 claims that our decision on this point conflicts with *Universal Communication Systems, Inc. v. Lycos, Inc.,* 478 F.3d 413 (1st Cir.2007). But neither party in that

case raised the question of whether state law counts as "intellectual property" for purposes of § 230 and the court seems to simply have assumed that it does. We thus create no conflict with *Universal Communication*.

We note that *Universal Communication* demonstrates the difficulties inherent in allowing state laws to count as intellectual property for CDA purposes. In that case, the district court struggled with the question of whether the "trademark dilution" claim brought under Florida Law counted as intellectual property for purposes of the CDA, and concluded that it was more like a defamation claim than a trademark claim. *Id.* at 423 n. 7. Rather than decide how to draw the line between defamation and trademark, the First Circuit held that "because of the serious First Amendment issues that would be raised" if Lycos were found liable, defendant had not violated the Florida statute. *Id.* at 423.

The First Circuit was able to sidestep the question of what counted as intellectual property on First Amendment grounds. But we cannot do so here. States have any number of laws that could be characterized as intellectual property laws: trademark, unfair competition, dilution, right of publicity and trade defamation, to name just a few. Because such laws vary widely from state to state, no litigant will know if he is entitled to immunity for a state claim until a court decides the legal issue. And, of course, defendants that are otherwise entitled to CDA immunity will usually be subject to the law of numerous states. An entity otherwise entitled to § 230 immunity would thus be forced to bear the costs of litigation under a wide variety of state statutes that could arguably be classified as "intellectual property." As a practical matter, inclusion of rights protected by state law within the "intellectual property" exemption would fatally undermine the broad grant of immunity provided by the CDA.

Accordingly, CCBill and CWIE are eligible for CDA immunity for all of the state claims raised by Perfect 10.

## III. DIRECT COPYRIGHT INFRINGEMENT

"Plaintiffs must satisfy two requirements to present a prima facie case of direct infringement: (1) they must show

ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *Napster,* 239 F.3d at 1013. Perfect 10 alleges that CCBill and CWIE directly infringed its copyrights through its website, hornybees.com.

There is a genuine issue of material fact as to the relationship between CCBill/CWIE and hornybees.com. CCBill and CWIE state that hornybees.com is operated by an entity called "CCBucks," and that CCBill and CWIE have no interest in hornybees.com. However, the hornybees.com website reads: "Brought to you by CCBill LLC and Cavecreek Web Hosting." The record indicates that Cavecreek Web Hosting may be CWIE, and that CWIE may be the registrant of hornybees.com. Furthermore, the vice president of operations of both CCBill and CWIE lists CCBucks as being related to CWIE and CCBill.

Perfect 10 has also raised a genuine issue of material fact that hornybees.com has infringed Perfect 10's copyrights by posting pictures of a Perfect 10 model's body with the head of a celebrity. The declaration provided by Perfect 10's founder and president asserting that the photo is that of a Perfect 10 model is **\*1120** sufficient evidence to raise a genuine issue of material fact.

Because Perfect 10 has raised a triable issue whether CCBill and CWIE directly infringed Perfect 10 copyrights by operating hornybees.com, and because the district court did not address this issue in its order granting summary judgment in favor of Perfect 10, we remand this issue for a determination by the district court. [6]

[6]    If CCBill and CWIE operate hornybees.com, no immunity for infringement on that site is available under either the DMCA or the CDA.

## IV. COSTS AND ATTORNEY'S FEES

The Copyright Act of 1976 permits the district court to "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Fees are proper under this statute when either successful prosecution or successful defense of the action furthers the purposes of the Copyright Act. *See Fantasy, Inc. v. Fogerty,* 94 F.3d 553, 558 (9th Cir.1996) ("[A] successful defense of a copyright infringement action may further the policies of the Copyright Act every bit as much

Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102 (2007)

07 Cal. Daily Op. Serv. 6174, 2007 Daily Journal D.A.R. 8124

as a successful prosecution of an infringement claim by the holder of a copyright.") (quoting *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 527, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994)). As such, prevailing defendants as well as prevailing plaintiffs are eligible for such an award, and the standards for evaluating whether an award is proper are the same regardless of which party prevails. *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

Thus, the awarding of attorney's fees is a matter for the district court's discretion. *Id.* To guide that discretion, the Supreme Court endorsed the non-exclusive list employed by the Third Circuit in *Lieb v. Topstone Industries, Inc.,* 788 F.2d 151, 156 (1986) (the so-called "*Lieb* factors"). *Fogerty,* 510 U.S. at 534 n. 19, 114 S.Ct. 1023. The list includes "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.*

The district court made clear in its order denying fees that it had weighed each of the *Lieb* factors and validly exercised its discretion to deny defendants' fees. Defendants argue that the district judge inadequately considered these factors, that Perfect 10's litigation positions were frivolous and meritless, and that Perfect 10 is a serial filer of nuisance copyright claims. Because we reverse in part and remand a substantial portion of this case to the district court, there is ample support for the district court's finding that Perfect 10's legal claims are not frivolous or objectively unreasonable. The district court reasonably found the evidence regarding Perfect 10's motivation to be equivocal, and did not abuse its discretion in weighing the interests of compensation and deterrence and denying costs and attorney's fees to defendants.

## CONCLUSION

We remand to the district court for a determination of whether CCBill and CWIE reasonably implemented a policy under § 512(i)(1)(A) based on its treatment of non-party copyright holders. Because § 512(i)(1)(A) is a threshold determination, we remand the remaining issues under § 512 for further proceedings consistent with this opinion.

We remand for further determination of whether hornybees.com is owned by CCBill or CWIE, and if so, whether **\*1121** CCBill or CWIE are directly liable under state or federal law for its operation.

The district court's decision regarding CDA immunity is affirmed as to the unfair competition and false advertising claims, and reversed as to the right of publicity claim.

We affirm the district court's decision to deny an award of attorney's fees and costs to defendants.

Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

### All Citations

488 F.3d 1102, 07 Cal. Daily Op. Serv. 6174, 2007 Daily Journal D.A.R. 8124

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
　Title 47. Telecommunications (Refs & Annos)
　　Chapter 5. Wire or Radio Communication (Refs & Annos)
　　　Subchapter II. Common Carriers (Refs & Annos)
　　　　Part I. Common Carrier Regulation

47 U.S.C.A. § 230

§ 230. Protection for private blocking and screening of offensive material

Currentness

**(a) Findings**

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States--

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) Civil liability**

No provider or user of an interactive computer service shall be held liable on account of--

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

**(1) No effect on criminal law**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

**(2) No effect on intellectual property law**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit--

**(A)** any claim in a civil action brought under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

**(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of Title 18; or

**(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of Title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

As used in this section:

**(1) Internet**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3) Information content provider**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) Access software provider**

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

    **(A)** filter, screen, allow, or disallow content;

    **(B)** pick, choose, analyze, or digest content; or

    **(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

**CREDIT(S)**

(June 19, 1934, c. 652, Title II, § 230, as added Pub.L. 104-104, Title V, § 509, Feb. 8, 1996, 110 Stat. 137; amended Pub.L. 105-277, Div. C, Title XIV, § 1404(a), Oct. 21, 1998, 112 Stat. 2681-739; Pub.L. 115-164, § 4(a), Apr. 11, 2018, 132 Stat. 1254.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 13925**

Ex. Ord. No. 13925, May 28, 2020, 85 F.R. 34079, which related to moderation of content posted on social media platforms, was revoked by Ex. Ord. No. 14029, § 1, May 14, 2021, 86 F.R. 27025.

Notes of Decisions (303)

**Footnotes**

1       So in original. Probably should be "subparagraph (A)".

47 U.S.C.A. § 230, 47 USCA § 230
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.